## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ex rel. THOMAS SCHROEDER ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. _____ |
| v. ) | |
| ) | |
| MEDTRONIC PLC, ) | |
| ) | |
| Defendant ) | |
| ) | **FILED UNDER SEAL** |
| ) | **PURSUANT TO** |
| ) | **31 U.S.C. § 3730** |
| ) | **DO NOT SERVE** |
| ) | |
| ) | |
| ) | **DO NOT ENTER ON PACER** |

## COMPLAINT

Plaintiff United States of America ("USA"), *ex rel.* Thomas Schroeder

("Relator"), for its Complaint against defendant Medtronic plc ("Medtronic" or

"Defendant") for primary and successor liability for treble damages and civil penalties

arising from Medtronic's payment of monetary kickbacks and other remuneration to

healthcare providers that induced false claims to be made to the Veterans Affairs Health

Care ("VA Health Care"), TRICARE, Medicare and other government healthcare plans

in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.* (the "False Claims Act"),

alleges and states as follows:

### JURISDICTION, VENUE AND STATUTORY REQUIREMENTS

1.      This action arises under the False Claims Act, 31 U.S.C. § 3729, *et seq.*

Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b) and 28

U.S.C. § 1331.

2.      Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. §§ 3729, *et seq.* complained of herein took place in part in this district and Defendant transacted and continues to transact business in this district.

3.      Pursuant to 31 U.S.C. § 3730(b)(2), the Relator will serve with the Complaint to the Attorney General of the United States and the United States Attorney for the District of Kansas (courtesy copy) a statement of all material evidence and information currently in his possession and of which he is the original source.  This disclosure statement is supported by material evidence known to Relator at the time of filing establishing the existence of Defendant's false claims.  Because the statement includes attorney-client communications and work product of Realtor's attorney, and was submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, Relator understands this disclosure to be confidential.

**PRELIMINARY STATEMENT**

4.      This is a civil action brought by Relator on behalf of the United States to recover treble damages, civil penalties and restitution owed to the Government as a result of Defendant's kickback schemes. Defendant knowingly submitted and/or caused to be submitted and continues to submit and/or cause false claims to be submitted to the VA Health Care, TRICARE, Medicare, the Federal Employees Compensation Act Program and other Government-funded healthcare plans (collectively referred to as "Government Healthcare Plans") that were and are tainted by the following schemes, causing these

programs to pay and continue to pay millions of dollars in reimbursements based on false claims.

<u>Overview of Defendant's Kickback Scheme</u>

5. Defendant is a multinational corporation that is among the world's largest medical technology and device companies ([www.medtronic.com](www.medtronic.com)). It is publically traded on the NYSE as MDT.

6. Defendant's three categories of surgical devices that are at the heart of the illegal schemes detailed in this Complaint are used in the treatment of peripheral artery disease ("PAD"), predominantly in the legs, are: (1) Medtronic's HawkOne Directional Atherectomy System ("HawkOne Atherectomy"), which is a catheter that shaves plaque out of arteries in patients with PAD; (2) Medtronic IN.PACT Admiral Paclitaxel-coated PTA Balloon ("IN.PACT DCB"), which is a drug-coated balloon ("DBC") used to re-open blocked or narrowed arteries due to PAD; and (3) Self-Expanding Nitinol Stent Systems ("Nitinol Stent Systems"), which include self-expanding stents that are vascular and biliary stents made of nickel titanium alloy (nitinol) cut into an open lattice design that exerts constant outward forced and are used to keep iliac (pelvic) arteries open.

7. These three vascular PAD device categories are highly lucrative for Defendant and highly reimbursable by Government Healthcare Plans. As reported in its SEC filings, Defendant's Cardiac and Vascular Group accounted for $8.8 billion out of a total of $17 billion in sales in 2014.

8. The federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b) (the "AKS"), expressly prohibits any individual or entity from offering, paying, soliciting or receiving any "remuneration," which "include[s] any kickback [or] bribe" to "any person to induce

such person" to purchase or recommend a drug or service that is covered by a Government Healthcare Plan. Defendant has disregarded and continues to disregard this provision, choosing instead to put sales growth and profits before its duty to comply with federal law.

