## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,    )
*ex rel.* THOMAS SCHROEDER    )
    )
    Plaintiff,    )
    )
v.    )    Case No. 2:17-02060-DCC-KGG
    )
MEDTRONIC, INC.    )
    )
and    )
    )
HUTCHINSON REGIONAL MEDICAL    )
CENTER,    )
    )
    Defendants.    )

## <u>THIRD AMENDED COMPLAINT</u>

Plaintiff United States of America ("USA"), *ex rel.* Thomas Schroeder ("Relator"), brings this Third Amended Complaint against Defendant Medtronic, Inc. ("Medtronic") and Hutchinson Regional Medical Center ("Hutchinson") (collectively referred to as "Defendants") for primary and successor liability for treble damages and civil penalties arising from Medtronic's payment of remuneration to healthcare providers in Kansas including Defendant Hutchinson Regional Medical Center and the Robert J. Dole Veterans Administration Medical Center that induced false claims to be made to, and reimbursed by, the United States Department of Veterans Affairs, Tricare, Medicare, Medicaid and/or other government healthcare plans in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.* (the "False Claims Act" or "FCA").  Relator alleges and states as follows:

TABLE OF CONTENTS

Preliminary Statement.................................................................................3

Parties..........................................................................................................3

Jurisdiction, Venue & Statutory Requirements ..................................4

Applicable Statutes & Authorities .........................................................5

    Statutes & Authorities Related to Kickbacks and Fraud ...............5
    The Government Healthcare Plans ..................................................7

Factual Background ................................................................................12

    A.    Defendants' Kickback Scheme ............................................12

            *Medtronic's Kickback Scheme at Dole VA* ...............................16
            *Medtronic and Hutchinson's Kickback Scheme* ......................27

    B.    Defendant Medtronic's Medically Unnecessary Services &
          Supplies and Off-Label Marketing at Dole VA.....................32

            *Excessive & Medically Unnecessary Atherectomy Devices* ......35
            *Treating with Excessive Stents*.................................................39
            *Excessive Use of Drug Coated Balloons* ..................................40
            *Other Waste of Devices & Patient Results* ...............................42

    C.    Medtronic Promotes Off-label Use of Devices.........................44

            *Off-label Promotion of Peripheral Drug Coated Balloons* ........45
            *Off-label Promotion of Peripheral Stents* ................................48

Count I. ....................................................................................................51

Count II ...................................................................................................53

Count III..................................................................................................55

## PRELIMINARY STATEMENT

1.      This is a civil action brought by Relator on behalf of the United States to recover treble damages, civil penalties and restitution owed to the Government as a result of Defendants' kickback schemes, seeking reimbursement for medically unnecessary treatment, and seeking reimbursement for promoting, marketing, and inducing use of medical devices "off-label."  To increase the sales of its medical devices and create a near monopoly of its product at hospitals, Defendant Medtronic, Inc. bribed hospital staff to purchase its devices over those of competitors and to purchase grossly excessive inventory.  One such hospital, Defendant Hutchinson Regional Medical Center, readily solicited and accepted such bribes from Medtronic, Inc.  Medtronic, Inc. also enticed, trained, and encouraged its devices to be used "off label" and in medically unnecessary procedures.  As a result of this conduct, Defendants knowingly submitted, caused to be submitted, and/or conspired to be submitted false claims to the United States Department of Veterans Administration, Tricare, Medicare, Medicaid and other Government-funded healthcare plans (collectively referred to as "Government Healthcare Plans").

## PARTIES

2.      Relator Thomas Schroeder ("Schroeder") is an individual residing in Missouri. Since 2006, Relator has been in a sales role (previously Midwest Sales Manager and now Regional Sales Manager which includes all of the Midwest, Western U.S., upper Northeast U.S., and Florida) for a company that sells atherectomy devices, drug-coated balloons and stent devices.

3.      Defendant Medtronic, Inc.[1] (hereafter "Medtronic") is a medical device and

---

[1] Note: in earlier filings in this matter, this defendant was referred to as Medtronic Plc.  Plc stands for "public limited company;" a term often used for publicly traded companies in the

technology company registered as a Minnesota corporation in good standing in the state of Kansas. Its registered agent is the Corporation Service Company, 2900 S.W. Wanamaker Dr., Topeka, KS 66614. Medtronic is a global medical device manufacturer with its principal place of business at 710 Medtronic Parkway, LC300, Minneapolis, Minnesota.

4.      In 2015, Medtronic acquired a fellow medical device manufacturer Covidien Plc. for $50 billion. In 2010, Covidien had acquired a fellow medical device manufacturer ev3, Inc. for $2.3 billion. And in 2007, ev3 had acquired a fellow device manufacture FoxHollow Technologies, Inc. for $780 million.

5.      Upon information and belief, Medtronic has assumed the liabilities for predecessor companies Covidien, ev3 and FoxHollow and in turn, Medtronic has successor liability for the fraudulent schemes addressed herein committed by said entities and its employees and agents as well as primary liability for its own actions.

6.      Defendant Hutchinson Regional Medical Center ("Hutchinson") is a not-for-profit hospital organized and existing under the laws of the State of Kansas. Its principal place of business is 1701 East 23rd Avenue, Hutchinson, Kansas 67502. Hutchinson provides a broad range of healthcare services, including cardiac and other peripheral vascular procedures, diagnostic measures and interventions.

## JURISDICTION, VENUE & STATUTORY REQUIREMENTS

7.      This action arises under the False Claims Act, 31 U.S.C. § 3729, *et seq*. Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b) and 28 U.S.C. § 1331.

---

United Kingdom. It has the same meaning as "Inc." in the United States. Medtronic is registered with the Kansas Secretary of State as "Medtronic, Inc.," therefore, Relator will apply this hereafter.

8.      Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. §§ 3729, *et seq.* complained of herein took place in part in this district and Defendants transacted and continue to transact business in this district.

9.      Pursuant to 31 U.S.C. § 3730(b)(2), the Relator has and will continue to serve the Third Amended Complaint and all future filings with this Court to the Attorney General of the United States and the United States Attorney for the District of Kansas.

## APPLICABLE STATUTES & AUTHORITIES

### Statutes & Authorities Related to Kickbacks and Fraud

10.      The federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b) (the "AKS"), arose out of Congressional concern that remuneration given to those who can influence healthcare decisions would result in the provision of goods and services that are medically unnecessary, of poor quality or even harmful to a vulnerable patient population. To protect patient and Government Healthcare Plans from these harms, Congress enacted a prohibition against the payment of kickbacks in any form. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Publ. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Anti-fraud and Abuse Amendments, Publ. L. No. 95-142; Medicare and Medicaid Patient Program Protection Act of 1987, Pub. L. No. 100-93.

11.      The AKS makes it illegal for individuals or entities to "offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) . . . to any person to induce such person … to purchase, … order, … or recommend purchasing … or ordering any good … or item for which payment may be made in whole or in part under a Federal Healthcare program." 42 U.S.C. § 1320a-7b(b)(2). Payments by a medical device company like Medtronic to healthcare providers

to induce them to recommend or purchase the company's surgical devices violate this statute to the extent that the devices are reimbursed by a Government Healthcare Plan. Violation of the AKS is a felony punishable by fines and imprisonment and can also result in exclusion from participation in Government Healthcare Plans. 42 U.S.C. § 1320a-7b(b)(2) and 42 U.S.C. § 1320a-7(b)(7).

12.      As early as 1994, the Government pointed out the special position of trust that providers hold with patients and made it clear that the AKS prohibits offers of financial incentives to providers to use specific surgical devices on patients. Specifically, Health and Human Services-Office of the Inspector General issued "Special Fraud Alerts" explaining that:

> Traditionally, physicians and pharmacists have been trusted to provide treatments and recommend products in the best interest of the patient. In an era of aggressive drug marketing, however, patients may now be using prescription drug items, unaware that their physician or pharmacist is being compensated for promoting the selection of a specific product.

1.  ed. Reg. at 65, 376 (Dec. 19, 1994).

13.      Falsely certifying compliance with the AKS in connection with a claim submitted to a federally funded insurance program is actionable under the FCA. As codified in the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, 6402(f), 124 Stat. 119, codified at 42 U.S.C. § 1320a-7b(g), "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]."

14.      The False Claims Act, 31 U.S.C. § 3729 *et seq*. ("FCA") reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986). As relevant here, the FCA establishes treble damages liability to the United States for an individual or entity that:

(i)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1) (2000) and, as amended, 31 U.S.C. § 3729(a)(1)(a);

(ii)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, *id.* § 3729(a)(1)(B); or

(iii)    conspires to defraud the Government by getting a false or fraudulent claim allowed or paid" *id.* § 3729(a)(3)(1986), and, as amended, 31 U.S.C. § 33729(a)(1)(C).

15.     "Knowing," within the meaning of the FCA, is defined to include reckless disregard and deliberate indifference. *Id.*

<u>The Government Healthcare Plans</u>

16.     Our country's retired members of the uniformed services are covered by the United States Department of Veterans Affairs ("U.S. VA") which provide healthcare benefits for, among other things, surgical procedures performed at public and private hospitals,  including Veterans Administration hospitals such as  the Robert J. Dole Veterans Administration Medical Center in Wichita, Kansas.

17.     In 1967, the Department of Defense created the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical program created by Congress. 10 U.S.C. § 1071. CHAMPUS beneficiaries include active military personnel, retired personnel, and dependents of both active and retired personnel. *Id.*

18.     In 1995, the Department of Defense established Tricare, a managed healthcare program, which operates as a supplement to CHAMPUS. *See* 32 C.F.R. §§ 199.4, 199.17(a). Since the establishment of Tricare in 1995, both programs are Tricare/CHAMPUS, or just "Tricare."[2]  The purpose of the Tricare program is to improve healthcare services to beneficiaries

---

[2] There are four varieties of Tricare: Tricare Prime, Tricare Extra, Tricare Standard, and Tricare for Life.

by creating "managed care support contracts that include special arrangements with civilian sector health care providers."[3] 32 C.F.R. § 199.17(a)(1).

19.     The federal Tricare program provides health benefits to eligible dependents of active duty, retired members of the uniformed services and their eligible dependents, eligible spouses and dependents of deceased members, as well as to Tricare eligible beneficiaries, in certain circumstances, who are also Medicare eligible.  Tricare is administered by the Tricare Management Activity ("TMA").  TMA is Department of Defense ("DOD") Field Activity of the Under Secretary of Defense for Personnel and Readiness ("USD (P&R)") to operate under the authority, direction and control of the Assistant Secretary of Defense for Health Affairs ("ASD (HA)").  DOD is an agency and instrumentality of the United States, and its TMA/Tricare activities, operations, and contracts are paid for with federal funds.  *See* 10 U.S.C. §§ 1071, *et seq*.

20.     The Tricare program is administered through the TMA/DOD that uses contractors to process claims for payment from providers of medical services and devices.

