# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* THOMAS SCHROEDER<br><br>Relator,<br><br><br><br><br>MEDTRONIC, INC.; COVIDIEN, L.P.;<br>HUTCHINSON REGIONAL MEDICAL<br>CENTER, and WICHITA<br>RADIOLOGICAL GROUP, P.A.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 2:17-02060-DCC-KGG |

## FIFTH AMENDED COMPLAINT

The United States of America ("USA"), *ex rel.* Thomas Schroeder ("Relator"), brings this

Fifth Amended Complaint against Defendants Medtronic, Inc.; Covidien, L.P.; Hutchinson

Regional Medical Center, and Wichita Radiological Group, P.A. (collectively referred to as

"Defendants") for primary and successor liability for treble damages and civil penalties arising

from (i) Medtronic, Inc.'s and Covidien L.P.'s payment of remuneration to healthcare providers

in Kansas including Defendant Hutchinson Regional Medical Center and the Robert J. Dole

Veterans Administration Medical Center and (2) Medtronic, Inc.; and Covidien L.P.; and

Wichita Radiological Group, P.A. providing medically unnecessary treatment including the

usage of medical devices off-label; all of which induced false claims to be made to, and

reimbursed by, the United States Department of Veterans Affairs, Tricare, Medicare, Medicaid

and/or other government healthcare plans in violation of the False Claims Act, 31 U.S.C. § 3729,

*et seq.* (the "False Claims Act" or "FCA").  Relator alleges and states as follows:

TABLE OF CONTENTS

Preliminary Statement ................................................................................3

Parties ..........................................................................................................3

Jurisdiction, Venue & Statutory Requirements ...................................5

Applicable Statutes & Authorities .........................................................6

    Statutes & Authorities Related to Kickbacks and Fraud ...............6
    The Government Healthcare Plans .................................................8

Factual Background ..................................................................................12

A.    Defendant's Kickback Scheme ...................................................13

        *Medtronic/Covidien's Kickback Scheme at Dole VA*....................18
        *Medtronic/Covidien and Hutchinson's Kickback Scheme* ...........28

B.    Medtronic/Covidien's and WRG's Medically Unnecessary Services &
      Supplies and Off-label Use at Dole VA.........................................33

        *Excessive & Medically Unnecessary Atherectomy Devices* .........39
        *Treating with Excessive Stents*......................................................44
        *Excessive Use of Drug Coated Balloons* ......................................46
        *WRG's Unnecessary Interventional Procedures & Self-Dealing*...49
        *Other Waste of Devices & Patient Results* ...................................50

C.    Medtronic/Covidien and WRG — Off-label Use of Devices ...................52

        *Off-label Promotion of Peripheral Drug Coated Balloons* ..........53
        *Off-label Promotion of Peripheral Stents* ....................................57

Count I. .......................................................................................................60

Count II .......................................................................................................62

Count III.......................................................................................................64

## PRELIMINARY STATEMENT

1.      This is a civil action brought by Relator on behalf of the United States to recover treble damages, civil penalties and restitution owed to the Government as a result of Defendants' kickback schemes, seeking reimbursement for medically unnecessary treatment, and seeking reimbursement for performing, promoting, marketing, and inducing use of medical devices "off-label."  To increase the sales of its medical devices and create a near monopoly of its product at hospitals, Defendants Medtronic, Inc. and Covidien, L.P. bribed hospital staff to purchase its devices over those of competitors and to purchase grossly excessive inventory.  One such hospital, Defendant Hutchinson Regional Medical Center, readily solicited and accepted such bribes from Medtronic, Inc. and Covidien, L.P.  Defendants Medtronic, Inc. and Covidien, L.P. also enticed, trained, and encouraged its devices to be used "off label" and in medically unnecessary procedures whereby Wichita Radiological Group, P.A. performed these procedures. As a result of this conduct, Defendants knowingly submitted, caused to be submitted, and/or conspired to be submitted false claims to the United States Department of Veterans Administration, Tricare, Medicare, Medicaid and other Government-funded healthcare plans (collectively referred to as "Government Healthcare Plans").

## PARTIES

2.      Relator Thomas Schroeder ("Schroeder") is an individual residing in Missouri. Since 2006, Relator has been in a sales role (previously Midwest Sales Manager and now Regional Sales Manager which includes all of the Midwest, Western U.S., upper Northeast U.S., and Florida) for a company that sells atherectomy devices, drug-coated balloons and stent devices.

3.      Medtronic, Plc is a holding corporation under the laws of Ireland with its principal

place of business at 20 On Hatch, Lower Hatch Street, Dublin 2, Ireland and its Operational

Headquarters located at 710 Medtronic Parkway, Minneapolis, Minnesota 55432.  Defendants

Medtronic, Inc. and Covidien, L.P. are wholly owned subsidiaries of Medtronic, Plc.

4.     Defendant Medtronic, Inc. (hereafter "Medtronic") is a medical device and

technology company registered as a Minnesota corporation in good standing in the state of

Kansas.  Its registered agent is the Corporation Service Company, 2900 S.W. Wanamaker Dr.,

Topeka, KS 66614. Medtronic is a global medical device manufacturer with its principal place of

business at 710 Medtronic Parkway, LC300, Minneapolis, Minnesota.

5.     On or about January 26, 2015, Medtronic, Plc. completed a transaction with

Covidien, Plc. to purchase Covidien for $50 billion.  In turn, a newly formed Covidien L.P.

(hereafter "Covidien") became a wholly owned subsidiary of Medtronic, Plc.[1]  Defendant

Covidien L.P. is a limited partnership organized and existing under the laws of Delaware with its

principal place of business at 15 Hampshire Street, Mansfield, Massachusetts 02048.  Covidien,

L.P. is registered and in good standing to do business in the state of Kansas with a registered

agent of Corporation Service Company 2900 S.W. Wanamaker Dr., Topeka, KS 66614.

6.     Upon information and belief, over a period of time, Medtronic employees began

selling Covidien, Plc. medical devices under either Covidien's name or under Medtronic's name

and Medtronic began making, using, selling and or importing Covidien, Plc. products.

Medtronic has successor liability for the fraudulent schemes addressed herein committed by

Covidien, Plc. and its employees and agents as well as primary liability for its own actions.

---

[1] In 2010, Covidien had acquired a fellow medical device manufacturer ev3, Inc. for $2.3 billion.
And in 2007, ev3 had acquired a fellow device manufacture FoxHollow Technologies, Inc. for
$780 million.

7.      Defendant Hutchinson Regional Medical Center ("Hutchinson") is a not-for-profit hospital organized and existing under the laws of the State of Kansas. Its principal place of business is 1701 East 23rd Avenue, Hutchinson, Kansas 67502.  Hutchinson provides a broad range of healthcare services, including cardiac and other peripheral vascular procedures, diagnostic measures and interventions.

8.      Defendant Wichita Radiological Group, P.A. ("WRG") is incorporated as a professional association under Kansas law with its principal place of business located at 551 N. Hillside, Suite 320, Wichita, Kansas 67214.  Dr. Kamran Ali, M.D. is its president.  On its website, WRG states: "The radiologists of Wichita Radiological Group offer expertise in diagnostic radiology, neuroradiology, nuclear radiology, pediatric radiology, vascular & interventional radiology, and women's imaging. Radiologists provide services at Wesley Medical Center, a 650-bed level 1 trauma center, and Robert J. Dole VA Medical Center, a teaching hospital providing a full range of patient care services. In addition, WRG owns and operates four imaging centers, including the area's only comprehensive women's imaging services with a special emphasis on breast cancer."

## JURISDICTION, VENUE & STATUTORY REQUIREMENTS

9.      This action arises under the False Claims Act, 31 U.S.C. § 3729, *et seq*. Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b) and 28 U.S.C. § 1331.

10.      Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. §§ 3729, *et seq.* complained of herein took place in part in this district and Defendants transacted and continue to transact business in this district.

11.      Pursuant to 31 U.S.C. § 3730(b)(2), the Relator has and will continue to serve the

Fifth Amended Complaint and all future filings with this Court to the Attorney General of the United States and the United States Attorney for the District of Kansas.

## APPLICABLE STATUTES & AUTHORITIES

### Statutes & Authorities Related to Kickbacks and Fraud

12.     The federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b) (the "AKS"), arose out of Congressional concern that remuneration given to those who can influence healthcare decisions would result in the provision of goods and services that are medically unnecessary, of poor quality or even harmful to a vulnerable patient population. To protect patient and Government Healthcare Plans from these harms, Congress enacted a prohibition against the payment of kickbacks in any form. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Publ. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Anti-fraud and Abuse Amendments, Publ. L. No. 95-142; Medicare and Medicaid Patient Program Protection Act of 1987, Pub. L. No. 100-93.

13.     The AKS makes it illegal for individuals or entities to "offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) . . . to any person to induce such person … to purchase, … order, … or recommend purchasing … or ordering any good … or item for which payment may be made in whole or in part under a Federal Healthcare program." 42 U.S.C. § 1320a-7b(b)(2). Payments by a medical device company like Medtronic to healthcare providers to induce them to recommend or purchase the company's surgical devices violate this statute to the extent that the devices are reimbursed by a Government Healthcare Plan. Violation of the AKS is a felony punishable by fines and imprisonment and can also result in exclusion from participation in Government Healthcare Plans. 42 U.S.C. § 1320a-7b(b)(2) and 42 U.S.C. §

1320a-7(b)(7).

14.     As early as 1994, the Government pointed out the special position of trust that providers hold with patients and made it clear that the AKS prohibits offers of financial incentives to providers to use specific surgical devices on patients. Specifically, Health and Human Services-Office of the Inspector General issued "Special Fraud Alerts" explaining that:

> Traditionally, physicians and pharmacists have been trusted to provide treatments and recommend products in the best interest of the patient. In an era of aggressive drug marketing, however, patients may now be using prescription drug items, unaware that their physician or pharmacist is being compensated for promoting the selection of a specific product.

1.  ed. Reg. at 65, 376 (Dec. 19, 1994).

15.     Falsely certifying compliance with the AKS in connection with a claim submitted to a federally funded insurance program is actionable under the FCA. As codified in the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, 6402(f), 124 Stat. 119, codified at 42 U.S.C. § 1320a-7b(g), "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]."

16.     The False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA") reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986). As relevant here, the FCA establishes treble damages liability to the United States for an individual or entity that:

> (i)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1) (2000) and, as amended, 31 U.S.C. § 3729(a)(1)(a);

> (ii)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, *id.* § 3729(a)(1)(B); or

> (iii)     conspires to defraud the Government by getting a false or

7

fraudulent claim allowed or paid" *id.* § 3729(a)(3)(1986), and, as amended, 31 U.S.C. § 33729(a)(1)(C).

17.    "Knowing," within the meaning of the FCA, is defined to include reckless disregard and deliberate indifference. *Id.*

<u>The Government Healthcare Plans</u>

18.    Our country's retired members of the uniformed services are covered by the United States Department of Veterans Affairs ("U.S. VA") which provide healthcare benefits for, among other things, surgical procedures performed at public and private hospitals, including Veterans Administration hospitals such as the Robert J. Dole Veterans Administration Medical Center in Wichita, Kansas.

19.    In 1967, the Department of Defense created the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical program created by Congress. 10 U.S.C. § 1071. CHAMPUS beneficiaries include active military personnel, retired personnel, and dependents of both active and retired personnel. *Id.*

20.    In 1995, the Department of Defense established Tricare, a managed healthcare program, which operates as a supplement to CHAMPUS. *See* 32 C.F.R. §§ 199.4, 199.17(a). Since the establishment of Tricare in 1995, both programs are Tricare/CHAMPUS, or just "Tricare."[2]  The purpose of the Tricare program is to improve healthcare services to beneficiaries by creating "managed care support contracts that include special arrangements with civilian sector health care providers."[3] 32 C.F.R. § 199.17(a)(1).

---

[2] There are four varieties of Tricare: Tricare Prime, Tricare Extra, Tricare Standard, and Tricare for Life.

[3] Anyone who has reached 20 years of service, even if they were never activated on a [federal] order for more than 180 days outside of training, will now be considered a veteran.  If you are medically retired, you can get TRICARE benefits as a retired service member. You must be on the: Temporary Disabled Retirement List, or, Permanent Disability Retirement List.

21.     The federal Tricare program provides health benefits to eligible dependents of active duty, retired members of the uniformed services and their eligible dependents, eligible spouses and dependents of deceased members, as well as to Tricare eligible beneficiaries, in certain circumstances, who are also Medicare eligible.  Tricare is administered by the Tricare Management Activity ("TMA").  TMA is Department of Defense ("DOD") Field Activity of the Under Secretary of Defense for Personnel and Readiness ("USD (P&R)") to operate under the authority, direction and control of the Assistant Secretary of Defense for Health Affairs ("ASD (HA)").  DOD is an agency and instrumentality of the United States, and its TMA/Tricare activities, operations, and contracts are paid for with federal funds.  *See* 10 U.S.C. §§ 1071, *et seq*.

22.     The Tricare program is administered through the TMA/DOD that uses contractors to process claims for payment from providers of medical services and devices.

