IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA, )
ex rel. THOMAS SCHROEDER )
 )
   Plaintiff, )
 )
v. )  Case No. 2:17-cv-02060-DCC-KGG
 )
MEDTRONIC, INC., COVIDIEN, L.P. )
HUTCHINSON REGIONAL )
MEDICAL CENTER, and WICHITA )
RADIOLOGICAL GROUP, P.A., )
 )
   Defendants. )
_____)


**<u>DEFENDANTS MEDTRONIC, INC AND COVIDIEN L.P.'S MEMORANDUM
SUPPORTING MOTION TO DISMISS RELATOR'S FIFTH AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

INTRODUCTION................................................................................................................1

BACKGROUND................................................................................................................2

I.      The Parties.............................................................................................................2

II.     Relator's Previous Complaints. ...........................................................................3

III.    Relator's Fifth Amended Complaint.....................................................................6

ARGUMENT .....................................................................................................................9

I.      The Public Disclosure Bar Precludes Relator's "Medical Necessity" and "Per Diem
        Marketing" Claims. ...........................................................................................11

        A.      Relator's Medical-Necessity and Off-Label Claims Are Derived From an
                OIG Investigation and Therefore Barred As Public Disclosures.............13

                1.      The Allegations Relating to Medical Necessity and Off-Label Device
                        Usage Were Previously Known and Disclosed Through the United
                        States' Own OIG Investigation................................................14

                2.      The Public Disclosure Alleged Substantially the Same Conduct As
                        Alleged by Relator. ...............................................................16

                3.      Relator Does Not Adequately Plead that He Is An "Original Source"
                        of the Medical Necessity Allegations. .....................................18

        B.      Relator's "Per Diem Marketing" Allegations Are Substantially Similar to the
                Government's Previous Public Disclosure and Settlement. ...................20

                1.      The Per Diem Marketing Claims Were Publicly Disclosed Through
                        Federal Complaints and the News Media. .................................20

                2.      The *Hayes-Ponder* and *Howerton* Cases Disclosed Substantially the
                        Same Per Diem Marketing Allegations as Now Alleged by Relator. ........21

                3.      Relator Does Not Adequately Plead that he Is an "Original Source" of
                        the Per Diem Marketing Allegations. ......................................23

II.     Relator's "Medical Necessity" Claims Are Not Pled with Particularity As Required
        By Federal Rule of Civil Procedure 9(b) and Fail to Plead the Required Elements. ........24

        A.      Relator's Generalized Medical Necessity Allegations Do Not Identify a
                Single Specific Medically Unnecessary Procedure. ...............................24

        B.      Relator Fails to Allege All Required Elements for his Medical Necessity
                Claims. ..................................................................................28

                1.      Relator Does Not Allege Any Specific Medically Unnecessary
                        Procedures.............................................................................28

　　　　2.　　Relator Does Not Allege any Specific Act *by Defendants Medtronic or Covidien* that Caused Medically Unnecessary Procedures. ....................30

　　　　3.　　Relator Does Not Identify Any False Claims to the Government that Resulted from These Procedures. ..................................................32

III.　Relator Fails to Plead the Required Elements of his Off-Label Claims Because he Fails to Allege ANY Off-Label Use and Promotion that Resulted in a False Claim. ........33

　　A.　Claims Involving Alleged Off-Label Use or Promotion Are Not False Claims within the Meaning of the False Claims Act. ..........................................33

　　　　1.　　Off-Label Use of Medical Devices Is Not Unlawful...................................33

　　　　2.　　Off-Label Promotion Is Not Sufficient to State a False Claim....................35

　　B.　Relator Again Fails to Allege Facts Showing That Off-Label Use Occurred That Could Result in FCA Liability Against Defendants......................................37

　　　　1.　　Relator Fails to Identify an Off-Label Use of Balloons that Is Actionable Under the FCA. ........................................................37

　　　　2.　　Relator Fails to Allege Off-Label Use of Stents that Is Actionable Under the FCA...............................................................39

IV.　Relator Fails to Plead the Elements of an Actionable Civil Conspiracy Claim. ..............39

# INTRODUCTION

Over two years ago, Defendant Medtronic, Inc. moved to dismiss Relator's Second Amended Complaint on all grounds. (ECF No. 45.) The Court granted Medtronic's motion in part and dismissed all of Relator's claims except those related to alleged illegal kickbacks. (Sept. 14, 2021, Memorandum and Order, ECF No. 67 ("Order")). Relator then filed his Third and Fourth Amended Complaints, each of which were met with a Motion to Dismiss by Medtronic, Inc and its later added corporate sibling, Covidien L.P. (collectively "Medtronic"). Before the Court could decide either of those motions, Relator filed amended complaints.

Now, in this Fifth Amended Complaint, Relator's pleadings reveal that the statutory public disclosure bar, 31 U.S.C. § 3730(e)(4)(A), squarely applies and precludes Relator from being able to pursue his non-kickback claims. In addition, Relator still has not cured the deficiencies first identified by Defendants in September 2020 relating to his medical necessity and off-label promotion allegations. As such, Relator's Fifth Amended Complaint also fails to state claims upon which relief may be granted for the same reasons raised in Medtronic's previous (extensive) motions to dismiss. Accordingly, Medtronic respectfully requests that the Court grant its motion to dismiss in its entirety and with prejudice.

## BACKGROUND

### I.   THE PARTIES.

Medtronic is a global medical technology company that manufactures and sells medical devices.  (Oct. 24, 2022, Fifth Am. Compl., ECF No. 233 ("5AC") ¶ 4.) Its products include cardiac devices, cranial and spinal robotics, insulin pumps, surgical tools, patient monitoring systems, mechanical thrombectomy devices for stroke, tremor-reducing stimulators for Parkinson's disease, and more.  The specific devices at issue in this case treat Peripheral Artery Disease ("PAD"), which occurs when plaque accumulates in an artery and restricts blood flow. (*See* 5AC ¶ 37.) The devices include Medtronic's "HawkOne" atherectomy device, which removes arterial plaque; the IN.PACT ADMIRAL drug-coated balloon ("DCB"), which is used to open blocked or narrowed arteries and deliver medication to the interior of the artery; and vascular and biliary stents designed to keep arteries from narrowing or closing. (*Id.*)

Relator works for a large multinational company that competes with Medtronic to sell devices to treat PAD in Kansas.  (Order, at 5; 5AC ¶¶ 1–4; .)

Defendant Hutchinson Regional Medical Center ("Hutchinson") is a hospital located in Kansas. (5AC ¶ 7.)  Defendant Wichita Radiological Group, P.A. ("WRG") is a professional association located in Kansas that provides services at Robert J. Dole Department of Veterans Affairs Medical and Regional Office Center ("Dole VA"). (5AC ¶ 8.)  Both Relator's employer and Medtronic market and sell their devices to Hutchinson and to Dole VA. (Order at 5.)

## II.    RELATOR'S PREVIOUS COMPLAINTS.

Relator filed his initial *qui tam* False Claims Act Complaint under seal in January 2017, alleging a scheme of illegal kickbacks at the Dole VA, that then allegedly resulted in the submission of false claims to the government.  (ECF No. 1.)  Importantly, the initial complaint made allegations relating only to alleged kickbacks at Dole VA; *it included no allegations that any procedures performed were medically unnecessary or off-label*. (*See generally*, ECF No. 1.)

On September 27, 2019, Relator filed his First Amended Complaint. (ECF No. 14.) The First Amended Complaint continued to assert Relator's kickback claims, but also asserted two new theories under the False Claims Act: (1) medically unnecessary goods and services; and (2) off-label sales and marketing. (*See, e.g.*, ECF No. 14 ¶¶ 19, 87, 115–53.)  Relator's "medical necessity" allegations curtly stated that the alleged kickback scheme "resulted in using more Medtronic devices than were medically necessary on patients at Dole VA and at other providers . . . ." (*Id.* ¶ 19.) Relator's "off-label" allegations were similarly conclusory: "[Medtronic employee Doug] Winger was selling Medtronic's DCBs off-label to coronary providers at the Dole VA for use in coronary heart procedures." (*Id.* ¶ 87.)