9.     The kickback scheme worked as follows. In at least as early as 2007 and continuing to the present, to induce millions of dollars in purchases of Defendant's HawkOne Atherectomy, IN.PACT DCB and Nitinol Stent Systems surgical devices, Defendant Senior Sales Rep/Field Sales Trainer Doug Winger has been giving kickbacks to Teri Brinkley, Radiology Technologist and Lab Manager of the Catheter Lab at the Robert J. Dole Veterans Administration Medical Center 5500 East Kellogg Ave., Wichita, Kansas 67218.

10.     The kickbacks took the form of weekly and daily lunches, ipads, iphones, NASCAR as well as other entertainment event tickets, weekend parties, as well as frequent nights at bars and restaurants with VA staff and, upon information and belief, large monetary payments given by Defendant Senior Sales Rep/Field Sales Trainer Winger to Brinkley to induce Brinkley to purchase or recommend millions of dollars in purchases of Defendant's HawkOne Atherectomy, Nitinol Stent Systems, and, more recently, IN.PACT DCB.

11.     Upon information and belief, the monetary kickbacks given by Defendant Senior Sales Rep/Field Sales Trainer Winger were based on the amount of Defendant's product that Brinkley purchased on behalf of the Dole VA Medical Center.

12.     Defendant's kickback scheme resulted in the VA over-purchasing a tremendous amount of HawkOne Atherectomy, IN.PACT DCB, and Nitinol Stent

Systems and throwing away vast amounts of product after it had expired because it was impossible to use all of the over-purchased product on patients before expiration.

13.     Defendant's kickback schemes have been and continue to be integral to Defendant's marketing strategy at the Dole VA in Wichita and have been very profitable for Defendant. In 2015, Defendant crowned Winger its Sales Representative of the Year, where Winger beat out all other Medtronic Sales Representatives for the title based on the volume of his sales to Dole VA, his largest account. In 2016, Defendant awarded Winger its President's Club honor based on his sales to Dole VA.

14.     Not only has Defendant made Winger a Senior Principal Sales Representative, it has also placed Winger in a Field Sales Trainer role, entrusting Winger to train other Medtronic Sales Representatives on how he is successful.

## PARTIES

15.     Relator Thomas Schroeder is an individual residing in Missouri. Since 2006, Relator has been in a sales role (currently Midwest Sales Manager) for a company that also sells atherectomy, drug-coated balloons and stent devices. Relator has first-hand knowledge of Defendant Senior Sales Representative and Field Sales Trainer Winger's illegal sales practices.

16.     Defendant Medtronic plc is a global medical device manufacturer that is headquartered in Minneapolis, Minnesota. Defendant has and continues to engage in the fraudulent schemes outlined herein and has primary liability for such acts. In addition, as it relates to Defendant's HawkOne Atherectomy device, Defendant has successor liability for the fraudulent schemes committed by FoxHollow Technologies (where Defendant Senior Sales Rep/Field Sales Trainer Doug Winger was one of the first sales

5

representatives), Ev3 and Covidien, all of which Defendant purchased, as outlined below. Medtronic's Winger worked as a sales rep for FoxHollow, Ev3 and Covidien, where he sold the predecessor device to Defendant's HawkOne Atherectomy – Silver Hawk Atherectomy device. Upon information and belief, Medtronic has assumed the liabilities for all three of these predecessor companies.

## THE APPLICABLE STATUTES AND AUTHORITIES

Statutes and Authorities Relating to Kickbacks

17.     The AKS, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that remuneration given to those who can influence health care decisions would result in the provision of goods and services that are medically unnecessary, of poor quality or even harmful to a vulnerable patient population. To protect patient and Government Healthcare Plans including VA Health Care and TRICARE from these harms, Congress enacted a prohibition against the payment of kickbacks in any form. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Publ. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Anti-fraud and Abuse Amendments, Publ. L. No. 95-142; Medicare and Medicaid Patient Program Protection Act of 1987, Pub. L. No. 100-93.