21.     Tricare providers have an obligation to provide services and supplies at only the appropriate level and "only when and to the extent medically necessary." 32 C.F.R. §199.6(a)(5). Tricare's governing regulations require that services provided be "furnished at the appropriate level and only when and to the extent medically necessary," and such care must "meet[] professionally recognized standards of health care [and be] supported by adequate medical documentation…to evidence the medical necessity and quality of services furnished, as well as

---

[3] Anyone who has reached 20 years of service, even if they were never activated on a [federal] order for more than 180 days outside of training, will now be considered a veteran.  If you are medically retired, you can get TRICARE benefits as a retired service member. You must be on the: Temporary Disabled Retirement List, or, Permanent Disability Retirement List.

the appropriateness of the level of care." *Id.*

22.     Tricare covers "durable medical equipment" that is "medically appropriate equipment to improve, restore, or maintain the function of a . . . diseased, or injured body part or can otherwise minimize or prevent the deterioration of the beneficiary's function or condition; or maximize the beneficiary's function consistent with the beneficiary's physiological or medical needs" (*i.e.,* medical devices such as the PAD devices discussed herein) or "provides the medically appropriate level of performance and quality for the medical condition present" and does not cover any medical devices used "off label" under FDA standards.  32 C.F.R. §§ 199.4(b)(2)(vi); 199.4(d)(3)(ii); 199.2; Tricare Policy Manual, Chap. 8, § 5.1.

23.     Medicare is a federal program that provides federally subsidized health insurance for persons who are 65 or older or are disabled. *See* 42 U.S.C. §§ 1395, *et seq.* ("Medicare Program"). Part B of the Medicare Program provides supplemental benefits to participants to cover, among other things, physician services, procedures, prescription drugs and devices. *See generally id.* §§ 1395j-1395w-4.

24.     Medicare is administered by CMS, which is part of the Department of Health and Human Services. CMS contracts with private contractors referred to as Medicare Administrative Contractors to act as agents in reviewing and paying claims submitted by healthcare providers. 42 U.S.C. § 1395h; 42 C.F.R. §§ 421.3, 421.100. These contractors review claims to determine whether they are appropriate for reimbursement under Medicare Part A (inpatient hospital and related services) and Medicare Part B (outpatient hospital and physician services).

25.     Medicare is not permitted to pay for any expense that is not "reasonable and necessary for the diagnosis and treatment of illness or injury." 42 U.S.C. § 1395(a)(1)(a).

9

Regulations, national coverage determinations, and local coverage determinations specify

services that are covered as medically reasonable and necessary.

26.     Certain services and devices are excluded from coverage because they are not

reasonable and necessary. Experimental or investigational medical devices are excluded. 42

C.F.R. § 411.15(o). Medicare considers a medical device investigational if it has not completed

the applicable clearance (510(k)) or approval (PMA) process that a manufacturer, in accordance

with FDA's requirements, must complete before it is allowed to fully market its product.

Medicare makes an exception for devices classified by the FDA as Category B investigational

and furnished in commerce consistent with FDA protocols for clinical trials. 42 C.F.R. §

411.15(o). An investigational device exemption must be granted by the FDA to be eligible for

coverage as an investigational Category B medical device. 42 C.F.R. § 405.201(a)(2).

27.     Medicare payment is not made for medical and hospital services that are related to

the use of a device that is not covered because CMS determines the device is not "reasonable"

and "necessary" or because it is excluded from coverage for other reasons. 42 C.F.R. § 405.207.

These excluded services include all services furnished in preparation for the use of a noncovered

device, services furnished contemporaneously with and necessary to the use of a noncovered

device, and services furnished as necessary after-care that are incident to recovery from the use

of the device or from receiving related noncovered services. *Id.*

28.     Medicare's manuals expressly exclude from coverage a medical device that

requires, but has not obtained, premarket approval from the FDA because the device is

investigational and not established to be reasonable and necessary. Medicare's longstanding

policy, which is binding on its fiscal intermediaries, excludes coverage for devices and related

services that have not been authorized for marketing by the FDA, in accordance with the FDA's requirements.

29.     Medicare enters into provider agreements with providers and suppliers to establish their eligibility to participate in the program. During all relevant times herein,[4] to be eligible for payment under the Medicare program, providers and suppliers must certify:

> I agree to abide by the Social Security Act and all applicable Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

*See, e.g.,* CMS Form-855S (04/06) at 26.

30.     The federal Medicaid Program was created in 1965 under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*  Funding for Medicaid is shared between the federal government and those states participating in the Medicaid program.  Federal funds are distributed to the states, which in turn provide certain medical services to certain low-income individuals.

31.     Federal Medicaid regulations require each state to designate a single state agency responsible for administering the Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of Health and Human Services ("the Secretary").  After the Secretary approves the plan submitted by the state, the state is entitled each quarter to be

---

[4] Any reference herein to "relevant times" or "all relevant times" refers to the permissible period of time under Relator's FCA claims which would be six years from the initiation of this action. 31 U.S.C. § 3731(b)(1).

reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan. *See* 42 U.S.C. § 1396b(a)(1). This reimbursement is called "federal financial participation" ("FFP").

32.    The federal programs described above are referred to collectively herein as the "Government Healthcare Plans."

## FACTUAL BACKGROUND

33.    The allegations contained herein are based upon the personal knowledge of Relator obtained through Relator's firsthand observations or interactions and communication with other firsthand witnesses.

### A.    Defendants' Kickback Scheme

34.    Medtronic employs a Class III Device Sales Representative and Clinical Specialist named Doug Winger ("Winger"). Winger also acts as a Field Trainer on behalf of Medronic and trains other Medtronic Sales Representatives on sales techniques. Winger began working in approximately 2007 as sales representative for FoxHollow Technologies where he sold its directional atherectomy device named SilverHawk. SilverHawk was the previous version of what is now Medtronic's HawkOne atherectomy device. Winger continuously worked for FoxHollow, ev3 and Covidien selling this medical device via the acquisitions referenced in ¶ 4 during the relevant time period in this Third Amended Complaint. Upon information and belief, Winger continuously ran the schemes detailed herein on behalf of each of his successive employers and then Medtronic.

35.    The Medtronic surgical devices used in the schemes detailed herein are for the treatment of peripheral artery disease ("PAD"), predominantly in the legs, and include Medtronic's: (1) HawkOne directional atherectomy system ("HawkOne") which is a catheter that

12

shaves plaque out of arteries in patients with PAD (previously known as Silverhawk); (2)

IN.PACT Admiral Paclitaxel-coated PTA Balloon ("IN.PACT DCB"), which is a drug-coated

balloon ("DCB") used to re-open blocked or narrowed arteries due to PAD; (3) Self-Expanding

Nitinol Stent Systems ("Nitinol Stent Systems"), which include self-expanding stents that are

vascular and biliary stents made of nickel titanium alloy (nitinol) cut into an open lattice design

that exerts constant outward force used to keep iliac (pelvic), superficial femoral and proximal

popliteal arteries open; (4) standard angioplasty balloon catheters; (5) Enteer Re-Entry catheter;

and (6) Viance CTO catheter. Hereafter these devices are referred to collectively as Medtronic's

"PAD devices."

36.     These PAD devices are highly lucrative for Medtronic and highly reimbursable by

Government Healthcare Plans. As an example, as reported in its SEC filings, Medtronic's

Cardiac and Vascular Group accounted for $8.8 billion out of a total of $17 billion in sales in

2014, and $11.5 billion out of a total $30.5 billion in sales in 2019.

37.     These PAD devices are used on arteries in patients' legs in peripheral

endovascular procedures which are routinely performed in cardiac catheterization labs,

interventional radiology suites, and operating rooms. These are typically patients having surgical

procedures for PAD which occurs when plaque builds up in the arteries and circulation is

compromised. The devices assist in "opening up" arteries, removing plaque and, consequently,

improving circulation. The stent products remain in the patients while the directional

atherectomy catheters and balloons are used and removed for disposal.

38.     The federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b) (the "AKS"),

expressly prohibits any individual or entity from offering, paying, soliciting or receiving any

"remuneration," which "include[s] any kickback [or] bribe" to "any person to induce such

person" to purchase or recommend a drug, service or supply (included medical devices) that is covered by a Government Healthcare Plan.

39.     Although Defendants knew they were bound by the AKS, they have chosen to disregard these laws and prohibitions, instead choosing to put sales growth and profits before their duty to comply with federal law. Moreover, Defendant Hutchinson falsely certified compliance with the AKS and the Stark Law[5] in connection with all claims submitted to the Government Health Programs within the relevant time asserted herein, and as such made, caused to be made, or conspired to be made fraudulent claims actionable under the FCA.  As codified in the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, 6402(f), 124 Stat. 119, codified at 42 U.S.C. § 1320a-7b(g), "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Defendant Hutchinson, as described in ¶ 29, certified to their compliance with the AKS when submitting claims for reimbursement regarding Government Healthcare Plans.

40.     Defendant Medtronic's kickback scheme is set forth in more detail below.  In summary, in at least as early as 2007 and continuing to when the Dole VA catheterization lab was shut down in 2018, starting with FoxHollow's SilverHawk atherectomy device, and continuing to present day with Medtronic's HawkOne atherectomy device, and the rest of the PAD devices referenced above, Medtronic (through Winger and at Winger's direction) has been providing remuneration to the Radiology Technologist and Lab Manager Teri Brinkley and her staff at the Robert J. Dole Veterans Administration Medical Center, 5500 East Kellogg Ave., Wichita, Kansas (hereafter "Dole VA") and the Director of Supply Chain Mark Wilson and other

---

[5] Limitation on Certain Physician Referrals.  42 U.S.C. § 1395nn(a).

employees at Defendant Hutchinson Hospital.

41.     These kickback schemes have been, and continue to be, integral to Medtronic's overall marketing strategy to sell medical devices at the Dole VA, Defendant Hutchinson as well as other locations across the country.

42.     Since approximately 2007 and continuing to the present, Medtronic and its predecessors failed to have (and/or enforce) policies and practices in place to prevent payment of remuneration by its Sales Representatives, Field Sales Trainers and managers.

43.     As an example and confirming Medtronic's practices of implementing kickbacks as part of its sales tactics, in the summer of 2019, Medtronic terminated PAD device sales representative Dave Johnson for violation of the AKS and the Stark Law regarding his sales activity.

44.     Further demonstrating Medtronic's pattern and practice in selling medical devices, in 2008, Medtronic settled an AKS / FCA claim with the Department of Justice for $75 million related to paying kickbacks to doctors performing spinal surgeries using their devices.  In 2011, Medtronic paid another $23.5 million to settle AKS / FCA claims regarding paying kickbacks to doctors who utilized its pacemaker devices.

45.     In December 2018, Medtronic agreed to pay nearly $20 million to resolve claims against two of its acquisitions (Covidien and ev3) regarding the payment of kickbacks and off-label promotion in violation of the AKS and the FCA.