23.     Tricare providers have an obligation to provide services and supplies at only the appropriate level and "only when and to the extent medically necessary." 32 C.F.R. §199.6(a)(5). Tricare's governing regulations require that services provided be "furnished at the appropriate level and only when and to the extent medically necessary," and such care must "meet[] professionally recognized standards of health care [and be] supported by adequate medical documentation…to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care." *Id.*

24.     Tricare covers "durable medical equipment" that is "medically appropriate equipment to improve, restore, or maintain the function of a . . .  diseased, or injured body part or can otherwise minimize or prevent the deterioration of the beneficiary's function or condition; or maximize the beneficiary's function consistent with the beneficiary's physiological or medical

needs" (*i.e.,* medical devices such as the PAD devices discussed herein) or "provides the medically appropriate level of performance and quality for the medical condition present" and does not cover any medical devices used "off label" under FDA standards.  32 C.F.R. §§ 199.4(b)(2)(vi); 199.4(d)(3)(ii); 199.2; Tricare Policy Manual, Chap. 8, § 5.1.

25.     Medicare is a federal program that provides federally subsidized health insurance for persons who are 65 or older or are disabled. *See* 42 U.S.C. §§ 1395, *et seq.* ("Medicare Program"). Part B of the Medicare Program provides supplemental benefits to participants to cover, among other things, physician services, procedures, prescription drugs and devices. *See generally id.* §§ 1395j-1395w-4.

26.     Medicare is administered by CMS, which is part of the Department of Health and Human Services. CMS contracts with private contractors referred to as Medicare Administrative Contractors to act as agents in reviewing and paying claims submitted by healthcare providers. 42 U.S.C. § 1395h; 42 C.F.R. §§ 421.3, 421.100. These contractors review claims to determine whether they are appropriate for reimbursement under Medicare Part A (inpatient hospital and related services) and Medicare Part B (outpatient hospital and physician services).

27.     Medicare is not permitted to pay for any expense that is not "reasonable and necessary for the diagnosis and treatment of illness or injury." 42 U.S.C. § 1395(a)(1)(a). Regulations, national coverage determinations, and local coverage determinations specify services that are covered as medically reasonable and necessary.

28.     Certain services and devices are excluded from coverage because they are not reasonable and necessary. Experimental or investigational medical devices are excluded. 42 C.F.R. § 411.15(o). Medicare considers a medical device investigational if it has not completed the applicable clearance (510(k)) or approval (PMA) process that a manufacturer, in accordance

with FDA's requirements, must complete before it is allowed to fully market its product.

Medicare makes an exception for devices classified by the FDA as Category B investigational

and furnished in commerce consistent with FDA protocols for clinical trials. 42 C.F.R. §

411.15(o). An investigational device exemption must be granted by the FDA to be eligible for

coverage as an investigational Category B medical device. 42 C.F.R. § 405.201(a)(2).

29.     Medicare payment is not made for medical and hospital services that are related to

the use of a device that is not covered because CMS determines the device is not "reasonable"

and "necessary" or because it is excluded from coverage for other reasons. 42 C.F.R. § 405.207.

These excluded services include all services furnished in preparation for the use of a noncovered

device, services furnished contemporaneously with and necessary to the use of a noncovered

device, and services furnished as necessary after-care that are incident to recovery from the use

of the device or from receiving related noncovered services. *Id.*

30.     Medicare's manuals expressly exclude from coverage a medical device that

requires, but has not obtained, premarket approval from the FDA because the device is

investigational and not established to be reasonable and necessary. Medicare's longstanding

policy, which is binding on its fiscal intermediaries, excludes coverage for devices and related

services that have not been authorized for marketing by the FDA, in accordance with the FDA's

requirements.

31.     Medicare enters into provider agreements with providers and suppliers to

establish their eligibility to participate in the program. During all relevant times herein,[4] to be

eligible for payment under the Medicare program, providers and suppliers must certify:

---

[4] Any reference herein to "relevant times" or "all relevant times" refers to the permissible period of time under Relator's FCA claims which would be six years from the initiation of this action. 31 U.S.C. § 3731(b)(1).

I agree to abide by the Social Security Act and all applicable Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

*See, e.g.,* CMS Form-855S (04/06) at 26.

32.     The federal Medicaid Program was created in 1965 under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*  Funding for Medicaid is shared between the federal government and those states participating in the Medicaid program.  Federal funds are distributed to the states, which in turn provide certain medical services to certain low-income individuals.

33.     Federal Medicaid regulations require each state to designate a single state agency responsible for administering the Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of Health and Human Services ("the Secretary").  After the Secretary approves the plan submitted by the state, the state is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan. *See* 42 U.S.C. § 1396b(a)(1).  This reimbursement is called "federal financial participation" ("FFP").

34.     The federal programs described above are referred to collectively herein as the "Government Healthcare Plans."

## FACTUAL BACKGROUND

35.     The allegations contained herein are based upon the personal knowledge of Relator obtained through Relator's firsthand observations or interactions and communication

with other firsthand witnesses.

A.       Defendants' Kickback Scheme

36.       Medtronic/Covidien (due to the consolidation of Defendant Covidien's products under the Medtronic purchase, Relator will refer to both Medtronic and Covidien Defendants as "Medtronic/Covidien") employs a Class III Device Sales Representative and Clinical Specialist named Doug Winger ("Winger") as well as Winger's supervisor throughout all relevant times Greg Davisson ("Davisson"). Winger and Davisson train other Medtronic/Covidien Sales Representatives on sales techniques.  Winger and Davisson both began working in approximately 2007 as sales representatives FoxHollow, ev3 and Covidien selling directional atherectomy medical devices via the acquisitions referenced in ¶ 5 during the relevant time period in this Fifth Amended Complaint. Upon information and belief, Winger and Davisson continuously ran the schemes detailed herein on behalf of each of their  successive employers and then Medtronic/Covidien.

37.       The Medtronic/Covidien peripheral vascular devices used in the schemes detailed herein are for the treatment of peripheral artery disease ("PAD"), predominantly in the legs. These include Medtronic/Covidien's: (1) directional atherectomy devices (examples include, but are not limited to, TurboHawk, HawkOne, SilverHawk) which are  catheters that shave plaque out of arteries; (2) drug-coated balloons ("DCB") (examples include but are not limited to, IN.PACT and IN.PACT AV) used to re-open blocked or narrowed arteries or veins due to PAD or ESKD; (3) self-expanding nitinol stent systems ("Nitinol Stent Systems"), which include self-expanding stents that are vascular and biliary stents made of nickel titanium alloy (nitinol) cut into an open lattice design that exerts constant outward force used to keep iliac (pelvic), superficial femoral and proximal popliteal arteries open; (4) percutaneous transluminal

angioplasty ("PTA") balloon catheters (including but not limited to all guidewire capable options 014/018/035, high pressure balloons e.g., Fortrex, rapid & over-the-wire, and balloons of all compliance variations); (5) re-entry catheters; (6) chronic total occlusion ("CTO") catheters; (7) balloon-expandable Stents; (8) infusion therapy; (9) snares and guidewires; (10) support and guide catheters, (11) embolic protection, and (12) unmounted stents (including but not limited to Intrasent).   In essence, this includes any PAD devices sold by Medtronic/Covidien employees Doug Winger, Greg Davisson, or Keri Montgomery Kirk to either Dole VA or Hutchinson for the relevant time period.  Hereafter these devices are referred to collectively as Medtronic/Covidien's "PAD devices."

38.     These PAD devices are used on arteries in patients' legs in peripheral endovascular procedures which are routinely performed in cardiac catheterization labs, interventional radiology suites, and operating rooms. These are typically patients having surgical procedures for PAD which occurs when plaque builds up in the arteries and circulation is compromised. The devices assist in "opening up" arteries, removing plaque and, consequently, improving circulation. The stent products remain in the patients while the directional atherectomy catheters and balloons are used and removed for disposal.

39.     The Medtronic/Covidien cardiovascular devices used in the schemes detailed herein are for the treatment of coronary disease.  These include Medtronic/Covidien's coronary catheters, coronary guidewires, and coronary stents.  In essence, this includes any coronary devices sold by Medtronic/Covidien employees Doug Winger, Greg Davisson, or Keri Montgomery Kirk to either Dole VA or Hutchinson for the relevant time period in this complaint.  Hereafter these devices are referred to collectively as Medtronic/Covidien's "coronary devices."

40.     These PAD devices are highly lucrative for Medtronic/Covidien and highly reimbursable by Government Healthcare Plans. As an example, as reported in its SEC filings, Medtronic/Covidien's Cardiac and Vascular Group accounted for $8.8 billion out of a total of $17 billion in sales in 2014, and $11.5 billion out of a total $30.5 billion in sales in 2019.

41.     The federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b) (the "AKS"), expressly prohibits any individual or entity from offering, paying, soliciting or receiving any "remuneration," which "include[s] any kickback [or] bribe" to "any person to induce such person" to purchase or recommend a drug, service or supply (included medical devices) that is covered by a Government Healthcare Plan.

42.     Although Defendants knew they were bound by the AKS, they have chosen to disregard these laws and prohibitions, instead choosing to put sales growth and profits before their duty to comply with federal law. Moreover, Defendant Hutchinson falsely certified compliance with the AKS and the Stark Law[5] in connection with all claims submitted to the Government Health Programs within the relevant time asserted herein, and as such made, caused to be made, or conspired to be made fraudulent claims actionable under the FCA.  As codified in the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, 6402(f), 124 Stat. 119, codified at 42 U.S.C. § 1320a-7b(g), "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Defendant Hutchinson, as described in ¶ 31, certified to their compliance with the AKS when submitting claims for reimbursement regarding Government Healthcare Plans.

43.     Defendant Medtronic/Covidien's kickback scheme is set forth in more detail

---

[5] Limitation on Certain Physician Referrals.  42 U.S.C. § 1395nn(a).

below.  In summary, in at least as early as 2007 and continuing to when the Dole VA

catheterization lab was shut down in 2018, starting with FoxHollow's SilverHawk atherectomy

device, and continuing to present day with Medtronic's PAD and coronary devices referenced

above, Medtronic/Covidien (through Winger and Davisson, or at their direction) have been

providing remuneration to the Radiology Technologist and Lab Manager Teri Brinkley and her

staff at the Robert J. Dole Veterans Administration Medical Center, 5500 East Kellogg Ave.,

Wichita, Kansas (hereafter "Dole VA") and the Director of Supply Chain Mark Wilson and other

employees at Defendant Hutchinson Hospital.

44.     These kickback schemes have been, and continue to be, integral to

Medtronic/Covidien's overall marketing strategy to sell PAD and coronary devices at the Dole

VA, Defendant Hutchinson as well as other locations across the country.

45.     Since approximately 2007 and continuing to the present, Medtronic/Covidien and

its predecessors failed to have (and/or enforce) policies and practices in place to prevent payment

of remuneration by its Sales Representatives, Field Sales Trainers and managers.

46.     As an example, and confirming Medtronic/Covidien's practices of implementing

kickbacks as part of its sales tactics, in the summer of 2019, Medtronic/Covidien terminated

PAD device sales representative Dave Johnson for violation of the AKS and the Stark Law

regarding his sales activity.

47.     Further demonstrating Medtronic/Covidien's pattern and practice in selling

medical devices, in 2008, Medtronic/Covidien settled an AKS / FCA claim with the Department

of Justice for $75 million related to paying kickbacks to doctors performing spinal surgeries

using their devices.  In 2011, Medtronic/Covidien paid another $23.5 million to settle AKS /

FCA claims regarding paying kickbacks to doctors who utilized its pacemaker devices.

48.     In December 2018, Medtronic/Covidien agreed to pay nearly $20 million to resolve claims against two of its acquisitions (Covidien and ev3) regarding the payment of kickbacks and off-label promotion in violation of the AKS and the FCA.

49.     In March 2019, Medtronic/Covidien's group settled an AKS / FCA claim with the Department of Justice for $17 million for allegedly paying illegal kickbacks in the form of free or discounted marketing services to induce the purchase of medical devices that were being billed to Medicare. "Today's settlement serves as an important reminder to those in the health care community that unlawful kickbacks come in many forms and are not limited to monetary payments to providers," said Assistant Attorney General Jody Hunt for the Department of Justice's Civil Division. "Providing free or discounted services to health care providers to induce the use of certain items or services can lead to excessive and unnecessary treatments and drive up health care costs for everyone."[6]

50.     More recently, it was reported in April 2020 that Medtronic/Covidien agreed to resolve an AKS / FCA claim for $9.9 million, in the U.S. District Court for the E.D. of California, for allegedly paying unlawful kickbacks in forms of vacations, gift cards, consulting jobs, cash, sports tickets, and entertainment to physicians using their cardiac devices.

51.     After becoming aware of the allegations set forth in the Relator's initial Complaint, instead of investigating and holding Winger and Davisson (and other employees involved) accountable for their activities, Medtronic/Covidien actually decided to increase their role within the company by entrusting them to train other Medtronic/Covidien Sales Representatives on Medtronic/Covidien's marketing strategy including the payment of

---

[6] "Covidien to Pay More Than $17 Million to Settle Catheter Kickback Case," Policy & Medicine, Mar. 13, 2019, Thomas Sullivan.

remuneration and "off-label" and medically unnecessary promotion of its PAD devices.

*Medtronic/Covidien's Kickback Scheme at Dole VA*

52.     At all relevant times herein, Defendant Medtronic/Covidien claimed, caused a claim to be made, or conspired to have a fraudulent claim be made to the U.S. VA for reimbursement regarding PAD and coronary devices provided to Dole VA based on Medtronic/Covidien offering and/or paying remuneration to Dole VA employees in exchange for Dole VA purchasing, or recommending for purchase, Medtronic/Covidien's PAD and coronary devices.