The government investigated Relator's sealed complaints and, on April 10, 2020, formally declined to intervene. (ECF No. 19.) Shortly thereafter, on July 6, 2020, Relator filed a Second Amended Complaint in an attempt to "further develop[ ] and describe[ ] claims for medically unnecessary medical treatment and 'off-label' devices involving Defendant Medtronic." (ECF No. 24, Relator's Unopposed Motion for Leave to File a

Second Am. Compl.) Relator's "illegal kickback" claims in the Second Amended Complaint now alleged that Medtronic employees Winger and Kerri Montgomery Kirk "bribed hospital staff to purchase its devices over competitors and to purchase grossly excessive inventory" such that Medtronic could "increase the sales of its medical devices and create a near monopoly of its product at hospitals[.]"  (ECF No. 26 ¶ 1.)  Relator's "medical necessity" claims in the Second Amended Complaint alleged that "Winger and/or Kirk [were] present during procedures [at Dole VA] whereby they marketed, instructed, or encouraged the overuse of Medtronic atherectomy devices, DCBs, and stents in PAD procedures." (*Id.* ¶ 99; *see also id.* ¶¶ 100–09.) Relator's "off-label" claims in the Second Amended Complaint alleged that Medtronic "marketed, trained, encouraged, and/or coerced Dole VA and WRG to utilized [sic] medical devices outside their usage as approved by the FDA." (*Id.* ¶ 110; *see also id.* ¶¶ 111–16.)

Medtronic moved to dismiss the Second Amended Complaint in its entirety.  (ECF No. 45.)  On September 14, 2021, the Court granted in part and denied in part Medtronic's Motion, permitting Relator's kickback allegations to proceed, but dismissing Relator's medical necessity and off-label claims.  (Order, at 31–37.)

As to medical necessity, the Court noted that Relator had alleged only that "Winger and/or Kirk" were present during procedures and "marketed, instructed, or encouraged the overuse" of devices.  (*Id.* at 32.)  The Court found this pleading to be insufficient as it failed to provide any allegations about "*how* these Medtronic employees influenced" the procedures, *who* was involved in the procedures at issue, or *when* in an alleged seven-year timespan the alleged actions took place.  (*Id.* at 32–33.)

Relator's off-label promotion claims similarly failed to plead necessary facts. Recognizing the nuance around differences in permissible off-label use, off-label promotion, and a "promotion [that] knowingly included false statements or misrepresentations in connection with the submission of false claims," the Court found Relator had again not pleaded *when* the alleged acts happened, *what* was said, or *how* the alleged marketing was false.  (*Id.* at 35–37.)  The Court granted Relator 30 days to amend his complaint.

Relator thereafter filed his Third Amended Complaint (ECF No. 72). Given Relator's failure to cure the pleading infirmities from his Second Amended Complaint, Medtronic again moved to dismiss (ECF Nos. 75, 76). While Medtronic's motion was pending, the parties commenced fact discovery, including the exchange of documents regarding Medtronic's device sales  to Dole VA.

On May 25, 2022, Relator preempted the Court's decision on the pending motion to dismiss by filing his Fourth Amended Complaint. (ECF Nos. 126, 127.) Because Relator again failed to adequately plead facts alleging that Medtronic caused physicians to perform medically unnecessary procedures with Medtronic devices, or that Medtronic engaged in actionable false, off-label promotion, Medtronic again moved to dismiss Relator's medical necessity and off-label claims. (*See* ECF Nos. 149, 150.) In addition, Medtronic moved to dismiss a new category of Relator's illegal kickback claims, which alleged illegal kickbacks in connection with a *per diem* marketing referral program. (*See* ECF No. 150 at 27–33.)

Once again, on October 24, 2022, while Medtronic's motion to dismiss yet another amended complaint was pending,  Relator amended again and filed his Fifth Amended Complaint. (ECF No. 233.) None of Relator's serial amendments has adequately addressed the issues identified by the Court in the Fall of 2020.

## III.   RELATOR'S FIFTH AMENDED COMPLAINT.

The allegations about Medtronic in the Fifth Amended Complaint mirror are nearly identical to those in the fourth and fifth iterations of Relator's complaint.[1] Like the previous complaints, Counts I and II each assert three theories of liability under the False Claims Act (5AC ¶¶ 159–173):

1.     **Kickbacks.** Relator alleges two forms of kickbacks. The Fifth Amended Complaint continues to allege that Medtronic provided illegal renumeration to certain Dole VA employees and certain Hutchinson employees in the form of alleged "weekly/daily lunches . . . ipads, iphones, NASCAR as well as other entertainment event tickets . . . weekend parties, as well as frequent nights at bars and restaurants[.]" (5AC ¶ 56; *see also id.* ¶ 88.) Starting in the Fourth Amended Complaint, Relator also alleges that Medtronic provided kickbacks to Hutchinson in the form of "marketing services" (referred to hereafter as the "Per Diem Marketing Claims"). (5AC ¶¶ 89, 179.) Relator's Fifth Amended Complaint makes no substantive changes to these claims from his prior complaint.

---

[1]     A redline showing the changes in the allegations between the Fourth Amended Complaint and the Fifth Amended Complaint is attached as Exhibit A to the Declaration of Alethea M. Huyser ("Huyser Decl.").

2.    **Medically Unnecessary Goods and Services.** The 5AC alleges that three WRG radiologists performing surgeries at Dole VA performed medically unnecessary procedures allegedly at the behest of Winger and Kirk. (*See, e.g.*, 5AC ¶¶ 106–110, 113.) The 5AC adds allegations regarding a 2018 investigation conducted by the Office of Inspector General of the Department of Veterans Affairs ("VA OIG"). A few months later, the VA was also engaged in a Cost Reduction Project, during which it reviewed the utilization of PAD devices by WRG surgeons, including specifically the appropriateness and frequency of device usage by WRG.[2] (*See, e.g.*, 5AC ¶¶ 62, 121.)

3.    **Off-label Promotion and Usage**. In an attempt to salvage and to bolster his off-label claims, Relator's Fifth Amended Complaint adds an allegation that Medtronic "promoted and marketed the unnecessary use of atherectomy devices by sending radiologists such as Drs. Gonda, Winblad, and Rust to educational seminars" during which Medtronic allegedly instructed physicians to use the devices as a standard of care for all PAD procedures, and made "false or misleading representations regarding its own medical studies promoting the patency of such treatment[,]" and instructed physicians "on how to maximize their reimbursements by performing this medically unnecessary treatment." (5AC ¶ 118; *see also id.* ¶ 152.)

---

[2]    Although not relevant at this stage, contrary to the 5AC's complaint that the Dole VA terminated its contract with WRG following the VA OIG investigation (see 5AC ¶ 102), WRG physicians, including Dr. Rust, still perform surgical procedures at Dole VA. (*See* Huyser Decl. Ex. B, WRG000239-319.)

In addition to these three substantive categories of claims, Count III alleges that all Defendants conspired together to violate the False Claims Act. (5AC ¶¶ 174–84.)

## STANDARD OF REVIEW

To satisfy Rule 12(b)(6), every complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Cressman v. Thompson*, 719 F.3d 1139, 1152-53 (10th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quotations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Id.* at 79 (internal quotation marks and alteration marks omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (alteration marks omitted).

This standard is heightened where, as here, the pleading is grounded in fraud. *U.S. ex rel. Wickliffe v. EMC Corp.*, 473 F. App'x 849, 851 (10th Cir. 2012) ("Complaints alleging violations of the FCA must satisfy the heightened pleading standard of Fed. R. Civ. P. 9(b), which requires allegations of fraud to be 'stated with particularity.") (quotation and citation omitted). Rule 9(b) requires a plaintiff to state with particularity "the circumstances constituting the fraud or mistake." *U.S. ex rel. Schwartz v. Coastal*

*Healthcare Grp., Inc.*, 232 F.3d 902 (10th Cir. 2000) (quoting Fed. R. Civ. P. 9(b)). The particularity requirement is important to provide "fair notice of plaintiff's claims and the factual ground upon which [they] are based." *U.S. ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 (10th Cir. 2018) (quotation and citation omitted). At a minimum, Rule 9(b) requires an FCA relator to plead "the 'who, what, when, where and how' of the alleged fraud." *Schwartz*, 232 F.3d at 902 (quoting *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)); *see also Polukoff.*, 895 F.3d at 745 (same). Fair notice—and the four Ws—are important in FCA cases; they give defendants accused of wide-ranging fraud conspiracies a chance to defend themselves against specifics, rather than shifting targets and innuendo and shifting burdens to defendants to "prove the negative." *See, generally, United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1171-72 (10th Cir. 2010).

## **ARGUMENT**

Relator's Fifth Amended Complaint utterly fails to plead the required elements with particularity or to state an actionable FCA Claim for lack of medical necessity, off-label use, and conspiracy. Therefore, despite amending his complaint *five* times, Relator's claims against Medtronic *still* cannot be sustained.

As an initial matter, it has now become clear that vast swaths of the Fifth Amended Complaint—specifically, those allegations other than Relator's initial 2017 kickback claims—are statutorily barred by the public disclosure bar to the False Claims Act ("FCA"), 31 U.S.C. § 3730(e)(4)(A). The public disclosure bar aims to strike "the golden mean between" encouraging "whistle-blowing insiders with genuinely valuable

information" to come forward while discouraging "opportunistic plaintiffs who have no significant information to contribute of their own."  *U.S. ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 738 (10th Cir. 2019) (citations omitted); 31 U.S.C. § 3730(e)(4)(A).