18.     The AKS makes it illegal for individuals or entities to "offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) . . . to any person to induce such person … to purchase, … order, … or recommend purchasing … or ordering any good … or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2). Payments by a medical device company like

Defendant to healthcare providers to induce them to recommend or purchase the company's surgical devices violate this statute to the extent that the devices are reimbursed by a Government Healthcare Plan. Violation of the AKS is a felony punishable by fines and imprisonment, and can also result in exclusion from participation in Government Healthcare Plans. 42 U.S.C. § 1320a-7b(b)(2) and 42 U.S.C. § 1320a-7(b)(7).

19.     As early as 1994, the Government pointed out the special position of trust that providers hold with patients and made it clear that the AKS prohibits offers of financial incentives to providers to use specific surgical devices on patients. Specifically, Health and Human Services-Office of the Inspector General issued "Special Fraud Alerts" explaining that:

> Traditionally, physicians and pharmacists have been trusted to provide treatments and recommend products in the best interest of the patient. In an era of aggressive drug marketing, however, patients may now be using prescription drug items, unaware that their physician or pharmacist is being compensated for promoting the selection of a specific product.

59 Fed. Reg. at 65, 376 (Dec. 19, 1994).

20.     The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986). As relevant here, the FCA establishes treble damages liability to the United States for an individual or entity that:

> (i)      "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1) (2000) and, as amended, 31 U.S.C. § 3729(a)(1)(a);
>
> (ii) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, *id.* § 3729(a)(1)(B); or
>
> (iii) "conspires to defraud the Government by getting a false or fraudulent

7

claim allowed or paid" *id.* § 3729(a)(3)(1986), and, as amended, 31 U.S.C.
§ 33729(a)(1)(C).

21.    "Knowing," within the meaning of the FCA, is defined to include reckless

disregard and deliberate indifference. *Id.*

22.    Although Defendant knew it was bound by the AKS, it has chosen and

continues to choose to disregard these laws and prohibitions, instead choosing to put sales

growth and profits before its duty to comply with federal law. Moreover, falsely

certifying compliance with these laws in connection with a claim submitted to a federally

funded insurance program is actionable under the FCA. As codified in the Patient

Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, 6402(f),

124 Stat. 119, codified at 42 U.S.C. § 1320a-7b(g), "a claim that includes items or

services resulting from a violation of this section constitutes a false or fraudulent claim

for purposes of [the FCA]."

### THE GOVERNMENT HEALTHCARE PROGRAMS

23.    Our country's retired members of the uniformed services are covered by

VA Health Care, which provides health care benefits for, among other things, surgical

procedures performed at VA hospitals, including the Dole VA Medical Center in

Wichita. VA Health Care is administered by the U.S. Department of Veterans Affairs.

24.    The federal TRICARE program provides health benefits to eligible

dependents of active duty, retired members of the uniformed services and their eligible

dependents, eligible spouses and dependents of deceased members, as well as to

TRICARE eligible beneficiaries, in certain circumstances, who are also Medicare

eligible.  TRICARE is administered by the TRICARE Management Activity ("TMA").

TMA is Department of Defense ("DOD") Field Activity of the Under Secretary of

Defense for Personnel and Readiness ("USD (P&R)") to operate under the authority, direction and control of the Assistant Secretary of Defense for Health Affairs ("ASD (HA)").  DOD is an agency and instrumentality of the United States and its TMA/TRICARE activities, operations, and contracts are paid with federal funds.  *See* 10 U.S.C. §§ 1071, *et seq*.

25.     The TRICARE program is administered through the TMA/DOD uses contractors to process claims for payment from providers of medical services and devices.

26.     The Federal Employees' Compensation Act ("FECA") is the workers' compensation program for federal employees. *See* 5 U.S.C. § 8101, *et seq*. The FECA is administered by the Department of Labor and the cost of benefits are paid by each employee's host agency. Employees of the U.S. Postal Service currently comprise the largest group of FECA beneficiaries and are responsible for the largest share of FECA benefits. FECA covers all medical costs associated with covered conditions.