46.     In March 2019, Medtronic's Covidien group settled an AKS / FCA claim with the Department of Justice for $17 million for allegedly paying illegal kickbacks in the form of free or discounted marketing services to induce the purchase of medical devices that were being billed to Medicare. "Today's settlement serves as an important reminder to those in the health

care community that unlawful kickbacks come in many forms and are not limited to monetary payments to providers," said Assistant Attorney General Jody Hunt for the Department of Justice's Civil Division. "Providing free or discounted services to health care providers to induce the use of certain items or services can lead to excessive and unnecessary treatments and drive up health care costs for everyone."[6]

47.     More recently, it was reported in April 2020 that Medtronic agreed to resolve an AKS / FCA claim for $9.9 million, in the U.S. District Court for the E.D. of California, for allegedly paying unlawful kickbacks in forms of vacations, gift cards, consulting jobs, cash, sports tickets, and entertainment to physicians using their cardiac devices.

48.     After becoming aware of the allegations set forth in the Relator's initial Complaint, instead of investigating and holding Winger accountable for his activities, Medtronic actually decided to increase Winger's role within the company by adding the Field Sales Trainer responsibilities, entrusting him to train other Medtronic Sales Representatives on Medtronic's marketing strategy including the payment of remuneration and "off-label" promotion of its PAD devices.

### *Medtronic's Kickback Scheme at Dole VA*

49.     At all relevant times herein, Defendant Medtronic claimed, caused a claim to be made, or conspired to have a fraudulent claim be made to the U.S. VA for reimbursement regarding PAD devices provided to Dole VA based on Medtronic offering and/or paying remuneration to Dole VA employees in exchange for Dole VA purchasing, or recommending for purchase, Medtronic's PAD devices.

---

[6] "Covidien to Pay More Than $17 Million to Settle Catheter Kickback Case," Policy & Medicine, Mar. 13, 2019, Thomas Sullivan.

50.     As a provider of medical services to active and retired military members, all devices used in PAD procedures at Dole VA are paid for by the U.S. VA.

51.     Dole VA was one of the nation's smallest vascular surgery providers.  Yet, despite its relatively small number of patients and even smaller number of vascular procedures performed each week, Dole VA was Winger's largest customer for vascular devices, often exceeding $2-3 million dollars in annual revenue for Medtronic at all relevant times herein. Throughout Winger's course of business at Dole VA including all relevant times herein, the remuneration paid to Dole VA employees led to claims being submitted to, and paid by, the U.S. VA for well over $10 million dollars of Medtronic PAD, and later coronary, devices.

52.     Teri Brinkley worked as the Radiology Technologist and Lab Manager of the cath lab at the Dole VA at all relevant times asserted herein. At all relevant times herein, Brinkley was responsible for ordering, or recommending for ordering, medical devices for the Dole VA cath lab that were paid for by the U.S. VA, including the Medtronic PAD devices sold by Winger.

53.     Winger's kickback scheme at Dole VA worked as follows. Throughout all relevant times herein, Winger - or Medtronic's Clinical Specialist Kerri Montgomery Kirk working with Winger - was giving remuneration to Teri Brinkley and other Dole VA cath lab employees. The remuneration took the form of weekly/daily lunches for Brinkley and other cath lab employees, ipads, iphones, NASCAR as well as other entertainment event tickets to Brinkley and her staff, weekend parties, as well as frequent nights at bars and restaurants.  All of this was done to induce Brinkley to purchase, or recommend purchases, of millions of dollars of

Defendant Medtronic's PAD devices by the U.S. VA.[7]

54.    As an example, Brinkley would routinely and jokingly tell her staff that the "physician" was paying for weekly lunches when in fact it was well known that Medtronic was paying.

55.    Winger and Kirk's expense reports, as well as their personal credit/debit card transactions, will set forth some of the amounts paid by Medtronic for the remuneration to Brinkley and the cath lab staff at the Dole VA.

56.    Medtronic's remuneration alleged herein served its purpose at Dole VA.  At all relevant times alleged herein, Defendant Medtronic was the near exclusive provider of PAD medical devices to Dole VA's cath lab, thereby eliminating the purchase of similar and lower cost PAD devices from other manufacturers.  Terri Brinkley would exclude access to the cath lab and its physicians for PAD device salespersons other than Winger.  Brinkley would also exclusively purchase or recommend for purchase all Medtronic devices outright, while all other vendors had to provide their devices on consignment.

57.    Due to Defendant Medtronic's kickback scheme, and in exchange for said remuneration it paid to Dole VA, Dole VA over-purchased a tremendous amount of unnecessary Medtronic PAD devices in relation to the size of Dole VA's cath lab and number of procedures performed.

58.    Throughout all relevant times herein, Dole VA operated just one cath lab with one

---

[7] As an example, and a conservative estimate, in one form of kickback, Winger paid remuneration in the form of free lunches at Dole VA at least twice a week.  Assuming a conservative $150 per lunch for the cath lab staff over 13 years, this would amount to over $200,000.

procedure room and one physician providing services.[8]  These services were typically performed two to three days per week and procedures usually stopped at 3:00 p.m.  There are other large well-known healthcare providers, with numerous physicians with multiple specialties performing numerous PAD procedures on a daily basis at their respective facilities.

59.    As demonstrated on this table covering a one-year timeframe, the disparity in volume of Dole VA's purchases regarding just Medtronic's atherectomy devices and DCBs is astonishing and reflects the impact that Medtronic's remuneration had on orders placed:

| ORGNAME | TOTAL ATHERECTOMY (all vessels) | TOTAL DCB | TOTAL ATHX/DCB |
|---|---|---|---|
| **DOLE VA MED CENTER \*\*** | **475** | **775** | **1250** |
| MOUNT SINAI HOSPITAL MIAMI | 464 | 781 | 1245 |
| CLEVELAND CLINIC FOUNDATION | 391 | 143 | 534 |
| NEW YORK-PRESBYTERIAN HOSPITAL | 387 | 188 | 575 |
| DUKE UNIVERSITY HOSPITAL | 339 | 144 | 483 |
| MASSACHUSETTS GENERAL HOSPITAL | 317 | 110 | 427 |
| NEBRASKA MEDICAL CENTER | 296 | 71 | 367 |
| JOHNS HOPKINS HOSPITAL | 203 | 58 | 261 |
| STANFORD UNIVERSITY SCHOOL OF MEDICINE | 197 | 109 | 306 |
| UNIVERSITY OF KANSAS HOSPITAL | 197 | 65 | 262 |

---

[8] For a period of time, Dole VA had two rooms where such procedures could occur.  However, they only utilized one room at any given time.

| | | | |
|---|---|---|---|
| SAINT LUKES HOSPITAL OF KANSAS CITY | 168 | 80 | 248 |
| EMORY UNIVERSITY HOSPITAL MIDTOWN | 144 | 22 | 166 |
| UNIVERSITY OF MIAMI HOSPITAL | 98 | 23 | 121 |
| MAYO CLINIC | 79 | 0 | 79 |
| HOUSTON MEDICAL CENTER | 17 | 0 | 17 |
| GEORGETOWN MEMORIAL HOSPITAL | 10 | 12 | 22 |

60.     Demonstrated in this table, during the 2017-2018 timeframe referenced therein,[9]

Dole VA purchased approximately **475** atherectomy devices and **775** DCBs from Defendant

Medtronic.  These other *significantly larger* healthcare providers averaged using **220**

atherectomy devices (median being **197**) and **120** DCBs (median being **71**). Again, Dole VA is

one of the nation's smallest vascular surgery providers doing procedures 2-3 days per week in

one procedure room.  In comparison, Mount Sinai Miami runs three dedicated rooms for PAD

procedures five days a week shared by six physicians.  Cleveland Clinic operates ten dedicated

rooms for PAD procedures five days a week shared by eleven physicians.  Data throughout all

relevant timeframes for the claims alleged herein will reflect an equal amount of gross disparity

for all PAD devices sold by Medtronic to Dole VA.

61.     One example of a Dole VA excessive order from Medtronic resulting from this

kickback scheme was on January 9, 2017. At the request of Dole VA's cath lab, the U.S. VA

---

[9] Numbers reflect Medicare claims and private insurance claims from July 2017 - July 2018.  ** Reflects number of devices purchased in all of 2017.  Therefore, these figures represent usage by all locations over a one-year timespan.

requested vendors to submit solicitations for the purchase of 320 DCBs totaling approximately $500,000. The point of contact for this purchase was Paul Dixon, Contracting Specialist for Network Contracting Office ("NCO") 15 out of Leavenworth, Kansas.

62.     On January 11, 2017, Relator sent Terri Brinkley and Diane Keene (Chief of Logistics at Dole VA who originally initiated the above referenced proposal) an email with comparative clinical trial data between Relator's company's DCBs and Medtronic's DCBs. The data showed equivalent clinical outcomes for the DCBs, and Relator's company was offering the DCBs at a significant cost savings ($106,000) over Medtronic's proposal.

63.     In addition to beating Medtronic's price, Relator also sent Dixon and Keene an email offering to incorporate a service-disabled veteran owned small businesses as distributors of the DCBs, and one of the physicians performing work in the Dole VA cath lab, Dr. Chad Ammar, reached out to Keene and Brinkley during this time and informed them via e-mail that Relator's company's DCB was his preferred device.

64.     Meanwhile, throughout this January 2017 timeframe, Dixon stated to Relator in several phone conversations that he (Dixon) was receiving significant pressure with "calls and daily emails" from both Brinkley and Keene to get the DCB order placed immediately as Dole VA was lacking product in stock, and patient care could be negatively impacted.  Hearing this from Dixon surprised Relator.  Relator informed Dixon that he had just witnessed more than 130 DCB units already in Dole VA's inventory less than 5 weeks earlier. Dixon was surprised to hear this and informed Relator that he did not feel comfortable placing an additional order for twice the amount of DCBs already in inventory.

65.     On January 19, 2017, Dixon informed Relator that the DCBs were not going to be purchased as originally requested, but instead would be ordered on a consignment contract from

21

Medtronic (*i.e.,* a certain number of DCBs would be stocked free of charge, and Dole VA would only pay for devices when used). Yet, throughout this process, Brinkley would deny to Relator and other competitive vendors that it had any consignment contract with Medtronic.

66.     On January 19, 2017, Relator reached out to Keene at Dole VA to confirm the Medtronic consignment order and also inquire about his company also being able to submit consignment terms since there were physicians at Dole VA who preferred DCBs from Relator's company. Keene never responded to Relator.

67.     Contradicting all information from Dole VA and Dixon, on January 23, 2017, at least 120 Medtronic DCBs arrived at Dole VA as evidenced by the following photograph of its DCBs on a cart at Dole VA.  Later, a second cart of an additional 120 Medtronic DCBs was delivered (not photographed).



68.     These ~240 DCBs were not provided by Medtronic to Dole VA on consignment. Companies in this industry would at most provide approximately 20-30 DCBs on consignment to a customer of similar size and procedural volume as Dole VA – not the initial 120 and

subsequent 120 DCBs provided to Dole VA by Medtronic.

69.     While Dixon claimed that the Dole VA had a current and active consignment contract with Medtronic for DCBs, in reality, Dole VA actually purchased this large order of DCBs from Medtronic.  These types of bulk, non-consignment, orders continued between Medtronic and Dole VA at all relevant times herein through mid-2018 when the cath lab was shut down.