53.     As a provider of medical services to active and retired military members, all devices used in PAD procedures at Dole VA are paid for by the U.S. VA.

54.     Dole VA was one of the nation's smallest vascular surgery providers.  Yet, despite its relatively small number of patients and even smaller number of vascular procedures performed each week, Dole VA was Winger's largest customer for vascular devices, often exceeding $2-3 million dollars in annual revenue for Medtronic/Covidien at all relevant times herein. Throughout Winger's, Kirk's, and Davisson's course of business at Dole VA including all relevant times herein, the remuneration paid to Dole VA employees led to claims being submitted to, and paid by, the U.S. VA for well over $10 million dollars of Medtronic/Covidien PAD and coronary devices.

55.     Teri Brinkley worked as the Radiology Technologist and Lab Manager of the cath lab at the Dole VA at all relevant times asserted herein. At all relevant times herein, Brinkley was responsible for ordering, or recommending for ordering, medical devices for the Dole VA cath lab that were paid for by the U.S. VA, including the Medtronic/Covidien PAD and coronary devices sold by Winger and Davisson.

56.     Winger's and Davisson's kickback scheme at Dole VA worked as follows. Throughout all relevant times herein, Winger and Davisson - or Medtronic/Covidien's Clinical Specialist Kerri Montgomery Kirk working with Winger or Davisson - were giving remuneration to Teri Brinkley and other Dole VA cath lab employees. The remuneration took the form of weekly/daily lunches for Brinkley and other cath lab employees, ipads, iphones, NASCAR as well as other entertainment event tickets to Brinkley and her staff, weekend parties, as well as frequent nights at bars and restaurants.  All of this was done to induce Brinkley to purchase, or recommend purchases, of millions of dollars of Defendant Medtronic/Covidien's PAD and coronary devices by the U.S. VA.[7]

57.     As an example, Brinkley would routinely and jokingly tell her staff that the "physician" was paying for weekly lunches when in fact it was well known that Medtronic/Covidien was paying.

58.     Winger's, Davisson's, and Kirk's expense reports, as well as their personal credit/debit card transactions, will set forth some of the amounts paid by Medtronic/Covidien for the remuneration to Brinkley and the cath lab staff at the Dole VA.

59.     Medtronic/Covidien's remuneration alleged herein served its purpose at Dole VA. At all relevant times alleged herein, Defendant Medtronic/Covidien was the near exclusive provider of PAD and coronary medical devices to Dole VA's cath lab, thereby eliminating the purchase of similar and lower cost devices from other manufacturers.  Terri Brinkley would exclude access to the cath lab and its physicians for device salespersons other than Winger and

---

[7] As an example, and a conservative estimate, in one form of kickback, Winger paid remuneration in the form of free lunches at Dole VA at least twice a week.  Assuming a conservative $150 per lunch for the cath lab staff over 13 years, this would amount to over $200,000.

Davisson.  Brinkley would also exclusively purchase or recommend for purchase all Medtronic/Covidien devices outright, while all other vendors had to provide their devices on consignment.

60.     Due to Defendant Medtronic/Covidien's kickback scheme, and in exchange for said remuneration it paid to Dole VA, Dole VA over-purchased a tremendous amount of unnecessary Medtronic/Covidien PAD devices in relation to the size of Dole VA's cath lab and number of procedures performed.

61.     Regarding PAD devices, throughout all relevant times herein, Dole VA operated just one cath lab with one procedure room and one physician providing services.[8]  These services were typically performed two to three days per week and procedures usually stopped at 3:00 p.m. There are other large well-known healthcare providers, with numerous physicians with multiple specialties performing numerous PAD procedures on a daily basis at their respective facilities.

62.     As a result of the Relator's initial complaint in this matter, the VA's Office of Inspector General ("OIG") conducted an investigation into allegations of excessive purchase and usage of Medtronic/Covidien PAD devices at Dole VA.  In one given year that was examined, Dole VA purchased **505** DCBs and directional atherectomy[9] devices from Medtronic/Covidien. The OIG compared this figure to 46 other VA cath labs around the country.  The next closet VA cath lab for the same period of time purchased only **137** DCBs and directional atherectomy devices.   The average number of same devices among these other VA cath labs was **28**.  For these devices, Dole VA paid $789,650.00, while the next closed VA cath lab purchased only

---

[8] For a period of time, Dole VA had two rooms where such procedures could occur.  However, they only utilized one room at any given time.
[9] This investigation did not include Dole VA purchases of HawkOne or SilverHawk directional atherectomies sold by Medtronic/Covidien.

$210,130.00, and the average amount of device purchases at all locations was $43,521.00.

63.    One example of a Dole VA excessive order from Medtronic/Covidien resulting from this kickback scheme was on January 9, 2017. At the request of Dole VA's cath lab, the U.S. VA requested vendors to submit solicitations for the purchase of 320 DCBs totaling approximately $500,000. The point of contact for this purchase was Paul Dixon, Contracting Specialist for Network Contracting Office ("NCO") 15 out of Leavenworth, Kansas.

64.    On January 11, 2017, Relator sent Terri Brinkley and Diane Keene (Chief of Logistics at Dole VA who originally initiated the above referenced proposal) an email with comparative clinical trial data between Relator's company's DCBs and Medtronic/Covidien's DCBs. The data showed equivalent clinical outcomes for the DCBs, and Relator's company was offering the DCBs at a significant cost savings ($106,000) over Medtronic/Covidien's proposal.

65.    In addition to beating Medtronic/Covidien's price, Relator also sent Dixon and Keene an email offering to incorporate a service-disabled veteran owned small businesses as distributors of the DCBs, and one of the physicians performing work in the Dole VA cath lab, Dr. Chad Ammar, reached out to Keene and Brinkley during this time and informed them via e-mail that Relator's company's DCB was his preferred device.

66.    Meanwhile, throughout this January 2017 timeframe, Dixon stated to Relator in several phone conversations that he (Dixon) was receiving significant pressure with "calls and daily emails" from both Brinkley and Keene to get the DCB order placed immediately as Dole VA was lacking product in stock, and patient care could be negatively impacted.  Hearing this from Dixon surprised Relator.  Relator informed Dixon that he had just witnessed more than 130 DCB units already in Dole VA's inventory less than 5 weeks earlier. Dixon was surprised to hear this and informed Relator that he did not feel comfortable placing an additional order for twice

21

the amount of DCBs already in inventory.

67.     On January 19, 2017, Dixon informed Relator that the DCBs were not going to be purchased as originally requested, but instead would be ordered on a consignment contract from Medtronic/Covidien (*i.e.,* a certain number of DCBs would be stocked free of charge, and Dole VA would only pay for devices when used). Yet, throughout this process, Brinkley would deny to Relator and other competitive vendors that it had any consignment contract with Medtronic/Covidien.

68.     On January 19, 2017, Relator reached out to Keene at Dole VA to confirm the Medtronic/Covidien consignment order and also inquire about his company also being able to submit consignment terms since there were physicians at Dole VA who preferred DCBs from Relator's company. Keene never responded to Relator.

69.     Contradicting all information from Dole VA and Dixon, on January 23, 2017, at least 120 Medtronic/Covidien DCBs arrived at Dole VA as evidenced by the following photograph of its DCBs on a cart at Dole VA.  Later, a second cart of an additional 120 Medtronic/Covidien DCBs was delivered (not photographed).



70.     These ~240 DCBs were not provided by Medtronic/Covidien to Dole VA on consignment.  Companies in this industry would at most provide approximately 20-30 DCBs on consignment to a customer of similar size and procedural volume as Dole VA – not the initial 120 and subsequent 120 DCBs provided to Dole VA by Medtronic/Covidien.

71.     While Dixon claimed that the Dole VA had a current and active consignment contract with Medtronic/Covidien for DCBs, in reality, Dole VA actually purchased this large order of DCBs from Medtronic/Covidien.  These types of bulk, non-consignment, orders continued between Medtronic/Covidien and Dole VA at all relevant times herein through mid-2018 when the cath lab was shut down.

72.     Grossly excessive unused Medtronic/Covidien inventory at Dole VA is tremendously wasteful due to product expiration dates.  This product cannot sit indefinitely and must be disposed of when it expires.  To demonstrate, in November 2016, the Dole VA cath lab had approximately 130 Medtronic/Covidien DCBs, as evidenced by the following photographs of its cath lab storage cabinet.  As shown in the close-up picture below, many of the units that were stocked at that time were set to begin expiring within two months from January 2017 (*e.g.,*

completely wasted inventory):







73.     In November 2016, Dole VA had purchased so many Medtronic/Covidien DCBs that its cath lab did not have enough space in its storage room, and spillover inventory had to be stored in the operating room:



74.    As previously stated, Dole VA purchased approximately 240 Medtronic/Covidien DCBs in January 2017 even though they had approximately 130 DCBs in stock.  Dole VA performed relatively few procedures each week that called for a DCB.  The 370 DCBs in Dole VA's inventory (again just during this limited period of time in late 2016 and early 2017) dwarf the device usage at other VA cath labs (*see* ¶ 62, *supra*).

75.    As another example of the benefits reaped upon Medtronic/Covidien from its kickback scheme, Dole VA purchased over $1 million in Medtronic/Covidien's HawkOne directional atherectomy devices (roughly 300 devices) in calendar year 2016. Yet, during that year, Dole VA had only one physician with consistent privileges through early summer who could perform the procedures, and he did only a handful of procedures each week. Starting late-summer 2016, there was a new physician who did not have privileges to do these types of procedures until October or November 2016 when he began doing infrequent procedures up through its 2018 closing.

76.    Also, in 2016, Dole VA purchased nearly $1 million in Defendant Medtronic/Covidien's DCBs.  In comparison to the figures in ¶ 62, this is again evidence of gross over purchasing of Medtronic/Covidien's product that was done as a result of Medtronic/Covidien's kickback scheme.

77.    Defendant Medtronic/Covidien's kickback scheme whereby Dole VA over-purchased excessive amounts of its devices led to Dole VA throwing away vast amounts of these devices due to expiration.  As an example, in 2017 or early 2018, Brinkley and the Dole VA cath lab employees removed from shelves and placed in numerous large trash bags over $700,000 of Medtronic/Covidien's PAD devices.

78.    To further demonstrate, in late 2017 or early 2018, to boost Winger's and

Davisson's quarterly sales revenue, Brinkley replaced over 200 Medtronic/Covidien Protégé stents with an entirely new purchase from Medtronic/Covidien of its newer version (the only difference between the two was the latter having a different deployment system). There is no basis to make this new purchase of product (most likely exceeding $350,000) to simply upgrade the deployment system. The standard industry practice would be Medtronic/Covidien simply swapping out the older units at no cost, or for Dole VA to reorder newer units as the existing ones are implanted.[10] Within the industry, the action to upgrade a stent inventory, especially of this magnitude and budgetary impact, for the purposes of implementing a more ergonomic handle would have to be made at the direction of the operating physician – which was never made here. Instead, a massive new order of unnecessary product from Winger was made by Brinkley at Dole VA.

79.     In the summer of 2018, Dole VA completely terminated all peripheral endovascular procedures in its catheterization lab ("cath lab") / radiology suite. Relator believes this was a result of his 2017 initial Complaint and related investigation regarding this kickback scheme. Cardiac procedures continued until late 2018 when they were also shut down.

80.     In the summer of 2018, Dole VA banned Winger from entering its facility and banned him from conducting any future business at Dole VA. Relator believes this was a result of his 2017 initial Complaint and related investigation regarding this kickback scheme.

81.     In approximately late 2018, Dole VA terminated Brinkley's employment as well as the cath lab staff. The longstanding contract between Dole VA and the physician group who exclusively provided services at the cath lab was also terminated at this time. Relator was informed that these terminations occurred due to an investigation regarding this kickback

---

[10] The stent itself was the same regardless, therefore patient care would not be compromised.

scheme.

### *Medtronic/Covidien and Hutchinson's Kickback Scheme*

82.     At all relevant times herein, Defendants Medtronic/Covidien and Hutchinson claimed, caused a claim to be made, or conspired to have a fraudulent claim be made, for reimbursement from Government Healthcare Plans for Medtronic/Covidien's PAD devices. These were purchased by Hutchinson based on Medtronic/Covidien offering, paying (and/or Hutchinson soliciting and receiving) remuneration.  This included kickbacks and marketing/promotional services to Hutchinson in exchange for Hutchinson purchasing Medtronic/Covidien's PAD and coronary devices covered by Government Healthcare Plans.

83.     Defendant Hutchinson services a rural part of Kansas where there is a high Medicare and Medicaid patient population. In addition, Defendant Hutchinson draws Medicare patients from a broad geographical area because it is the known facility in the region for patients with the most advanced peripheral vascular disease (*e.g.,* critical limb ischemia), almost all of whom are 65 and older and covered by Medicare and, to some extent, Medicaid.   As an example, between 2012 and 2017, just one physician at Hutchinson, Dr. Michael Hagley, performed 760 PAD procedures involving devices at issue herein that were submitted to CMS for payment.

84.     At all relevant times herein, Mark Wilson was the Director of Supply Chain for Defendant Hutchinson Hospital.  Wilson affected the entire supply chain at the hospital. His duties required him to negotiate and purchase hospital supplies, pharmaceuticals and devices including PAD and coronary devices.