The Fifth Amended Complaint implicates the public disclosure bar in two ways. First, Relator's claims that procedures at the Dole VA included the use of medical devices in a medically unnecessary or off-label manner.  These issues, however, were investigated by the VA and Office of Inspector General ("OIG") *before* Relator's ever made any assertions. Second, Relator's marketing claims regarding *per diem* contractors and services allegedly provided to HRMC were investigated by the Department of Justice ("DOJ") years ago, in a different case well underway before Relator's complaint.

Relator's Per Diem Marketing, Medical Necessity, and Off-Label Claims are also subject to dismissal for other reasons. Given the negligible substantive edits contained within the Fifth Amended Complaint, almost every word in support of Medtronic's previous motions to dismiss apply equally to this motion.  The Fifth Amended Complaint does not allege its claims with either the requisite specificity necessary to sustain a claim under the FCA or the elements required in order to survive a motion to dismiss. Accordingly, Relator's Per Diem Marketing, Medical Necessity, and Off-Label Claims contained in Counts I and II, and Relator's Civil Conspiracy Claim of Count III, should be dismissed in their entirety and with prejudice.

## I.     THE PUBLIC DISCLOSURE BAR PRECLUDES RELATOR'S "MEDICAL NECESSITY" AND "PER DIEM MARKETING" CLAIMS.

In order to pursue claims on behalf of the United States, Relator must strictly qualify as a *qui tam* relator by meeting the "express conditions" set forth in the False Claims Act. *See State Farm Fire & Cas. Co. v. U.S. ex rel. Rigsby*, 137 S.Ct. 436, 440 (2016).  This includes compliance with the public disclosure bar.  According to the Tenth Circuit, the "[t]he public disclosure bar *compels* courts to dismiss qui tam claims if 'substantially the same allegations ... were publicly disclosed,' *unless* the relator is 'an original source of the information.'" *Id.* at 741 (quoting 31 U.S.C. § 3730(e)(4)(A)(emphases added)).

This Court has adopted a four-step analysis: (1) whether the public disclosure contains allegations from a source specified in Section 3730(e)(4)(B); (2) whether the disclosure has been made public; (3) whether substantially the same allegations from the public disclosures are made in relator's complaint;[3] and (4) whether the relator qualifies as the "original source."  *In re: Syngenta AG Mir 162 Corn Litig.*, No. 14-MD-2591-JWL, 2016 WL 5851795, at *2 (D. Kan. Oct. 6, 2016) (citing *U.S. ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1048 (10th Cir. 2004)).  To qualify as an original source, the Relator: (1) must have voluntarily disclosed to the government the information on which the allegations are based "prior to [the] public disclosure[;]" or (2) must "ha[ve] knowledge that is independent of and materially adds to the publicly disclosed allegations or

---

[3]     Thus, determining public disclosure requires the Court to first determine whether "substantially the same allegations" have been disclosed "(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media." 31 U.S.C. § 3730(e)(4)(A).

transactions" and "has voluntarily provided the information to the Government before filing an action." 31 U.S.C. § 3730(e)(4)(B).

The Tenth Circuit has also affirmed that the public disclosure bar should be addressed promptly in a case. *See Reed*, 923 F.3d 729.[4] This can be on a motion to dismiss pursuant to Rule 12(b)(6) when "the complaint itself admits all the elements of the [public disclosure bar] by alleging the factual basis for those elements." *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018). Therefore, the Court may properly "consider not only the challenged complaint itself, but also attached exhibits and documents incorporated into the complaint by reference." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009); *U.S. ex rel. Kraxberger v. Kansas City Power & Light Co.*, 756 F.3d 1075, 1083 (8th Cir. 2014) ("Since the FCA *requires* a court to dismiss a claim based on public disclosure, a court necessarily considers the alleged public documents in its dismissal."). But if the Court determines that an evidentiary basis is needed to decide the merits of the issue, it can and should convert the motion to a partial summary judgment. *Reed*, 923 F.3d at 741 (affirming similar conversion).  Here, the 5AC, along with the documents expressly incorporated into it, establish the public-disclosure bar's applicability to numerous of his asserted claims.

---

[4]      In *Reed*, the Tenth Circuit considered whether the public disclosure bar was a jurisdictional requirement or an affirmative defense, but ultimately declined to decide the issue because it was "immaterial" to its conclusion.  *Id; see also U.S. ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201 (1st Cir. 2016) (declining to decide whether the public disclosure bar is an affirmative defense, but noting nonetheless that an affirmative defense may serve as a basis for dismissal under Rule 12(b)(6)).

### A. Relator's Medical-Necessity and Off-Label Claims Are Derived From an OIG Investigation and Therefore Barred As Public Disclosures.

Relator has *no actual* knowledge about peripheral vascular procedures performed at the Dole VA. Relator's original complaint, filed under seal in this case, contained no allegations medical necessity or other clinical concerns about care at the Dole VA or about the use of Medtronic/Covidien medical devices in those procedures. Indeed, through five years of litigation, Relator has never identified any source—any procedure, any eyewitness, any patient, any date, or any physician—that saw or heard about an unnecessary procedure involving Medtronic devices.

The government, however, did explore this issue. While Medtronic does not believe questions about the medical care provided at Dole VA had merit—the undisputed fact for purposes of this motion is that the government identified and looked into these concerns *independent of*, and *before*, Relator. Namely, documents produced by the Government show that in late 2017 or early 2018, before Relator made any allegation about medical necessity, it was the VA's OIG that conducted the first and only review of the medical care provided by WRG physicians at the peripheral vascular cath lab at the Dole VA. Relator was not a participant in the independent OIG investigation, nor did the United States share the existence or facts of the investigation with Relator. Rather, a third-party sales representative named Todd Brown, who was employed by the same company as Relator and worked under Relator, was interviewed by OIG as part of the investigation. Mr. Brown testified that the OIG agent asked him about the use of devices in those procedures and even advised Brown about the potential of over-utilization. Mr. Brown then relayed that

13

information to Relator.   Only then did any medical necessity allegations appear in a Complaint filed in this matter—namely, the September 27, 2019 First Amended Complaint (ECF No. 14) and added his conclusory medical necessity allegations.

These new claims are the epitome of a "stifling parasitic lawsuit" barred by the FCA. *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 295 (2010).   Discovery has shown the genesis of the true, parasitic allegations in Relator's complaint.   Relator nonetheless attempts to amend his complaint by touting the very government review—received from the government in discovery—on which his claims have been predicated from the beginning.  (*See* 5AC ¶ 62.)[5]  Relator lacks any information about procedures at the Dole VA and is not an original source.

> 1.   **The Allegations Relating to Medical Necessity and Off-Label Device Usage Were Previously Known and Disclosed Through the United States' Own OIG Investigation.**

Whether based on the Complaint itself or the larger record, one fact cannot be disputed: Relator's claims are a copy of allegations explored by and known to the federal government through its own prior investigation.

First, the OIG investigation identified in Paragraphs 62 and 79–81, 99, 121, and 139 of Relator's 5AC is a "federal investigation" for purposes of the FCA. 31 U.S.C. § 3730(e)(4)(A).  *See also, U.S. ex rel. Lager v. CSL Behring, L.L.C et al*, 855 F.3d 935,

---

[5]     Relator's Fifth Amended Complaint parrots the language contained in the OIG's investigation file, which was produced to him on September 20, 2022 pursuant to a *Touhy* Request because the current question for Court is not whether Relator's allegations are "true" or "false," but whether the government was aware of them prior to Relator's allegations.  The record unambiguously shows it was.

(8th Cir. 2017) (OIG report is a public disclosure); *U.S. ex rel. Davis v. Prince*, 753 F. Supp. 2d 569, 585 (E.D. Va. 2011) (holding that a 2005 OIG Audit Report qualifies as an "administrative audit" within the plain meaning of § 3730(e)(4)(A)).

Second, the information is both public and publicly disclosed.  Relator's possession of the OIG materials was obtained through a Touhy request and because it was public under the Freedom of Information Act ("FOIA").  It is "generally accepted" that materials obtained through a public records request is "a public disclosure."  *U.S. ex rel. Grynberg v. Praxair, Inc.* 389 F.3d 1038, 1051 (10th Cir. 2004) (collecting cases about FOIA disclosures); *see also* Huyser Decl. Ex. C (Sept. 20, 2022 Letter from VA lodging objections to producing any materials not public under FOIA).