27.     Medicare is a federal program that provides federally subsidized health insurance for persons who are 65 or older or are disabled. *See* 42 U.S.C. §§ 1395, *et seq*. ("Medicare Program"). Part B of the Medicare Program provides supplemental benefits to participants to cover, among other things, physician services, procedures, prescription drugs and devices. *See generally id.* §§ 1395j-1395w-4. Part D of the Medicare Program was enacted as part of the Medicare Prescription  Drug, Improvement and Modernization Act of 2003, Pub. L. No. 108-173, to provide prescription drug benefits for Medicare beneficiaries. All persons enrolled in Medicare Part A and/or Medicare Part B are eligible to enroll in a prescription drug plan under Part D. The Department of Health and Human

Services ("HHS"), through its component agency, CMS, enters into agreements with private contractors authorized to sell Part D insurance coverage.

28.     Medicare enters into provider agreements with providers and suppliers to establish their eligibility to participate in the program. During the relevant times, to be eligible for payment under the Medicare program, providers and suppliers must certify:

> I agree to abide by the Social Security Act and all applicable Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations and program instructions are available through the Medicare contractor I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

*See, e.g.,* CMS Form-855S (04/06) at 26.

29.     The federal Medicaid Program was created in 1965 under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*  Funding for Medicaid is shared between the federal government and those states participating in the Medicaid program.  Federal funds are distributed to the states, which in turn provide certain medical services to certain low-income individuals.

30.     Federal Medicaid regulations require each state to designate a single state agency responsible for administering the Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of Health and Human Services ("the Secretary").  After the Secretary approves the plan submitted by the state, the state is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan. *See* 42 U.S.C. § 1396b(a)(1).  This reimbursement is

called "federal financial participation" ("FFP").

31.     These federal programs are referred to collectively herein as the "Government Healthcare Plans."

## FACTUAL BACKGROUND

Overview of Defendant's Operations and Acquisitions

32.     Medtronic is one of the world's largest medical surgical device companies.

33.     In approximately 2007, Defendant Sales Representative/Field Sales Trainer Winger was one of the first sales representative for FoxHollow Technologies and was selling Silver Hawk. Silver Hawk was the version of the Medtronic HawkOne Atherectomy device that existed at the time and was sold by FoxHollow.

34.     In 2007, Ev3 bought FoxHollow for $780 million. In 2010, Covidien acquired Ev3 for $2.3 billion. In January 2015, Medtronic bought Covidien for $50 billion.

35.     Medtronic's Winger continuously worked for FoxHollow, Ev3 and Covidien during the relevant time period in this Complaint and continuously ran the fraudulent kickback schemes detailed herein on behalf of each of his successive employers, including Defendant.

36.     The Dole VA Medical Center was, and has been at all relevant times herein, Winger's largest customer for vascular devices, despite its relatively small number of patients and even smaller number of vascular procedures performed each week, as compared to other medical centers in the country with numerous patients, locations and physicians performing numerous vascular procedures on a daily basis.

Defendant's Products Subject to Defendant's Illegal Kickback Schemes

37.    Defendant's vascular surgical devices used in the fraudulent schemes detailed herein and their estimated pricing are as follows:

| DCB | |
|---|---|
| 40mm-100mm | $1,450 |
| 120mm-150mm | $1,650 |
| **Self Expanding Stents** | |
| 20mm-100mm | $1,300 |
| 120mm-200mm | $1,800 |
| **Balloon Expandable Stents** | |
| All | $1,200 |
| **Re-Entry Catheter** | |
| All | $1,500 |
| **Atherectomy Catheter** | |
| All | $3,000 |
| **Standard Angioplasty Balloon** | |
| All | $300 |

38.    These products are all used on arteries in the legs in patients in vascular surgeries in catheter labs. These are typically patients having surgical procedures for Peripheral Artery Disease, or PAD, which occurs when plaque builds up in the arteries and circulation is compromised. The devices help to open up arteries, remove plaque and, consequently, improve circulation.

39.    The stent products remain in the patients and the catheters and balloons are used and then disposed of.

40.    The FDA has put limits on the length of time the devices can be on the

shelf before they expire.