70.     Grossly excessive unused Medtronic inventory at Dole VA is tremendously wasteful due to product expiration dates.  This product cannot sit indefinitely and must be disposed of when it expires.  To demonstrate, in November 2016, the Dole VA cath lab had approximately 130 Medtronic DCBs, as evidenced by the following photographs of its cath lab storage cabinet.  As shown in the close-up picture below, many of the units that were stocked at that time were set to begin expiring within two months from January 2017 (*e.g.,* completely wasted inventory):







71.     In November 2016, Dole VA had purchased so many Medtronic DCBs that its cath lab did not have enough space in its storage room, and spillover inventory had to be stored in the operating room:



72.     As previously stated, Dole VA purchased approximately 240 Medtronic DCBs in January 2017 even though they had approximately 130 DCBs in stock.  Dole VA performed relatively few procedures each week that called for a DCB.  The 370 DCBs in Dole VA's inventory (again just during this limited period of time in late 2016 and early 2017) dwarf the average *annual* usage of 120 DCBs per year by much larger providers (*see* ¶ 59, *supra*).

73.     As another example of the benefits reaped upon Medtronic from its kickback scheme, Dole VA purchased over $1 million in Medtronic's HawkOne directional atherectomy devices (roughly 300 devices) in calendar year 2016. Yet, during that year, Dole VA had only one physician with consistent privileges through early summer who could perform the procedures, and he did only a handful of procedures each week. Starting late-summer 2016, there was a new physician who did not have privileges to do these types of procedures until October or November 2016 when he began doing infrequent procedures up through its 2018 closing.

Compared to the figures represented in ¶ 59, this is again evidence of gross over purchasing of Medtronic's product.

74.     Also, in 2016, Dole VA purchased nearly $1 million in Defendant Medtronic's DCBs.  In comparison to the figures in ¶ 59, this is again evidence of gross over purchasing of Medtronic's product that was done as a result of Medtronic's kickback scheme.

75.     Defendant Medtronic's kickback scheme whereby Dole VA over-purchased excessive amounts of its devices led to Dole VA throwing away vast amounts of these devices due to expiration.  As an example, in 2017 or early 2018, Brinkley and the Dole VA cath lab employees removed from shelves and placed in numerous large trash bags over $700,000 of Medtronic's PAD devices.

76.     To further demonstrate, in late 2017 or early 2018, to boost Winger's quarterly sales revenue, Brinkley replaced over 200 Medtronic Protégé stents with an entirely new purchase from Medtronic of its newer version (the only difference between the two was the latter having a different deployment system).  There is no basis to make this new purchase of product (most likely exceeding $350,000) to simply upgrade the deployment system.  The standard industry practice would be Medtronic simply swapping out the older units at no cost, or for Dole VA to reorder newer units as the existing ones are implanted.[10]  Within the industry, the action to upgrade a stent inventory, especially of this magnitude and budgetary impact, for the purposes of implementing a more ergonomic handle would have to be made at the direction of the operating physician – which was never made here. Instead, a massive new order of unnecessary product from Winger was made by Brinkley at Dole VA.

77.     In the summer of 2018, Dole VA completely terminated all peripheral

---

[10] The stent itself was the same regardless, therefore patient care would not be compromised.

endovascular procedures in its catheterization lab ("cath lab") / radiology suite. Relator believes this was a result of his 2017 initial Complaint and related investigation regarding this kickback scheme. Cardiac procedures continued until late 2018 when they were also shut down.

78.     In the summer of 2018, Dole VA banned Winger from entering its facility and banned him from conducting any future business at Dole VA. Relator believes this was a result of his 2017 initial Complaint and related investigation regarding this kickback scheme.

79.     In approximately late 2018, Dole VA terminated Brinkley's employment as well as the cath lab staff. The longstanding contract between Dole VA and the physician group who exclusively provided services at the cath lab was also terminated at this time. Relator was informed that these terminations occurred due to an investigation regarding this kickback scheme.

### *Medtronic and Hutchinson's Kickback Scheme*

80.     At all relevant times herein, Defendants Medtronic and Hutchinson claimed, caused a claim to be made, or conspired to have a fraudulent claim be made, for reimbursement from Government Healthcare Plans for Medtronic's PAD devices. These were purchased by Hutchinson based on Medtronic offering, paying (and/or Hutchinson soliciting and receiving) remuneration. This included kickbacks and marketing/promotional services to Hutchinson in exchange for Hutchinson purchasing Medtronic's PAD devices covered by Government Healthcare Plans.

81.     Defendant Hutchinson services a rural part of Kansas where there is a high Medicare and Medicaid patient population. In addition, Defendant Hutchinson draws Medicare patients from a broad geographical area because it is the known facility in the region for patients with the most advanced peripheral vascular disease (*e.g.,* critical limb ischemia), almost all of

whom are 65 and older and covered by Medicare and, to some extent, Medicaid.   As an example, between 2012 and 2017, just one physician at Hutchinson, Dr. Michael Hagley, performed 760 PAD procedures involving devices at issue herein that were submitted to CMS for payment.

82.     At all relevant times herein, Mark Wilson was the Director of Supply Chain for Defendant Hutchinson Hospital.  Wilson affected the entire supply chain at the hospital. His duties required him to negotiate and purchase hospital supplies, pharmaceuticals and devices including PAD devices.

83.     As part of his duties, Wilson had purchasing responsibility over Medtronic Cardiac Rhythm Management ("CRM") devices (*i.e.,* pacemakers) and other medical devices for Defendant Hutchinson's cath lab and operating room including the Medtronic PAD devices described above.

84.     The Hutchinson cath lab has an implant budget of over $20 million annually to purchase products like PAD devices, CRM pacemakers, defibrillators and diagnostic catheters; all of which are submitted for reimbursement to the Government Healthcare Plans.

85.     Wilson started in this position in approximately 2010 and continued his employment through his termination in August 2019.

86.     Following Medtronic's playbook, Winger's kickback scheme at Hutchinson worked similar to the one at Dole VA. Winger was giving remuneration such as meals, food, alcohol, gratuities, event sponsorships, NASCAR and other sporting event tickets, golf outings and travel expenses to Hutchinson personnel including Wilson, Cath Lab Director/Cath Lab Supply Chain Manager Cindy Henning King (who has been at Hutchinson for more than 15 years) and other Hutchinson cath lab employees. All of this was done to induce Hutchinson to

directly purchase millions of dollars of Defendant Medtronic's PAD devices.

87.     In addition, Winger's remuneration also included "marketing services" for physicians performing PAD procedures at Hutchinson.  As an example, Winger would host events for referring physicians whereby Winger would promote physicians at Hutchinson such as Dr. Michael Hagley and encourage said referring physicians to send patients to Dr. Hagley at Hutchinson.  This included numerous luncheons and speaking events.  Winger would also assist Hutchinson physicians such as Dr. Hagley in the advertising and promotion of their practices. This would include Winger assisting referring physicians in obtaining appointments for their patients with Dr. Hagley.

88.     Winger and Kirk's expense reports, as well as personal credit/debit card transactions, will set forth some of these amounts paid by Medtronic.

89.     Also, part of Medtronic's kickback scheme included Winger giving free PAD devices at Wilson's request, in exchange for Wilson making purchases from Medtronic.  This practice occurred throughout all relevant times herein.  Medtronic's scheme was not only paying illegal remuneration in exchange for purchases under the AKS, but also had the effect of creating an illegal "rebate" under the AKS as well.

90.     Wilson would also solicit the same free product from Relator and Relator's sales representatives throughout all relevant times herein.  In this process, Wilson would inform them that Winger/Medtronic was providing this free product to win the bids, and if they wanted to compete, they needed to do the same.

91.     As an example, in approximately late 2016, Relator and one of Relator's sales representatives had a meeting with Wilson. In that meeting, Wilson stated that if Relator's company wanted to compete like Medtronic, it would have to give him free devices, such as the

10 "free" DCBs, atherectomy devices and "Outback" re-entry catheters that Medtronic had given in the past. Relator explained to Wilson that his company does not do business that way, so he could not match that offer and implied that it was not appropriate business procedure. Wilson immediately threw his hands up and stated (to paraphrase), "whoa easy there, listen, nothing we do is in writing. Doug [Winger] just has creative ways of getting the devices he needs from other folks in his company. Nothing is in writing; he just knows how to maneuver the units around."

92.     Ten free units of the "Outback" re-entry catheters[11] alone would net the price paid by Defendant Hutchinson to Defendant Medtronic down by approximately $25,000. In turn, Defendant Hutchinson would bill Government Healthcare Plans for these "free" devices from Winger, allowing Hutchinson to capitalize again on the kickback.

93.     As another example, during the week of August 5, 2019, Relator's sales representative for Defendant Hutchinson received a call from Wilson in which he requested a proposal for a bulk buy of DCBs/stents in 25/50 unit increments. Later, Wilson said that he had requested bulk buy proposals from Relator's company and Medtronic, and that Relator's company proposal was significantly more expensive than Medtronic's. Wilson went on to say that "in order to get close to what Medtronic is offering," Relator's company would have to provide "10 free balloons" (approximately $15,000 in value) if Hutchinson purchased Relator's Company's 25-unit proposal and "25 free balloons" (approximately $37,500 in value) in exchange for a purchase of Relator's company's 50-unit proposal.  Because Relator's sales representative was driving at the time of this conversation, and because he knew the illegal nature of what Wilson was requesting, Relator's representative requested that Wilson put this ask

---

[11] Medtronic did not sell Outback devices.  These are produced by another manufacturer. Winger was obtaining these devices from some other source of inventory.  Relator believes these came from the Dole VA.

in an email. Wilson refused. Relator's sales representative then informed Wilson that Relator's company could not provide free inventory to win a bid.  Relator later learned that Hutchinson had accepted Medtronic's proposal, which, as admitted by Wilson, included "free" inventory as part of the purchase.

94.     In addition to Relator and Medtronic, Wilson requested bribes from other device providers as well.  Wilson made a similar phone call to a Phillips sales representative in the PAD device market stating his proposal was significantly less than Medtronic, and if he wanted to compete better at Hutchinson he would need to provide free devices.  Wilson also repeatedly made similar solicitations regarding PAD devices for free material from a Cardiovascular System Inc.'s ("CSI") sales representative from 2012 through 2016.

95.     Defendant Hutchinson financially benefits from accepting bribes in the forms of free medical devices from Medtronic because it is later paid for these free devices.  These free devices, when utilized by Hutchinson, are submitted to the Government Healthcare Plans for reimbursement at said devices reimbursable rate (*i.e.,* to reimburse Hutchinson for the cost of the device and related procedure even though the device cost Hutchinson nothing).  The costs saved at Hutchinson by accepting these bribes is significant and generates a much larger margin on its procedures.  Average retail costs in this industry for directional atherectomy devices are $2,800 - $3,200; for DCBs are $1,000 - $2,000; and drug eluding stents $1,000 - $2,000.[12]

96.     Since 2012, Defendant Hutchinson billed just Medicare alone for tens of millions of dollars for reimbursement for the Medtronic devices used and sold as part of the Medtronic kickback scheme with Hutchinson and Wilson. As an example, from 2012-2017, for just one

---

[12] *High Reintervention and Amputation Rates After Outpatient Atherectomy for Claudication.* Vasc Endovascular Surg. 2018 Aug; 52(6):427-433.

physician using Medtronic PAD devices, CMS reimbursed $1 million to the physician and in excess of $7.5 million to Hutchinson.