85.     As part of his duties, Wilson had purchasing responsibility over Medtronic/Covidien Cardiac Rhythm Management ("CRM") devices (*i.e.,* pacemakers) and

other medical devices for Defendant Hutchinson's cath lab and operating room including the Medtronic/Covidien PAD and coronary devices described above.

86.     The Hutchinson cath lab has an implant budget of over $20 million annually to purchase products like PAD and coronary devices, CRM pacemakers, defibrillators and diagnostic catheters; all of which are submitted for reimbursement to the Government Healthcare Plans.

87.     Wilson started in this position in approximately 2010 and continued his employment through his termination in August 2019.

88.     Following Medtronic/Covidien's playbook, Winger's and Davisson's kickback scheme at Hutchinson worked similar to the one at Dole VA. Winger and Davisson were giving remuneration such as meals, food, alcohol, gratuities, event sponsorships, NASCAR and other sporting event tickets, golf outings and travel expenses to Hutchinson personnel including Wilson, Cath Lab Director/Cath Lab Supply Chain Manager Cindy Henning King (who has been at Hutchinson for more than 15 years) and other Hutchinson cath lab employees. All of this was done to induce Hutchinson to directly purchase millions of dollars of Defendant Medtronic/Covidien's PAD and coronary devices.

89.     In addition, Defendant's remuneration also included "marketing services" for physicians performing PAD procedures at Hutchinson.  As an example, Winger, Davisson, Kirk and other Medtronic employees would host events for referring physicians whereby they would promote physicians at Hutchinson such as Dr. Michael Hagley and encourage said referring physicians to send patients to Dr. Hagley at Hutchinson.  This included numerous luncheons and speaking events.  Winger, Davisson, and Kirk would also assist Hutchinson physicians such as Dr. Hagley in the advertising and promotion of their practices.  This would include Winger

assisting referring physicians in obtaining appointments for their patients with Dr. Hagley.

90.     Winger's, Davisson's and Kirk's expense reports, as well as personal credit/debit card transactions, will set forth some of these amounts paid by Medtronic/Covidien.

91.     Also, part of Medtronic/Covidien's kickback scheme included Winger providing free PAD devices at Wilson's request, in exchange for Wilson making purchases from Medtronic/Covidien.  This practice occurred throughout all relevant times herein. Medtronic/Covidien's scheme was not only paying illegal remuneration in exchange for purchases under the AKS, but also had the effect of creating an illegal "rebate" under the AKS as well.

92.     Wilson would also solicit the same free product from Relator and Relator's sales representatives throughout all relevant times herein.  In this process, Wilson would inform them that Winger/Medtronic/Covidien was providing this free product to win the bids, and if they wanted to compete, they needed to do the same.

93.     As an example, in approximately late 2016, Relator and one of Relator's sales representatives had a meeting with Wilson. In that meeting, Wilson stated that if Relator's company wanted to compete like Medtronic/Covidien, it would have to give him free devices, such as the 10 "free" DCBs, atherectomy devices and "Outback" re-entry catheters that Medtronic/Covidien had given in the past. Relator explained to Wilson that his company does not do business that way, so he could not match that offer and implied that it was not appropriate business procedure. Wilson immediately threw his hands up and stated (to paraphrase), "whoa easy there, listen, nothing we do is in writing. Doug [Winger] just has creative ways of getting the devices he needs from other folks in his company. Nothing is in writing; he just knows how to maneuver the units around."

94.     Ten free units of the "Outback" re-entry catheters[11] alone would net the price paid by Defendant Hutchinson to Defendant Medtronic/Covidien down by approximately $25,000. In turn, Defendant Hutchinson would bill Government Healthcare Plans for these "free" devices from Winger, allowing Hutchinson to capitalize again on the kickback.

95.     As another example, during the week of August 5, 2019, Relator's sales representative for Defendant Hutchinson received a call from Wilson in which he requested a proposal for a bulk buy of DCBs/stents in 25/50 unit increments. Later, Wilson said that he had requested bulk buy proposals from Relator's company and Medtronic/Covidien, and that Relator's company proposal was significantly more expensive than Medtronic/Covidien's. Wilson went on to say that "in order to get close to what Medtronic/Covidien is offering," Relator's company would have to provide "10 free balloons" (approximately $15,000 in value) if Hutchinson purchased Relator's Company's 25-unit proposal and "25 free balloons" (approximately $37,500 in value) in exchange for a purchase of Relator's company's 50-unit proposal.  Because Relator's sales representative was driving at the time of this conversation, and because he knew the illegal nature of what Wilson was requesting, Relator's representative requested that Wilson put this ask in an email. Wilson refused. Relator's sales representative then informed Wilson that Relator's company could not provide free inventory to win a bid.  Relator later learned that Hutchinson had accepted Medtronic/Covidien's proposal, which, as admitted by Wilson, included "free" inventory as part of the purchase.

96.     In addition to Relator and Medtronic/Covidien, Wilson requested bribes from other device providers as well.  Wilson made a similar phone call to a Phillips sales

---

[11] Medtronic did not sell Outback devices.  These are produced by another manufacturer. Winger was obtaining these devices from some other source of inventory.  Relator believes these came from the Dole VA.

representative in the PAD device market stating his proposal was significantly less than Medtronic/Covidien, and if he wanted to compete better at Hutchinson he would need to provide free devices. Wilson also repeatedly made similar solicitations regarding PAD devices for free material from a Cardiovascular System Inc.'s ("CSI") sales representative from 2012 through 2016.

97.     Defendant Hutchinson financially benefits from accepting bribes in the forms of free medical devices from Medtronic/Covidien because it is later paid for these free devices. These free devices, when utilized by Hutchinson, are submitted to the Government Healthcare Plans for reimbursement at said devices reimbursable rate (*i.e.,* to reimburse Hutchinson for the cost of the device and related procedure even though the device cost Hutchinson nothing). The costs saved at Hutchinson by accepting these bribes is significant and generates a much larger margin on its procedures. Average retail costs in this industry for directional atherectomy devices are $2,800 - $3,200; for DCBs are $1,000 - $2,000; and drug eluding stents $1,000 - $2,000.[12]

98.     Since 2012, Defendant Hutchinson billed just Medicare alone for tens of millions of dollars for reimbursement for the Medtronic/Covidien devices used and sold as part of the Medtronic/Covidien kickback scheme with Hutchinson and Wilson. As an example, from 2012-2017, for just one physician using Medtronic/Covidien PAD devices, CMS reimbursed $1 million to the physician and in excess of $7.5 million to Hutchinson.

---

[12] *High Reintervention and Amputation Rates After Outpatient Atherectomy for Claudication.* Vasc Endovascular Surg. 2018 Aug; 52(6):427-433.

99.     Upon information and belief, and like Brinkley at Dole VA, Wilson was relieved of his duties in 2019 as a result of the allegations set forth in Relator's 2017 initial Complaint and related investigation.

100.     As a result of the allegations set forth in Relator's 2017 initial Complaint and related investigations, Winger was banned from entering Hutchinson and conducting any future business with Hutchinson.

B.     Medtronic/Covidien's and WRG's Unnecessary Services & Supplies and Off-label Use at Dole VA

101.     At all relevant times herein, Defendants Medtronic/Covidien and WRG claimed, caused a claim to be made, or conspired to have a fraudulent claim be made, to the U.S. VA for reimbursement for unnecessary medical treatment and devices.  This included, but is not limited to, Winger and/or Kirk being present during procedures—and performing their duties described in more detail in ¶ 107—whereby they marketed, instructed, or encouraged the overuse of Medtronic/Covidien atherectomy devices, DCBs, and stents in PAD procedures at Dole VA.

102.     Covering periods beginning prior to January 30, 2011 and through the present, WRG entered into several contracts with the U.S. V.A. to perform interventional (*e.g.,* the performance of the PAD procedures discussed herein in its cath lab) and non-interventional radiology services at Dole VA.  WRG had the exclusive contract to provide such services.  The following physicians were employed by WRG and performed the interventional services at Dole VA:

Dr. Shaun Gonda –from July 1, 2010 through 09/01/15
Dr. Bret Winblad –from July 3, 2014 – April 30, 2016
Dr. Kermit Rust –from July 1, 2016 through August 2018

WRG is vicariously liable for the actions and conduct of these physicians alleged herein at all

relevant times for their conduct at Dole VA.

103.    At all relevant times herein, WRG would perform PAD interventional procedures usually two (occasionally three) days per week at Dole VA and average between two to four procedures per week.

104.    Under the compensation agreement between the U.S. VA and WRG, WRG's physicians were paid on an hourly basis for time spent performing the various PAD interventional procedures.

105.    As the number of PAD devices used per procedure increases, the time required for WRG physicians to perform said procedures also increases.  In turn, WRG would earn more income by the utilization of excessive medically unnecessary PAD devices under its agreement with the U.S. VA.  Also, Medtronic/Covidien would earn more revenue promoting said procedures because more devices were being utilized than necessary.

106.    As a Medtronic/Covidien Class III Device Sales Representative, Winger and Davisson along with Medtronic/Covidien Clinical Specialist Kirk, played an active role at Dole VA working with physicians from WRG as representatives of Medtronic/Covidien.  In the industry, class III device sales representatives and clinical specialists play an integral role in the complex and invasive PAD procedures.  They can, and often do, serve another highly technical role during patient surgeries and pre-operative planning sessions that may be less well understood or appreciated.[13]  Medtronic/Covidien representatives such as Winger, Davisson and Kirk are not simply salespersons only or mere bystanders in PAD procedures.  Winger and Kirk

---

[13] Ideally, industry representatives are present during numerous varied surgeries.  The representative's experience of observing physician's approaches, and subsequent outcomes when treating similar disease or patient types plays a role in guiding a proper, safe, and effective outcome for the physician and their patient.  It can also aid the surgeon in avoiding common or avoidable missteps during these challenging operations.

provide advice and direction to physicians and other operating room staff, and these medical

professionals rely on this advice and believe (unless the providers are associated with the

kickbacks described in this Complaint) that it is accurate and compliant with the law.  With their

training from Medtronic/Covidien, Winger's, Davisson's and Kirk's roles at Dole VA include:

- advising physicians when evaluating a specific patient type prior to surgery to help identify the best device, size, tool, or application to be used.

- consulting with physicians before and during a surgery to ensure all necessary tools and equipment are available at the time of operation and ready for use.

- advising and directing physicians on the number of Medtronic/Covidien devices to use on a particular patient

- advising and directing physicians on which type of Medtronic/Covidien devices to use on a particular patient

- opening packaging for multiple single-use Medtronic/Covidien devices (which would be discarded if not used because the packaging has been opened) and preparing those devices and having them ready for the physicians on the operating table next to the patient (or directing Brinkley to do that for Medtronic/Covidien devices)

- providing intra-operative assistance and advice during challenges or unexpected situations which can, and often do, arise during the procedure.

- consulting with physicians on device selection, sizing, and approach during the operation when the original pre-operative plan must be adjusted or abandoned altogether.

- assisting staff during the procedure in preparing devices for use (*e.g.,* opening packages, recording catalogue/lot/expiration numbers).

- answering a physician's or staff questions intra-operatively regarding proper device indication or contraindication.

- properly reporting device malfunctions or surgery complications related to device performance to proper authorities in a timely manner.

It is through this role—via training provided by Medtronic/Covidien—that Winger, Davisson

and Kirk marketed, instructed or encouraged the overuse and "off label" use of

Medtronic/Covidien PAD devices that directly influenced WRG's actions at Dole VA.

107.    Defendant Medtronic/Covidien's policy and practice was to evaluate and reward its sales representatives such as Winger and Davisson to promote and market unnecessary medical treatment and excessive use of its PAD devices.  As an example, as early as October 2011, Defendant's policy evaluated and awarded Davisson (Winger's supervisor) for identifying "all of these . . . key physicians that needed to be groomed for maximum output . . ."  Its policy also rewarded its employees for influencing physicians to purchase and use a maximum amount of product.  Furthermore, throughout Davisson's, Winger's and Kirk's performance reviews from 2011 through 2018, Defendant set standards and rewarded its salesforce for convincing physicians to use its atherectomy devices in all PAD medical procedures (see ¶¶ 112-123, *infra*, describing this as being medically unnecessary).  Defendant applied a term for this policy in employee performance reviews.  Physician who were "groomed" to use its atherectomy devices in all PAD procedures were called a "Hawker" (this is a reference to its atherectomy devices having this word in their name: SilverHawk, TurboHawk, HawkOne).  As an example, in Davisson's October 2011 review, Defendant's policy measured his ability to "Develop Hawkers."  In the same review he was acknowledged for "developing" six "Hawkers" in the Kansas region.  And that he did a better job in "shoring up some Hawkers that were falling off ([Dr.] Hagley)."  He was acknowledged by Defendant for "aggressively" executing on "targeting" the physicians and "converting" them over to use SilverHawks in all procedures.  Defendant's policy is also reflected in performance reviews whereby these employees' role in advising physicians on device usage.  As an example, in Kirk's October 2014 evaluation, she readily admits that she is to "provide advice" to physicians for device usage.   Once a "Hawker" was sufficiently "groomed" for "maximum output", using directional atherectomy in 100% of PAD procedures Medtronic then hired part time contract sales personnel to help further increase

unnecessary usage through referral market manipulation. Throughout all relevant times, Davisson and Winger, based on marketing strategies developed by Medtronic, hired untrained, non-medical, contract (hourly paid) sales employees for the purpose of providing free marketing and referral services to increase the volume of unnecessary procedures. The duties and activities of these hourly sales personnel included buying lunch or breakfast for non-interventional physicians treating patients likely to have PAD within proximity to a "Hawker."  During these meetings, contract employees would convince referring physicians to redirect their patients from other non-"Hawkers" in the region to a physician where they could ensure more Hawk usage.