Moreover, beyond the Rule 12 documents, evidence shows that Relator's decision to add claims about medically unnecessary care and excessive device usage in 2019 was derived from the governments' own disclosures.  A disclosure is "public" for purposes of the FCA because it was "affirmatively disclosed to members of the public who are otherwise strangers to the fraud." *U.S. ex rel. Lancaster v. Boeing Co.*, 778 F. Supp. 2d 1231 (N.D. Okl. 2011) (quoting *U.S. ex rel. Fine v. Advanced Sciences, Inc.,* 99 F.3d 1000, 1005 (10th Cir. 1996)).  Here, between June 2017 and April 2018, Special Agent Nathen Howard disclosed to Todd Brown during the course of an OIG interview that the cost of doing procedures at Dole VA was "exponentially larger, 300 to 1,000 times more for a procedure" than the cost at other VA locations. (Huyser Decl. Ex. D (Dep. of Todd Brown at 74:21–75:2; 192:19-25)).  Likewise, Relator testified to obtaining hearsay information from his co-employees that VA employees in Oklahoma knew about the investigation and

had reported a belief that excessive devices were used in procedures.  (*Id.*, Ex. E (Dep. of Dan Clinkscales at 54:8 to 56:8); *id.*, Ex. F (Dep. Thomas Schroeder at 92:5–93:21, 161:5–14)).

In short, Relator has no basis to assert that disclosures about the investigation were not public—because that is the only way Relator himself learned of the allegations.  Indeed, by Relator's own account, he had *no information* about procedures at the Dole VA and *no evidence* to support his then-nonexistent medical necessity allegations unless and until he obtained discovery from the VA itself.  (*Id.*, Ex. G (Rel.'s Resp. to Interrog. No. 21 (stating that Relator "cannot provide exact dates for each of these medically unnecessary procedures, the physician performing each procedure, the patient's identity, witnesses present, and all devices used" until the Touhy records "are produced.")).

### 2.    The Public Disclosure Alleged Substantially the Same Conduct As Alleged by Relator.

Given that the 2018 VA OIG investigation was the genesis of Relator's 2019 medical necessity claims, it is unsurprising that the OIG investigation and Realtor's 5AC involve "substantially the same" concerns.  *See* 31 U.S.C. § 3730(e)(4)(A). The operative question for this inquiry is "whether the public disclosures were sufficient to set the government 'on the trail of the alleged fraud without [the relator's] assistance.'" *Reed*, 923 F.3d at 744 (change in original).  Relator need not identify the same defendant by name or have learned of the basis for the *qui tam* action from the disclosure to trigger the bar. *Id.* at 745 (citations omitted).  Nor is "a *complete* identity of allegations, even as to time, place,

and manner . . . required to implicate the public disclosure bar." *Id*.  It is enough if the "essence" of the relator's allegations is derived from a prior public disclosure.  *Id*.

Although identity is not required, when Relator filed his Amended Complaint in 2019 and added claims based on alleged medical necessity issues, his allegations were almost identical to the allegations that had been investigated by the VA itself.

For example, Relator added allegations that  "Brinkley caused the VA to purchase a shockingly excessive amount of Medtronic's products."  (ECF No. 14, First Am. Comp. ¶ 63.)  Relator's allegations focused specifically on atherectomy devices and DCBs.  (*Id.* ¶¶ 64-68.)  The VA OIG documents verify that—prior to Relator's 2019 allegations—the government had already investigated and collected information on this very same topic. Dole VA's investigation looked at purchase numbers of Turbohawks, which are an atherectomy device, and DCBs. (*See* Huyser Decl. Ex. H (VA Production, Schroeder 01290-93); *id.*, Ex. I (Dep. of Teri Brinkley at 151:3–21 172:14–174:9, and 183:5–25 (regarding interviews of her by VA OIG agents on the topic of peripheral vascular purchasing)]).  As mentioned above, the OIG was also collecting information on how those purchases compared to use at the Dole VA and other VA facilities.

Likewise, in 2019 Relator added a single conclusory assertion that "medically unnecessary and/or excessive amounts of Medtronic's products are being placed in patients at the VA."  (ECF No. 14, First Am. Comp. ¶ 85.)  Again, Relator was keyed into this concern by disclosures made by Oklahoma VA employees to  employees that Relator supervised.  (Huyser Decl. Ex. E (Clinkscales Dep. at 54:8 to 56:8); *id.*, Ex. F. (Schroeder Dep. 92:5–93:21, 161:5–14)).  The OIG investigation materials Relator now seeks to

capitalize upon indicate that around March of 2018 consultants for the VA conducted a "review of charts" for procedures utilizing atherectomy and DCBs for treatment. (*See, e.g.*, *id.*, Ex. J, (VA Production, Schroeder 01287-88)).   One focus of the review was the level of device usage in the lab.  (*Id.*; *id.*, Ex. K (VA Production, Schroeder 01277)).   In addition, consultants compared purchase levels to usage levels at the Dole VA, as well as usage levels between different VA hospitals.  (*Id.*)

In early 2018, the government was squarely reviewing the question of whether the purchase and use of peripheral vascular devices at the Dole VA was excessive.  Then, Relator then took disclosures about that review and added medical necessity claims to his First Amended Complaint in September 2019.  Now, having received the investigation file, Relator once again amends the complaint to add publicly-disclosed information contained therein.  What is clear is the "parasitic" nature of these claims based on the similarity and connection between the publicly disclosed materials and Relator's Amended Complaints.

### 3.    Relator Does Not Adequately Plead that He Is An "Original Source" of the Medical Necessity Allegations.

Relator's Fifth Amended Complaint does not include any factual allegations that would qualify him as an original source, as would be necessary to avoid the public-disclosure bar.  Relator has included a few bald assertions but such assertions need not be accepted as true on a Rule 12 motion.  *See Iqbal*, 556 U.S. at 678 (2009).  Moreover, when converted to summary judgment, evidence shows these assertions are demonstrably false.

For example, Relator states that the "allegations contained herein are based upon the personal knowledge of Relator obtained through Relator's firsthand observations or

interactions and *communication with other firsthand witnesses*." (5AC ¶ 35 (emphasis added).)  The Court need not accept this assertion on its face, nor should it.  The record is replete with testimony confirming that Relator has no firsthand knowledge or information about procedures at the Dole VA.  He has testified under oath that he has only been in a Dole VA administrative office two or three times, has never attended or seen a single peripheral vascular procedure at the Dole VA, and he has no knowledge about a single patient's care at the Dole VA. (Huyser Decl. F (Schroeder Dep. 18:25–19:7, 27:8–10, 27:25–30:1)).  Relator also does not even know the physicians.  (*See, e.g., id.* at 28:8-10 (Q. "How about Dr. Gonda? Have you ever met him? A: No, sir."); *id.* at 28:19-21 ("Q. How about Dr. Rust? How often have you met Dr. Rust? A. Never.")).

In his Fifth Amended Complaint, Relator now also alleges, without support, that the OIG investigation was conducted "[a]s a result of the Relator's initial complaint in this matter[.]"  (5AC ¶ 62.)  Again, Relator identifies no source for this bald assertion. *See Ashcroft*, 556 U.S. at 678. Nor can Relator claim to materially add to the information already known by the United States.  *Reed*, 923 F.3d at 757 (noting that a relator who satisfies the "materially-adds" standard ordinarily discloses "new information" and that "a relator who merely adds background information or details about a known fraudulent scheme typically will be found not to have materially added to the publicly disclosed information") (citations omitted).  Relator acknowledged that he "absolutely" was not "present for any procedure at the Dole VA cath lab. (Huyser Decl. F (Schroeder Dep. 29:5-10)).  In discovery, Relator has also been unable to produce *any* support for these allegations. (*See id.,* Ex. G (Rel.'s Resp. to Interrog. No. 21–23.)  Moreover, when his

witnesses are deposed, each disclaimed any knowledge of medically unnecessary procedures.  (*Id*., Ex. L (Dep. of Monique Liebelt (formerly Lloyd) at 127:15-128:3 (stating that she's never said the WRG doctors were "doing something inappropriate" in patient procedures)); *id,* Ex. M (Dep. of Larry Valdivia at 102:1-9; 131:6-132:22)).

### B.   Relator's "Per Diem Marketing" Allegations Are Substantially Similar to the Government's Previous Public Disclosure and Settlement.

The public disclosure bar also applies to the specific allegations relating to marketing services to Hutchinson doctors provided by a *per diem* contractor. As Medtronic's previous motion to dismiss briefing laid out, publicly available materials show that this category of alleged false claims had been the subject of two prior FCA  lawsuits and a DOJ investigation that lasted from 2014 to 2019 and resulted in a national settlement in March 2019. (ECF No. 150 at 27–33.) During the DOJ  investigation, Medtronic expressly disclosed the sole *per diem* contractor who worked for Covidien in the Wichita area, (*see* Declaration of Adam Morris, ECF No. 196), showing that this claim is plainly within the public-disclosure bar.