41.     With respect to Defendant's IN.PACT DCB, the FDA has mandated that, "Expiration dating for this device has been established and approved at 12 months." *See* 12.30.14 FDA Approval Letter re Medtronic IN.PACT DCB.

Defendant's Kickback Schemes

42.     As noted above, The AKS makes it illegal for individuals or entities to "offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) . . . to any person to induce such person … to purchase, … order, … or recommend purchasing … or ordering any good … or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2).

43.     Beginning in at least 2007, and continuing to the present, Defendant Sales Representative/Field Sales Trainer Winger has been paying and offering to give remuneration to healthcare providers in connection with the promotion of atherectomy devices, starting with FoxHollow's Silver Hawk and continuing to present day with Defendant Medtronic's HawkOne Atherectomy, IN.PACT DCB and Nitinol Stent System devices.

44.     Starting in at least 2007, Defendant Sales Representative/Field Sales Trainer Winger developed an illegal relationship with Dole VA Medical Center Catheter Lab Manager and Radiology Technician Teri Brinkley. For over ten years, Winger has given and offered to give Brinkley ipads, iphones, NASCAR tickets, all-paid parties, and weekly (sometimes daily) lunches to Brinkley as well as her entire Cardiac Cathether Lab staff at her request.

45.     Brinkley would routinely and jokingly tell her staff  that the "physician"

was paying for the meal when in fact it was well known that Winger was paying for the meals.

46.     In addition, on many occasions over the course of their fraudulent relationship, Defendant Sales Representative/Field Sales Trainer Winger would routinely gift his company iPhone and iPad to Brinkley after he had received a new version through Defendant's communications program or had purchased a new version himself.

47.     Upon information and belief, Winger's expense reports, as well as his personal credit/debit card transactions, will set forth this remuneration and the amounts paid by Defendant for the kickbacks to Brinkley.

48.     Upon information and belief, Defendant Sales Representative/Field Sales Trainer Winger has made and continues to make monetary payments to Brinkley based on the amount of Defendant's products that Brinkley purchased on behalf of the Dole VA Medical Center.

49.     Upon information and belief, other medical centers and healthcare providers are part of Defendant Sales Representative/Field Sales Trainer Winger's illegal kickback schemes.

50.     In exchange, Brinkley purchased a shockingly excessive amount of Defendant's products.

51.     Relator learned from Defendant Clinical Specialist Kari Montgomery Kirk, who is the Clinical Assistant to Defendant Sales Representative/Field Sales Trainer Winger, that the Dole VA purchased over a million dollars in Defendant's HawkOne Atherectomy – or over 300 devices last year. Last year Dole VA had only one physician with consistent privileges through early summer who could perform the procedures and

he did only a handful of procedures a week. Starting late-summer 2016, there was a new physician who did not have privileges to do procedures until October or November 2016, when he began doing infrequent procedures up to the present.

52.     As a comparison, upon information and belief, only the largest US hospital systems with vastly more locations, physicians, patients and daily procedures than Dole VA purchased a similar amount of Defendant's atherectomy devices last year.

53.     Kirk also divulged that she maxed out her bonus from Defendant because of the Dole VA's nearly $1,000,000 in DCB sales in addition to the approximately $1,000,000 of atherectomy, stent, and re-entry catheters purchased. Given the number of DBCs in its inventory outlined and pictured below and the number of DCBs it recently purchased, Dole VA would have been on pace to have purchased approximately 950 DCBs or roughly $1,445,000 last year. Again, in 2016, the Dole VA was one of the nation's smallest vascular surgery providers, especially given the fact that Dole VA did not even have a practicing physician for these procedures for several months during the second half of the year.

54.     In 2016, the largest US hospital system purchased approximately 650 DCBs or roughly $1 million in product. These sales are supported by several physicians doing several procedures that would call for DCBs each day.

55.     Brinkley continues to maintain control over the Dole VA's purchasing.

56.     On January 9, 2017, the Department of Veterans Affairs requested vendors to submit solicitations for 320 DCBs for a total of approximately $500,000. The point of contact was Paul Dixon, Contracting Specialist for Network Contracting Office ("NCO") 15 out of Leavenworth, Kansas.