97.     Upon information and belief, and like Brinkley at Dole VA, Wilson was relieved of his duties in 2019 as a result of the allegations set forth in Relator's 2017 initial Complaint and related investigation.

98.     As a result of the allegations set forth in Relator's 2017 initial Complaint and related investigations, Winger was banned from entering Hutchinson and conducting any future business with Hutchinson.

B.     Defendant Medtronic's Unnecessary Services & Supplies
and Off-Label Marketing at Dole VA

99.     At all relevant times herein, Defendant Medtronic claimed, caused a claim to be made, or conspired to have a fraudulent claim be made, to the U.S. VA for reimbursement for unnecessary medical treatment and devices.  This included, but is not limited to, Winger and/or Kirk being present during procedures—and performing their duties described in more detail in ¶ 101—whereby they marketed, instructed, or encouraged the overuse of Medtronic atherectomy devices, DCBs, and stents in PAD procedures at Dole VA.

100.     A radiology group located in Wichita (referred to herein as "WRG") had the exclusive contract to provide PAD treatment and procedures at Dole VA at all relevant times herein. Under the compensation agreement between the U.S. VA and WRG, WRG was paid based upon time spent performing the various PAD procedures.  As the number of PAD devices used per procedure increases, the time required to perform said procedures also increases.  In turn, WRG would earn more income by the utilization of excessive medically unnecessary PAD devices under its agreement with Dole VA and the U.S. VA.  Also, Medtronic would earn more

in said procedures because more of its devices were being utilized than necessary.

101.     As a Medtronic Class III Device Sales Representative, Winger, along with Medtronic Clinical Specialist  Kirk, played an active role at Dole VA working with physicians from WRG as representatives of Medtronic.  In the industry, class III device sales representatives and clinical specialists play an integral role in the complex and invasive PAD procedures.  They can, and often do, serve another highly technical role during patient surgeries and pre-operative planning sessions that may be less well understood or appreciated.[13]  Medtronic representatives such as Winger and Kirk are not simply salespersons only or mere bystanders in PAD procedures.  Winger and Kirk provide advice and direction to physicians and other operating room staff, and these medical professionals rely on this advice and believe (unless the providers are associated with the kickbacks described in this Complaint) that it is accurate and compliant with the law.  With their training from Medtronic, Winger and Kirk's roles at Dole VA include:

- advising physicians when evaluating a specific patient type prior to surgery to help identify the best device, size, tool, or application to be used.

- consulting with physicians  before and during a surgery to ensure all necessary tools and equipment are available at the time of operation and ready for use.

- advising and directing physicians on the number of Medtronic devices to use on a particular patient

- advising and directing physicians on which type of Medtronic devices to use on a particular patient

- opening packaging for multiple single-use Medtronic devices (which would be discarded if not used because the packaging has been opened) and preparing those devices and having them ready for the physicians on the operating table next to the patient (or directing Brinkley to do that for Medtronic devices)

---

[13] Ideally, industry representatives are present during numerous varied surgeries.  The representative's experience of observing physician's approaches, and subsequent outcomes when treating similar disease or patient types plays a role in guiding a proper, safe, and effective outcome for the physician and their patient.  It can also aid the surgeon in avoiding common or avoidable missteps during these challenging operations.

- providing intra-operative assistance and advice during challenges or unexpected situations which can, and often do, arise during the procedure.

- consulting with physicians on device selection, sizing, and approach during the operation when the original pre-operative plan must be adjusted or abandoned altogether.

- assisting staff during the procedure in preparing devices for use (*e.g.,* opening packages, recording catalogue/lot/expiration numbers).

- answering a physician's or staff questions intra-operatively regarding proper device indication or contraindication.

- properly reporting device malfunctions or surgery complications related to device performance to proper authorities in a timely manner.

It is through this role—via training provided by Medtronic—that Winger and Kirk marketed, instructed or encouraged the overuse and "off label" use of Medtronic PAD devices that directly influenced WRG's actions at Dole VA.

102.    As noted above in paragraph 101 and as outlined below by witnesses described in paragraphs 104 to 139, Winger and Kirk instructed physicians on what and how many Medtronic devices to use and went even further than off-label verbal directives to providers when they opened single-use Medtronic devices and prepped them without getting any direction from the physician (see paragraph 110 below).

103.    Providers of healthcare to former military personnel have an obligation to provide services and supplies at only the appropriate level and "only when and to the extent medically necessary." 32 C.F.R. §199.6(a)(5).  Services provided must be "furnished at the appropriate level and only when and to the extent medically necessary," and such care must "meet[] professionally recognized standards of health care [and be] supported by adequate medical documentation…to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care." 32 C.F.R. 199.6(a)(5).

104.    Medtronic's conduct as alleged herein regarding medically unnecessary services and supplies permitted this Defendant to utilize a portion of the grossly excessive inventory it sold to Dole VA and increase its overall profits at tax-payers' expense.  Sadly, Medtronic's conduct extended the length of these procedures causing harm to the veteran patients.  These prolonged procedures extended exposure to damaging radiation, significantly increased volumes of contrast dyes which directly harm the kidneys, caused multiple unnecessary traumas to the same arteries (*e.g.,* using four DCBs on one artery when one would suffice), increased the necessity for implanting additional stents to repair subsequent arterial dissections, and unnecessarily increased future amputation rates and mortality.

### Excessive & Medically Unnecessary Atherectomy Devices

105.    It is well established within the medical community that a *single* atherectomy device such as Medtronic's is typically used in only 17% of procedures when treating PAD.[14]

106.    Due to Medtronic's training and marketing to Dole VA's PAD service provider WRG, WRG provided medically unnecessary treatment by using numerous Medtronic directional/cutting atherectomy devices in all PAD procedures and when not clinically warranted or indicated (*e.g.,* in multiple vessel beds per patient limb, and on multiple limbs per patient during the same PAD interventional treatment).  For example, in the 2012 - 2013 timeframe, during one procedure witnessed by Healthcare Professional #1, Dr. Shaun Gonda from WRG used three Medtronic atherectomy devices in one PAD procedure.[15]  This was done while

---

[14] *Wall Street Journal*. Among vascular surgeons surveyed in their registry, the average rate of atherectomy is about 17%, September 10, 2019.

[15] When Plaintiff refers to devices being "Medtronic" that includes devices it acquired.  *See*, ¶¶ 4-5 *infra.*

Winger was present in the room and with Winger performing all the roles described in ¶ 101.

107.    In another example, Healthcare Professional #2 was present in numerous PAD procedures at Dole VA where Dr. Gonda utilized multiple Medtronic atherectomy devices.  This occurred during the 2011 - 2015 timeframe.  This was done while Winger and/or Kirk were present in the room performing all the roles described in ¶ 101.

108.    In another example, Healthcare Professional #4 was present, almost weekly, when numerous PAD procedures were performed at Dole VA where Dr. Gonda, Dr. Kermit Rust or Dr. Bret Winblad from WRG utilized multiple Medtronic directional/cutting atherectomy devices.  This occurred during the 2014 - 2018 timeframe.  This was done while Winger and/or Kirk were present in the room performing all the roles described in ¶ 101.

109.    In another example, in the 2017 timeframe, a Wichita vascular surgeon (who was not a member of WRG) was performing a peripheral intervention procedure at the Dole VA Cath Lab.  Standard procedure during these cases would be for the operating physician to conclude diagnostic images, reassess and confirm the disease state and treatment choice, and then instruct the nursing and technologist team as to the specific devices to open and prep for use.  This sequence is critical for ensuring expensive product is not wasted in the event a different device is required.  In this particular circumstance, as the vascular surgeon turned around, he noticed that Brinkley had already opened a $3,500 HawkOne device that was prepped and ready on the table.  This is not a device that this particular surgeon would use for the procedure.  He admonished Brinkley for opening (and wasting) a device that was unnecessary for the patient and not requested by the physician.  Brinkley never asked him which device he wanted to use or waited for him to request a specific device. This was a rare occasion when this vascular surgeon did a peripheral intervention at the Dole VA cath lab because of WRG's exclusive contract.  This

contract effectively prevented surgeons from outside of WRG from performing procedures at Dole VA as it required any surgeon and cardiologist who wished to conduct peripheral interventions to have procedural oversight and supervision by a WRG radiologist.  This example shows the frequency of the Medtronic practices described in this section because this vascular surgeon rarely did procedures at Dole VA and yet the effects of Medtronic's fraud were evident on this rare occasion.

110.    As another example, Healthcare Professional #5 was present at Dole VA cath lab procedures during 2012-2015.  This person recalls that Winger was in almost every procedure witnessed.  In these procedures, Winger would have opened up all of the Medtronic devices and have them ready to go for the procedures.  This person did not see any physician or hospital staff direct Winger to do so.

111.    The use of multiple Medtronic atherectomy devices in single PAD procedures occurred numerous times throughout the 2011 - 2018 timeframe.  The personnel attendance logs, procedural notes, and patient implant logbook records at Dole VA will reflect each and every instance this occurred and will reflect the presence of Drs. Gonda, Rust or Winblad as well as Winger and/or Kirk in each procedure.  Utilizing more than two directional/cutting atherectomy devices per PAD procedure far exceeds the accepted standards of medical practice in treating PAD and is an unreasonable and unnecessary medical procedure.

112.    As the Society for Vascular Surgery (SVS) President Kim Hodgson, MD, recently discussed: "'The impact of the explosive growth of atherectomy on patients and healthcare finances is problematic and growing exponentially,' Hodgson lamented.  He turned to further findings from Hicks showing that of the roughly $267 million reimbursed by Medicare for first-time femoropopliteal peripheral vascular interventions in 2019, 90% was for atherectomy,

'leaving only $26 million to pay for all of the other therapies that actually have evidence showing that they work.'"[16]  "Hodgson also fingered vascular surgery's industry partners [*e.g.,* Medtronic]."   He said they should be "the canary in the coal mine for inappropriateness. You are uniquely positioned to spot abuse early—before patients are harmed.  You know every one of the outliers in vascular care."[17]  Furthermore, Dr. Hodgson stated, "We can play whack a mole every time the bad actors surface until the cows come home, but that leaves a trail of harmed patients and wasted resources . . ."[18]

113.    Indeed, using a single atherectomy device in PAD procedures alone has been shown in studies to increase amputation rates and additional interventional treatments which would not have otherwise been required.[19]

114.    There are no academic or clinical studies supporting the use of multiple Medtronic directional atherectomy devices in a single patient in a single PAD procedure. Furthermore, the primary treatment or "frontline" use of Medtronic directional/cutting atherectomy devices for *all* PAD morphologies, as marketed and promoted by Medtronic, to supplant all other FDA approved and properly studied PAD treatment devices is excessive and unnecessary on its face for even a single device in a patient.