108.    As noted above in ¶ 106-107 and as outlined below by witnesses described in ¶¶ 113-158, Winger and Kirk instructed WRG physicians on what and how many Medtronic/Covidien devices to use.

109.    Providers of healthcare—such as the WRG physicians—to former military personnel have an obligation to provide services and supplies at only the appropriate level and "only when and to the extent medically necessary." 32 C.F.R. §199.6(a)(5).  Services provided must be "furnished at the appropriate level and only when and to the extent medically necessary," and such care must "meet[] professionally recognized standards of health care [and be] supported by adequate medical documentation…to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care." 32 C.F.R. 199.6(a)(5).

110.    Medtronic/Covidien's and WRG's conduct as alleged herein regarding medically unnecessary services and supplies and devices utilized off-label permitted these Defendants to utilize a portion of the grossly excessive inventory sold to Dole VA and increase its overall profits at tax-payers' expense.  Sadly, Medtronic/Covidien's and WRG's conduct extended the

length of these procedures causing harm to the veteran patients. These prolonged procedures extended exposure to damaging radiation, significantly increased volumes of contrast dyes which directly harm the kidneys, caused multiple unnecessary traumas to the same arteries (*e.g.,* using four DCBs on one artery when one would suffice), increased the necessity for implanting additional stents to repair subsequent arterial dissections, and unnecessarily increased future amputation rates and mortality.

111.    To demonstrate the grossly excessive use of Medtronic/Covidien PAD devices in patients at Dole VA, Relator provides the following example. In addition to the work performed at Dole VA, WRG and its physicians operate outpatient labs outside the construct of its contract with the U.S. V.A. (*e.g.,* Cypress Interventional) whereby it also purchased Medtronic/Covidien PAD devices. There, the WRG physicians are typically compensated under set reimbursable amounts from federal healthcare programs (*e.g.,* Medicare) for PAD procedures performed. The lower the cost of PAD devices (*i.e.,* fewer) used in these procedures, the higher the margin of revenue on the set rates for reimbursement. On the other hand, at Dole VA, the use of medically unnecessary devices did not decrease WRG's profit margin as they were paid for by the VA and WRG was compensated for hours worked. Conversely, excessive use of PAD devices increased WRG's profits due to more time being expended in PAD procedures. Dole VA and WRG's outside labs would perform roughly the same number of similar PAD procedures per week. For WRG physicians working at Dole VA, Dole VA was ordering on average $25,412/week of Medtronic/Covidien PAD devices. Yet, at WRG's Cypress lab, WRG was ordering only on average $4,329/week of Medtronic/Covidien PAD devices. **Six times more** PAD devices were being used at Dole VA compared to WRG's Cypress lab for roughly the same number of procedures.

### *Excessive & Medically Unnecessary Atherectomy Devices*

112.    It is well established within the medical community that a *single* atherectomy device such as Medtronic/Covidien's is typically used in only 17% of procedures when treating PAD.[14]  Medtronic/Covidien atherectomy devices (*e.g.* HawkOne, TurboHawk, SilverHawk) are to be used only in cases of severe calcification—not in every PAD procedure as marketed and promoted by Medtronic/Covidien.  *E.g.,* for HawkOne: "Indications for Use: The HawkOne™ peripheral directional atherectomy system is intended for use in atherectomy of the peripheral vasculature. The HawkOne catheter is indicated for use in conjunction with the SpiderFX™ embolic protection device in the treatment of *severely calcified lesions*. The HawkOne catheter is NOT intended for use in the coronary, carotid, iliac or renal vasculature."  (emphasis added)

113.    Following Medtronic/Covidien's training and marketing to WRG physicians, WRG physicians provided medically unnecessary treatment by using numerous Medtronic/Covidien directional/cutting atherectomy devices in all PAD procedures and when not clinically warranted or indicated (*e.g.,* in multiple vessel beds per patient limb, and on multiple limbs per patient during the same PAD interventional treatment).  For example, in the 2012 - 2013 timeframe, during one procedure witnessed by Healthcare Professional #1, Dr. Gonda from WRG used three Covidien atherectomy devices in one PAD procedure.[15]  This was done while Winger was present in the room and with Winger performing all the roles described in ¶¶ 106.  Use of these medically unnecessary and excessive devices increased WRG's time performed in this procedure, and in turn, increased its compensation from the U.S. V.A.

---

[14] *Wall Street Journal*. Among vascular surgeons surveyed in their registry, the average rate of atherectomy is about 17%, September 10, 2019.
[15] When Plaintiff refers to devices being "Medtronic" that includes devices it acquired.  *See*, ¶¶ 4-5 *infra.*

114.    In another example, Healthcare Professional #2 was present in numerous PAD procedures at Dole VA where Dr. Gonda utilized multiple Medtronic/Covidien atherectomy devices.  This occurred during the 2011 - 2015 timeframe.  This was done while Winger and/or Kirk were present in the room performing all the roles described in ¶ 107.  Use of these medically unnecessary and excessive devices increased WRG's time performed in this procedure, and in turn, increased its compensation from the U.S. V.A.

115.    In another example, Healthcare Professional #4 was present, almost weekly, when numerous PAD procedures were performed at Dole VA where Dr. Gonda, Dr. Rust or Dr. Winblad from WRG utilized multiple Medtronic/Covidien directional atherectomy devices.  This occurred during the 2014 - 2018 timeframe.  This was done while Winger and/or Kirk were present in the room performing all the roles described in ¶¶ 106.  Use of these medically unnecessary and excessive devices increased WRG's time performed in this procedure, and in turn, increased its compensation from the U.S. V.A.

116.    The partial data available to Relator to date confirms excessive use of directional atherectomy devices promoted by Medtronic/Covidien and used by WRG physicians at Dole VA.  Dole VA would order on average seven atherectomy devices per week for WRG to use in PAD procedures.  Dole VA's cath lab operated two (sometimes three) days per week with one physician.  Other VA cath labs across the country ordered and used significantly fewer devices such as directional atherectomy (see table in ¶ 62).  As another example, on October 29-30, 2015, **27** atherectomy devices (@ $216,565)  were ordered by Dole VA from Medtronic/Covidien for WRG physician Dr. Winblad's use.  Less than two weeks later on November 19-20, 2015, **17** additional atherectomy devices (@ $59,415) were ordered.  Four weeks later, on December 23-24, 2015, **30** atherectomy devices (@ $104,850) were ordered.  Two weeks later on January 6,

2016, **60** atherectomy devices (@ $209,700) were ordered.  This reflects **134** atherectomy devices purchased over a ten week period for Dr. Winblad's use (or, 13 atherectomies per week, on average of at least three atherectomy devices per procedure).   As another example, for all PAD procedures performed during or near the week of September 18, 2016, Dr. Rust from WRG used an estimated 8 atherectomy devices (equaling at least 2-4 per procedure).   Again, as an example, on June 29, 2017, for Dr. Rust's use, Dole VA ordered 115 atherectomy devices.  The next order was six and one-half weeks later on August 14, 2017 for similar devices.  Roughly 18 atherectomy devices per week were used (again, well over three atherectomy devices per procedure).

117.     As a comparative scenario, in the 2017 timeframe, a Wichita vascular surgeon (who was not a member of WRG) was performing a peripheral intervention procedure at the Dole VA Cath Lab.  Standard procedure during these cases would be for the operating physician to conclude diagnostic images, reassess and confirm the disease state and treatment choice, and then instruct the nursing and technologist team as to the specific devices to open and prep for use.  This sequence is critical for ensuring expensive product is not wasted in the event a different device is required.  In this particular circumstance, as the vascular surgeon turned around, he noticed that Brinkley had already opened a $3,500 HawkOne device that was prepped and ready on the table.  This is not a device that this particular surgeon would use for the procedure.  He admonished Brinkley for opening (and wasting) a device that was unnecessary for the patient and not requested by the physician.  Brinkley never asked him which device he wanted to use or waited for him to request a specific device. This was a rare occasion when this vascular surgeon did a peripheral intervention at the Dole VA cath lab because of WRG's exclusive contract.  This contract effectively prevented surgeons from outside of WRG from

performing procedures at Dole VA as it required any surgeon and cardiologist who wished to conduct peripheral interventions to have procedural oversight and supervision by a WRG radiologist.  This example shows the frequency of the Medtronic/Covidien practices described in this section because this vascular surgeon rarely did procedures at Dole VA and yet the effects of Medtronic/Covidien's fraud were evident on this rare occasion.

118.     Medtronic/Covidien promoted and marketed the unnecessary use of atherectomy devices by sending physicians such as Drs. Gonda, Winblad, and Rust to educational seminars, programs, or other training. There, instruction was provided to physicians to use their directional atherectomy devices as a standard of care for all PAD procedures while Medtronic/Covidien made false or misleading representations regarding its own medical studies promoting the patency of such treatment. Medtronic/Covidien also provided instruction to physicians on how to maximize their reimbursements by performing this medically unnecessary treatment. Medtronic/Covidien also awarded their sales representatives such as Davisson, Winger and Kirk by having the train physicians such as the ones at Dole VA to utilize an atherectomy and DCB in every interventional procedure.

119.     The use of multiple Medtronic/Covidien atherectomy devices in single PAD procedures occurred numerous times throughout the 2011 - 2018 timeframe.  The personnel attendance logs, procedural notes, and patient implant logbook records at Dole VA will reflect each and every instance this occurred and will reflect the presence of Drs. Gonda, Rust or Winblad as well as Winger and/or Kirk in each procedure.  Utilizing more than two directional/cutting atherectomy devices per PAD procedure far exceeds the accepted standards of medical practice in treating PAD and is an unreasonable and unnecessary medical procedure.

120.     As the Society for Vascular Surgery (SVS) President Dr. Kim Hodgson, MD, recently discussed: "'The impact of the explosive growth of atherectomy on patients and healthcare finances is problematic and growing exponentially,' Hodgson lamented.  He turned to

further findings from Hicks showing that of the roughly $267 million reimbursed by Medicare for first-time femoropopliteal peripheral vascular interventions in 2019, 90% was for atherectomy, 'leaving only $26 million to pay for all of the other therapies that actually have evidence showing that they work.'"[16]  "Hodgson also fingered vascular surgery's industry partners [*e.g.,* Medtronic/Covidien]."   He said they should be "the canary in the coal mine for inappropriateness. You are uniquely positioned to spot abuse early—before patients are harmed. You know every one of the outliers in vascular care."[17]  Furthermore, Dr. Hodgson stated, "We can play whack a mole every time the bad actors surface until the cows come home, but that leaves a trail of harmed patients and wasted resources . . ."[18]

121.    Indeed, using a single atherectomy device in PAD procedures alone has been shown in studies to increase amputation rates and additional interventional treatments which would not have otherwise been required.[19]  Not surprisingly, during the VA OIG's investigation, it uncovered amputation rates for veteran patients treated for PAD at Dole VA to be occurring at a higher rate compared to national figures.

122.    There are no academic or clinical studies supporting the use of multiple Medtronic/Covidien directional atherectomy devices in a single patient in a single PAD procedure.  Furthermore, the primary treatment or "frontline" use of Medtronic/Covidien directional/cutting atherectomy devices for *all* PAD morphologies, as marketed and promoted by Medtronic/Covidien, to supplant all other FDA approved and properly studied PAD treatment

---

[16] https://vascularspecialistonline.com/cleaning-up-vascular-surgery-hodgson-lays-out-path-to-tackle-inappropriateness-in-care/.

[17] *Id.*

[18] *Id.*

[19] *See* Journal of the American Heart Association, "Adverse Events After Atherectomy: Analyzing Long-Term Outcomes of Endovascular Lower Extremity Revascularization Techniques," Vol. 8, No. 12.

devices is excessive and unnecessary on its face for even a single device in a patient.

123.    Despite all studies to the contrary, Medtronic/Covidien's marketing materials—
and in turn Winger's training of the Medtronic/Covidien sales force pursuant to his Field Trainer
position—state that atherectomy devices should be used in treating *every* PAD procedure.[20]  In
the face of a well-established, evidence-based standard in peripheral medicine,
Medtronic/Covidien explicitly promotes—and WRG utilized—the use of atherectomy devices as
a "frontline" treatment to supersede, and even replace properly studied and proven therapies
which cost less and are clinically proven as effective.