Relator, by contrast, did not articulate this category of alleged illegal kickbacks and false claims until more than three years later, in his June 17, 2022 Fourth Amended Complaint. (Fourth Am. Compl. ¶ 90, ECF No. 127.)  Relator's 5AC offers no basis to save these claims. The Court should dismiss Relator's Per Diem Marketing Claims.

### 1.   The Per Diem Marketing Claims Were Publicly Disclosed Through Federal Complaints and the News Media.

Here, the Per Diem Marketing allegations were made in two publicly filed federal *qui tam* actions in which the federal government intervened. (Huyser Decl. at Ex. N

(Hayes-Ponder Compl.); *id.* Ex. O (Howerton Compl.)).[6]  The Settlement was also heavily reported by the news media, as evidenced by the DOJ's Press Release and Relator's own citation in the 5AC to an article reporting on the Settlement (5AC, ECF No. 233, ¶¶ 49 n. 6).  In addition, Medtronic made significant disclosures to DOJ during a five-year nationwide investigation of Covidien's *per diem* program.  (*See* Morris Decl., ECF No. 196).  As set forth in that declaration, Medtronic even specifically produced to DOJ **the per diem contract of Danielle Hoover** that Relator now seeks in discovery.  *Id.*

Accordingly, there is no question the allegations in the *Hayes-Ponder* and *Howerton* cases, as well as the broader DOJ investigation, were public disclosures under the FCA .  Steps one and two for application of the public disclosure bar are met.

> **2.    The *Hayes-Ponder* and *Howerton* Cases Disclosed Substantially the Same Per Diem Marketing Allegations as Now Alleged by Relator.**

Next, the federal complaints and news media disclosed "substantially the same" allegations or transactions as the Per Diem Marketing allegations in the instant action. *See* 31 U.S.C. § 3730(e)(4)(A).  The *Hayes-Ponder* and *Howerton* Cases disclosed allegations of a nationwide kickback scheme of Covidien employees offering physicians remuneration in the form of marketing services to incentivize the sale of Covidien products designed to treat PAD.  (Huyser Decl. at Exs. N, O.)  For example, the *Hayes-Ponder* complaint alleged

---

[6]    These Complaints are necessarily embraced by the pleadings given Relator's allegations related to the settlement of these claims. (*See* 5AC ¶ 49.) Accordingly, the Court may consider them on this motion to dismiss without converting the instant motion into one for summary judgment.

Covidien engaged in a "nationwide practice" in which sales representatives and alleged "per diem" employees "directly and indirectly offered and provided remuneration to physicians in the form of free advertising and practice-specific marketing and screening." (*Id.*, Ex. N ¶¶ 10, 45-60.) Similarly, the *Howerton* complaint alleged Covidien sales representatives and "per diem" employees defrayed a physician's marketing expenses for ultrasound vein screenings designed to obtain patient referrals for  procedures in which Covidien catheters would be used.  Howerton also alleged a marketer was hired to market the vein practice through lunch meetings with referring physicians and staff. Covidien guaranteed patient referrals to physicians and defrayed marketing costs.  (*Id.*, Ex. O, ¶¶ 1, 23, 25, 43, 45, 54.) The relator alleged the scheme was implemented "in other areas of California and in other states" and that "Covidien employed 43 so-called 'marketers' nationally implementing the same kickback scheme nationally."  (*Id.* ¶¶ 40–41.)

These allegations of a nationwide kickback scheme pursuant to which Covidien employees and contractors offered physicians renumeration in the form of marketing services to incentivize the sale of Covidien products to treat PAD were filed in federal complaints in 2014 and 2015. They were publicly settled in 2019. On July 8, 2020, a*fter* these allegations were publicly filed and settled by the federal government, Relator amended his complaint to add the first marketing-based allegations.  (ECF No. 26 ¶¶ 80, 87; 5AC ¶¶ 82, 89 (showing the amended version, which focus on non-employees), *compare with* Huyser Decl. Ex. N. ¶¶ 10, 45-60 *and* Ex. O ¶¶ 1, 23, 38.)

The government does not need Relator's flimsy allegations to put it "on the trail" of some alleged kickback scheme perpetrated by Covidien involving marketing service

renumeration.  *Reed*, 923 F.3d at 744.  The DOJ was made well aware of these alleged practices specific to Medtronic/Covidien PAD devices since *at least* 2014, and the parties settled those claims before Relator ever said a word about them.

### 3.      Relator Does Not Adequately Plead that he Is an "Original Source" of the Per Diem Marketing Allegations.

It is indisputable that Relator fails the test to qualify as an original source.  Relator provides no factual allegations to show he is an original source or that he has any independent knowledge of Covidien "marketing services."  The viability of the Per Diem Marketing Claims therefore turns on whether Relator "discloses new information that is sufficiently significant or important that it would be capable of 'influenc[ing] the behavior of the recipient'—*i.e.*, the government—ordinarily will satisfy the materially-adds standard." *Reed*, 923 F.3d at 756-57 (quoting *Winkelman*, 827 F.3d at 211).

Relator cannot meet this standard.  Here, Relator alleges Medtronic/Covidien defrauded the government using the exact same theory of harm as was alleged in the *Hayes-Ponder* and *Howerton* cases: free advertising and marketing services with referring physicians.  (*Compare* Huyser Decl.  Ex. N, ¶¶ 10, 45-60, *and* Ex. O, ¶¶  1, 23, 25, 43, 45, 54 *with* 5AC ¶ 90.)  Relator does not even identify a new example of the alleged *nationwide* scheme—Medtronic expressly disclosed Ms. Hoover's role with Covidien to DOJ years ago.  In short, Relator fails to make any material contribution to the already publicly disclosed information.  Relator's claims are therefore barred.

## II. RELATOR'S "MEDICAL NECESSITY" CLAIMS ARE NOT PLED WITH PARTICULARITY AS REQUIRED BY FEDERAL RULE OF CIVIL PROCEDURE 9(B) AND FAIL TO PLEAD THE REQUIRED ELEMENTS.

Because the FCA is grounded in fraud, Federal Rule of Civil Procedure 9(b) requires the 5AC to do more than just state a plausible claim for relief.  At a minimum, it must allege with particularity the "who, what, when, where, and how" of the purported fraud in order to avoid dismissal.  *Polukoff*, 895 F.3d at 745.  Relator fails to do so here. As the Court has recognized, and despite being on notice of this deficiency (Order, at 34-37), Relator has still not identified a single, actual procedure with enough detail for the Court to infer that medically unnecessary care was given or to infer the existence of a single instance of improper, off-label use of a device, or a false claim.

### A. Relator's Generalized Medical Necessity Allegations Do Not Identify a Single Specific Medically Unnecessary Procedure.

Relator's medical necessity allegations remain deficient under Rule 9(b) because Relator fails to: (1) identify the procedures and claims with *any* of the required specificity; or to (2) explain *how* and *why* individual procedures were medically unnecessary for each patient at issue, or even for any one patient. These are not technical hurdles—they go to the crux of whether Relator has actual knowledge of any violation of law, as opposed to opinions, suppositions, and rumors.  Despite receiving significant discovery and being on notice of this deficiency, Relator's medical necessity allegations remain generic and circumstantial.  Rule 9(b) requires far more.  *See U.S. ex rel. Feaster v. Dopps Chiropractic Clinic, LLC*, No. 13-1453-EFM-KGG, 2015 WL 6801829, at *4-5 (D. Kan. Nov. 5, 2015) (granting motion to dismiss under Rule 9(b) for claim of unperformed, uncovered,

unnecessary, or undocumented treatment because relator failed to provide dates of false claims, the value of the claims, the dates of the treatment, any identifiers for the patients who were treated, or any other facts indicating the "who, what, when, where, and how" required by 9(b)).