57.     On January 11, 2017, Relator sent Dixon an email with comparative clinical trial data between Relator's company's DCBs and Defendant's DCBs. The data showed equivalent clinical outcomes for the DCBs and Relator's company was offering the DCBs at a significant cost savings ($106,000) over Defendant's proposal.

58.     Dixon stated to Relator in several phone conversations during this time that he (Dixon) was receiving significant pressure with "calls and emails daily" from the Dole VA staff to get the order placed immediately as they did not have product in stock and patient care could be negatively impacted by the lack of inventory.  Relator informed Dixon he had just personally witnessed more than 130 units in inventory less than 5 weeks earlier and it was enough product to last a lab their size 9-18 months.  Dixon was surprised and informed Relator that he did not feel comfortable placing an additional order for 2 times the amount of stock already in inventory.

59.     Relator also sent Dixon and Diane Keen, Chief of Logistics at Dole VA, an email offering to incorporate service disabled veteran owned small businesses as distributors of the DCBs.

60.     In addition, one of the VA physicians, Dr. Chad Ammar, reached out to Keen during this time and informed her via e-mail that Relator's company's DCB were his preferred device.

61.     On January 19, 2017, Dixon informed Relator that the DCBs were on a consignment contract from Defendant and would be stocked pursuant to those consignment terms. Just earlier in the month Brinkley had denied that there was a consignment contract with Defendant.

62.     Pursuant to consignment terms in the industry, providers like Dole VA can

order units like Defendant's DCB to be stocked, free of charge until the device is used, on

consignment from Defendant.

63.    On January 19, 2017, Relator reached out to Keene to confirm the

consignment order and inquire about submitting consignment terms from Relator's

company since there were physicians who prefer DCBs from Relator's company. Keene

never responded to Relator.

64.    On January 23, 2017, at least 120 DCBs arrived at Dole VA Hospital, as

evidenced by the following photograph of DCBs on a cart at the Dole VA:



65.    A company like Defendant would, at most, provide approximately 20

DCBs on consignment to a customer of similar size and procedural volume as Dole VA.

66.     Only a few months earlier, in November 2016, the Dole VA Catheter Lab had approximately 130 DCBs, as evidenced by the following photographs of the Catheter Lab storage cabinet taken at that time.  As shown in the close-up picture below, many of the units that were stocked at that time were set to begin expiring starting only 2 months from January 2017 in March and April 2017:







67.     In November 2016, there were so many DCBs at Dole VA that there was not enough storage room in the Catheter Lab and spillover inventory had to be stored in the Operating Room:



68.     The fact that Dole VA Hospital purchased over 120 DCBs in January 2017 even though they had approximately 130 DCBs in stock in at the beginning of December 2016 and even though they have a consignment contract with Defendant and even though they perform very few procedures each week that would call for a DCB, in addition to the fact that many units were already expiring is evidence of Defendant's illegal arrangement

20

with Dole VA.

69.     The excessive amount of Defendant's products purchased from Defendant Sales Representative/Field Sales Trainer Winger are dumped after they expire (within, at most, 12 months).

70.     Since approximately 2007 and continuing to the present, Defendant and its predecessors failed to have (or enforce) policies and practices in place to prevent kickbacks and bribes by its Sales Representatives and Field Sales Trainers.

71.     Defendant has FCA liability for the submission of false claims for reimbursement of medical devices including devices in the following categories: (1) HawkOne Atherectomy devices, (2) IN.PACT DCBs, and (3) Nitinol Stent Systems.

## COUNT I:

### Violation of the False Claims Act: Presenting False Claims for Payment
### 31 U.S.C. § 3729(a)(1) (2000), and, as amended, 31 U.S.C.(a)(1)(A)

### (Illegal Kickbacks)

72.     Relator incorporates by reference the above paragraphs as if set forth fully here.

73.     Relator and the United States seek relief against Defendant under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. § 3729(a)(1) (2000), and, as amended, 31 U.S.C. §3729(a)(1)(A).