115.    Despite all studies to the contrary, Medtronic's marketing materials—and in turn Winger's training of the Medtronic sales force pursuant to his Field Trainer position—state that

---

[16] https://vascularspecialistonline.com/cleaning-up-vascular-surgery-hodgson-lays-out-path-to-tackle-inappropriateness-in-care/.
[17] *Id.*
[18] *Id.*
[19] *See* Journal of the American Heart Association, "Adverse Events After Atherectomy: Analyzing Long-Term Outcomes of Endovascular Lower Extremity Revascularization Techniques," Vol. 8, No. 12.

atherectomy devices should be used in treating *every* PAD procedure.[20]  In the face of a well-established, evidence-based standard in peripheral medicine, Medtronic explicitly promotes the use of atherectomy devices as a "frontline" treatment to supersede, and even replace properly studied and proven therapies which cost less and are clinically proven as effective.

### *Treating with Excessive Stents*

116.    WRG and Medtronic had a practice of using numerous stents in a single patient's leg, often stenting from areas at or below the knee ("off label") when the clinical application was unwarranted and higher risk, often stenting from areas just above the ankle up to and behind the knee and stenting upward on the leg.  Doing so is an unreasonable and unnecessary medical procedure with extreme risk for veterans' short and long term health.  Routinely treating a single leg with multiple overlapping stents (including ones in the calf as well as below and behind the knee) significantly increases the likelihood for recurrent disease requiring additional and expensive invasive procedures, commonly within the following 6-12 months.[21]  In addition to requiring more frequent and progressively more expensive future procedures, it is also well established in medical literature that this unnecessary procedure can often result in stent fracturing and can result in significant harm to the patient. As an example, Healthcare Professional  #2 witnessed numerous occasions between 2011 – 2018 where Winger and/or Kirk performed these procedures with Dr. Gonda at Dole VA Treating a single leg with 3-5 stents, when not clinically warranted, in a single PAD procedure occurred numerous times throughout

---

[20] This includes their marketing material making statements such as, atherectomy is a "frontline" treatment, or marketing message of "nothing left behind" and/or "no stent left behind"—an unsubstantiated competitive claim that atherectomy is superior to stenting.
[21] *See* National Institute of Health, https://pubmed.ncbi.nlm.nih.gov/15653033/, "Prevalence and Clinical Impact of Stent Fractures after Femoropopliteal Stenting,"  Am Coll Cardiol, 2005 Jan 18; 45(2):312-5.

the 2011-2018 timeframe.  This was done while Winger and/or Kirk were present in the room performing all the roles described in ¶ 101.

117.    As another example, between the 2012 - 2013 timeframe, Healthcare Professional #1 witnessed numerous procedures where multiple, clinically unnecessary stents were placed in a leg—one where five stents were placed in one leg where Winger and/or Kirk performed this procedure with Dr. Gonda at Dole VA.  This was done while Winger and/or Kirk were present in the room performing all the roles described in ¶ 101.

118.    Another example, between the 2014 - 2018 timeframe, Healthcare Professional #4 witnessed numerous procedures where multiple stents were placed in a leg (up to 4-5), when clinically unwarranted, where Winger and/or Kirk performed this procedure with Dr. Gonda, Dr. Rust or Dr. Winblad at Dole VA.  This was done while Winger and/or Kirk were present in the room performing all the roles described in ¶ 101.

119.    Utilizing excessive and unnecessary stents in a single PAD procedure occurred routinely throughout the 2011 - 2018 timeframe.  The personnel attendance logs, procedures notes, and patient implant logbook records at Dole VA will reflect each and every instance this occurred and will reflect the presence of Drs. Gonda, Rust or Winblad from WRG as well as Winger and/or Kirk in each procedure.

### Excessive Use of Drug Coated Balloons

120.    WRG and Medtronic had a practice of using numerous DCBs per arterial location in a PAD procedure when one of the proper length DCBs was readily and immediately accessible on the Dole VA inventory supply shelves and would serve the same purpose.  Doing so is an unreasonable and unnecessary medical procedure.  As an example, a certain length of artery may need to be treated with a DCB.  A physician can use one "longer" balloon to treat this

entire area.  Due to Medtronic's training and marketing as described in ¶ 101, Winger and/or

Kirk along with WRG physicians provided medically unnecessary treatment by using numerous

(2-4) shorter Medtronic DCBs to cover the same area.[22]  As an example, Healthcare Professional

#2 witnessed numerous occasions between 2015 – 2018 when this occurred and where Winger

and/or Kirk were present with Dr. Gonda at Dole VA.  Also, Healthcare Professional  #4

witnessed numerous occasions when this occurred between 2015 – 2018 where Winger and/or

Kirk were present with Dr. Gonda, Dr. Rust or Dr. Winblad at Dole VA.  Interestingly, on the

rare occasions where neither Winger nor Kirk were present, Healthcare Professional #4

witnessed the same doctors using the proper longer length DCB and not using the multiple

Medtronic DCBs that Winger and/or Kirk would advise or instruct had they been present.

121.    Utilizing excessive Medtronic DCBs in a single PAD procedure—when not

clinically warranted—occurred routinely throughout the 2015 - 2018 timeframe.  The personnel

attendance logs, procedures notes, and patient implant logbook records at Dole VA will reflect

each and every instance this occurred and will reflect the presence of physicians from WRG as

well as Winger and/or Kirk in each procedure.

122.    Due to Medtronic's training and marketing to Dole VA's PAD services provider

WRG, WRG also provided medically unnecessary treatment by often utilizing unnecessary

quantities of all of Medtronic's PAD devices in one procedure.  As an example, in November

2016, Brinkley informed Healthcare Professional #3 that Winger or Kirk along with Dr.

Winblad, or a WRG resident, treated both legs on one patient and used the following Medtronic

---

[22] Not only does this practice quadruple the use of Medtronic devices, but it also quadruples the trauma to the artery as well as often requiring the unintended implantation of additional stents to repair subsequent arterial dissections, unnecessarily increasing the risk of vessel rupture, as well as embolizing broken plaque to smaller arteries downstream thereby causing acute vessel occlusion.

devices in this procedure: six directional/cutting atherectomy devices (~$21,000), six stents (~$18,000), and twelve drug coated balloons (~$42,000).  Utilizing excessive Medtronic devices in a single PAD procedure occurred numerous times throughout the 2011 - 2018 timeframe.  The personnel attendance logs, procedures notes, and patient implant logbook records at Dole VA will reflect each and every instance this occurred and will reflect the presence of physicians from WRG as well as Winger and/or Kirk in each procedure.

### *Other Waste of Devices & Patient Results*

123.    Due to the excessive usage of Medtronic PAD medical devices at Dole VA via the conduct of Winger and Kirk during the relevant time period described herein, Healthcare Professional #1 was informed that the average cost per PAD procedure at Dole VA was 300 to 1,000 times more expensive versus other labs doing similar procedures.

124.    In order to consume the grossly excessive Medtronic PAD devices purchased by Dole VA, during the 2014 - 2018 timeframe, Healthcare Professional #4 witnessed numerous records regarding coronary procedures at Dole VA's lab whereby the operation procedure records reflected a Medtronic PAD device, including Medtronic DCBs, used off label in a coronary procedure.  The procedure and device logs at Dole VA will reflect this occurring in numerous procedures between 2012 - 2018.[23]

125.    During the 2014 - 2018 timeframe, Healthcare Professional #4 witnessed Winger taking Medtronic PAD devices from the Dole VA inventory while on his way to conduct

---

[23] In late 2018 the cardiology group who has maintained an exclusive contract to provide all cardiac catheterization procedures at the Dole VA Cath lab, similar to WRG for PAD procedures, also had their contract cancelled by Dole VA and are no longer allowed to provide cardiac interventional services at the Dole VA. Upon information and belief, this was due to the subsequent investigation resulting from Relator's initial complaint filed in January 2017.

business at Hutchinson Hospital, per Winger's admission.  Plaintiff has a good faith basis to believe that Winger was utilizing Medtronic PAD inventory taken from Dole VA—paid for by U.S. taxpayers—as illegal remuneration being paid to Wilson at Hutchinson as previously described herein.  Medtronic's device sales invoices, including their bill of lading records as well as inventory receiving records at Dole VA reflecting device serials numbers when compared to Hutchinson's records reflecting Medtronic devices in inventory or used in procedures subsequently billed to Medicare/Medicaid will reflect this scheme from 2011 through 2018.

126.    A recent publication found about 1% per year of persons with a natural history of PAD, end up requiring an amputation.[24]  Patients who are treated with atherectomy devices femoropopliteal (*i.e.,* above knee) in a hospital setting, 4.8% per year require an amputation.[25] Patients who are treated with atherectomy devices in the tibial-peroneal (*i.e.,* at or below knee) in a hospital setting, 10.4% per year subsequently require an amputation in the following twelve months.[26]  Having more than one PAD atherectomy procedure leads to even higher percentage rates of amputations.[27]  Excessive usage of other Medtronic PAD devices at Dole VA via the conduct of Winger and Kirk described herein—and in order to utilize as much of the grossly excessive Medtronic inventory at Dole VA—compared to the national study discussed herein, a significantly higher percentage of veterans will have been subjected to major amputations and increased mortality rates.[28]  The patient records, personnel attendance logs, procedures notes,

---

[24] "Outpatient atherectomy outcomes may be worse than the natural history of disease." *Vascular News*; Mukherjee, Dipankar (Aug. 7, 2017).
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *See* "Risk of Major Amputation Following Application of Paclitaxel Coated Balloons in the Lower Limb Arteries: A Systematic Review and Meta-Analysis of Randomized

and patient implant logbook records at Dole VA will reflect this outcome.  Sadly, as the PAD procedures increase, the risks of amputations greatly increase, and in turn, the veterans' life expectancy dramatically decreases.[29]

127.    At all relevant times herein, Defendant Medtronic's marketing and training described in ¶ 101, including its scheme of offering or paying remuneration, which includes remuneration to Dole VA, led to Dole VA and WRG utilizing excessive and medically unnecessary PAD devices paid for by the U.S. VA.

C.    Defendant Medtronic Promotes Off-label Use of Devices

128.    At all relevant times herein, Defendant Medtronic claimed, caused a claim to be made, or conspired to have a fraudulent claim be made, to the U.S. VA for reimbursement for medical devices being used outside their FDA approved use ("off-label").  This included, but is not limited to, Winger and/or Kirk being present during procedures—and performing their duties described in more detail in ¶ 101—whereby they marketed, instructed, or encouraged the off-label use of Medtronic DCBs, directional/cutting atherectomy, and stents.