### *Treating with Excessive Stents*

124.    WRG and Medtronic/Covidien had a practice of using numerous stents in a single
patient's leg, often stenting from areas at or below the knee ("off label") when the clinical
application was unwarranted and higher risk, often stenting from areas just above the ankle up to
and behind the knee and stenting upward on the leg.  Doing so is an unreasonable and
unnecessary medical procedure with extreme risk for veterans' short and long term health.
Routinely treating a single leg with multiple overlapping stents (including ones in the calf as well
as below and behind the knee) significantly increases the likelihood for recurrent disease
requiring additional and expensive invasive procedures, commonly within the following 6-12
months.[21]  In addition to requiring more frequent and progressively more expensive future
procedures, it is also well established in medical literature that this unnecessary procedure can

---

[20] This includes their marketing material making statements such as, atherectomy is a "frontline"
treatment, or marketing message of "nothing left behind" and/or "no stent left behind"—an
unsubstantiated competitive claim that atherectomy is superior to stenting.
[21] *See* National Institute of Health, https://pubmed.ncbi.nlm.nih.gov/15653033/, "*Prevalence and
Clinical Impact of Stent Fractures after Femoropopliteal Stenting,"*  Am Coll Cardiol, 2005 Jan
18; 45(2):312-5.

often result in stent fracturing and can result in significant harm to the patient.

125.     As an example, Healthcare Professional #2 witnessed numerous occasions between 2011 – 2015 where Winger and/or Kirk performed these procedures with Dr. Gonda at Dole VA Treating a single leg with 3-5 stents, when not clinically warranted, in a single PAD procedure occurred numerous times throughout the 2011-2015 timeframe.  This was done while Winger and/or Kirk were present in the room performing all the roles described in ¶ 106.  As another example, during the week of April 4, 2016, for Dr. Winblad's use in PAD procedures, Dole VA purchased 11 Medtronic/Covidien stents.  This represents three or more stents being used per procedure.  Use of these medically unnecessary and excessive devices increased WRG's time performed in this procedure, and in turn, increased its compensation from the U.S. V.A.

126.     As another example, between the 2012 - 2013 timeframe, Healthcare Professional #1 witnessed numerous procedures where multiple, clinically unnecessary stents were placed in a leg—one where five stents were placed in one leg where Winger and/or Kirk performed this procedure with Dr. Gonda at Dole VA.  This was done while Winger and/or Kirk were present in the room performing all the roles described in ¶ 106.  An example, during the week of March 11, 2013, for Dr. Gonda's use in PAD procedures, Dole VA purchased 24 Medtronic/Covidien stents.  This would lead to five or more stents being used per procedure.  Use of these medically unnecessary and excessive devices increased WRG's time performed in this procedure, and in turn, increased its compensation from the U.S. V.A.

127.     Another example, between the 2014 - 2018 timeframe, Healthcare Professional #4 witnessed numerous procedures where multiple stents were placed in a leg (up to 4-5), when clinically unwarranted, where Winger and/or Kirk performed this procedure with Dr. Gonda, Dr. Rust or Dr. Winblad at Dole VA.  This was done while Winger and/or Kirk were present in the

room performing all the roles described in ¶ 106.   As an example, during the week of May 28, 2017, for Dr. Rust's use in PAD procedures, Dole VA purchased 16 Medtronic/Covidien stents. This would lead to four or more stents being used per procedure.  Use of these medically unnecessary and excessive devices increased WRG's time performed in this procedure, and in turn, increased its compensation from the U.S. V.A.

128.    Utilizing excessive and unnecessary stents in a single PAD procedure occurred routinely throughout the 2011 - 2018 timeframe.  The personnel attendance logs, procedures notes, and patient implant logbook records at Dole VA will reflect each and every instance this occurred and will reflect the presence of Drs. Gonda, Rust or Winblad from WRG as well as Winger and/or Kirk in each procedure.

### *Excessive Use of Drug Coated Balloons*

129.    WRG and Medtronic/Covidien had a practice of using numerous DCBs per arterial location in a PAD procedure when one of the proper length DCBs was readily and immediately accessible on the Dole VA inventory supply shelves and would serve the same purpose, or they simply used excessive DCBs unnecessary for the treatment.  Doing so is an unreasonable and unnecessary medical procedure.  As an example, a certain length of artery may need to be treated with a DCB.  A physician can use one "longer" balloon to treat this entire area. Due to Medtronic/Covidien's training and marketing as described in ¶ 106, Winger and/or Kirk along with WRG physicians provided medically unnecessary treatment by using numerous (2-4) shorter Medtronic/Covidien DCBs to cover the same area.[22]

130.    Healthcare Professional #2 witnessed numerous occasions between 2015 – 2018

---

[22] Not only does this practice quadruple the use of Medtronic/Covidien devices, but it also quadruples the trauma to the artery as well as often requiring the unintended implantation of

when numerous shorter DCBs were used when a longer balloon would suffice whereby Winger and/or Kirk were present with Dr. Gonda at Dole VA.  Also, Healthcare Professional #4 witnessed numerous occasions when this occurred between 2015 – 2018 where Winger and/or Kirk were present with Dr. Gonda, Dr. Rust or Dr. Winblad at Dole VA.  As an example, on or about the week of May 14, 2015, for Dr. Gonda's and/or Dr. Winblad's use in PAD procedures, Dole VA purchased 66 Medtronic/Covidien DCBs (@ $96,415). This would lead to more than 10 DCBs being used per procedure.  As another example, during the week of January 16, 2017, for Dr. Rust's use in PAD procedures, Dole VA purchased 120 Medtronic/Covidien DCBs (@ $187,800). This would lead to more than 12 DCBs being used per procedure.  Use of these medically unnecessary and excessive devices increased WRG's time performed in this procedure, and in turn, increased its compensation from the U.S. V.A.  Interestingly, on the rare occasions where neither Winger nor Kirk were present, Healthcare Professional #4 witnessed the same doctors using the proper longer length DCB and not using the multiple Medtronic/Covidien DCBs that Winger and/or Kirk would advise or instruct had they been present.

131.    In further support, at WRG's Cypress lab, over roughly a two year timeframe (*e.g.,* 2020-2021), WRG purchased only one Medtronic/Covidien DCB for PAD procedures (as these devices are expensive and not taken into account in the set Medicare reimbursement amount).  However, on just one single day in February 2016 at Dole VA, 353 Medtronic/Covidien DCBs (@ $561,970) were ordered for PAD procedures to be performed by WRG's physicians.  Medtronic/Covidien sales representatives Winger, Davisson, and Kirk sold PAD devices to these same WRG physicians who worked at both WRG's Cypress lab and Dole

---

additional stents to repair subsequent arterial dissections, unnecessarily increasing the risk of vessel rupture, as well as embolizing broken plaque to smaller arteries downstream thereby causing acute vessel occlusion.

VA.  Based upon the grossly excessive purchases of PAD devices that Defendant and WRG

physicians requested for Dole VA to purchase, Winger and Davisson returned the favor by

selling the same PAD devices at cheaper rates to WRG for its procedures at Cypress.

132.    Utilizing excessive Medtronic/Covidien DCBs in a single PAD procedure—when

not clinically warranted—occurred routinely throughout the 2015 - 2018 timeframe.  The

personnel attendance logs, procedures notes, and patient implant logbook records at Dole VA

will reflect each and every instance this occurred and will reflect the presence of physicians from

WRG as well as Winger and/or Kirk in each procedure.

133.    In relation to Medtronic/Covidien's training and marketing to Dole VA's PAD

services provider WRG, WRG also provided medically unnecessary treatment by often utilizing

unnecessary quantities of all of Medtronic/Covidien's PAD devices in procedures.  As an

example, in November 2016, Brinkley informed Healthcare Professional #3 that Winger or Kirk

along with Dr. Winblad, or a WRG resident, treated both legs on one patient and used the

following Medtronic/Covidien devices in this procedure: six directional/cutting atherectomy

devices (~$21,000), six stents (~$18,000), and twelve drug coated balloons (~$42,000).

Utilizing excessive Medtronic/Covidien devices in a single PAD procedure occurred numerous

times throughout the 2011 - 2018 timeframe.  The personnel attendance logs, procedures notes,

and patient implant logbook records at Dole VA will reflect each and every instance this

occurred and will reflect the presence of physicians from WRG as well as Winger and/or Kirk in

each procedure.

### *WRG's Performance of Unnecessary Interventional Procedures & Self-Dealing*

134.    WRG performed medically unnecessary PAD interventional procedures on

Veterans at Dole VA when noninvasive treatment (*e.g.,* medication, lifestyle adjustment) was the

only medically necessary treatment.  WRG is compensated for performing interventional procedures, and therefore, had no interest in determining whether noninvasive evidence based medical care was appropriate for these veterans.

135.    The VA's OIG determined that WRG physicians provided medically unnecessary invasive treatment on veterans at Dole VA when only noninvasive treatment (*e.g.,* lifestyle change, medication) was warranted.  WRG was found to have (a) failed to practice evidence based medicine on the majority of patient cases, and totally disregarded nationally accepted multidisciplinary guidelines on how to diagnose and treat PAD; (b) failed to provide any justification for the standard of care it provided; (c) failed to properly review cases and decide the best possible approach to treat the PAD veteran patients; (d) failed to perform essential diagnostic testing to determine if interventional treatment was even necessary under established standards; and (e) overutilized DCBs on patients—averaging 6-8 DCBs per procedure—along with overutilization of directional atherectomy.  The OIG also found that, contrary to Dole VA staff and WRG's position that their treatment with excessive devices provided better patient care, the subsequent amputation rates among veterans treated were significant.

136.    WRG submitted claims for hourly compensation to the VA regarding these unnecessary interventional procedures that were medically unnecessary and were paid for such claims by the VA.

137.    WRG also used their contractual relationship at Dole VA to refer veteran patients seen at Dole VA to their outside practice in order to further financially benefit from its relationship with the VA.

### *Other Waste of Devices & Patient Results*

138.    Due to the excessive usage of Medtronic/Covidien PAD medical devices at Dole

VA via the conduct of Winger and Kirk during the relevant time period described herein, Healthcare Professional #1 was informed that the average cost per PAD procedure at Dole VA was 300 to 1,000 times more expensive versus other labs doing similar procedures.

139.   In order to consume the grossly excessive Medtronic/Covidien PAD devices purchased by Dole VA, during the 2014 - 2018 timeframe, Healthcare Professional #4 witnessed numerous records regarding coronary procedures at Dole VA's lab whereby the operation procedure records reflected a Medtronic/Covidien PAD device, including Medtronic/Covidien DCBs, used off label in a coronary procedure.  The procedure and device logs at Dole VA will reflect this occurring in numerous procedures between 2012 - 2018.[23]

140.   During the 2014 - 2018 timeframe, Healthcare Professional #4 witnessed Winger taking Medtronic/Covidien PAD devices from the Dole VA inventory while on his way to conduct business at Hutchinson Hospital, per Winger's admission.  Plaintiff has a good faith basis to believe that Winger was utilizing Medtronic/Covidien PAD inventory taken from Dole VA—paid for by U.S. taxpayers—as illegal remuneration being paid to Wilson at Hutchinson as previously described herein.  Medtronic/Covidien's device sales invoices, including their bill of lading records as well as inventory receiving records at Dole VA reflecting device serials numbers when compared to Hutchinson's records reflecting Medtronic/Covidien devices in inventory or used in procedures subsequently billed to Medicare/Medicaid will reflect this scheme from 2011 through 2018.

141.   A recent publication found about 1% per year of persons with a natural history of

---

[23] In late 2018 the cardiology group who has maintained an exclusive contract to provide all cardiac catheterization procedures at the Dole VA Cath lab, similar to WRG for PAD procedures, also had their contract cancelled by Dole VA and are no longer allowed to provide cardiac interventional services at the Dole VA. Upon information and belief, this was due to the subsequent investigation resulting from Relator's initial complaint filed in January 2017.

PAD, end up requiring an amputation.[24]  Patients who are treated with atherectomy devices

femoropopliteal (*i.e.,* above knee) in a hospital setting, 4.8% per year require an amputation.[25]

Patients who are treated with atherectomy devices in the tibial-peroneal (*i.e.,* at or below knee) in

a hospital setting, 10.4% per year subsequently require an amputation in the following twelve

months.[26]  Having more than one PAD atherectomy procedure leads to even higher percentage

rates of amputations.[27]  Excessive usage of other Medtronic/Covidien PAD devices at Dole VA

via the conduct of Winger and Kirk described herein—and in order to utilize as much of the

grossly excessive Medtronic/Covidien inventory at Dole VA—compared to the national study

discussed herein, a significantly higher percentage of veterans will have been subjected to major

amputations and increased mortality rates.[28]  The patient records, personnel attendance logs,

procedures notes, and patient implant logbook records at Dole VA will reflect this outcome.

Sadly, as the PAD procedures increase, the risks of amputations greatly increase, and in turn, the

veterans' life expectancy dramatically decreases.[29]

---

[24] "Outpatient atherectomy outcomes may be worse than the natural history of disease." *Vascular News*; Mukherjee, Dipankar (Aug. 7, 2017).

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *See* "Risk of Major Amputation Following Application of Paclitaxel Coated Balloons in the Lower Limb Arteries: A Systematic Review and Meta-Analysis of Randomized Controlled Trials," (2021) Published by Elsevier B.V. on behalf of European Society for Vascular Surgery. This is an open access article under the CC BYNC-ND license (http://creativecommons.org/licenses/by-nc-nd/4.0/)

[29] "In total, 168/651 patients (178 legs; 26%) underwent a major amputation. Patients were stratified by age: 70–80 years (n=86) and >80 years (n=82). Overall mortality after major amputation was 44%, 66% and 85% after 1, 3, and 5 years respectively.  The 6-month and 1-year mortality in patients aged 80 years or older was, respectively, 59% or 63% after a secondary amputation <3 months versus 34% and 44% after a secondary amputation >3 months. Per year of age, the mortality rate increased by 4% (*P*=0.005). No significant difference in mortality after major amputation was found in the presence of comorbidity or according to Rutherford

142.    At all relevant times herein, Defendant Medtronic/Covidien's marketing and training described in ¶¶ 106-107, including its scheme of offering or paying remuneration, which includes remuneration to Dole VA, played a direct role in Dole VA and WRG utilizing excessive and medically unnecessary PAD devices paid for by the U.S. VA.