First, Relator still cannot answer the *who* and *when* questions with any degree of specificity.  As to *when*, the Court previously explained that a bald assertion of an alleged scheme taking place over a period of seven years from 2011 to 2018 is insufficient. (Order at 33-34.) Yet the 5AC still fails to identify the specific act or procedures that Relator alleges are at issue.  Instead, he disguises his prior generalized assertions by breaking that timeframe up into two- to four-year overlapping periods, giving the appearance of specificity without providing any more precise information. (*See* 5AC ¶¶ 114–116, 119, 134 (alleging "numerous PAD procedures" during 2012-2013, 2011–2015, 2014–2018, 2012-2015, and 2011-2018); *id.* ¶¶ 126–28 (alleging multiple stents used in 2011–2015, 2012–2013, 2014–2018, 2011–2018); *id.* ¶¶ 130–33 (alleging "numerous occasions between 2015–2018 when numerous shorter DCBs were used when a longer balloon would suffice"). Indeed, instead of adding specificity regarding the procedures at issue, Relator has presented only the illusion of specificity by pointing to specific purchases of Medtronic devices. (5AC ¶¶ 126-28, 131-32.) Yet, Relator acknowledges the absence of any temporal tie between device purchases and the procedures using those devices, because the VA purchased medical devices in "bulk." (5AC ¶¶ 72, 96, 175.)  Thus, the medical necessity allegations remain insufficient under Rule 9(b) because Relator cannot put Medtronic on notice as to *when* the alleged procedures occurred. Likewise, as to the question of *who*,

many of Relator's allegations still fail to identify a specific procedure. In sum, Relator has changed the window dressing but still cannot provide specific allegations sufficient to put Medtronic on fair notice of the claims against it or to comply with Rule 9(b). *See Feaster*, 2015 WL 6801829 at *1-4 (dismissing claims alleging that a relator "routinely observed" unnecessary procedures where he failed to identify any specifics tied to particular claims).

Second, Relator lacks any data about specific procedures sufficient to support his medical necessity claims, instead relying on statistics and articles for propositions that are unsupported by those sources. For example, Relator relies on a *Wall Street Journal* article relating to rates at which atherectomy procedures were used as an *initial* treatment by vascular surgeons, not the efficacy of the procedure overall nor an analysis of the ***number of devices*** used in procedures. Sumathi Reddy, *Doctors Sound an Alarm Over Leg-Stent Surgery*, WALL STREET JOURNAL, Sept. 10, 2019. None of Relator's factual allegations relate to the primary thesis of the article. (Contra 5AC ¶ 112.) Similarly, Relator's allegation that "the use of multiple stents is unreasonable and medically unnecessary" is another legal conclusion and is insufficient to survive a motion to dismiss. (5AC ¶ 124 n.21.)

Relator also relies on purported observations by witnesses at various times over multi-year time periods during which he claims "multiple devices were used" that were "medically unnecessary." (5AC ¶¶ 114–116 (multiple atherectomy devices), 125–128 (multiple stents), 130, 132 (several short balloons used instead of one long balloon).) These conclusory allegations are not entitled to weight. Given the risk of amputation associated with conditions such as critical limb ischemia if untreated, it is notable that Relator

provides no information on the baseline condition of patients or the viability of other non-amputation treatments.  The Court lacks any patient-specific facts from which it can infer whether the devices used in these cases were unsafe, ineffective, or otherwise medically inappropriate *for that patient*.  *Polukoff*, 895 F.3d at 742; *see also U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 779 (7th Cir. 2016) (affirming dismissal where relator's complaint referenced four individuals who allegedly received medically unnecessary treatment but failed to explain "why these treatments actually were unnecessary other than [Relator's] personal view").  Moreover, while the allegation only identifies witnesses as "Healthcare Professionals," the allegations fail to provide any medical credentials for these witnesses for the Court to rely on.

Inherent in the concept of medical necessity is whether the procedure was safe, effective, not experimental or investigative, and appropriate—all in the context of a specific person's condition.  *Polukoff*, 895 F.3d at 742–43.  Instead of alleging such facts, Relator is content to smear Medtronic and numerous licensed doctors by alleging breathtaking, broad-scale malpractice.  Thus, while Relator's complaint requires speculation, the Court must look for sufficiently concrete factual allegations from which one could reasonably conclude that a specific, medically unnecessary procedure occurred.  (Order at 20 (dismissing claim because facts leave only "a sheer possibility that [the] defendant has acted unlawfully" which is insufficient).)[7]  Five years and six complaints

---

[7]     The cases previously cited by Relator in response to Medtronic's prior motion to dismiss are inapposite.  *U.S. ex rel. Daugherty v. Bostwick Lab'ys*, 1:08-CV-00354, 2012 WL 6593804 (S.D. Ohio Dec. 18, 2012) (pertaining to whether Medicare could be billed for tests never ordered by a physician), and *U.S. v. Robinson*, 13-CV-27-GFVT, 2015 WL

into this litigation, Relator still lacks sufficiently concrete factual allegations to plausibly claim medically unnecessary procedures occurred.

**B.      Relator Fails to Allege All Required Elements for his Medical Necessity Claims.**

Relator's medical necessity claims are prohibited by the public disclosure bar, fail to allege fraud with particularity, and fail for another independent reason—Relator has not pleaded facts showing how Medtronic and Covidien caused any supposedly medically unnecessary procedure. Nor does Relator allege a single false claim that was presented to the government.

**1.      Relator Does Not Allege Any Specific Medically Unnecessary Procedures.**

Relator has not pleaded how any specific procedures were medically unnecessary. *Polukoff*, 895 F.3d at 745.   Instead, Relator claims only that numerous devices were purchased by or used at Dole VA; after that, Relator provides only an assumption the care therefore must not have been medically justified. Relator's allegations related to purchase volumes are facially insufficient to state a claim and are unsupported by the sales data on which they purport to rely. In *Polukoff,* the relator alleged that the physician had "performed an unusually large number of procedures" in a specific year compared to other providers. *Polukoff*, 895 F.3d at 743.   The relator, however, was also able to point to a specific set of procedures that had been determined unnecessary on an individualized basis. *Id.* at 743.   Specifically, the relator pleaded facts about specific billing records as well as

1479396 (E.D. Ky. Mar. 31, 2015) (relator had an expert review of 30 specific cases to support alleged medical necessity).

an audit by the physician's employer that had looked at individual patient cases and "concluded that its guidelines *had been violated* in many of the 47 cases reviewed[.]" *Id.* (emphasis added).  Relator here, by contrast, has not alleged any similar reliable indicia.

Here, instead of pointing to an internal analysis done by the relator's employer and of which the relator has personal knowledge, Relator tries to bolster his allegations about purchase volume by incorporating into his 5AC the 2018 OIG investigation report and "partial data" on Medtronic sales to the Dole VA that were produced in discovery and which he contends "confirm[] excessive use" of Medtronic's devices.  (5AC ¶ 116; *see also id.* ¶¶ 117, 121.)  This reliance is insufficient to save Relator's pleading for four reasons. First, the 2018 OIG investigation report, and its underlying documentation, cannot serve as the basis for Relator's claims given the public disclosure bar.

Second, the 2018 OIG investigation was a preliminary review that did not consider all relevant materials. In fact, Relator paints only a partial picture of the sales data.  In full, the Medtronic sales data relied upon by Relator facially refutes his characterizations. (Huyser Decl. Ex. P (summary of produced sales data).)  Relator cherry-picked sales dates to allege that each device was used in the time period it was purchased.  But, as Relator repeatedly *pleads*, Dole VA orders its medical devices in "bulk."  (5AC ¶¶ 72, 96, 175.) Indeed, the sales data which Relator incorporates into its 5AC show *only* when devices were *invoiced* to Dole VA, not when they were used in a procedure. (Huyser Decl. Ex. T (sales data).) Moreover, as described in Medtronic's prior briefing, the sales data itself contradicts Relator's allegations both in terms of total devices purchased and that purchases were "excessive." ECF No. 199 at 13–14. In other words, Relator's volume-based

allegations are not only insufficient to survive Rule 9(b), but they are contradicted by the sales data Relator purports to describe.

Third, while the 2018 OIG investigation did review the medical effectiveness of the Dole VA's cath lab procedures, the investigation materials are devoid of any allegation or conclusion of medically unnecessary procedures. Rather, the investigation was intended to evaluate purchasing oversight and to identify cost-reduction measures. (*See, e.g.*, Huyser Decl. Ex. Q (VA Production, Schroeder 01305–07); *id.,* Ex. R (VA Production, Schroeder 01340-1343); and Huyser Decl. Ex. S (VA Production, Schroeder 01386-87)). Given the absence of any confirmed or suspected medically unnecessary procedure, Relator's reliance on the OIG materials is insufficient to properly plead the existence of any specific medically unnecessary procedure.

Finally, there is nothing contained in the OIG materials to suggest, let alone to plead with the required specificity, that Medtronic played any role in any of the identified procedures. In sum, when analyzing medical necessity, the physician's use of professional judgment to determine the necessity of care will always be patient—and case—sensitive. *Polukoff*, 895 F.3d at 742-43.   Relator pleads no basis to conclude that he even has knowledge of such facts, let alone a particularized basis to conclude the care delivered was medically unnecessary.

## 2. Relator Does Not Allege any Specific Act *by Defendants Medtronic or Covidien* that Caused Medically Unnecessary Procedures.

The Court has already found insufficient the allegations that Winger and Kirk were present at procedures where they "marketed, instructed, or encouraged the overuse of

Medtronic devices." (Order at 31–34.) The Court told Relator that, to state a viable claim, he must provide "particularized details" of "*how* these Medtronic employees influenced medical procedures and the devices that were used." *Id.* Relator does not—and apparently cannot—do so.