74.     As a result of offering and paying kickbacks to induce sales of Defendant's vascular surgical device products, in violation of the federal AKS, 42 U.S.C. § 1320a-7b(b), Defendant presented claims for reimbursement to VA Health Care, TRICARE and other Government Healthcare Plans that were false or fraudulent.

75.     Accordingly, Defendant knowingly presented false or fraudulent claims

for payment or approval in violation of 31 U.S.C. § 3729(a)(1) (2000), and, as amended, 31 U.S.C. § 3729(a)(1)(A).

76.     By reason of the false or fraudulent claims that Defendant knowingly presented to VA Health Care, TRICARE and other Government Healthcare Plans, the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

WHEREFORE, Relators respectfully request that the Court enter judgment against Defendant and in favor of the United States as follows:

a.      that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

b.      that civil penalties of $21,563 be imposed for each and every false claim that Defendant presented to the United States and/or its grantees;

c.      that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.      that the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this Complaint;

e.      that Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act;

f.    that Relator be awarded the maximum amount allowed to him of

any portion of a judgment or settlement fund that goes to any State

government; and

g.    that this Court award such other and further relief as it deems

proper.

## COUNT II:

### Violation of the False Claims Act: Use of False Statements
### 31 U.S.C. § 3729(a)(2) (2000), and, as amended, 31 U.S.C. § 3729(a)(1)(B)(Supp. 2009)

### (Illegal Kickbacks)

77.    Relator incorporates by reference the above paragraphs as if set forth fully here.

78.    Relator and the United States seek relief against Defendant under Section 3729(a)(2) of the False Claims Act, 31 U.S.C. § 3729(a)(2) and, as amended, 31 U.S.C. § 3729(a)(1)(B) (Supp. 2009).

79.    As a result of offering and paying kickbacks to induce sales of Defendant's vascular surgical device products, in violation of the federal AKS, 42 U.S.C. § 1320a-7b(b), Defendant made false records or statements that were material to getting false or fraudulent claims paid by VA Health Care, TRICARE and other Government Healthcare Plans.

80.    More specifically, Defendant falsely certified, stated, and/or represented that the reimbursements it sought for its vascular surgical devices were in full compliance with applicable federal and state laws prohibiting fraudulent and false reporting, including but not limited to the federal AKS, 42 U.S.C. § 1320a-7b(b). Defendant's false

certifications, statements, or representations caused VA Health Care, TRICARE and other Government Healthcare Plans to pay out sums to Defendant that would not have been paid if those programs had been made aware of the falsity of the Defendant's certifications, statements, or representations.

81.     Accordingly, Defendant knowingly used false records or statements material to false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(B).

82.     By reasons of these false records or statements that Defendant used, the United States has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false record or statement.

WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendant and in favor of the United States as follows:

    a.     that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

    b.     that civil penalties of $21,563 be imposed for each and every false claim that Defendant presented to the United States and/or its grantees;

    c.     that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relators necessarily incurred in bringing and pressing this case;

d.    that the Court grant permanent injunctive relief to prevent any

recurrence of the False Claims Act for which redress is sought in

this Complaint;

e.    that Relator be awarded the maximum amount allowed to him

pursuant to the False Claims Act;

f.    that Relator be awarded the maximum amount allowed to him of

any portion of a judgment or settlement fund that goes to any State

government; and

g.    that this Court award such other and further relief as it deems

proper.

**Demand for Jury Trial and Designation of Place of Trial**

Relator, on behalf of the United States, and on behalf of himself, hereby demands

a trial by jury on all counts and allegations of wrongful conduct alleged in this Complaint

in the United States District Court for the District of Kansas at Kansas City, Kansas.

Dated: January 30, 2017

Respectfully submitted,

/s/ Carrie M. Brous
Carrie M. Brous KS #18157
Brous Law LLC
3965 West 83rd Street, Ste. #115
Prairie Village, KS  66208
(913) 209-8596

cbrous@brouslaw.com

ATTORNEY FOR RELATOR

25