129.    Medtronic representatives such as Winger and Kirk marketed, trained, encouraged, and/or coerced Dole VA and WRG to utilize medical devices outside their usage as

---

Controlled Trials," (2021) Published by Elsevier B.V. on behalf of European Society for Vascular Surgery. This is an open access article under the CC BYNC-ND license (http://creativecommons.org/licenses/by-nc-nd/4.0/)

[29] "In total, 168/651 patients (178 legs; 26%) underwent a major amputation. Patients were stratified by age: 70–80 years (n=86) and >80 years (n=82). Overall mortality after major amputation was 44%, 66% and 85% after 1, 3, and 5 years respectively.  The 6-month and 1-year mortality in patients aged 80 years or older was, respectively, 59% or 63% after a secondary amputation <3 months versus 34% and 44% after a secondary amputation >3 months. Per year of age, the mortality rate increased by 4% ($P$=0.005). No significant difference in mortality after major amputation was found in the presence of comorbidity or according to Rutherford classification."  "Mortality after Major Amputation in Elderly Patients with Critical Limb Ischemia," *Clinical Interventions in Aging*, (Dec. 2017).

approved by the FDA.  In turn, these claims for reimbursement were made to the U.S. VA

regarding the devices themselves as well as the time taken by WRG to implement said devices.

These include the following.

### *Off-label Promotion of Peripheral Drug Coated Balloons*

130.    Defendant Medtronic used to sell a DCB outside the United States called

IN.PACT AMPHIRION DEEP Drug Eluding Balloon.  Outside the United States, this DCB was

already CE Marked (European equivalent of FDA approval) for use in the tibial arteries (*i.e.,*

"below the knee application) to treat PAD.  On November 13, 2013, Medtronic issued a

worldwide recall of the IN.PACT AMPHIRION DEEP DCB.  This recall was related to an FDA

required PMA Level I study being conducted in the United States where Medtronic was seeking

FDA approval specifically for use in below the knee arteries.  The study and related data

compared using IN.PACT AMPHIRION DEEP against the existing standard of care, and FDA

approved, standard (un-coated) balloon angioplasty.  Approximately midway through the pre-

defined study protocol, Medtronic conducted an interim analysis of the ongoing clinical trial

data.  During this data review, trial investigators found the drug-coated study device was

providing no additional clinical benefit for patients over the standard un-coated balloon

angioplasty cohort.  In addition to a lack of patient benefit, trial investigators also identified an

alarming trend toward significantly higher incidences of major amputation associated with the

study device (IN-PACT AMPHIRION DEEP) cohort.  As a result of these unexpected findings,

Medtronic took the unprecedented step to prematurely stop the study and issue the immediate

global recall of the device over concerns for patient safety.[30]

131.    Defendant Medtronic eventually obtained very limited FDA approval for the use
of the formerly know IN.PACT AMPHIRION DEEP DCB that it now calls the IN.PACT
Admiral Paclitaxel-Coated PTA ("IN.PACT ADMIRAL").  On its website, Medtronic states the
following regarding indications for this device which now reflect limitations on the types and
sizes of arteries where it may be safely applied:

> The IN.PACT™ Admiral™ Paclitaxel-Coated PTA Balloon catheter is indicated
> for percutaneous transluminal angioplasty, after appropriate vessel preparation,
> of *de novo,* restenotic, or in-stent restenotic lesions with up to 360 mm in
> superficial femoral or popliteal arteries with reference vessel diameters of 4-7
> mm.

And further states:

> The IN.PACT Admiral drug-coated balloon (DCB) is a clinically proven, primary
> endovascular therapy that treats femoropopliteal disease, reduces interventions,
> and preserves future treatment options.

132.    The FDA's Summary of Safety and Effectiveness Data (SSED) states that
IN.PACT indications for use are limited solely to femoral and popliteal arteries.

133.    Via its 2013 IN.PACT DEEP worldwide recall, Medtronic—and its
representatives including Winger and Kirk—had full knowledge that utilizing this device outside
its now FDA approved parameters (*i.e.,* the label limits on IN.PACT ADMIRAL) could
significantly increase the risk of future major amputations.  They were also aware that utilizing
their own gold standard un-coated balloon for angioplasty in applications outside IN.PACT
ADMIRAL FDA approved parameters was just as clinically effective for below the knee

---

[30] See article discussing this study/data: "*Drug-Eluting Balloon Versus Standard Balloon
Angioplasty for Infrapopliteal Arterial Revascularization in Critical Limb Ischemia,*" Journal of
the American College of Cardiology, Vol. 64, No. 15, 2014 (Oct. 14, 2014).

treatment, albeit without the significant increased risk of major amputation.

134.    Despite this knowledge, Defendant Medtronic through Winger and Kirk knowingly promoted, marketed and/or demonstrated as described in ¶ 101 the off-label use of IN.PACT ADMIRAL in arteries and sizes of arteries outside its FDA approval.  As an example, between 2015 and 2018, Healthcare Professional #4 attended a pre-procedure meeting with Dr. Kermit Rust from WRG, Terri Brinkley, and Doug Winger.  For this particular patient, Dr. Rust and Winger discussed what procedure will be performed and what Medtronic products will be used.  During the procedure, Dr. Rust sought to treat a *below the knee artery* with a *2-3 mm diameter*.  Winger informed Dr. Rust that he should use a Medtronic IN.PACT ADMIRAL—again, not approved for any arteries smaller than 4 mm let alone a below the knee artery.  Winger instructed Dr. Rust that he should only partially inflate the IN.PACT ADMIRAL to half atmospheric pressure in this smaller artery which would reduce the balloon diameter in an attempt to minimize the risk of rupturing the artery.[31]  Dr. Rust followed Winger's direction which involved three "off label" uses: utilizing this IN.PACT ADMIRAL below the knee; utilizing it for an artery smaller than its indication and instructing Dr. Rust how to modify the FDA approved instructions for use.  Doing so not only significantly increased this veteran's exposure to future major amputation; increased the acute risk of arterial dissection or vessel rupture unnecessarily from the significantly oversized IN.PACT balloon, as well wasting the $3,500 IN.PACT ADMIRAL as opposed to more effective, less dangerous, and FDA approved $300 standard angioplasty balloon.  The personnel attendance logs, procedures notes, and patient implant logbook records at Dole VA will reflect each and every instance this occurred and will

---

[31] Rupturing the vessel wall is a well-known complication when a balloon is inflated and significantly oversized relative to the target artery.

reflect the presence of physicians from WRG as well as Winger and/or Kirk in each procedure.

135.    In another example of off-label usage of PAD devices, Healthcare Professional #2 witnessed a PAD procedure at Dole VA during the 2012 - 2015 timeframe.  In this procedure, Winger was assisting Dr. Gonda from WRG.  The procedure called for a $300 standard balloon angioplasty (un-coated) for an iliac artery.  Winger did not have the specific size of balloon with him for that application and which Dr. Gonda thought was appropriate.  Healthcare Professional #2 stated that he had such a balloon in his trunk stock inventory and offered to retrieve it. Winger informed Dr. Gonda that this was not necessary.  Winger proceeded to de-package a Medtronic balloon expandable *stent device* (which includes a balloon within the stent to expand and deploy the stent).  Winger instructed Dr. Gonda to remove the stent from the balloon and dispose of it.  Taking these multiple off-label steps resulted in the originally requested size balloon which was then used in the procedure.[32]  During this same timeframe, this representative also witnessed other Medtronic stents being used off-label on a number of occasions in the common iliac, femoral, and popliteal arteries in procedures performed by Dr. Gonda with Winger and/or Kirk present.  The personnel attendance logs, procedures notes, and patient implant logbook records at Dole VA will reflect each and every instance this occurred and will reflect the presence of physicians from WRG as well as Winger and/or Kirk in each procedure.

### *Off-label Promotion of Peripheral Stents*

136.    Defendant Medtronic sells a peripheral nitinol stent called EverFlex.  Medtronic's

---

[32] Not only did this represent Medtronic promoting use of devices off label, but it further demonstrates the chokehold Winger had on all devices being used at Dole VA and the extensive profits for Medtronic and costs to taxpayers.  The balloon proposed by Healthcare Professional #2 only cost $300 compared to the estimated $3,000 cost of the ultimately disposed stent used off-label by Winger.

catalog describes this device as:

> The EverFlex™ stent system is designed for flexibility and durability. It is a second-generation stent indicated for use in the superficial femoral and proximal popliteal arteries (SFA/PPA), common iliac, and/or external iliac arteries. The EverFlex stent is available in sizes ranging from 20 mm to 200 mm lengths (SFA/PPA) or 20-120 mm lengths (iliac).

On its website, it states the FDA's SSED indication for this device:

> The EverFlex Self-Expanding Peripheral Stent System is intended to improve luminal diameter in the treatment of symptamotic *de novo* or restenotic lesions up to 180 mm in length in the native superficial femoral artery and/or proximal popliteal arteries with reference vessel diameters ranging from 4.5 mm – 7.5 mm.

> The EverFlex Self-Expanding Peripheral Stent System is indicated for improving luminal diameter in patients with atherosclerotic disease of the common and/or external iliac arteries up to and including 100 mm in length, with a reference vessel diameter of 4.5 mm - 7.5 mm.

137.    At Dole VA, Defendant Medtronic knowingly marketed this device to be used "off-label" (*i.e.,* outside the superficial femoral artery and/or proximal popliteal arteries with reference vessel diameters ranging from 4.5 mm - 7.5 mm, and outside the external iliac arteries up to and including 100 mm in length, with a reference vessel diameter of 4.5 mm - 7.5 mm) by promoting its usage in arteries at or below the knee for use in patients.[33]  As an example, in the 2012 - 2013 timeframe, during several procedures witnessed by Healthcare Professional #1, Winger along with Dr. Gonda (or a resident from WRG) used multiple Medtronic peripheral stents per PAD procedure at locations at the ankle extending into the calf as well as at or below the knee (*i.e.,* "off label").  Healthcare Professional #1's reactions were: "I got to the point where

---

[33] The fact that there is no clinical benefit for this off label procedure is well documented.  One should only stent to repair dissections or other flow limiting issues after angioplasty fails in these specific locations.  *See* 54 ENDOVASCULAR TODAY, MAY 2021, VOL. 20, NO. 5 BTK DSEASE. "The State of Stenting in Below-the-Knee Applications Assessing stent options and additional technologies for below-the-knee interventions."

I was uncomfortable with the way cases were going." "The treatment of veterans . . . seeing an artery that was open, the physician would go in and balloon it and just destroy the artery and then follow it up with a stent." "I couldn't stomach what was going on, so that's why ultimately just left and never went back." Healthcare Professional #1 had to inform the company sales manager that Dole VA would no longer be a potential client. The representative told him, "I'm not going to be involved in something that feels bad and I cannot imagine treating a veteran so poorly."

138.    In another example, between the 2014 - 2018 timeframe, during numerous procedures witnessed by Healthcare Professional #4, Winger and/or Kirk along with Drs. Gonda, Rust or Winblad used multiple Medtronic peripheral stents per PAD procedure at locations just above the ankle and extending upwards at or behind the knee (*i.e.,* "off label").

139.    Medtronic peripheral stents being used "off-label" in PAD procedures occurred numerous times throughout the 2011 - 2018 timeframe. The personnel attendance logs, procedures notes, and patient implant logbook records at Dole VA will reflect each and every instance this occurred and will reflect the presence of Dr. Gonda as well as Winger and/or Kirk in each procedure where Winger and Kirk knowingly promoted, marketed and/or demonstrated such off-label use via the methods described in ¶ 101.