C.    Medtronic/Covidien & WRG — Off-label Use of Devices

143.    At all relevant times herein, Defendants Medtronic/Covidien and WRG claimed, caused a claim to be made, or conspired to have a fraudulent claim be made, to the U.S. VA for reimbursement for medical devices being used outside their FDA approved use ("off-label") in medically unnecessary procedures.  This included, but is not limited to, Winger and/or Kirk being present during procedures—and performing their duties described in more detail in ¶ 106—whereby they marketed, instructed, or encouraged the off-label use of Medtronic DCBs, directional/cutting atherectomy, and stents.

144.    Medtronic representatives such as Winger, Kirk and Davisson marketed, trained, encouraged, and/or coerced Dole VA and WRG to utilize medical devices outside their usage as approved by the FDA.  In turn, these claims for reimbursement were made to the U.S. VA regarding the devices themselves as well as the time taken by WRG to implement said devices. These include the following.

### *Off-label Promotion of Peripheral Drug Coated Balloons*

145.    Defendant Medtronic used to sell a DCB outside the United States called IN.PACT AMPHIRION DEEP Drug Eluding Balloon.  Outside the United States, this DCB was already CE Marked (European equivalent of FDA approval) for use in the tibial arteries (*i.e.,*

---

classification."  "Mortality after Major Amputation in Elderly Patients with Critical Limb Ischemia," *Clinical Interventions in Aging*, (Dec. 2017).

"below the knee application) to treat PAD.  On November 13, 2013, Medtronic issued a worldwide recall of the IN.PACT AMPHIRION DEEP DCB.  This recall was related to an FDA required PMA Level I study being conducted in the United States where Medtronic was seeking FDA approval specifically for use in below the knee arteries.  The study and related data compared using IN.PACT AMPHIRION DEEP against the existing standard of care, and FDA approved, standard (un-coated) balloon angioplasty.  Approximately midway through the pre-defined study protocol, Medtronic conducted an interim analysis of the ongoing clinical trial data.  During this data review, trial investigators found the drug-coated study device was providing no additional clinical benefit for patients over the standard un-coated balloon angioplasty cohort.  In addition to a lack of patient benefit, trial investigators also identified an alarming trend toward significantly higher incidences of major amputation associated with the study device (IN-PACT AMPHIRION DEEP) cohort.  As a result of these unexpected findings, Medtronic took the unprecedented step to prematurely stop the study and issue the immediate global recall of the device over concerns for patient safety.[30]

146.    Defendant Medtronic eventually obtained very limited FDA approval for the use of the formerly know IN.PACT AMPHIRION DEEP DCB that it now calls the IN.PACT Admiral Paclitaxel-Coated PTA ("IN.PACT ADMIRAL").  On its website, Medtronic states the following regarding indications for this device which now reflect limitations on the types and sizes of arteries where it may be safely applied:

> The IN.PACT™ Admiral™ Paclitaxel-Coated PTA Balloon catheter is indicated for percutaneous transluminal angioplasty, after appropriate vessel preparation, of *de novo,* restenotic, or in-stent restenotic lesions with up to 360 mm in superficial femoral or popliteal arteries with reference vessel diameters of 4-7

---

[30] See article discussing this study/data: "*Drug-Eluting Balloon Versus Standard Balloon Angioplasty for Infrapopliteal Arterial Revascularization in Critical Limb Ischemia,*" Journal of the American College of Cardiology, Vol. 64, No. 15, 2014 (Oct. 14, 2014).

mm.

And further states:

> The IN.PACT Admiral drug-coated balloon (DCB) is a clinically proven, primary endovascular therapy that treats femoropopliteal disease, reduces interventions, and preserves future treatment options.

147.    The FDA's Summary of Safety and Effectiveness Data (SSED) states that IN.PACT indications for use are limited solely to femoral and popliteal arteries.

148.    Via its 2013 IN.PACT DEEP worldwide recall, Medtronic—and its representatives including Winger and Kirk—had full knowledge that utilizing this device outside its now FDA approved parameters (*i.e.,* the label limits on IN.PACT ADMIRAL) could significantly increase the risk of future major amputations.  They were also aware that utilizing their own gold standard un-coated balloon for angioplasty in applications outside IN.PACT ADMIRAL FDA approved parameters was just as clinically effective for below the knee treatment, albeit without the significant increased risk of major amputation.

149.    Despite this knowledge and clear labeling, Defendant Medtronic through Winger, Kirk and Davisson knowingly promoted, marketed and/or demonstrated as described in ¶¶ 106-107, and Defendant WRG's physicians participated in, the off-label use of IN.PACT ADMIRAL in arteries and sizes of arteries outside its FDA approval.  As an example, between 2016 and 2018, Healthcare Professional #4 attended a pre-procedure meeting with Dr. Kermit Rust from WRG, Terri Brinkley, and Doug Winger.  For this particular patient, Dr. Rust and Winger discussed what procedure will be performed and what Medtronic products will be used.  During the procedure, Dr. Rust sought to treat a *below the knee artery* with a *2-3 mm diameter*.  Winger informed Dr. Rust that he should use a Medtronic IN.PACT ADMIRAL—again, not approved for any arteries smaller than 4 mm let alone a below the knee artery.  Winger instructed Dr. Rust

that he should only partially inflate the IN.PACT ADMIRAL to half atmospheric pressure in this smaller artery which would reduce the balloon diameter in an attempt to minimize the risk of rupturing the artery.[31]  Dr. Rust followed Winger's direction which involved three "off label" uses: utilizing this IN.PACT ADMIRAL below the knee; utilizing it for an artery smaller than its indication and instructing Dr. Rust how to modify the FDA approved instructions for use.  Doing so not only significantly increased this veteran's exposure to future major amputation; increased the acute risk of arterial dissection or vessel rupture unnecessarily from the significantly oversized IN.PACT balloon, as well wasting the $3,500 IN.PACT ADMIRAL as opposed to more effective, less dangerous, and FDA approved $300 standard angioplasty balloon.  The personnel attendance logs, procedures notes, and patient implant logbook records at Dole VA will reflect each and every instance this occurred and will reflect the presence of physicians from WRG as well as Winger and/or Kirk in each procedure.

150.    In another example of off-label usage of PAD devices, Healthcare Professional #2 witnessed a PAD procedure at Dole VA during the 2012 - 2015 timeframe.  In this procedure, Winger was assisting Dr. Gonda from WRG.  The procedure called for a $300 standard balloon angioplasty (un-coated) for an iliac artery.  Winger did not have the specific size of balloon with him for that application and which Dr. Gonda thought was appropriate.  Healthcare Professional #2 stated that he had such a balloon in his trunk stock inventory and offered to retrieve it.  Winger informed Dr. Gonda that this was not necessary.  Winger proceeded to de-package a Medtronic balloon expandable *stent device* (which includes a balloon within the stent to expand and deploy the stent).  Winger instructed Dr. Gonda to remove the stent from the balloon and

---

[31] Rupturing the vessel wall is a well-known complication when a balloon is inflated and significantly oversized relative to the target artery.

dispose of it.  Taking these multiple off-label steps resulted in the originally requested size balloon which was then used in the procedure.[32]  During this same timeframe, this representative also witnessed other Medtronic stents being used off-label on a number of occasions in the common iliac, femoral, and popliteal arteries in procedures performed by Dr. Gonda with Winger and/or Kirk present.  The personnel attendance logs, procedures notes, and patient implant logbook records at Dole VA will reflect each and every instance this occurred and will reflect the presence of physicians from WRG as well as Winger and/or Kirk in each procedure.

151.    The 4 mm diameter IN.PACT DCBs are rarely used in femoral popliteal (*e.g.,* "above the knee) PAD procedures as very few persons in the population have such small arteries above the knee.  Even the largest performers of PAD procedures would have limited 4 mm diameter balloons in stock for an entire year.  However, when using IN.PACT DCBs off-label below the knee, the 4 mm diameter is the one commonly used as the arteries are much narrower in that area.  Supporting the witnesses' claim that WRG physicians at Dole VA performed these off-label PAD procedures at the direction of Winger, Davisson, and Kirk, excessive orders of these smaller 4 mm IN.PACT DCBs occurred.  As an example, Drs. Gonda/Winblad used IN.PACT off-label below the knee on or around the week of May 11, 2015 as Dole VA's purchase of twelve 4 mm DCBs reflects.  As another example, Dr. Winblad used IN.PACT off-label below the knee on or around the week of February 11, 2016 as Dole VA's purchase of **sixty** 4 mm DCBs reflects.  As another example, Dr. Rust used IN.PACT off-label below the knee on

---

[32] Not only did this represent Medtronic promoting use of devices off label, but it further demonstrates the chokehold Winger had on all devices being used at Dole VA and the extensive profits for Medtronic and costs to taxpayers.  The balloon proposed by Healthcare Professional #2 only cost $300 compared to the estimated $3,000 cost of the ultimately disposed stent used off-label by Winger.

or around the week of August 21, 2017 as Dole VA's purchase of ten 4 mm DCBs reflects.

152.    Throughout all relevant times, Medtronic/Covidien would falsely market through its sales representatives, physician training and seminars—including WRG physicians— that studies and data show that its IN.PACT DCB applied would result in superior outcomes for patients after using a Medtronic/Covidien directional atherectomy device as vessel prep (referred to as DAART), even though the IN.PACT Instructions for Use issued by Medtronic/Covidien stated that one should avoid using directional atherectomy in conjunction with IN.PACT "whenever possible." Yet, Medtronic/Covidien expressly marketed, promoted, and trained physicians such as WRG to always use its directional atherectomy prior to using IN.PACT in all PAD procedures for improved efficacy despite the lack of any safety or efficacy data in the current FDA approved labelling for either device which is required for safe use of any combination therapy.

### *Off-label Promotion of Peripheral Stents*

153.    Defendant Medtronic sells a peripheral nitinol stent called EverFlex.  Medtronic's catalog describes this device as:

> The EverFlex™ stent system is designed for flexibility and durability. It is a second-generation stent indicated for use in the superficial femoral and proximal popliteal arteries (SFA/PPA), common iliac, and/or external iliac arteries. The EverFlex stent is available in sizes ranging from 20 mm to 200 mm lengths (SFA/PPA) or 20-120 mm lengths (iliac).

On its website, it states the FDA's SSED indication for this device:

> The EverFlex Self-Expanding Peripheral Stent System is intended to improve luminal diameter in the treatment of symptomatic *de novo* or restenotic lesions up to 180 mm in length in the native superficial femoral artery and/or proximal popliteal arteries with reference vessel diameters ranging from 4.5 mm – 7.5 mm.

> The EverFlex Self-Expanding Peripheral Stent System is indicated for improving luminal diameter in patients with atherosclerotic disease of the common and/or external iliac arteries up to and including 100 mm in length, with a reference vessel diameter of 4.5 mm - 7.5 mm.

154.    At Dole VA, Defendant Medtronic knowingly marketed, and Defendant WRG's physicians participated in, this device being used "off-label" (*i.e.,* outside the superficial femoral artery and/or proximal popliteal arteries with reference vessel diameters ranging from 4.5 mm - 7.5 mm, and outside the external iliac arteries up to and including 100 mm in length, with a reference vessel diameter of 4.5 mm - 7.5 mm) by promoting its usage in arteries at or below the knee for use in patients in medically unnecessary procedures.[33]

155.    As an example, in the 2012 - 2013 timeframe, during several procedures witnessed by Healthcare Professional #1, Winger along with Dr. Gonda (or a resident from WRG) used multiple Medtronic peripheral stents per PAD procedure at locations at the ankle extending into the calf as well as at or below the knee (*i.e.,* "off label"). Healthcare Professional #1's reactions were: "I got to the point where I was uncomfortable with the way cases were going." "The treatment of veterans . . . seeing an artery that was open, the physician would go in and balloon it and just destroy the artery and then follow it up with a stent." "I couldn't stomach what was going on, so that's why ultimately just left and never went back." Healthcare Professional #1 had to inform the company sales manager that Dole VA would no longer be a potential client. The representative told him, "I'm not going to be involved in something that feels bad and I cannot imagine treating a veteran so poorly."

156.    In another example, between the 2014 - 2018 timeframe, during numerous

---

[33] The fact that there is no clinical benefit for this off label procedure is well documented. One should only stent to repair dissections or other flow limiting issues after angioplasty fails in these specific locations. *See* 54 ENDOVASCULAR TODAY, MAY 2021, VOL. 20, NO. 5 BTK DSEASE. "The State of Stenting in Below-the-Knee Applications Assessing stent options and additional technologies for below-the-knee interventions."

procedures witnessed by Healthcare Professional #4, Winger and/or Kirk along with Drs. Gonda, Rust or Winblad used multiple Medtronic peripheral stents per PAD procedure at locations just above the ankle and extending upwards at or behind the knee (*i.e.,* "off label").