Relator's 5AC does not contain a single allegation about a specific action by Winger, Kirk, or Davisson that caused a medically unnecessary device to be used. Perhaps recognizing the paucity of alleged facts regarding how Winger, Kirk, or Davisson apparently caused multiple radiologists to perform numerous medically-unnecessary procedures over the course of a decade, Relator points to Medtronic's alleged marketing materials and internal policies and performance reviews. (*See* 5AC ¶¶ 107, 122, 123, 123 n.20.) The 5AC does not identify the specific marketing material, policy, or review used, much less the "who, what, when, where, and how [the marketing material] promoted medically unnecessary treatment." (Order at 34 (citing *Polukoff*, 895 F.3d at 745).) It simply alleges that the term "frontline treatment" was used to describe the device and concludes it promotes unnecessary utilization. (*See* 5AC ¶¶ 123, 124, 124 n.20.) Moreover, not only do such allegations fail to create a basis for a claim, they also fail to allege that any of the radiologists at issue ever read the Medtronic materials or were in any way influenced by them.

As to the performance reviews, Relator points to two specific reviews, one from October 2011 and the other from October 2014. (5AC ¶ 107.) Relator's description of the October 2011 review, even taken at face value, does not support an inference that Davisson *caused* Dole VA physicians to perform medically unnecessary procedures. Relator

describes run-of-the-mill sales language in internal performance reviews, such as key physicians "needed to be groomed for maximum output."  (5AC ¶ 108 (emphasis added).) Seeking to maximize potential use of Medtronic devices does not mean that such education caused independent, licensed physicians to use Medtronic devices in procedures for which there was no medical justification.  The October 2014 review is deficient for the same reason.  (5AC ¶ 107.)  Relator simply does nothing to plead the "who, what, when, where, and how [the internal policies and performance reviews] prompted medically unnecessary treatment."  (Order at 34 (citing *Polukoff*, 895 F.3d at 745).) The Medical Necessity Claims in the Fifth Amended Complaint should be dismissed.

### 3.    Relator Does Not Identify Any False Claims to the Government that Resulted from These Procedures.

Relator also does not identify false claims to the government, much less match any with a medically unnecessary procedure from which it resulted.  Indeed, Relator's conclusory allegations of false claims are like those dismissed in *U.S. ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1311-12 (11th Cir. 2002).  Like Relator, Clausen was a direct competitor to the defendant, LabCorp.  *Id.* at 1302.  Clausen alleged that LabCorp engaged in various schemes to subject patients to "duplicative and unnecessary testing of patients," and "duplicative billing for blood draws."  *Id.* at 1303.  In multiple attempts to solve its pleading deficiencies, Clausen tried to add more details regarding the "alleged schemes by LabCorp" and then "tacked on to each allegation" a "conclusory statement . . . that bills were submitted to the Government as a result. . . ."  *Id.* at 1312.

Like Clausen, Relator has not identified specific claims *for federal payment* made or caused by Medtronic that resulted from these purported schemes.  (*See, e.g.*, 5AC ¶¶ 161–62, 169 (summarily concluding that Medtronic caused WRG to make "claims for reimbursement to Government Healthcare Plans and the U.S. VA that were false or fraudulent.").)  In other words, Relator fails to identify *either* actual false claims submitted *or* false claims that necessarily must have been submitted if the facts alleged are assumed true.  *See U.S. ex rel. Prather, Brookdale Snr. Living Cntr.*, 838 F.3d 750, 773 (6th Cir. 2016); *Clausen*, 290 F.3d at 1313 ("If Rule 9(b) is to carry any water, it must mean that an essential allegation and circumstance of fraudulent conduct cannot be alleged in such conclusory fashion.").

## III.   RELATOR FAILS TO PLEAD THE REQUIRED ELEMENTS OF HIS OFF-LABEL CLAIMS BECAUSE HE FAILS TO ALLEGE ANY OFF-LABEL USE AND PROMOTION THAT RESULTED IN A FALSE CLAIM.

In order to properly state his Off-Label Claims against Medtronic, Relator must allege both that any off-label use was medically unnecessary and that Medtronic in some way *caused* the off-label use.  Relator's allegations fail to meet either requirement.

### A.   Claims Involving Alleged Off-Label Use or Promotion Are Not False Claims within the Meaning of the False Claims Act.

#### 1.   Off-Label Use of Medical Devices Is Not Unlawful.

The Supreme Court has explained that, " 'off-label' usage of medical devices (use of a device for some other purpose than that for which it has been approved by the FDA) is an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine." *Buckman Co. v. Plaintiff's Legal*

*Committee*, 531 U.S. 341, 350 (2001). Congress has expressly stated the law should not "be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship." *Id.* (citing 21 U.S.C. § 396 (1994 ed., Supp. V) (internal quotations omitted). Indeed, it is the FDA's position that "off-label uses or treatment regimens may be important and may even constitute a medically recognized standard of care." U.S. Food & Drug Admin., FDA–2008–D–0053, *Good Reprint Practices for The Distribution of Medical Journal Articles: Guidance for Industry* (2009) ("Good Reprint Practices").[8].

This policy has transferred over to federal programs that administer health-care claims. For example, the Veteran's Administration relies on FDA guidance that off-label use should be permitted when based on an individual physician's scientific knowledge and judgment. *E.g.,* U.S. Dep't of Vet. Affairs., *Pharmaceutical Use Outside of Approved Indications: Guidance on "Off-label" Prescribing* (2004) (citing in Appendix 2 longstanding FDA guidance for taking this position on off-label use of both drugs and devices).

Likewise, TRICARE (a federal healthcare program) will reimburse for "off-label use of a drug or device" that is "safe, effective, and in accordance with nationally accepted standards of practice in the medical community." 32 C.F.R. § 199.4(g)(15)(i)(A). And the

---

[8]   Available   at   https://www.federalregister.gov/documents/2009/01/13/E9-452/guidance-for-industry-on-good-reprint-practices-for-the-distribution-of-medical-journal-articles-and

Center for Medicare and Medicaid Services ("CMS"), who administers the federal health care programs at issue in this case, also does not exercise "control over the practice of medicine or the manner in which medical services are provided," and will reimburse when off-label use has occurred, so long as an item or service is "reasonable and necessary for the diagnosis or treatment." 42 U.S.C. §§ 1395, 1395y(a)(1)(A).

As a result, to state a claim under the FCA for off-label use, Relator must allege off-label use of the device that was medically unnecessary. Otherwise, there is no improper claim made, let alone one that was caused to be made by Medtronic. *U.S. ex rel. Nowak*, 806 F.Supp.2d 310, 354 (D. Mass. 2011) (explaining that for off-label claims in the medical device context, "[e]ach individual health care provider's medical judgment is an essential element of [the Relator's] FCA claim, without which []he cannot demonstrate that a *false* or *fraudulent* claim was submitted."); *U.S. ex rel. Bennett*, 747 F. Supp.2d 745, 777–79 (S.D. Texas 2010) (granting motion to dismiss in part because there is no false claim for off-label promotion if "individual physicians are exercising independent professional judgment based on the knowledge of their particular patients" in a medically necessary way). If medical necessity exists, then a claim associated with the off-label use cannot be "false" as a matter of law. *Nowak*, 806 F.Supp.2d at 354-55 (granting motion to dismiss off-label claims because, if health provider used a device that was reasonable and necessary, then no "*false* or *fraudulent* claim was submitted").

### 2.   Off-Label Promotion Is Not Sufficient to State a False Claim.

Seeking to link a physician's alleged off-label use to Medtronic, Relator asserts that Medtronic "marketed, instructed, or encouraged the off-label use." (5AC ¶ 140.) This at

least makes a passing effort to address one of the legal requirements for this claim, but Relator's allegations fail in other respects. First, nothing prohibits Medtronic employees from discussing off-label use of products with physicians. Indeed, off-label use—even contraindicated use—can become an accepted standard of care before FDA approval occurs. For example, in *Nowak*, the court observed that FDA's insertion in 1999 of a "contraindication stating that biliary stents are not approved or tested for use in the vascular system" did not prevent their use from becoming so prolific that, by 2001, an industry journal declared that use of biliary stents to treat peripheral vascular disease was "already regarded as the standard of care, even though the procedure is off-label." *Nowak*, 806 F. Supp. 2d at 320-21.