140.    Much of the conduct and actions of Winger described in ¶¶ 104-139 were done while he held the position of Field Sales Trainer training the Medtronic sales force on sales tactics. Medtronic was fully aware of Winger's conduct when providing him this promotion, and Medtronic desired to have all its PAD salesforce act in the same way. Accordingly, Winger not only played an active role in the conduct alleged herein, but also spread the fraud as he trained

other Medtronic representatives to do the same.

## COUNT I:

**Violation of the False Claims Act: Presenting False Claims for Payment**
**31 U.S.C. § 3729(a)(1) (2000), and, as amended, 31 U.S.C.(a)(1)(A)**

**(Illegal Kickbacks Against Both Defendants)**

**(Medically Unnecessary Goods and Services Against Defendant Medtronic)**

**(Off-Label Sales Against Defendant Medtronic)**

141.　Relator incorporates by reference the above paragraphs as if set forth fully here.

142.　Relator and the United States seek relief against Defendants under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. § 3729(a)(1) (2000), and, as amended, 31 U.S.C. §3729(a)(1)(A).

143.　As set forth in detail above in paragraphs 33 through 139, as a result of offering and paying remuneration to induce sales of Medtronic's devices and to induce medically unnecessary goods and services for reimbursement, and marketing, promoting and instructing the usage of medical devices not authorized by the FDA, in violation of the federal AKS, 42 U.S.C. § 1320a-7b(b), Defendant Medtronic presented – or caused to be presented – claims for reimbursement to Government Healthcare Plans and the U.S. VA that were false or fraudulent.

144.　As set forth in detail above in paragraphs 33 through 48 and 80 through 98, as a result of accepting remuneration to induce sales of Medtronic's devices, in violation of the federal AKS, 42 U.S.C. § 1320a-7b(b), Defendant Hutchinson presented – or caused to be presented – claims for reimbursement to Government Healthcare Plans that were false or fraudulent.

145.　Accordingly, Defendants Medtronic and Hutchinson knowingly presented false or fraudulent claims – or caused the presentment of false or fraudulent claims – for payment or

approval in violation of 31 U.S.C. § 3729(a)(1) (2000), and, as amended, 31 U.S.C. § 3729(a)(1)(A).

146.    By reason of the false or fraudulent claims that Defendants knowingly presented (or caused to be presented) to Government Healthcare Plans and the U.S. VA, the United States has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

WHEREFORE, Relators respectfully request that the Court enter judgment against Defendants Medtronic and Hutchinson and in favor of the United States as follows:

a.    that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Third Amended Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

b.    that civil penalties of $21,563 be imposed for each and every false claim that Defendants presented – or caused to be presented – to the United States and/or its grantees;

c.    that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.    that the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this Third Amended Complaint;

e.    that Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act;

f.    that Relator be awarded the maximum amount allowed to him of any portion of a judgment or settlement fund that goes to any State government; and

g.    that this Court award such other and further relief as it deems proper.

## COUNT II:

**Violation of the False Claims Act: Use of False Statements**
**31 U.S.C. § 3729(a)(2) (2000), and, as amended, 31 U.S.C. § 3729(a)(1)(B)(Supp. 2009)**

**(Illegal Kickbacks Against Both Defendants)**

**(Medically Unnecessary Goods and Services Against Defendant Medtronic)**

**(Off-Label Sales Against Defendant Medtronic)**

147.    Relator incorporates by reference the above paragraphs as if set forth fully here.

148.    Relator and the United States seek relief against Defendants Medtronic and Hutchinson under Section 3729(a)(2) of the False Claims Act, 31 U.S.C. § 3729(a)(2) and, as amended, 31 U.S.C. § 3729(a)(1)(B) (Supp. 2009).

149.     As set forth in detail above in paragraphs 33 through 139, as a result of offering and paying remuneration to induce sales of Medtronic's devices and to induce medically unnecessary goods and services for reimbursement, and marketing, promoting and instructing the usage of medical devices not authorized by the FDA, in violation of the federal AKS, 42 U.S.C. § 1320a-7b(b), Defendant Medtronic made – or caused to be made – false records or statements that were material to getting false or fraudulent claims paid by Government Healthcare Plans and the U.S. VA.

150.    As set forth in detail above in paragraphs 33 through 48 and 80 through 98, as a result of accepting remuneration to induce sales of Medtronic's devices in violation of the federal AKS, 42 U.S.C. § 1320a-7b(b), Defendant Hutchinson made – or caused to be made – false records or statements that were material to getting false or fraudulent claims paid by Government Healthcare Plans.

151.    Defendants Medtronic and Hutchinson falsely certified, stated, and/or represented that the reimbursements they sought for Medtronic devices were in full compliance with

applicable federal laws prohibiting fraudulent and false reporting, including but not limited to the federal AKS, 42 U.S.C. § 1320a-7b(b) and, with respect to Defendant Medtronic, FDA regulations concerning off-label marketing. Defendants' false certifications, statements, or representations caused Government Healthcare Plans to pay out sums to Defendants that would not have been paid if those programs had been made aware of the falsity of the Defendants' certifications, statements, or representations.

152.    Accordingly, Defendants Medtronic and Hutchinson knowingly used – or caused the use of – false records or statements material to false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(B).

153.    By reasons of these false records or statements that Defendants Medtronic and Hutchinson used (or caused to be used), the United States has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false record or statement.

WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants Medtronic and Hutchinson and in favor of the United States as follows:

a.    that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Third Amended Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

b.    that civil penalties of $21,563 be imposed for each and every false claim that Defendants presented – or caused to be presented – to the United States and/or its grantees;

c.    that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relators necessarily incurred in bringing and pressing this case;

d.    that the Court grant permanent injunctive relief to prevent any recurrence of the

False Claims Act for which redress is sought in this Third Amended Complaint;

e.      that Relator be awarded the maximum amount allowed to him pursuant to the

False Claims Act;

f.      that Relator be awarded the maximum amount allowed to him of any portion of a

judgment or settlement fund that goes to any State government; and

g.      that this Court award such other and further relief as it deems proper.

### COUNT III

**Violation of the False Claims Act: Conspiring to Violate the False Claims Act
31 U.S.C. § 3729(a)(3) (1986), and, as amended, 31 U.S.C. § 3729(a)(1)(C)**

**(Conspiracy Against Both Defendants)**

154.    Relator incorporates by reference the above paragraphs as if set forth fully here.

155.    Relator and the United States seek relief against Defendants Medtronic and

Hutchinson under Section 3729(a)(3) of the False Claims Act, 31 U.S.C. § 3729(a)(3)(1986) and,

as amended, 31 U.S.C. § 3729(a)(1)(C).

156.    A conspiracy violation of the FCA occurs when a person "conspires to commit a

violation of subparagraph (A), (B), (D), (E), (F), or (G)" of the FCA.  31 U.S.C. § 3729(a)(1)(C).

157.    As set forth in detail above in paragraphs 33 through 48 and 80 through 98,

Relator alleges that Defendants Medtronic and Hutchinson entered into an agreement and plan to

conspire to violate the FCA through their company pol14icies and practices, which were devised,

perpetrated and implemented by Defendants Medtronic, Hutchinson and other unnamed co-

conspirator providers as developed by the material and witnesses provided by Relator.

158.    As set forth in detail above in paragraphs 33 through 79 and 99 through 139,

Relator alleges that Defendant Medtronic and Teri Brinkley, WRG and other unnamed co-

conspirators entered into an agreement and plan to conspire to violate the FCA through

Medtronic's company policies and practices, which were devised, perpetrated and implemented by Defendants Medtronic, Teri Brinkley and other unnamed co-conspirator providers as developed by the material and witnesses provided by Relator.

159.    The fraudulent company practices that Defendants conspired to commit included engaging in an illegal kickback scheme whereby Medtronic's Sales Representative/Field Sales Trainer Doug Winger would provide remuneration including "free" or "marketing material" or "leverage" devices to Hutchinson's Director of Supply Chain Mark Wilson to net down the cost of Medtronic's bulk device proposals to Hutchinson. Hutchinson would benefit again from the kickbacks, as it would bill Government Healthcare Plans for the "free" "marketing material" or "leverage" devices it received free of charge from Medtronic as part of the sale.

160.    As set forth throughout the Third Amended Complaint, these Co-Defendants and Co-Conspirators agreed verbally and in writing to commit acts in furtherance of these fraudulent business operations and took actions in furtherance of their conspiracy.

161.    The conspiracy of these Co-Defendants and Co-Conspirators caused the submission of false and fraudulent claims to Government Healthcare Plans seeking reimbursement for products tainted by the fraudulent schemes devised, perpetrated and implemented by both Defendants.

162.    Accordingly, Defendants Medtronic and Hutchinson conspired to defraud the United States by getting false or fraudulent claims allowed or paid, in violation of 31 U.S.C. § 3729(a)(3)(1986), and conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B), in violation of 31 U.S.C. § 3729(a)(1)(C) (2009).

163.    By reason of the false or fraudulent claims and Defendants' actions taken in furtherance of their conspiracy to get paid by reasons of their conspiracy to violate 31 U.S.C. §§

3729(a)(1)(A) and 3729(a)(1)(B), the United States has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants Medtronic and Hutchinson and in favor of the United States as follows:

a.     that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Third Amended Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

b.     that civil penalties of $21,563 be imposed for each and every false claim that Defendants presented – or caused to be presented – to the United States and/or its grantees;

c.     that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relators necessarily incurred in bringing and pressing this case;

d.     that the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this Third Amended Complaint;

e.     that Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act;

f.     that Relator be awarded the maximum amount allowed to him of any portion of a judgment or settlement fund that goes to any State government; and

g.     that this Court award such other and further relief as it deems proper.

## Demand for Jury Trial and Designation of Place of Trial

Relator, on behalf of the United States, and on behalf of himself, hereby demands a trial by jury on all counts and allegations of wrongful conduct as alleged in this Third Amended Complaint in the United States District Court for the District of Kansas at Kansas City, Kansas.

Respectfully submitted,

Carrie Mulholland Brous KS #18157
**Brous Law LLC**
3965 West 83rd Street, Ste. #115
Prairie Village, KS  66208
(913) 209-8596
cbrous@brouslaw.com



/s/ Brendan J. Donelon
Brendan J. Donelon, KS #17420
4600 Madison, Suite 810
Kansas City, Missouri 64112
Tel:     (816) 221-7100
Fax:     (816) 709-1044
brendan@donelonpc.com

Daniel W. Craig, D.Kan. #78146
6642 Clayton Rd., #320
St. Louis, Missouri 63117
Tel:     (314) 297-8385
Fax:     (816) 709-1044
dan@donelonpc.com

<u>Certificate of Service</u>

I hereby certify that on <u>October 12, 2021</u> the above and foregoing was sent pursuant to this Court's CM/ECF procedures to the attorneys of record in this matter.

/s/ Brendan J. Donelon