157.    Medtronic peripheral stents being used "off-label" in PAD procedures occurred numerous times throughout the 2011 - 2018 timeframe.  The personnel attendance logs, procedures notes, and patient implant logbook records at Dole VA will reflect each and every instance this occurred and will reflect the presence of WRG's physicians as well as Winger and/or Kirk in each procedure where Winger and Kirk knowingly promoted, marketed and/or demonstrated such off-label use via the methods described in ¶¶ 106-107.

158.    Much of the conduct and actions of Winger described in ¶¶ 113-156 were done while he held the position of Field Sales Trainer training the Medtronic sales force on sales tactics.  Medtronic was fully aware of Winger's conduct when providing him this promotion, and Medtronic desired to have all its PAD salesforce act in the same way.  Accordingly, Winger not only played an active role in the conduct alleged herein, but also spread the fraud as he trained other Medtronic representatives to do the same.

## COUNT I:

**Violation of the False Claims Act: Presenting False Claims for Payment**
**31 U.S.C. § 3729(a)(1) (2000), and, as amended, 31 U.S.C.(a)(1)(A)**

**(Illegal Kickbacks Against Defendants Medtronic/Covidien and Hutchinson)**

**(Medically Unnecessary Goods and Services Against Defendants Medtronic/Covidien and WRG)**

**(Off-Label Promotion and Usage Against Defendants Medtronic/Covidien and WRG)**

159.    Relator incorporates by reference the above paragraphs as if set forth fully here.

160.    Relator and the United States seek relief against Defendants under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. § 3729(a)(1) (2000), and, as amended, 31 U.S.C.

§3729(a)(1)(A).

161.     As set forth in detail above in paragraphs 52 through 158, as a result of offering
and paying remuneration to induce sales of Medtronic/Covidien's devices and to induce
medically unnecessary goods and services for reimbursement, and marketing, promoting and
instructing the usage of medical devices not authorized by the FDA, in violation of the federal
AKS, 42 U.S.C. § 1320a-7b(b), Defendant Medtronic/Covidien presented – or caused to be
presented – claims for reimbursement to Government Healthcare Plans and the U.S. VA that
were false or fraudulent.

162.     As set forth in detail above in paragraphs 101 through 158, Defendant WRG
provided medically unnecessary services, as well as medical devices not authorized by the FDA
used in medically unnecessary procedures, and in turn, presented time worked for reimbursement
from the U.S. V.A. for such services and procedures.  In doing so, Defendant WRG presented –
or caused to be presented – claims for reimbursement to the U.S. VA that were false or
fraudulent.

163.     As set forth in detail above in paragraphs 82 through 100, as a result of accepting
remuneration to induce sales of Medtronic/Covidien's devices, in violation of the federal AKS,
42 U.S.C. § 1320a-7b(b), Defendant Hutchinson presented – or caused to be presented – claims
for reimbursement to Government Healthcare Plans that were false or fraudulent.

164.     Accordingly, Defendants Medtronic/Covidien, Hutchinson and WRG knowingly
presented false or fraudulent claims – or caused the presentment of false or fraudulent claims –
for payment or approval in violation of 31 U.S.C. § 3729(a)(1) (2000), and, as amended, 31
U.S.C. § 3729(a)(1)(A).

165.     By reason of the false or fraudulent claims that Defendants knowingly presented

(or caused to be presented) to Government Healthcare Plans and the U.S. VA, the United States has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

WHEREFORE, Relators respectfully request that the Court enter judgment against Defendants Medtronic/Covidien, Hutchinson and WRG and in favor of the United States as follows:

a.      that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Fifth Amended Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

b.      that civil penalties of $21,563 be imposed for each and every false claim that Defendants presented – or caused to be presented – to the United States and/or its grantees;

c.      that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.      that the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this Fifth Amended Complaint;

e.      that Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act;

f.      that Relator be awarded the maximum amount allowed to him of any portion of a judgment or settlement fund that goes to any State government; and

g.      that this Court award such other and further relief as it deems proper.

## COUNT II:

**Violation of the False Claims Act: Use of False Statements**
**31 U.S.C. § 3729(a)(2) (2000), and, as amended, 31 U.S.C. § 3729(a)(1)(B)(Supp. 2009)**

**(Illegal Kickbacks Against Defendants Medtronic/Covidien and Hutchinson)**

**(Medically Unnecessary Goods and Services Against Defendants Medtronic/Covidien and WRG)**

**(Off-Label Promotion and Usage Against Defendants Medtronic/Covidien and WRG)**

166.     Relator incorporates by reference the above paragraphs as if set forth fully here.

167.     Relator and the United States seek relief against Defendants Medtronic/Covidien, Hutchinson and WRG under Section 3729(a)(2) of the False Claims Act, 31 U.S.C. § 3729(a)(2) and, as amended, 31 U.S.C. § 3729(a)(1)(B) (Supp. 2009).

168.      As set forth in detail above in paragraphs 52 through 158, as a result of offering and paying remuneration to induce sales of Medtronic/Covidien's devices and to induce medically unnecessary goods and services for reimbursement, and marketing, promoting and instructing the usage of medical devices not authorized by the FDA, in violation of the federal AKS, 42 U.S.C. § 1320a-7b(b), Defendant Medtronic/Covidien made – or caused to be made – false records or statements that were material to getting false or fraudulent claims paid by Government Healthcare Plans and the U.S. VA.

169.     As set forth in detail above in paragraphs 101 through 158, Defendant WRG provided medically unnecessary services, as well as medical devices not authorized by the FDA used in medically unnecessary procedures, and in turn, presented time worked for reimbursement from the U.S. V.A. for such services and procedures.  In doing so, Defendant WRG made – or caused to be made – claims for reimbursement to the U.S. VA that were false or fraudulent.

170.     As set forth in detail above in paragraphs 82 through 100, as a result of accepting remuneration to induce sales of Medtronic/Covidien's devices in violation of the federal AKS,

42 U.S.C. § 1320a-7b(b), Defendant Hutchinson made – or caused to be made – false records or statements that were material to getting false or fraudulent claims paid by Government Healthcare Plans.

171.   Defendants Medtronic/Covidien and Hutchinson falsely certified, stated, and/or represented that the reimbursements they sought for Medtronic/Covidien devices were in full compliance with applicable federal laws prohibiting fraudulent and false reporting, including but not limited to the federal AKS, 42 U.S.C. § 1320a-7b(b) and, with respect to Defendant Medtronic/Covidien, FDA regulations concerning off-label marketing.  Defendants' false certifications, statements, or representations caused Government Healthcare Plans to pay out sums to Defendants that would not have been paid if those programs had been made aware of the falsity of the Defendants' certifications, statements, or representations.

172.   Accordingly, Defendants Medtronic/Covidien, Hutchinson and WRG knowingly used – or caused the use of – false records or statements material to false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(B).

173.   By reasons of these false records or statements that Defendants Medtronic/Covidien, Hutchinson and WRG used (or caused to be used), the United States has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false record or statement.

WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants Medtronic/Covidien, Hutchinson and WRG and in favor of the United States as follows:

a.   that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Fifth

Amended Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

b.       that civil penalties of $21,563 be imposed for each and every false claim that

Defendants presented – or caused to be presented – to the United States and/or its grantees;

c.       that pre- and post-judgment interest be awarded along with reasonable attorneys'

fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case;

d.       that the Court grant permanent injunctive relief to prevent any recurrence of the

False Claims Act for which redress is sought in this Fifth Amended Complaint;

e.       that Relator be awarded the maximum amount allowed to him pursuant to the

False Claims Act;

f.       that Relator be awarded the maximum amount allowed to him of any portion of a

judgment or settlement fund that goes to any State government; and

g.       that this Court award such other and further relief as it deems proper.

## COUNT III

**Violation of the False Claims Act: Conspiring to Violate the False Claims Act
31 U.S.C. § 3729(a)(3) (1986), and, as amended, 31 U.S.C. § 3729(a)(1)(C)**

**(Conspiracy Against all Defendants)**

174.     Relator incorporates by reference the above paragraphs as if set forth fully here.

175.     Relator and the United States seek relief against Defendants Medtronic/Covidien,

Hutchinson and WRG under Section 3729(a)(3) of the False Claims Act, 31 U.S.C. §

3729(a)(3)(1986) and, as amended, 31 U.S.C. § 3729(a)(1)(C).

176.     A conspiracy violation of the FCA occurs when a person "conspires to commit a

violation of subparagraph (A), (B), (D), (E), (F), or (G)" of the FCA.  31 U.S.C. § 3729(a)(1)(C).

177.     As set forth in detail above in paragraphs 82 through 100, Relator alleges that

Defendants Medtronic/Covidien and Hutchinson entered into an agreement and plan to conspire

to violate the FCA through their company policies and practices, which were devised, perpetrated and implemented by Defendants Medtronic/Covidien, Hutchinson and other unnamed co-conspirator providers as developed by the material and witnesses provided by Relator.

178.    As set forth in detail above in paragraphs 52 through 80 and 101 through 158, Relator alleges that Defendants Medtronic/Covidien and WRG, and Teri Brinkley, and other unnamed co-conspirators entered into an agreement and plan to conspire to violate the FCA through Medtronic/Covidien's and WRG's company policies and practices, which were devised, perpetrated and implemented by Defendants Medtronic/Covidien and WRG, Teri Brinkley and other unnamed co-conspirator providers as developed by the material and witnesses provided by Relator.

179.    The fraudulent company practices that Defendants Medtronic/Covidien and Hutchinson conspired to commit included engaging in an illegal kickback scheme whereby Medtronic/Covidien's Sales Representative/Field Sales Trainer Doug Winger would provide remuneration including "free" or "marketing material" or "leverage" devices to Hutchinson's Director of Supply Chain Mark Wilson to net down the cost of Medtronic/Covidien's bulk device proposals to Hutchinson. Hutchinson would benefit again from the kickbacks, as it would bill Government Healthcare Plans for the "free" "marketing material" or "leverage" devices it received free of charge from Medtronic/Covidien as part of the sale.

180.    The fraudulent company practices that Defendants Medtronic/Covidien and WRG conspired to commit involved/included? an illegal scheme whereby Medtronic/Covidien's Sales Representative Winger would promote and market the use of medically unnecessary and excessive PAD devices to Defendant WRG's physicians and PAD devices being used off-label

in medically unnecessary procedures.  Defendant Medtronic/Covidien would benefit by increased revenue paid by the U.S. V.A. from selling said devices, and Defendant WRG would benefit by requesting and then utilizing these excessive devices, which in turn, increased its compensation provided under its agreements with Dole VA.

181.    As set forth throughout the Fifth Amended Complaint, these Co-Defendants and Co-Conspirators agreed verbally and in writing to commit acts in furtherance of these fraudulent business operations and took actions in furtherance of their conspiracy.

182.    The conspiracy of these Co-Defendants and Co-Conspirators caused the submission of false and fraudulent claims to the U.S. V.A. and Government Healthcare Plans seeking reimbursement for products tainted by the fraudulent schemes devised, perpetrated and implemented by Defendants.

183.    Accordingly, Defendants Medtronic/Covidien, Hutchinson and WRG conspired to defraud the United States by getting false or fraudulent claims allowed or paid, in violation of 31 U.S.C. § 3729(a)(3)(1986), and conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B), in violation of 31 U.S.C. § 3729(a)(1)(C) (2009).

184.    By reason of the false or fraudulent claims and Defendants' actions taken in furtherance of their conspiracy to get paid by reasons of their conspiracy to violate 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B), the United States has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants Medtronic/Covidien, Hutchinson and WRG and in favor of the United States as follows:

a.      that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Fifth Amended Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

b.      that civil penalties of $21,563 be imposed for each and every false claim that Defendants presented – or caused to be presented – to the United States and/or its grantees;

c.      that pre- and post-judgment interest be awarded along with reasonable attorneys' fees, costs, and expenses that Relators necessarily incurred in bringing and pressing this case;

d.      that the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this Fifth Amended Complaint;

e.      that Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act;

f.      that Relator be awarded the maximum amount allowed to him of any portion of a judgment or settlement fund that goes to any State government; and

g.      that this Court award such other and further relief as it deems proper.

## Demand for Jury Trial and Designation of Place of Trial

Relator, on behalf of the United States, and on behalf of himself, hereby demands a trial by jury on all counts and allegations of wrongful conduct as alleged in this Fifth Amended Complaint in the United States District Court for the District of Kansas at Kansas City, Kansas.

Respectfully submitted,

Carrie Mulholland Brous KS #18157
**Brous Law LLC**
3965 West 83rd Street, Ste. #115
Prairie Village, KS  66208
(913) 209-8596
cbrous@brouslaw.com



*/s/ Brendan J. Donelon*
Brendan J. Donelon, KS #17420
4600 Madison, Suite 810
Kansas City, Missouri 64112
Tel:    (816) 221-7100
Fax:    (816) 709-1044
brendan@donelonpc.com

Daniel W. Craig, D.Kan. #78146
6642 Clayton Rd., #320
St. Louis, Missouri 63117
Tel:    (314) 297-8385
Fax:    (816) 709-1044
dan@donelonpc.com

<u>Certificate of Service</u>

I hereby certify that on <u>October 21, 2022</u> the above and foregoing was sent pursuant to this Court's CM/ECF procedures to the attorneys of record in this matter.

*/s/ Brendan J. Donelon*