Moreover, it is now accepted that the Federal Food, Drug, and Cosmetic Act ("FDCA") "do[es] not expressly prohibit" the sharing of truthful information about off-label uses. *Caronia*, 703 F.3d at 160. To the contrary, truthful off-label speech is protected by the First Amendment. *Id.* at 165–69; *cf. Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667 (2011). Nor do all violations of the FDCA automatically qualify as a "false claim" under the FCA. *U.S. ex rel. Booker v. Pfizer, Inc.*, 847 F.3d 52, 60 (1st Cir. 2017) (explaining that FDCA violations made in marketing are "independent of any false claim" in the context of regulated pharmaceuticals) (citation omitted). Thus, even if Relator had the law right, he would have to allege more.

To state a claim under the FCA based on a "promotion" theory, Relator must "allege that the promotion knowingly included *false statements or misrepresentations* in connection with the submission of false claims." *Nowak*, 806 F. Supp. 2d at 346. In an

FCA case, Relator must make specific allegations about falsity in the complaint.  *See, e.g.,* *U.S. ex rel. Bergman v. Abbott Lab'ys*, 995 F. Supp. 2d 357, 375–76 (E.D. Pa. 2014). Because Relator has not done so, the claims necessarily fail.

*Bennett* provides a helpful analog.  2011 WL 1231577, at *4.  Like Relator here, the *Bennett* relator contended that the defendant had violated the FCA by promoting Boston Scientific's "FlexView" for treatment of an atrial fibrillation through instructions to salespeople and promotional materials.  *Id.* at *26.  The relator alleged this was off-label because the FlexView system did not have FDA approval to treat atrial fibrillation and sought to assert FCA claims on that basis.  *Id.* at *27.  The Court rejected the argument because the promotion alleged did not misrepresent the FDA approval or make false statements.  *Id.*

### B. Relator Again Fails to Allege Facts Showing That Off-Label Use Occurred That Could Result in FCA Liability Against Defendants.

Relator has not identified any facts from which the Court can find that any alleged off-label use of a medical device resulted in a medically unnecessary claim, nor any *false* statements that caused the unnecessary use to occur.  As with the other Medical Necessity claims discussed above, the analysis of these claims will always be a patient-specific, fact-intensive inquiry.  For both balloon and stent claims, Relator's anecdotal examples do not address the patient's condition, viable alternative treatments other than amputation, or whether the procedure at issue was reasonable and necessary *for that patient*.  Nor does Relator identify any *untrue* statements made by Medtronic or its employees.

### 1. Relator Fails to Identify an Off-Label Use of Balloons that Is Actionable Under the FCA.

Relator's factual allegations about off-label use of balloons focuses on a historical discussion of Medtronic's IN.PACT AMPHIRION DEEP DCB drug-coated balloon ("DEEP DCB"), which Medtronic voluntarily recalled when an early study showed mixed outcomes.  (5AC ¶¶ 142–146.)  Relator misleading cites that single 2014 study about the use of DEEP DCBs to treat arteries below the knee (called "infrapopliteal" arteries).  *Id.* Although Medtronic took a cautious and responsible approach to the study outcomes at the time, the correlation identified in the study was actually statistically insignificant.[9]

All that is a sideshow, however, because Relator's allegations about patients do not involve the DEEP DCB.   Relator's allegations all involve a ***different*** product—the IN.PACT ADMIRAL DCB. Repeated subsequent studies have concluded that the use of DCBs below the knee *does not* increase patient risk of amputation or mortality.[10]  These studies, which span 2016 to 2022, make it clear that below-the-knee procedures are within the standard of care.

Thus, Relator's allegation that false claims were submitted simply because WRG used an IN.PACT ADMIRAL, or a balloon removed from a stent, below the knee fails to state facts from which this Court could conclude that use of the device was medically

---

[9]    Thomas Zeller, et al., *The IN.PACT DEEP Clinical Drug-Coated Balloon Trial: 5-Year Outcomes*, J. AM. COLL. CARDIOVASCULAR. INTERVENTIONS. 431, 431-43 (2020), https://clinicaltrials.gov/ct2/show/NCT01609296.

[10]    *E.g., id.*; Daniel Garcia, et al., *Meta-Analysis of Drug-Coated Balloon Versus Standard Balloon Angioplasty for Treatment of Intrapoplitial Lesions in Critical Limb Ischemia*, Presentation at the American College of Cardiology, (Apr. 3, 2016), *in* 67 J. AM. COLL. CARDIOLOGY 2254 (2016), https://www.jacc.org/doi/full/10.1016/S0735-1097%2816%2932255-0.

unnecessary for a given patient.  (*See* 5AC ¶¶ 146–148.)  In addition, the statements allegedly made by Winger—that IN.PACT ADMIRAL can be used below the knee and only partially inflating a balloon would decrease its diameter (5AC ¶ 146) and that a stent could be removed and a balloon used alone (5AC ¶ 147)—are not false and are not plausibly alleged to be false.

### 2.   Relator Fails to Allege Off-Label Use of Stents that Is Actionable Under the FCA.

Relator's allegations about stents likewise rely almost entirely on the fact that stents were used in an off-label manner to address below-the-knee arteries.  (5AC ¶¶ 149–150.) This is not an actionable FCA theory.  *Nowak*, 806 F.Supp.2d at 354-55.  Relator does not identify specific patient conditions, viable alternative treatments for these arteries to prevent amputation, nor any other particularities required by Rule 9(b) to state a viable claim that the procedure for which a claim was submitted was medically unnecessary. (5AC ¶¶ 149-154.)  Relator also fails to identify any actual statement by Winger (or anyone from Medtronic) associated with stent use in these procedures, let alone a statement that was false or misleading.  *Id.*

## IV.   RELATOR FAILS TO PLEAD THE ELEMENTS OF AN ACTIONABLE CIVIL CONSPIRACY CLAIM.

Finally, Relator adds a Civil Conspiracy Claim (Count III) despite lacking any factual for doing so.  A civil conspiracy claim must "allege specific facts showing an agreement and concerted action amongst the defendants," and "the manner in which the conspiracy operated." *Montgomery v. City of Ardmore*, 365 F.3d 926, 940 (10th Cir. 2004). Just like Relator's fraud claims, these allegations must be pled with specificity under Rule

9(b) of the Federal Rules of Civil Procedure. *Lochhead v. Alacano*, 662 F.Supp. 230, 234 (D. Utah 1987). Relator's 5AC, contains *no* allegations of the specific facts required to assert this serious claim, including either the formation of an agreement or the operation of a conspiracy.

Second, a claim for civil conspiracy under the FCA requires a plaintiff to allege facts showing that "(1) the defendant agreed with one or more persons to get a false or fraudulent claim allowed or paid by the United States; and (2) one or more conspirators performed any act to effect the object of the conspiracy." *U.S. ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487, 509 (S.D. Tex. 2003), aff'd, 111 F. App'x 296 (5th Cir. 2004). Because Relator is prohibited by the public disclosure bar from asserting his Per Diem Marketing, Medical Necessity, and Off-Label Claims, and because such claims are not adequately pleaded, there can be no conspiracy and Relator's Civil Conspiracy Claim (Count III) must also be dismissed as it relates to those claims. *See U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 459 F. Supp. 2d 1081, 1091 (D. Kan. 2006) (granting a motion to dismiss a conspiracy claim brought under the FCA because, when the relator's "FCA claims fail to state a claim, there can be no conspiracy").

## CONCLUSION

For the foregoing reasons, Defendants Medtronic, Inc. and Covidien, L.P. respectfully request the Court enter an Order as follows:

1.     First, dismissing Relator's Medical Necessity and Off-Label Claims (Counts I and II) because they are prohibited by the public disclosure bar, were not pled with particularity, and fail to allege each of the required elements of a valid FCA claim;

3.      Third, dismissing Relator's Per Diem Marketing Claims (Counts I and II) because they are prohibited by the public disclosure bar;

4.      Fourth, dismissing Relator's Civil Conspiracy Claim (Count III) because it fails to plead the required elements with required particularity and fails to allege an attendant violation of the FCA; and

5.      Fifth, denying Relator the opportunity to amend for a sixth time because it would be futile and the parties have agreed that there will be no further amendments.

DATED:  November 21, 2022

Respectfully submitted,

*s/ Joseph Dixon*
Joseph T. Dixon, III (*admitted pro hac vice*)
Alethea M. Huyser (*admitted pro hac vice*)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Phone: (612) 492-7000
Fax: (612) 492-7077
jdixon@fredlaw.com
ahuyser@fredlaw.com

Robert J. McCully (KS #12433)
Rebecca M. Gosch (*admitted pro hac vice*)
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Blvd.
Kansas City, MO 64108
Phone: (816) 474-6550
Fax: (816) 421-5547
Email: rmccully@shb.com
Email: rgosch@shb.com

*Attorneys for Defendants*
*Medtronic, Inc. and Covidien, L.P.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 21, 2022, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF parties of interest.

SHOOK, HARDY & BACON L.L.P.


*s/ Robert J. McCully*_____
Robert J. McCully (KS #12433)

43