UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| ex rel. THOMAS SCHROEDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:17-cv-02060-DDC-BGS |
| | ) | |
| MEDTRONIC, INC., COVIDIEN, L.P. | ) | |
| HUTCHINSON REGIONAL | ) | |
| MEDICAL CENTER, and WICHITA | ) | |
| RADIOLOGICAL GROUP, P.A., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEDTRONIC, INC. AND COVIDIEN L.P.'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

INTRODUCTION ..................................................................................................... 1

RELEVANT PROCEDURAL BACKGROUND ..................................................... 2

STATEMENT OF MATERIAL AND UNDISPUTED FACTS ......................... 4

IV.    MEDTRONIC'S RESPONSE TO RELATOR'S ALLEGED FACTS. ................ 24
       A.     Medtronic's Response to Relator's "Summary of Undisputed Facts." ....... 24
       B.     Medtronic's Response to Relator's Numbered "UMF" Paragraphs: .......... 24

SUMMARY JUDGMENT STANDARD .............................................................. 39

LEGAL ARGUMENT .......................................................................................... 39

I.     RELATOR'S ALLEGATIONS OF ILLEGAL KICKBACKS PAID TO
       HRMC FAILS AS A MATTER OF LAW ........................................................ 40
       A.     No Illegal Remuneration Was Provided. .................................................... 41
              1.    Legal Standard on Illegal Remuneration. ........................................... 41
              2.    Alleged Extravagant Kickbacks Were Malicious Rumors and
                    Did Not Occur. .................................................................................... 42
              3.    Bulk and Bundle Discounts Are Not Unlawful Remuneration. ........ 45
              4.    Relator Has Provided No Evidence That Device "Swap-Outs"
                    Occurred At All or Were Unlawful. .................................................... 45
       B.     Defendants Did Not Knowingly or Willfully Engage In Acts They
              Understood To Be Unlawful. ...................................................................... 47
              1.    Legal Standard on Knowing and Willfully Unlawful Conduct. ...... 47
              2.    Because In-Service Meals Are Commonly Accepted and a
                    Common Practice, No Evidence of Knowing or Willful
                    Conduct Exists. ................................................................................... 48
              3.    Medtronic Employees Believed the Discounts Were Lawful
                    and Thus Lack The Requisite Scienter. .............................................. 50
              4.    Occasional Replacement of Broken or Expired Devices Is Not
                    a Knowing or Willful Kickback. ......................................................... 52
       C.     Device Swap-Outs and In-Service Lunches Were Provided Without
              Intent to Induce. .......................................................................................... 53
              1.    Legal Standard on Intent to Induce. ................................................... 53
              2.    Most Meals Were Provided to Staff Who Are Not
                    Decisionmakers. .................................................................................. 54

3.      Defendants Did Not Replace A Handful of Devices with the
        Intent to Induce Future Purchases. ................................................... 55

II.   MEDTRONIC'S CONDUCT AT HRMC DID NOT RESULT IN FALSE
      CLAIMS OR DAMAGE TO THE UNITED STATES ......................................... 55
      A.   The Alleged Kickbacks Did Not Cause False Claims. .............................. 56
           1.      Legal Standard .................................................................... 56
           2.      There Is No Causal Connection Between Staff Lunches and
                   Dr. Hagley's Use of Devices. ............................................. 59
           3.      The Bundled Discounts Also Did Not Cause False Claims. ............ 60
           4.      There is No Evidence about the Items or Services billed to the
                   Government as a Result of "Swap-Outs." ........................................ 61
      B.   Medtronic Did Not Present False Claims, Nor Knowingly Cause The
           Submission Of False Claims. ........................................................... 62
      C.   Relator's Allegations Of Conspiracy Under The False Claims Act
           Are Wholly Without An Evidentiary Basis ................................................ 63
      D.   There Is No Evidence of Any Damage to the Federal Government. .......... 64

III.  AS WITH HRMC, MODEST IN-SERVICE FOOD AT THE  DOLE VA
      ARE NOT UNLAWFUL KICKBACKS. .......................................................... 67
      A.   Again, Modest In-Service Food is Not Unlawful Remuneration. .............. 67
      B.   Medtronic Did Not Knowingly And Willfully Violate The Law. .............. 69
           1.      Relator Cannot Show Medtronic Employees Acted
                   Knowingly or Willfully. ...................................................... 69
           2.      Relator's "Summary Judgement" Focuses Entirely On the
                   Executive Branch Ethics Standard, Which Does Not Apply. .......... 70
      C.   Relator has Identified No Evidence That Meals Were Provided With
           an Intent to Induce Purchases. ........................................................ 72

IV.   MEDTRONIC'S ACTIONS  DID NOT RESULT IN FALSE CLAIMS
      NOR CAUSE DAMAGE TO THE UNITED STATES. ........................................ 73
      A.   Relator Can Identify No Evidence That But-For Modest Food To
           Staff, the Items Sold By Medtronic Would Not Have Been
           Purchased. .................................................................................. 74
      B.   Relator Has Identified No Facts To Support an Alleged Conspiracy. ........ 75
      C.   The United States Received the Exact Products It Purchased and
           There Is No Evidence of Damage. ..................................................... 76

V.    RELATOR'S PARTIAL MOTION FOR SUMMARY JUDGMENT
      FAILS FOR ADDITIONAL REASONS. ............................................................ 77

      A.    Relator's Rule 56 Motion Fails Because Arguments Go to Elements
            of His Own Claim on Which He Does Not Seek Judgment. ...................... 77

      B.    Relator Does Not Seek Judgment As a Matter of Law, and As Such
            His Motion Does Not Meet the Requirements For a Rule 56(a)
            Motion. ..................................................................................................... 79

CONCLUSION ................................................................................................................ 80

## INTRODUCTION

In 2018, after an unsuccessful attempt to obtain a large bid for drug-coated balloons at the Robert J. Dole VA Hospital then-Bard representative Thomas Schroeder ("Relator") decided to a file a *qui tam* complaint against his largest competitor, Medtronic. Relator had no personal knowledge of the allegations he made. Indeed, he had no more than a passing acquaintance with the facilities and people he made allegations about. But, as is common in competitive industries, company representatives explained their own lost sales through gossip and rumors about how their competitors were "cheating." Relator took it one (giant) leap further, and filed a complaint filled with allegations of extravagant kickbacks like trips and expensive sports tickets.

The United States investigated Relator's allegations and declined to intervene. Undeterred, Relator pushed forward with the case, shifting his theories of the case as evidence proved each successive theory untrue.  As a result, this case has spanned six different complaints, years of litigation, hundreds of thousands of pages of discovery, and more than 27 depositions so far.  The evidence has proven beyond any doubt that Relator's allegations of extravagant illegal kickbacks and "bribes" were fabrications.

What the evidence reveals, instead, are common and lawful industry activities: some modest in-service lunches costing an average of $11-13 per person and, at Hutchinson Regional Medical Center ("HRMC"), some product discounts and exchanges.  These are not fraudulent and criminal activities.  They are standard business practices in the medical industries, undertaken by Medtronic employees who (correctly) believed them to be lawful. The employees' beliefs are not surprising, because evidence shows that the competitor

representatives in Wichita who gossiped about Medtronic's representatives—including those working for Relator's own company—were undertaking the same types of activities.

Six years after the *qui tam* was filed, Medtronic asks this Court to finally dismiss Relator's baseless allegations. To survive summary judgment, Relator must point to more than supposition, spin, and allegations. Relator must be able to identify record evidence to support each element of his claims under both the Anti-Kickback Statute ("AKS") and the False Claims Act ("FCA"). Relator cannot meet that burden and dismissal of his kickback-based allegations is required.

**RELEVANT PROCEDURAL BACKGROUND**

Relator's Fifth Amended Complaint ("FAC") asserts three causes of action under the FCA: (1) Presentation of False Claims, (2) Causing the Presentment of False Claims, and (3) Conspiracy. FAC (Doc. 233) at 60-64. These claims are alleged based on the same three alleged factual circumstances:

First, Relator has alleged that Medtronic provided various extravagant kickbacks in the form of trips, sporting tickets, and "weekly/daily lunches" to Dole VA staff at the Dole VA catheterization labs ("Cath lab"). *See* Doc. 233 ¶¶ 52-158, 161, 168. Discovery has proven that these allegations were predicated on rumors and gossip. Indeed, the only kernel of fact is that a Medtronic employee provided Cath lab staff with in-service lunches approximately bi-monthly, as well as a few external events. Medtronic seeks summary judgment on these allegations. Medtronic also responds to Relator's second partial summary judgment motion, which concerns the application of three affirmative defenses to this claim.

Second, Relator has alleged that Medtronic employees gave kickbacks to Cath lab employees at HRMC in several forms.  Relator again alleged kickbacks in the form of trips and sporting tickets to HRMC.  These allegations have also proven to be baseless, with the exception of industry-standard in-service lunches. Although not initially pled, the FAC also alleged that Medtronic illegally provided "free devices" to HRMC in the form of (1) Bundle Discounts, and (2) Swap-Outs. Medtronic is seeking summary judgment on all three of these theories.  Whether the Bundle Discounts are protected activity under AKS safe harbors is the subject of already pending cross-motions for partial summary judgment. *See* Doc. 398, 430.  Apart from the legal issue of whether the Bundle Discounts qualify for the Safe Harbor, Medtronic is entitled to summary judgment on these claims because they also do not violate the AKS.

Third, Relator has alleged that Medtronic and Wichita Radiological Group ("WRG") submitted false claims to the VA based on medically unnecessary procedures. Discovery remains ongoing for these allegations.

The following charts track these various claims:

| Relator's Claim | Summary of Claim | Summary of Medtronic Argument | Brief Citations by Section |
|---|---|---|---|
| **Dole VA:** Kickbacks (Meals) | Relator alleged that various gifts and meals were given to induce VA purchases. | Evidence shows only modest, industry standard meals given to staff, not decisionmakers. | Fact Sections: III.<br><br>Legal Sections: III, IV. |
| | Relator Summary Judgment on Affirmative Defenses of Good Faith, Compliance, Ambiguity. | Relator's motion is procedurally improper and substantively fails. | Fact Sections: IV.<br><br>Legal Sections: III.B.2; V. |

| | | | |
|---|---|---|---|
| **Dole VA:** Medical Necessity (Device) | Still in discovery. | Still in discovery. | N/A |
| **HRMC:** Kickbacks (Meals) | Relator alleged that various gifts and meals were given to induce HRMC purchases. | Evidence shows only modest, industry standard meals given to staff, not decisionmakers. | Fact Sections: III.<br><br>Legal Sections: I.A.2, B.2, C.2, IIA.2, B-D |
| **HRMC:** Kickbacks (Discounts) | Relator moved for Summary Judgment on Affirmative Defense based on the Discount Safe Harbor | Bundled discounts are exempt from AKS because they complied with Discount Safe Harbors. | Memorandum and Reply in Support of Partial Summary Judgment, Doc 430, 464. |
| | Relator alleges that bundle discounts were "kickbacks." | Evidence shows that bundle discounts were provided in good faith and did not cause damages. | Legal Sections: I.A.3, B.3; II.A.3, B-D. |
| **HRMC:** Kickbacks (Swaps) | Medtronic's replacement of devices resulted in "free products." | Medtronic lawfully replaced devices that were expiring or had performance issues. | Fact Sections: II.B.<br><br>Legal Sections: I.A.4, B.4, C.3, II.A.4, B-D. |

## STATEMENT OF MATERIAL AND UNDISPUTED FACTS

I.     BACKGROUND INFORMATION

A. Medtronic Sells Peripheral Vascular Devices For Use in Customer Care.

1.     Medtronic sells peripheral vascular devices for use in the treatment of peripheral arterial disease.[1]

---

[1] Consistent with the Court's order (Doc. 511) to avoid unnecessary length, Medtronic incorporates by reference background information set forth in its prior Motion for Partial Summary Judgment (Doc. 430).

2.      Medtronic peripheral vascular devices come in different sizes for different sized vessels and arteries and clinics often stock numerous models of a single device.  For example, drug-coated balloons ("DCBs") come in 44 different potential lengths and sizes.[2] This has two implications, at least, for this case:  (a) volumes of DCBs in stock at a given customer appear larger than the number of procedures, and (b) if the exact right size is not in stock, physicians may mix and match to achieve the clinical goals of a procedure—a certain diameter dilation of a vessel of a particular length.

3.      It is not uncommon for physicians to develop tool preferences.  Brown Dep. 122:13-123:20 (Doc. 381-11).  Wichita area sales representatives for different companies have testified that certain physicians prefer their products and others do not.  *See, e.g., id.*; Valdivia Dep. 91:21-92:19 (Doc. 381-15).

## II.      MEDTRONIC'S SALE OF PERIPHERAL VASCULAR DEVICES.

### A.  HRMC's Purchase and Use Of Medtronic Products

4.      As set forth in Medtronic's prior Motion for Partial Summary Judgment (Doc. 430), HRMC purchased products through several different purchasing arrangements, including products that were on "consignment."  When a product is on consignment, the product manufacturer agrees to stock a certain number of products on the hospital's shelf.  *Id.* at ¶ 5.b.  The hospital does not own or purchase the product until it is used.  *Id.*

---

[2]  *See IN.PACT Admiral and IN.PACT 018 drug-coated balloons,* https://www.medtronic.com/us-en/healthcare-professionals/products/cardiovascular/drug-coated-balloons/inpact-drug-coated-balloon.html.

5.      At HRMC, "the cardiologists make the decision" as to what devices will be purchased and used in PAD surgical procedures.  Ex. 1, Naab Dep. 107:17-108:12.[3]

6.      HRMC had a product committee, in which physicians would meet and go over product options, list prices, and any new trials or information.  Physicians would then provide instruction to HRMC buyers on what to purchase.  *Id.* at 20:5-21:25

7.      During many of the years in question, HRMC physicians preferred a number of Medtronic devices for PAD procedures.  Wilson Dep. 173:14-175:6 (Doc. 398-4).

8.      Once a physician preference was expressed, it was then Mark Wilson's responsibility as HRMC's purchasing director to obtain the most competitive price possible.  *Id.* at Wilson Dep. 13:16-18 (Doc. 398-4).

9.      HRMC purchased products from Medtronic that were not discounted.  *E.g.,* Ex. 2 at 15, n.29.

**B.  Relator Pursues An Unpled Theory of Alleged "Swap-Outs."**

10.      In August 2022, Relator served supplemental responses to Interrogatory No. 3 with a new theory that Winger would:

> "replace expired PAD devices that were purchased and owned by Hutchinson free of cost, but these devices were not documented as being free as required, and would in turn, be used in medical procedures paid in whole or part by government healthcare programs. At this time under discovery produced to date, Relator believes the following documents support this allegation: HRMC 000910, DW 166, DW 177, HRMC 811, DW 172, HRMC 3305, DW 181, DW 182, HRMC 824, MDT 8939, HRMC 912-913, DW 169, HRMC 793, MDT 3060, HRMC 796, DW 189, HRMC 317, DW 146, HRMC 866-867, DW 173, DW 167, DW 183."

---

[3] Unless otherwise specified, all exhibits identified are attached to the Declaration of Leah Huyser (June 7, 2024) ("Huyser Decl.").

Ex. 3 at 7.  This allegation is not included in the FAC.

11.  Through his expert, Relator identified the list of "Expired Devices Swapped"

he now purports is at issue:

| Swap Out (SO) No. | Date | Alleged Item(s) "Swapped" | Medtronic Summary of Record Evidence |
|---|---|---|---|
| SO 1 | 3/12/2012 | 1 Intrastent Doublestrut<br><br>1 Intrastent Max | No evidence of unlawful action. |
| SO 2 | 9/27/2012 | 1 Nanocross PTA Balloon Catheter<br><br>1 Spider Guidewire and Embolic Protection Device | Devices on consignment, product return. |
| SO 3 | 11/1/2012 | 1 Intrastent Mega | No evidence it occurred. |
| SO 4 | 11/6/2012 | 1 Evercross PTA Balloon Catheter | On consignment. |
| SO 5 | 1/8/2013 | 8 unidentified items | No evidence. |
| SO 6 | 8/6/2013 | 2 Viances<br>2 Everflex Stent<br>1 Nanocross PTA Balloon Catheter<br>1 Evercross PTA Balloon Catheter | Stents and PTAs on consignment.<br><br>Medtronic states that HRMC would need to purchase any replacement Viances. |
| SO 7 | 10/10/2013 | 3 Trailblazer Support Catheter | HRMC told it would need to purchase replacement devices. |
| SO 8 | 2/18/2014 | 1 Intrastent Mega<br>1 Nanocross PTA Balloon Catheter<br>2 VisiPros | On consignment. |
| SO 9 | 3/20/2014 | 1 SX-C Atherectomy Device | Product returned due to performance issue. |
| SO 10 | 1/6/2015 | 1 Intrastent LD Max #S18-36 | On consignment. |
| SO 11 | 7/14/2015 | 2 Atherectomy Devices | Exchange of unexpired same-price product. |

Report of Jessica Schmor (Doc. 451) at 53-54; Exs. 4 to 14.

12.     A number of the products Relator contends were "purchased and owned by HRMC" were on consignment, including the Everflex Stent, Nanocross PTA Balloon Catheters, and Evercross PTA Balloon Catheters.  Ex. 15 (purchasing agreement and list price) and Ex. 16 (consignment inventory list); *see id.*, Ex. 17 (returning Nanocrosses and other devices as "return of consignment").[4] Although the start date has not been definitively identified, it is clear that Intrastent and Visi-pros were also on consignment by no later than 2013.  *See id.*, Ex. 18 (Covidien consignment audit showing Intrastent and VisiPro were on consignment at HRMC).  Thus, evidence shows that SO 2, SO 4, SO 6 (except Viances), SO 8, and SO 10 all involve consigned products.

13.     For three of the alleged "Swaps," SO 2,[5] SO 4, and SO 8, Relator identifies lot numbers associated with the expired devices.  Schmor Rep. (Doc. 451) at 53-54.  The evidence reflects that products with these lot numbers were on consignment:

   a. For example, Relator contends that SO2 involves a Nanocross, lot number 9550577.  *Id.* at 54.  A June 26, 2012 audit of HRMC consignment records shows a device matching that description.  Ex. 19 (listing Nanocross with lot number at issue on consignment),

   b. Relator contends that SO4 involved a "swap" of an Evercross with lot number 9288917.  A 2011 Covidien consignment audit identifies an Evercross with that lot number on consignment at HRMC. Ex. 20; Ex. 21 (internal communication noting that these items were on consignment and needed to be replaced due to expiration).

   c. Relator contends that SO8 includes an Intrastent Mega with lot number 9410718; a Nanocross with lot number 9532046, and two VisiPros with lot

---

[4] HRMC was previously known as "Promise Regional Medical Center."

[5] Some devices consistent with those listed in SO 2 were also documented as returned due to a performance issue. *See* Exs. 23-25.

numbers of 9404653 and 9407447. A July 2013 consignment audit lists devices matching those descriptions as on consignment at HRMC. Ex. 18.

14.     Because an unused consignment device is owned by Medtronic, HRMC is not financially impacted if it is removed or replaced. Ex. 1, Naab Dep. at 34:2-8.

15.     As to SO 1, Relator cited an email in which Doug Winger agreed to look into whether an exchange of an Intrastent Double and Intrastent Max was possible and to talk "tomorrow." Ex. 4. Medtronic records show an exchange of some kind occurred on March 20, 2012, in which an Intrastent Double strut was provided for $0. An Intrastent Max LC was sold for $1275 dollar three days later. Ex. 22. There is no evidence providing context of the circumstances of either of these transactions and no evidence they were unlawful.

16.     In SO 9 and SO 11, Relator exchanged non-expired devices of equal value, which again does not confer any additional value to HRMC.

   a.   In SO 9, Doug Winger wrote to HRMC explaining that in a procedure a week ago they had "used 3 hawks," referring to an SX-c, exl, and LS-c. Ex. 12. It is clear that two of the devices were used: an "exl" and a "LS-c." *Id.* The SX-c was pulled but not usable. Winger, who was present in the operation, agreed to replace the device that had not been usable. In short, this replacement of a device was intended to make HRMC whole, not to provide a new item of value.

   b.   In SO 11, Doug Winger agreed to exchange atherectomy devices of different sizes (medium for small). This is an exchange of equal value. Ex. 14.

17.     As to the remaining alleged "swaps," SO 3, SO 5, certain devices in SO 6, and SO 7, discovery has not identified evidence that a "swap" occurred at all:

   a.   As to SO 3, Doug Winger received an email dated November 1, 2012 in which HRMC asked if they could swap an Intrastent Mega. Ex. 6. There is no evidence any device exchange occurred.

b. As to SO5, Relator cites an email from HRMC mentioning certain unidentified devices that are expired.  Ex. 8.  There is no evidence any exchange occurred nor that the items discussed were non-consignment.

c. As to SO6, most of the devices were consigned.  *See supra* at ¶¶ 12-13. Although the Viance devices mentioned were not, both Doug Winger and a Covidien corporate employee stated the Viance was not on consignment and could not be returned.  Ex. 21.

d. In SO7, Relator identifies an email in which HRMC sought help dealing with expired atherectomy devices. Ex. 10. Doug Winger and Covidien responded, identifying that if they were not on consignment, then Covidien could ship a new device and send a new purchase order for the device.  Ex. 21.  Again, there is no evidence a "swap" occurred.

**C. Robert J. Dole VA's Purchase and Use of Medtronic Products**

18.     At the Dole VA, just like at HRMC, testimony is unanimous: physicians alone decide which devices to use and how many devices to use. Ex. 26, Brinkley Dep., Vol. I 28:18-29:25; Ex. 27, Hett Dep. 114:17-21, 129:24-130:3, Ex. 28; Rust Dep. 103:9-22, 255:25-256:7; Gonda Dep. 173:21-177:2 (Doc. 348-13); Ex. 29, Baalman Dep. 47:5-18; Winblad Dep. 120:5-121:20 (Doc. 348-14); Valdivia Dep. 91:21-92:19 (Doc. 381-15); Ex. 30, Tebbe Dep. 116:2-6; Schroeder Dep. 189:4-8 (Doc. 381-9); Brown Dep. 123:8-20 (Doc. 381-11); Lloyd-Liebelt Dep. 47:20-22, 88:22-89:6 (Doc. 381-16).

19.     Cath lab technicians do not, by contrast, make decisions about which or how many PAD devices to use in a procedure.  Liebelt-Lloyd Dep. 111:17-22 (Doc. 381-16); Brown Dep. 158:12-17 (Doc. 381-11); Ex. 26, Brinkley Dep., Vol I. 28:13-29:25.

20.     In order for a product to be stocked at the VA, it must be reviewed and approved by the Clinical Process Review Committee ("CPRC").  No employee of the Cath lab is a member of the CPRC committee.  Ex. 31, Keene Dep. 33-34:8.

21.     Once approved, the Dole VA can purchase that device for patient procedures. Ex. 26 Brinkley Dep. Vol I. 28:13-20.  Because Dole VA is a federal hospital, it directly procures and pays for the procedures in the facility.  Ex. 31 Keene Dep. 18:12-20:16.

22.     Diane Keene, who was the Head of Logistics until 2017, described the overall product ordering process from roughly 2013 until she left as follows:

> If somebody identifies a need, first it has to go to the clinical process review committee, CPRC . . .  And if it were approved, then levels would be established in the secondary, which is the end stop of where they're going to use it for patients.  And then we would use that as a basis to put it in the big grocery store; I kind of like say, you know . . . logistics was the Walmart. And then we would, you know, put it in the inventory and put barcode labels up, and when they -- the product came in, it would be first put in the primary, the big Walmart store, and then it would be distributed out to the secondary area.  And then the inventory manager would, generally once a week, would do what we call an auto generation of the products that they stock in the big warehouse, and it would kick out orders for them to review to see if they need to reorder, and that's how it got replenished.

*Id.* at 24:17-25:15.

23.     The Dole VA Logistics Department had purchasing agents who could place purchase for any items below $2,500, as well as supply staff who managed distribution of purchased devices.  *Id.* at 16:4-19:6.

24.     However, ordering for the Cath lab was "difficult" because there was "quick in and out, in and out" and "a lot of time we didn't have [needed products]."  *Id.* at 41:1-4.

25.     Cath Lab Manager Brinkley explained they had to "to make sure we had product on the shelf.  So knowing what the physicians wanted and what they used, it was my job to make sure they had what they needed."  Ex. 26 Brinkley Dep., Vol. I, 29:14-17.

26.     Orders occurred in primarily two ways:

a. For the weekly orders, staff had to replace what was used in the prior week. *Id.* at 41:7-16, 108:21-109:15. While the Cath lab staff would typically manage these weekly, smaller orders, the Cath lab did not have a purchasing budget. *Id.* at 126:12-16, 239:17-240:1. Rather, the orders would have to be placed by the Logistics Department.

b. The Logistics Department itself had a $2,500 purchasing cap, so Keene instructed Brinkley to prepare large purchase orders to stock up on devices because of the difficulty of purchasing them on an as-needed basis. *Id.* at 52:11-53:3, 239:1-5.

c. For these larger orders, the Dole VA had to work with a contracting officer out of the regional office. Brinkley was instructed to put together paperwork to support a large order. *Id.* at 110:3-11:5, 126:12-16. This type of order required the Dole VA to go through a formal posting and bidding processes. *Id.* at 239:6-8

27.    A bulk order means the VA would purchase and take physical custody of a larger quantity of devices all at one time. Ex. 32 Dixon Dep. 122:9-19. When the VA was making purchases at the end of the year, they sometimes purposefully placed large orders because a budget freeze could limit their ability to order until a new budget was approved. Ex. 26 Brinkley, Vol. 1 Dep. 244:9-13. In such circumstances, Brinkley was instructed to fill out the statement of work, explaining the purchase. *Id.* at 28:5-12.

28.    When placing a large bulk order, Brinkley would "usually sit down and discuss [] with the doctor" the devices they anticipated needing. She would also talk to sales representatives such as "Doug [Winger], because he could pull my usage from the prior fiscal year" and that allowed her to "extrapolate out what would be needed for the future year." *Id.* at 259:6-13. The input from her physicians and historical ordering would then guide recommendations for orders. *Id.* at 28:13-29:25.

29.     The contracting officer in Leavenworth was responsible for finalizing and publishing the bid, including completing all requirements and diligence to ensure VA procurement processes are followed.  Ex. 32 Dixon Dep. 44:23-49:20.

30.     The Dole VA Cath lab was closed in April 2018.  Ex. 26 Brinkley Dep., Vol. I, 215:9-12.  Relator alleges that 1,194 invoices were submitted to the Dole VA between January 2011 and May 2020, some of which are necessarily unrelated to the Cath lab.

## III.     "KICKBACKS" WERE JUST STANDARD INDUSTRY PRACTICE.

### A.  Accepted Industry Practice of Providing Moderate Meals

31.     The provision of moderate meals attendant to education or business purposes is common within the medical industry.

32.     For example, Relator's own witnesses, including individuals who reported to Relator while at Bard, all acknowledged that in-service lunches were common at medical facilities in the Wichita area.  *See, e.g.*, Valdivia Dep. 96:6-97:15 (Doc. 381-15); Brown Dep. 30:25-32:2 (Doc. 381-11); Liebelt-Lloyd 110:12-17 (Doc. 381-16).

33.     Indeed, the meals at issue in this case are only a small fraction of the many such meals that have been provided throughout Kansas.  The United States Open Payment database was enacted as part of the Patient Protection and Affordable Care Act of 2010.  The Open Payment data is a public reporting system run by CMS for reporting items of value provided to medical professionals across the country.  OpenPayments, https://openpaymentsdata.cms.gov (last visited May 30, 2024).

34.     In 2022, the most recent year reported, the following *food and beverage payments* in Kansas were publicly reported:

- 74,423 individual payments totaling $1,776,866,97 to physicians, and

- 46,824 payments totaling $915,827.55 to non-physician medical staff.

*See Kansas*, OpenPayments, https://openpaymentsdata.cms.gov/state/kansas.

35. As another example, in 2019, Bard Peripheral Vascular, the company Relator worked for, paid for 8,971 meals for physicians totaling $442,077.99. *See Bard Peripheral Vascular, Inc.*, https://openpaymentsdata.cms.gov/company/ 100000005481.

36. Modest meals attendant to a business purpose are widely recognized as acceptable by industry leading compliance organizations. The industry leading compliance guidance for the pharmaceutical industry, known as the PhRMA Code, states that:

> In order to provide important scientific information and to respect health care professionals' abilities to manage their schedules and provide patient care, company representatives may take the opportunity to present information during health care professionals' working day, including mealtimes. In connection with such presentations or discussions, it is appropriate for occasional, incidental meals to be offered as a business courtesy to the health care professionals, as well as members of their staff attending presentations, so long as the presentation provides scientific or educational value, and the meal provided is: (a) modest as judged by local standards; (b) not part of an entertainment or recreational event; and (c) provided in a manner conducive to informational communication.

PhRMA, *Code on Interacting With Health Care Professionals,* at 6, https://phrma.org/-/media/Project/PhRMA/PhRMA-Org/PhRMA-Org/PDF/P-R/PhRMA-Code---Final.pdf.

37. Within the medical device industry, there is also the AdvaMed Code which allows companies to "conduct sales, promotional, and other business meetings with Health Care Professionals to discuss, for example, Technology features, sales terms, or contracts." *See* AdvaMed *Code of Ethics at 26,* https://www.advamed.org/wp-content/uploads/2022/03/2022-AdvaMed-Code-of-Ethics-Digital.pdf.

38.     The AdvaMed Code explains that it is acceptable for meetings between sales representatives and medical professionals to "occur close to the Health Care Professional's place of business" and for the representative "to provide occasional modest meals and refreshments in connection with such meetings . . . [to attendees who] have a bona fide professional interest in the information being shared." *Id.*

### B.  Medtronic Training and Policies

39.     Medtronic, and one of its predecessor companies, Covidien, have a number of policies and procedures related to provision of meals to potential referral sources.

40.     In 2014, the Covidien Global Business Travel & Expense Policy provided for the following: "modest meals, in a setting conducive to business discussions" for which "[a]ctual cost of meals, including beverage and tip, should be reasonably priced and will be reimbursed.  Such costs should also fall within the accepted norm for the country where the meals are purchased."  Ex. 33 at 19

41.     Specific to business meals with Healthcare Professionals, Covidien provided as follows: "Covidien may provide modest and occasional business meals to healthcare professionals in connection with bona fide scientific, educational or business presentations, as long as the setting is conducive to the exchange of information and the meal is subordinate in time and focus to the business purpose of the meeting."  *Id.* at 20.

42.     Covidien also set specific spending limits for the meals, as follows:

- The meal limit for a modest dinner at a restaurant is $125 per person, excluding tip and tax;

- A $50 per person limit is in place for restaurant lunch meals, excluding tip and tax; and

- The limit for in-office or in-hospital meals, snacks or refreshments is $35 per person, excluding tax and tip.

*Id.* This was in line with industry standards. *See, e.g.,* AdvaMed Benchmarking Survey,

*Providing Meals to U.S. Health Care Professionals* (2018) at 3, 10 (average per person

limits were $50 for lunch and $150 for dinner; also noting 75% of respondents did not have

a separate meal limit for government employees).[6]

43.  In 2017, Medtronic's policy on meals to Healthcare Providers stated:

You may also provide modest meals in conjunction with these activities[7] and as an occasional business courtesy if:
- The business meeting has a legitimate business purpose and includes only attendees with a business-appropriate need to attend
- The cost falls within Medtronic-approved spending limits
- The meal is incidental to the business interaction's appropriate purpose (as defined in these standards)
- The setting is conducive to the exchange of information, and
- A Medtronic representative attends

You must not pay for or contribute to:
- Meals for an individual HCP not in attendance
- Excessive or immodest alcohol
- Meals, travel, lodging, or other hospitality for a spouse, partner, or other guest of an HCP
- The cost of entertainment, recreational events, or parties.  Ex. 34.

44.  In Medtronic's 2020 Global Business Conduct Standards, Medtronic

discussed its "responsibility to ensure that interactions with [Healthcare Professionals]

HCPs are conducted in an ethical and compliant manner. Medtronic will not attempt to

---

[6] When Medtronic acquired Covidien in 2015, the Kansas employees became employees of Medtronic.  The Medtronic Global Business Conduct Standards underwent routine review and revision throughout the time period included in Relator's claims.

[7] The use of "these activities" refers to business meetings, meetings related to HCP service agreements, and Medtronic training and education programs.  *Id.* at 3.

inappropriately influence an HCP through an improper inducement. This means that Employees will not offer or provide (directly or indirectly) an improper payment or anything of value to an HCP as a reward for prior business or to encourage the future use or purchase of Medtronic Technologies."  Ex. 35 at 16-17.

45.     The 2020 standard provided for meals and refreshments was as follows:[8]

Employees may provide modest meals to HCPs if:
- The occurrence is an occasional business courtesy (i.e. infrequent and not routine);
- The cost of the meal is within Medtronic spending limits;
- The HCP attends and has a Legitimate Need for attending the activity associated with the meal; and
  - The meals and refreshments are provided in a manner conducive to the discussion or presentation of scientific, educational, or business information.  *Id.*

46.     Winger, Davisson and Kirk received training on these policies.  *See, e.g.,* Kirk Dep. 223:6-13 (Doc. 381-4); Exs. 36, 37.

### C. Relator's Allegations of Extravagant Kickbacks to HRMC Are Not Supported By Discovery.

#### i.  No Extravagant Meals or Trips Occurred.

47.     Relator alleged that "Winger and Davisson were giving remuneration such as meals, food, alcohol, gratuities, event sponsorships, NASCAR and other sporting event tickets, golf outings and travel expenses to Hutchinson personnel including Wilson, Cath Lab Director/Cath Lab Supply Chain Manager Cindy Henning King . . . and other Hutchinson cath lab employees."  FAC, (Doc. 233) at ¶ 88.

48.     Relator admitted he had no personal knowledge to support these allegations:

---

[8] *Id.* at 16-17.

Q. Do you have any personal knowledge of Winger, Davisson providing alcohol to Hutchinson personnel?

A. No.

* * *

Q. . . . What personal knowledge do you have of Winger or Davisson providing event sponsorships to Hutchinson personnel?

A. Again, nothing personal. . . .

* * *

Q. . . . You list other sporting event tickets. What personal knowledge do you have of Winger or Davisson providing other sporting event tickets to anybody at Hutchinson?

A. Nothing personal

Schroeder Dep. 149:22–150:8 (no personal knowledge of kickbacks), 203:3–205:4 (no personal knowledge of gifted NASCAR tickets) 310:6–312:11 (no personal knowledge of gifted food, meals, alcohol, or boating), 312:19–25 (no personal knowledge of sponsorships), 314:1–18 (no personal knowledge of gifted tickets to sporting events).

49. When asked for his sources, Schroeder testified he either assumed these to be true or "heard" things from vague, unidentified sources. *See generally, id.*

50. Daniel Clinkscales, one of Relator's former direct reports, explained the allegations were "gossip" and "just information that we had kind of heard through the grapevine." Clinkscales Dep. 173:19–20 (Doc. 381-17); *see also id.* at 157:16–158:4 (explaining that when he worked under Schroeder his experience was that "all the reps kind of talk all the time" and Medtronic's representative, Doug Winger, "had business at every

hospital" so "everybody's trying to take [his] business, right?"); *id.* at 162:12–21 (testifying that "reps, you know, talk bad about each other" and "there's a lot of gossip").)

51.     Relator has since admitted that, with the exception of in-service lunches, these allegations have not "come to fruition" and that discovery revealed no support for the accusations.  Relator's Mem. (Doc. 381) at 16-18.  It is evident that Relator made these allegations based solely on rumors.

### ii. Occasional and Modest Meals at HRMC Consistent with Standard Practices.

52.     Meals were similarly provided to staff at the HRMC Cath Lab by numerous different company representatives. *See, e.g.,* Valdivia Dep. 96:6-97:15, 142:7-24; 146:1-147:11 (Doc. 381-15); Brown Dep. 30:8-31:16, 33:14-24:25 (Doc. 381-11)*; see also* Ex. 38 (Cath Lab Vendor Agreement, setting rules for lab and signed by numerous reps).  Like other companies, Medtronic's sales representatives occasionally provided in-service lunches to staff at the HRMC Cath Lab.

53.     Doug Winger has testified that when he would bring meals, he would always provide in-service education or training to lab techs.  Winger Dep. 258:23-259:9 (Doc. 381-10).  For example, Doug testified, he commonly would: "in-service techs on the Hawk device. There were so many different [devices] – [] there is SilverHawk, there is HawkOne, there is TurboHawk, each size cleans a different way, the wire loads a different way, so a lot of the times when I would go do lunch I would bring a Hawk device with me and go over it with the techs and answer questions on stuff like that."  *Id*.

54.     From 2011 to 2020, Winger brought HRMC Cath lab employees food on 81 occasions.  The average cost was $11.87 per person per meal. Huyser Decl. ¶ 40.

55. Karianne Kirk brought lunch to HRMC only one time, and the price of the meal was $11.51 per person. *Id.* at ¶ 41.

56. From 2011 to 2020, Greg Davisson paid for just four meals. Ex. 39 at Ex. C.

57. Many of the Medtronic and Covidien expense reports identify the attendees at the meals. The attendees at the lunches were typically the staff of the Cath Lab. *Id.*

58. Wilson rarely attended meals. Wilson Dep. at 136:23-137:24 (Doc. 398-4). Medtronic expense data identifies only two lunches Winger shared with Wilson:

- On November 17, 2015, Winger and Wilson shared a meal that cost $14.43 per person. Ex. 39 at Ex A p. 44.

- On January 25, 2016, Wilson participated in a lunch along with 9 other attendees. *Id.* at Ex. A 46. The average cost of that meal was $19.28 per person. *Id.*

59. Relator does not allege kickbacks to HRMC physicians. FAC at ¶ 56.

**D. Discovery Also Reveals No Support For Relator's Allegations of Extravagant Kickbacks to Employees of Dole VA.**

      i.  No Expensive Trips or Tickets Occurred.

60. In his FAC, Relator made similar extravagant allegations about kickbacks to the Dole VA. Specifically, Relator alleged that "Teri Brinkley and other Dole VA cath lab employees" were given remuneration in the "form of weekly/daily lunches for Brinkley and other cath lab employees, ipads, iphones, NASCAR as well as other entertainment event tickets to Brinkley and her staff, weekend parties, as well as frequent nights at bars and restaurants." FAC at ¶56.

61. Once again, Relator had no personal knowledge or information to support these allegations. Schroeder Dep. 50:22-60:12. When asked for his sources, he pointed to

three specific sales representatives: Todd Brown, Larry Valdivia, and Monique Liebelt. Schroeder Dep. 52:17-53:3, 53:25-54:25 (Doc. 381-9).

62.     When deposed, Brown testified that he had not been to the Dole VA cath lab since 2013.  Brown Dep. 47:20-48:10 (Doc. 381-11).  When asked if he knew the basis for Relator's allegations of kickbacks to the Dole VA, Brown stated: "No . . . No, I don't know."  *Id.* at 197:2-9; see also *id.* at 172:15-21 (admitting he had no personal knowledge of kickbacks to Brinkley from Winger, just "all rumors").

63.     Aside from meals, Liebelt also had no information or knowledge of any remuneration.  For example, when asked whether "Teri [Brinkley] ever sa[id] that she received anything else, like tickets to a sporting event, from Doug Winger," she responded: "She never said anything about that." Liebelt-Lloyd Dep. at 109:12-15 (Doc. 381-16).

64.     Relator cited Larry Valdivia and Mary Bunting as the basis for his allegations that Teri Brinkley was given an iPhone or iPad.

65.     Bunting testified that Brinkley "had a broken phone . .  she was complaining about."  Bunting Dep. 23:9-18.  A short time later, Brinkley "had a new one" and said "I got it from a sales rep."  *Id.*  Bunting did not know if Brinkley paid for it.  *Id.* at 42:21-25.

66.     Valdivia testified to an "iPhone" and "iPad."  At one point he claimed it was 2010, Valdivia Dep. 76:4-76:25 (Doc. 381-15), at another point he claimed it was 2017, *Id.* at 116:19-118:10.  Valdivia did not remember the exact conversation or claim to know whether Brinkley paid for it.  *Id.*

67.     Brinkley, by contrast, had a more specific recollection.  Brinkley testified she "bought an iPhone" from Doug Winger and "did not receive it for free."  Rather, Brinkley

had "dropped" and broken "her iPhone."  Brinkley said Doug "had one I could buy from him" and she paid "fair market value" for the phone.  Ex. 26 Brinkley Dep., Vol. I, 102:25-103:21.  This also occurred "a long time ago."  *Id.*

68.     Valdivia was also the only witness who claimed to have heard anything about "tickets" of any kind.  Valdivia Dep. at 75:18–76:15, 114:6–115:18 (Doc. 381-15).  Valdivia testified that on one occasion "when she first started managing," Brinkley said she was planning to use some NASCAR tickets "Doug" had and couldn't use.  *Id.* at 114:6–115:18.  Valdivia admitted that Brinkley did not use a last name.  *Id.*  Valdivia did not have any further information or know what Brinkley paid for the tickets.  *Id.*

69.     Both Brinkley and Winger deny that Winger provided Brinkley with any tickets.  Winger Dep. 331:16-19, (Doc. 381-10); Ex. 26, Brinkley Dep. 252:6-15.

ii.     <u>Modest Meals Permitted at Dole VA.</u>

70.     In-service meals were long accepted at the Dole VA.  The manager of the Cath lab that preceded Brinkley had long permitted company sales representatives to provide in-service lunches.  Ex. 26, Brinkley Dep. Vol. I, 250:10-15.

71.      Brinkley testified that she did not "think there was anything improper" about her actions and that, prior to the VA investigation in 2018, she did not recall being told it was inappropriate or not allowed.  *Id.* at 230:12-231:10.  In her many years at the lab prior to 2018, she was never told to stop.  *Id.* at 249:20-250:9.  Prior to that time, Brinkley thought it was "okay . . to have lunches."  *Id.* at 250:7-9.

72.     Cath lab employees also knew that in-service meals and educational dinners were provided to other practices within the hospital.  *Id.* (explaining that "there were other

areas in the hospital that had lunches provided by sales representatives" and it "wasn't a secret").  Employees were also told that "snacks" were allowed.  *Id.* at 248:23-249:19.

73.    Representatives from companies other than Medtronic also brought in-service lunches or had educational meals at restaurants for Dole VA employees.  *E.g., id.* at 248:6-248:20; 250:24-251:9; Lloyd-Liebelt Dep. 109:16-19 (Doc. 381-16); Valdivia Dep. 98:22-99:1, 74:11-23 (Doc. 381-15).  As Winger explained, "[t]hey got food from us, from Abbott, from Boston, from about every medical device company that went in there." Winger Dep. 254:6-255:4 (Doc. 381-10).

74.    Testimony was that Medtronic provided in-service lunches at the Dole VA approximately one or two times a month.  Ex. 39, at Exs. A-C; Ex. 27, Hett Dep., 27:1-4; Valdivia Dep. 75:5-9 (Doc. 381-15); Ex. 26,  Brinkley Dep., Vol. I 252:16-24.

75.    Pursuant to Medtronic policy, Winger, Kirk, and Davisson kept expense records of in-service meals. The entries specific to Dole VA have been produced and confirm that modest food was typically brought to Dole VA one to two times a month.  Ex. 39, Exs. A-C. The food provided cost an average of $13.35 per person.  Huyser Decl. ¶ 42.

76.    Although far less common, a handful of off-site dinners also occurred. Brinkley remembers only ten or so over the entire time period and all were for an education or business-related purpose.  Ex. 26 Brinkley Dep., Vol. I, 100:21-102:24.  Throughout the relevant time period, none of these meals exceeded the company's policy limits of $125 per person. Ex. 39.  Indeed, only six meals even exceeded $50 per person.  Ex. 39.

77.    Winger testified that these meals were infrequent and always associated with some kind of product education.  Winger Dep. 333:22-335:6 (Doc. 381-10).

78.     Davisson explained that these types of dinner are "done in the industry all the time," and involve "some form of educational purposes or whatever agenda." Davisson Dep. 343:18-346:7 (Doc. 381-8). Davisson also testified that he believed competitor reps conducted similar educational events at the Dole VA; he also recalled "competitive reps" also providing similar paid events for other VA facilities. *Id.* at 347:12-13; 347:19-22.

79.     This was confirmed by the testimony of Brinkley, who confirmed that non-Medtronic sales representatives provided educational meals to staff outside the facility. Ex. 26, Brinkley Dep., Vol 1, 230:12-231:10. In addition, Brinkley was aware of events involving other companies and other VA Departments, such as the cardiology department. *Id.* Brinkley did not "think there was anything improper" about these dinners and did not recall being told not to attend prior to 2018. *Id.*

80.     The VA never disciplined Brinkley for authorizing in-service lunches at the Dole VA with food purchased by sales companies. Ament Dep. 224:18-23 (Doc. 381-13).

## IV.     MEDTRONIC'S RESPONSE TO RELATOR'S ALLEGED FACTS.

### A.     Medtronic's Response to Relator's "Summary of Undisputed Facts."

Medtronic states that Relator's "Summary of Undisputed Facts" is legal argument and thus requires no response. To the extent a response is required, Medtronic contests the characterization of facts except as expressly admitted below.

### B.     Medtronic's Response to Relator's Numbered "UMF" Paragraphs:

Medtronic states that, for purposes of this motion and without prejudice to Defendants' ability to challenge at trial, the following paragraphs are undisputed: Paragraphs 1-8, 21-22, 34-35, 41, 48, 50, 61, 71-72. Medtronic states that the following

paragraphs are immaterial to the legal issues presented in Relator's motion: Paragraphs 10, 23-24, 28-31, 52-53, 55-59.

**R.P. 9**:  Paragraph 9 is disputed.  Karianne Kirk was a clinical specialist, and not sales representative for Medtronic.  Medtronic refers to its sales data, which identifies each specific product purchased by the Dole VA. (Doc. 399-5)

**R.P. 10**:  Paragraph 10 is not relevant to this motion.  Relator has identified no facts tying his allegations to cardiac procedures at the Dole VA.

**R.P. 11**:  The first three sentences of Paragraph 11 are not disputed.  The last two sentences of Paragraph 11 are disputed.  Undisputed testimony as it pertains to devices choice and ordering at the Dole VA is set forth above *supra* at ¶¶ 18-30.

**R.P. 12**:  The first sentence of Paragraph 12 is not disputed.  The second sentence is disputed.  Brinkley did not state that the physicians "ordered" devices nor that they told her the exact quantities to order.  *See* Response to R.P. 11.  Rather, Brinkley testified that the physicians advised her on their needs, and she made sure devices were ordered based on what physicians used during procedures.  The specific quotations from the depositions of Dr. Gonda, Winblad, Rust and Baalman set forth in Paragraph 12 are accurate.  However, the physician testimony *confirmed* Brinkley's account that devices were ordered based on physician preference.  *Supra* at ¶¶ 18-30.

**R.P. 13**:  The first two sentences of Paragraph 13 are disputed.  The quotations from Keene set forth in Paragraph 13 are accurately quoted but fail to provide a complete or accurate explanation of the evidence.  *See* Response to R.P. 11.   Keene expressly

acknowledged in her testimony that the VA Logistics Department participated in ordering devices for the Dole VA:

> Q: "Do you recall your logistics department getting involved in the purchase of peripheral vacular products—."
>
> A:   "Yes."

Ex. 31 Keene Dep. at 21:10-14. *See also, e.g., id.* at 24:17-25:15.

Relator cites Page 103, line 9 to 22 of Keene's deposition, in which she was asked about emails to which she was not a party and about which she had no personal knowledge. She testifies, for example, that when deciding what needed to be ordered, Keene would expect Brinkley to "get with the doctor." Keene Dep. 103:14-15.  Had Keene been made aware of Brinkley's testimony, she would know that Brinkley did just that.  *Supra* at ¶¶ 25, 28.  The testimony from pages 113 and 114 of Keene's testimony pertains to an email showing that the Dole VA had decided to *reduce* their purchase amount to "below $500,000."  A reduction is not an "inducement to purchase."  42 U.S.C. § 1320a-7b.

**R.P. 14**:  Paragraph 14 is disputed.  Brinkley testified that a VA contracting officer out of Leavenworth, Kansas with no connection to Defendants recommended she lower the purchase size so it "wouldn't have to go through the lawyers" and would "be easier" to process.  Ex. 26 Brinkley Dep. Vol. I, 95:17-97:21; *see* Response to R.P. 13. Brinkley agreed to *lower* to the quantities being purchased.  *Id.* at 97:12-18.  Relator's second sentence refers to Brinkley's testimony at page 95, line 16.  This response pertained to a different document and topic—namely a physician request for a specific product—which

Brinkley testified she did not recall.  Her testimony at page 98, lines 12 to 16 also states only that she could not recall.

**R.P. 15**:  Paragraph 15 is disputed.  Defendants refer to their Response to R.P. 13 and 14.  Dixon was not a party to the email being referenced and he had no personal knowledge of the circumstances.  No "policy" has been produced or identified.

**R.P. 16**:  Paragraph 16 is disputed.  Devices were purchased by the VA, not Brinkley.  Brinkley Dep., Vol. I, 239:17-240:1 (explaining that the Cath lab did not have a purchasing budget, and all purchases were completed by the Logistics Department or a VA contracting officer).  Brinkley never denied that she was part of the process for ordering PAD devices for the Dole VA Cath lab.  *See, e.g.,* Response to R.P. 11 and 12.

**R.P. 17**:  Paragraph 17 is disputed.  As discussed above, Brinkley was involved in purchasing, as were numerous others, including:

- The physicians who determined which products were needed for patient care;

- The CPRC who needed to approve devices for use at the VA;

- Logistic department staff, who monitored inventory levels and placed orders to refill devices;

- Prosthetic department staff, who purchased implantable devices;  and

- Procurement contracting officers from Leavenworth, Kansas.

The citation to "work every angle" comes from a single email in 2011 which was not written by Brinkley.  When shown the email, Brinkley recalled that at the time the cath lab needed TurboHawks, and she was trying to get an order through the VA process quickly to serve the lab's needs.  Ex. 26, Brinkley Dep., Vol. I 168:13-15.  As the email itself shows, Brinkley lacked the authority to place the purchase within the timeframe she

wanted.  *Id.*  Brinkley had to inform Keene when the physicians in the cath lab needed things urgently because she couldn't order them herself.  *Id.* at 259:21-260:6.

**R.P. 18**:  Paragraph 18 is disputed.  Brinkley did not have a purchasing budget or the authority to "open up blanket purchase orders."  Rather, "blanket purchase orders" were completed only by VA purchasing officers out of the Leavenworth office.  *Id.* at 245:3-6; Ex. 31, Keene Dep. 19:2-13; *Id.*, Ex. 32 Dixon 13:5-13, 15:6-16:23, 139:13-140:13.  As compared to a bulk purchase order, a blanket purchase provides authority for the facility to purchase over time—"setting a minimum and maximum total order[.]"  Ex. 31 Dixon Dep. 139:19-21.  This was proposed by and benefitted the Dole VA.  *Id.* at 39:4-40:12.

**R.P. 19**:  Paragraph 19 is disputed.  *See* Response to R.P. 11 to 18.

**R.P. 20**:  Paragraph 20 is disputed.  The text between colleagues was meant in jest. Winger testified that Brinkley likely "asked me what my thoughts on like what sizes," but it "was up to them what dollar volume to order."  Winger Dep. 269:11-21 (Doc. 381-10).

**R.P. 23**:  Paragraph 23 is disputed and also not material to Relator's current motion. Procedures were performed by physicians from WRG, who did not receive and are not alleged to have been recipients of in-service lunches or kickbacks.  In any event, Ament conducted an investigation into the Dole VA Cath lab as part of his "cost-reduction effort;" he had "no reason to believe there were clinical issues."  Ament Dep. 227:3-13 (Doc. 381-13).  He decided the lab had high expenditures.  *Id.* at 40:5-23.  Ament admitted he had "no knowledge of clinical quality issues."  *Id*. at 227:3-228:10. But the VA has since undertaken a systematic quality assurance review of Cath lab procedures, which it calls a Clinical Episode Response Team (CERT) review.  Ex. 14.  The CERT committee review

process was a two-level review.  *Id.* The first level review identified patients who were treated by WRG from 2015 to 2018.  *Id.* After the first-level review, 56 out of 219 procedures were forwarded for second-level review. *Id.* The physicians ultimately determined, after completing the second-level review, that it had found "no evidence of patient harm related to the use or overuse of Medtronic devices." *Id.* Indeed, one physician who reviewed 8 cases wrote:

> The review did not substantiate concerns that providers were inappropriately or disproportionately using a specific commercial product from a specific vendor. Due to the complexity of the cases reviewed, a variety of products and devices were utilized including atherectomy devices, stents and balloons. In each case device selection was determined to be appropriately indicated by the clinical history and angiographic findings.

*Id.* Unlike the incomplete early review cited by Relator, the CERT review report was committee-based and constituted a complete review of procedures.

**R.P. 24**:  Paragraph 24 is disputed and is not relevant.  There is no evidence the Dole VA "inventory control procedures" were, in any way, impacted by, caused by, or controlled by Medtronic.  No documents or data reflecting the VA inventory system or how Cath lab employees used it have been produced.

**R.P. 25**:  Paragraph 25 is disputed.  The evidence directly contradicts Relator's claim that inventory movement "was done by [the] Dole VA cath lab manager."  Ament testified that after his experience in the private sector, he believed the Logistics Department paperwork should better track the inventory.  Ament Dep. 67:6-67:13 (Doc. 381-13). While Ament did not think product should be stored in the "cath lab" and the "manager's office," Ament admitted he did not know if Teri Brinkley was responsible for it being there,

nor did he know if it was unusual or unique compared to other departments within the Dole VA.  *Id.* at 68:9-69:10.   Brinkley was never interviewed by Ament or the Dole VA. However, she did testify that the product in her office was simply overflow that did not fit into the inventory room.  Ex. 26 Brinkley Dep., Vol. I, 150:4-8.

**R.P. 26**:  Paragraph 26 is disputed.  *See supra* at ¶¶ 20-22.

**R.P. 27**:  Paragraph 27 is incomplete and disputed.  *See supra* at ¶¶ 74-75.

**R.P. 28**:   Paragraph 28 is disputed.   No VA policy has ever been identified or produced.  Relator's motion also does not identify information that Medtronic was made aware of.  Brinkley plainly testified that she did not "think there was anything improper" about her actions and that, prior to the VA investigation in 2018, she did not recall being told it was inappropriate or not allowed.  Ex. 26 Brinkley Dep., Vol. I, 230:12-231:10.  In her many years at the lab, prior to 2018, she was never told to stop.  *Id.* at 249:20-250:9. Prior to that time, Brinkley thought it was "okay . . to have lunches."  *Id.* at 250:7-9.

**R.P. 29**:  Paragraph 29 accurately cites the transcript.  This is irrelevant however, as insinuations of potential "concern" is not relevant to Relator's AKS claims. *See* 42 U.S.C. § 1320a-7b  (requiring Relator to prove that a defendant (1) knowingly and willingly, (2) paid remuneration, (3) with the intent to improperly induce a purchase, and (4) but for which the federal government would not have paid for an item or service) Furthermore, Brinkley has explicitly stated that she purchased only what was needed by the lab.  *Id.* at 28:13-29:17.

**R.P. 30**:  Paragraph 30 is irrelevant.  There is no evidence tying this testimony to the case in any way and Relator's inclusion of this irrelevant contention against a non-party in a public filing is inappropriate.

**R.P. 31**:  Paragraph 31 is, again, irrelevant because insinuations of potential "concern" is not relevant to Relator's AKS claims.  *Supra* at Response to R.P. 30. Moreover, Relator has identified no evidence connecting this modest in-service food to anything other than in-service work at that facility that day.  Again, Brinkley has explicitly stated that she purchased only what was needed by the lab.  *Id.* at 28:13-29:17.

**R.P. 32**:  Paragraph 32 is disputed.  First, devices were purchased by the VA, not by Brinkley.  *See supra* at Response to R.P. 11-17; Ex. 26, Brinkley Dep., Vol. I, at 239:17-240:1 (explaining Cath lab did not have a purchasing budget).  As to VA purchases, the VA purchased products from 2011 to 2018 as identified in Sales Data. (Doc. 399-5).

Second, the educational and business lunches provided by Medtronic to Cath lab staff are documented and specifically set forth as identified in Exhibit 39 at Exhibits A, B, and C and Exhibit 42.  These do not identify meals brought by competitor reps, which also occurred throughout the time period.  *See* Response to R.P. 26. As set forth above, Medtronic's in-service provision of food was generally provided only once or twice a month and typically cost less than $10 to $15 per person.  *Id.*

**R.P. 33**:  Paragraph 33 is disputed.  *See* Response to R.P. 26, 27, 32.

**R.P. 36**:  The first sentence in Paragraph 36 is disputed.  There is no evidence this purchase ever occurred.  Winger testified that any food provided was always listed on his expense report.  *See* R.P. 35.

**R.P. 37**:  As to Paragraph 37, Defendants do not dispute that all expenses associated with the Dole VA were identified by Defendants and produced.  This information was provided to the VA OIG before the United States declined to intervene in the case.  Ex. 43.

**R.P. 38**:  Paragraph 38 is disputed.  Not all expenses labelled "Wichita" are associated with meals provided to staff at the Dole VA.

**R.P. 39**:  As to Paragraph 39, it is not disputed that this accurately recites Winger's testimony.  Expense reports for the 2017 to 2018 time period were produced.

**R.P. 40**:  Paragraph 40 is disputed.  Winger did not confirm that Relator's per week assertion was accurate.  Winger stated that his expense reports, which do not identify weekly purchase, were accurate.  Winger Dep. 117:22-25 (Doc. 381-10).

**R.P. 42**:  As to Paragraph 42, Winger testified that "if they have a really busy day and they don't have time to grab lunch, then that's when I probably usually get them lunch." Winger Dep. 251:16-18 (Doc. 381-10).  Kirk testified that the reference to cookies was to her homemade ones, which she only brought once.  Kirk Dep. 232:6-9 (Doc. 381-4).  The remainder of Paragraph 42 is undisputed.

**R.P. 43**:  As to Paragraph 43, Medtronic does not dispute that Kirk provided some lunches to clinical staff at the Dole VA.  *See* Exs. 39 at Ex. A, 42.  Medtronic does dispute that Kirk ever purchased a dinner, as Kirk does not recall buying dinner for the VA lab staff.  Kirk Dep. 396:2-8 (Doc. 381-4).  It is Kirk's understanding of Medtronic policy that she "can buy a modest lunch" for clinical staff.  *Id.*

**R.P. 44**:  As to Paragraph 44, Medtronic does not dispute that Kirk testified to the facts identified.  However, much of the information provided was not relevant and the

evidence is incomplete.  The medical procedure being discussed in Paragraph 44 took place on June 14, 2017 and is not relevant to this motion.  Dr. Rust, the contract treating physician, exercised his own professional judgment as to what devices to use:

> Q: . . . . with respect to the devices that Dr. Rust selected to use in that procedure, did Dr. Rust use his own professional judgment to determine what devices he used?
>
> A: Yes, sir.
>
> *              *              *              *
>
> Q: As far as the number of devices that were used, did you play any role in determining the number of devices that he used in that procedure?
>
>  A: Absolutely not.
>
> Q: He did that on his own, correct?
>
> A: Correct.

Kirk Dep. 384:13-386:5 (Doc. 381-4).  Karianne Kirk testified that in the procedure at issue, the VA physicians were treating "two legs at the same time," which is "rare."  *Id*. at 50:2-4.  Dr. Rust is not alleged to have taken kickbacks and he did not participate in any meal that day.  *See* Ex. 39 at Ex. B p. 16 (noting expense report details for June 14, 2017).

As it relates to the VA staff, neither clinical staff nor Kirk advised on which device or how many were appropriate to use in the procedure.  Kirk Dep. 384:13-386:5 (Doc 381-4).  Following this particular procedure, Kirk explained that, "I went to grab lunch for them 'cause it's obvious that they haven't eaten and it's 2:30 p.m.  And I don't know if there was, you know, some issue that happened during the case that maybe I was going to try to educate somebody on.  I don't know this with the information in front of me."  *Id.* at

219:24-220:4.  The food that Kirk bought on June 14, 2017 for VA staff cost $8.53 per person.  Ex. 39 at Ex. B p. 16.  Dr. Rust did not receive a meal.  *Id.*

**R.P. 45**:  Paragraph 45 is disputed.  Kirk did not testify to providing anything on June 15, 2017, which is the date that follows the events set forth in Paragraph 44.  The transcript and records shows the referenced text exchange occurred over a month later, on July 26, 2017.  Relator did not elicit any testimony from Kirk about her work at the Dole VA on that day.  The expense report shows that the food on July 26 cost $9.95 per person. *See id.* (noting expense report details for July 26, 2017).  Again, no WRG physician is listed as a participant in the meal.  *Id.*

**R.P. 46:**  The allegation in Paragraph 46 is the same one set forth in Paragraph 42. Defendants therefore incorporate their Response at R.P. 42.

**R.P. 47**:  The first and second sentence of Paragraph 47 are not disputed.  The remainder of the paragraph is disputed. When asked whether there was anything illegal about providing modest lunches to employees at the Dole VA, Davisson testified "I don't think it's illegal from the standpoint of its in—it's well within what can do in that –in the frame of all other customers" and he was not aware that the Dole VA facility had "notified" Winger "that he couldn't."  Davisson Dep. 17:2-17:15 (Doc. 381-8).

**R.P. 49**:  Paragraph 49 is disputed. *Supra* at ¶ 74-79, Response to R.P. 47.

**R.P. 51**:  Paragraph 51 is disputed.  *See* Response to R.P. 26 (showing meals were not provided "twice a week and dinners once a month.").  Hett explicitly testified meals were far less often:

> Q:  How often do you recall [Medtronic bringing lunch] happening?

A: Oh man.

Q: Weekly?

A: Once or twice a month –

Ex. 27, Hett Dep. 27:1-4, 28:4-16 (confirming same); *id.* at 38:3-38:12 (remembering that during lunch "Doug would talk about some of the procedures").

**R.P. 52**:  Paragraph 52 is both irrelevant and disputed.  When asked about policies, Davisson limited his answer only to his own knowledge.  Davisson Dep. 17:22 (Doc. 381-8) ("Not that I'm aware of.").  For a reference to policies, see *supra* at ¶¶ 39-46.

**R.P. 53**:  Paragraph 53 is both irrelevant and disputed.  When asked about policies, Davisson answer was actually "I don't know" and "Not that I recall."  Davisson Dep. 345:2-17 (Doc 381-8).

**R.P. 54: :**  This repeats the testimony at Paragraph 47.  *See* Response at R.P. 47.

**R.P. 55**:  Paragraph 55 is irrelevant and disputed.  Winger and Kirk provided food to the Dole VA lab staff, not "decision makers."  "It is a call by the physicians which product we use [at the VA]" and even the lab manager, Teri Brinkley, could not "sway a physician to use one product over another product."  Ex. 27 Hett Dep. 114:17-21.

**R.P. 56**:  Paragraph 56 is irrelevant and disputed.  Winger's testimony was that he could not recall whether he had received the training.  Winger Dep. 20:5-17 (Doc 381-10).

**R.P. 57**:  Paragraph 57 is irrelevant and disputed.  The document being reviewed was of unknown origin and Winger only testified that he could not recall if he had ever seen it and lacked information sufficient to evaluate Relator's interpretation of the document.  *Id.* at 344:15-345:2.

**R.P 58**:  Paragraph 58 is irrelevant and disputed.  The document being reviewed was of unknown origin and does not match the description.  For the remainder of Paragraph 58, see response at R.P. 57.

**R.P. 59**:  Paragraph 59 is irrelevant and disputed.  Winger did not recall his training on the topic on the power point shown to him during his deposition.  *Id.* at 345:19-346:7. He did not testify that no such training occurred.

**R.P. 60 and 62:**  Paragraphs 60 and 62 are not disputed.  Following its investigation, the U.S. brought no enforcement action against Medtronic, did not discipline any VA employee, Ament Dep. 224:18-23 (Doc. 381-13), and declined to intervene in this action.

**R.P. 63**:  Paragraph 63 is an accurate quotation but is incomplete and disputed.  As set forth above, the Dole VA had a long-standing practice that openly permitted sales representatives to provide food and no employee of the VA or sales representative was ever disciplined in connection with the report.  *See* Responses to R.P. 26, 60, 62.

**R.P. 64**:  Paragraph 64 is an accurate quotation in that Ament testified that "Vendors are supposed to receive a briefing on integrity . . . and corporate compliance."  Notably, Relator omits the last sentence of this quotation, in which Ament also admitted, "Whether that occurred, I do not know."  Ament Dep. 90:9-10 (Doc. 381-13).  There is no evidence that the Dole VA conducted any vendor training with Medtronic or its employees.

**R.P. 65**:  Paragraph 65 is an accurate quotation but is incomplete and disputed. Ament admitted he did not know what, if any, information had been provided to Medtronic regarding this expectation.  *Id.*

**R.P. 66**:  Paragraph 66 is disputed.  Ament testified that he "as a federal employee" can attend "an educational function or seminar" and can "accept a meal" in connection with his attendance up to $25 without reporting.  *Id.* at 94:11-17.

**R.P. 67**:  Paragraph 67 is an accurate quotation but is incomplete and disputed.  As set forth above, the Dole VA had a long-standing practice that openly permitted sales representatives to provide food and no employee of the VA or sales representative was ever disciplined in connection with the report.  *See* Responses to R.P. 26, 60, 62.

**R.P. 68**:  Paragraph 68 is irrelevant and disputed.  First, VA policy is not relevant to Relator's Motion.  No VA policy has ever been produced and VA policies are not legally binding.  *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015) (sub-regulatory guidance is not federal law).  As to this specific circumstance, Ament responded to a representation of facts which omitted material information, misrepresented the record and about which he had no personal knowledge.  *See also* Response to R.P. 26, 60, 62.

**R.P. 69**:  Paragraph 69 is an accurate quotation but is incomplete and disputed.  *See* Response to R.P. 26 (showing that in-service meals and dinners were openly permitted), 60, 62.  In any event, Ament had no first-hand knowledge of the circumstances of the actual meeting that occurred and lacked information on the legitimate purposes for the meeting.

**R.P. 70**:  Paragraph 70 is an accurate quotation but is incomplete and disputed.  Again, Ament had no first-hand knowledge of the circumstances nor any context for the communication he reviewed.

**R.P. 73**:  Paragraph 73 is disputed. The testimony cited pertains to VA's own internal policies and their application to employees.  *See* Stetler Dep. at 31:12-21:24 (Doc

469:15).  No training or policy has been identified or produced.  Testimony from other VA officials suggests that the training permitted food in certain circumstances.  *See, e.g.*, Ex. 39 Brinkley Dep. Vol. 1 248:23-249:3 (snacks permitted by VA policy); Ament Dep. 94:7-21 (meals could be taken if under $25 and connected with education) (Doc. 381-13).

**R.P. 74**:  Paragraph 74 is not disputed.  *See* Response to R.P. 73.

**R.P. 75**:  Paragraph 75 is an accurate quotation but is incomplete and disputed.  *See* Response to R.P. 73, 74.

**R.P. 76**:  Paragraph 76 is disputed.  Keene supposed a large company would know but did not actually know if that was true.  Keene Dep. 116:8-117:5 (Doc. 369-9).  It is unclear what, if any, basis Keene had for that testimony.

**R.P. 77**:  Paragraph 77 is not disputed.  Dixon works in Leavenworth, Kansas and is not an employee of the Dole VA.  Ex. 32 Dixon Dep. 13:5-13, 28:17-18.

**R.P. 78**:  Paragraph 78 is disputed and not relevant.  Although Dixon responded to a question about a "VA laboratory," he responded with an example of a situation that involved him personally.  Dixon is a contracting officer and does not work in a clinical setting, which is material because the AKS permits modest food to accompany clinical or educational content.  *Supra* at ¶¶ 31-51. Because he is a contracting officer, Dixon would have no experience with such content or the circumstances in which it is typically delivered.  In any event, numerous VA employees refuted the notion that this is a "strict rule."  *See* Response to R.P. 73 (noting both Brinkley and Ament testimony to contrary).

**R.P. 79**:  Paragraph 79 is disputed.  Dixon is a contracting officer in Leavenworth, KS whose role is ensure VA contracting rules are followed.

**R.P. 80**:  Paragraph 80 is disputed.  Unrebutted testimony of the physicians and VA employees was that product choices for the catheter lab were driven by physician preference. *Supra* at ¶ 18. The VA purchases the devices requested for patient treatment.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the moving party demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013).  "Relator bears the burden at the summary judgment stage to create a genuine issue of material fact about whether [Defendants] violated the [Anti-Kickback Statute]." *United States ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368, 373 (5th Cir. 2016).

A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Water Pik, Inc.*, 726 F.3d at 1143.  A fact is "material" if it is "essential to the proper disposition of the claim."  *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citation omitted).  When analyzing Relator's motion for summary judgment, the Court must view the facts and any reasonable inferences in a light most favorable to Medtronic, as the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994).

## LEGAL ARGUMENT

In his FAC, Relator alleges that unlawful kickbacks occurred at: (1) HRMC, and (2) the Dole VA.  To survive summary judgment, Relator must  identify evidence in the record sufficient to create a genuine issue of fact as to *each* element of *both* the Anti-Kickback

Statute (AKS) *and* the False Claims Act (FCA).  Failure to proffer evidence on any element of either the AKS or the FCA is fatal to Relator's claim.

It is undisputed that Relator made his allegations based on rumors and gossip without *any* personal knowledge to substantiate them.  As one of his colleagues explained, the sales representative community often trades in gossip and rumors about competitors.  Unsurprisingly, given these origins, discovery has overwhelmingly proven the rumor-based allegations to be complete fabrication.

After the exchange of hundreds of thousands of pages of discovery, and more than 27 depositions—including depositions of the competitor reps that were the supposed basis for the rumors—there is no evidence that gifts, tickets, trips, or other alleged extravagant kickbacks occurred. What discovery revealed, instead, were commonplace and lawful activities, such as modest in-service meals and various device sales, warranties, and exchanges.  As set forth below, Relator's kickback claims necessarily fail to establish liability under both the AKS and FCA.

## I. RELATOR'S ALLEGATIONS OF ILLEGAL KICKBACKS PAID TO HRMC FAILS AS A MATTER OF LAW

As the first step of his claims, Relator must prove a violation of the AKS.  The AKS, a criminal statute, prohibits:

> knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program[.]

42 U.S.C. § 1320a-7b(b)(2)(A)-(B).  Thus, Relator must identify evidence to support: (1) remuneration, (2) under circumstances known to be wrong to the defendant, (3) that is provided with the intent to induce the purchase of an item for which payment may be made under a federal health care program.  *Id; see also United States v. McClatchey,* 217 F.3d 823, 829 (10th Cir. 2000).

Because the AKS creates both civil and criminal liability, Courts must be cognizant that they "give the same interpretation to the same words, whether applied in a civil or criminal setting."  *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1050 (6th Cir. 2023).  "That means that, if ambiguity exists over the meaning of a provision, the rule of lenity favors the narrower definition."  *Id.*

**A.     No Illegal Remuneration Was Provided.**

1.     Legal Standard on Illegal Remuneration.

First and foremost, to survive summary judgment, Relator must have evidence that the actions he challenges were "unlawful remuneration."  In the context of the AKS, "[r]emuneration demands the transfer of something with substantial independent value[.]"  *United States v. Nw. Mem'l Healthcare*, No. 19-CV-00593, 2023 WL 6388328, at *5 (N.D. Ill. Sept. 29, 2023) (quotation omitted).  This exchange cannot just be "any act that may be valuable to another" but rather prohibits something more specific, namely "payments and other transfers of value."  *Hathaway*, 63 F.4th at 1048 (6th Cir. 2023).

In addition, items or services of nominal value are not considered unlawful remuneration under the AKS.  *See Miller v. Abbott Labs*, 648 F. App'x 555, 561 (6th Cir. 2016) ("[I]tems or services of nominal value are permitted under the AKS because those items or services could not reasonably be expected to induce a referral."); *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 402 (6th Cir. 2015) (holding that it "cannot plausibly be suggested" that a gift of a jacket and some hotdogs and hamburgers could induce a referral and that those items "represent such a low monetary value that they can only be characterized as 'token' gestures of good will under OIG guidance"); *United States ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 809 (S.D.N.Y. 2017), *rev'd and remanded on other grounds*, 899 F.3d 163 (2d Cir. 2018).

2.     Alleged Extravagant Kickbacks Were Malicious Rumors and Did Not Occur.

Relator's Complaint alleges that "Winger and Davisson" provided remuneration to HRMC Cath Lab employees in the form of "alcohol, gratuities, event sponsorships, NASCAR and other sporting event tickets, golf outings and travel expenses."  FAC at ¶ 88. Although Relator claimed his allegations were based on the "firsthand knowledge" of "healthcare professionals," evidence has proven that, in fact, he had no colorable basis for the vast majority of his alleged kickbacks.

Relator provided no basis for these allegations in his deposition.  Schroeder Dep. 310:6–314:18 (Doc 381-9).  Relator also did not identify any support for these allegations in response to written interrogatories.  *See* Ex. 44 at Nos. 3, 5, 7; Ex. 45 at No. 5.  No witness has identified any basis for these allegations.  *E.g.*, Brown Dep. 194:9–197:1 (Doc

381-11).  Relator has now admitted he had no basis for these allegations.  Rel.'s Resp. in Opp. to Mot. to Strike (Doc. 381) at 16-18.  As such, the allegations of remuneration in the form of alcohol, gratuities, event sponsorships, NASCAR and other sporting event tickets, golf outings, and travel expenses must be dismissed as a matter of law.

What remains, instead, after seven years and millions of dollars of litigation costs, are approximately **eight modest in-service lunches provided each year** with an average cost of **$11.87 per person**.  These meals represent items of "nominal value" and , thus, are not remuneration under the AKS because such items "could not reasonably be expected to induce a referral."  *Miller*, 648 F. App'x at 561.  In particular, educational meal events are not unlawful remuneration.  *See United States ex rel. Everest Principals, LLC v. Abbott Labs, Inc.*, 622 F. Supp. 3d 920, 932 (S.D. Cal. 2022) (comparing permissible "meal events" that can be "characterized as routine educational events" or "a token of goodwill" against those that are intended to "solicit patient referrals").

As set forth above, HHS-OIG has limited improper kickbacks in its own training for new physicians to "free rent, *expensive hotel stays and meals*, and excessive compensation for medical directorships or consultancies."  HHS-OIG, *A Roadmap for New Physicians, Avoiding Medicare and Medicaid Fraud and Abuse* at 4, https://oig.hhs.gov/documents/physicians-resources/947/roadmap_web_version.pdf (emphasis added).  Notably, HHS-OIG does not advise healthcare providers that *all* meals are prohibited.  Rather, it expressly advises companies to rely on long-standing industry guidance such as the PhRMA Code.  OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731, 23739 (May 5, 2003) ("*compliance*

*with the PhRMA Code with respect to these arrangements should substantially reduce a manufacturer's risk*.") (emphasis added).

This is meaningful here because the PhRMA Code—as well as its medical device counterpart, the AdvaMed Code—specifically recognize that low-cost meals provided along with information to health care providers is permitted.  *See AdvaMed Code of Ethics* at 26*,* https://www.advamed.org/wp-content/uploads/2022/03/2022-AdvaMed-Code-of-Ethics-Digital.pdf.  Consistent with that guidance, HRMC permitted device manufacturers to provide in-service meals in compliance with industry standards.  Medtronic was one of many companies that did so. The meals were provided attendant to representative education during or after procedures, Winger Dep. 333:12-5 (Doc. 381-10), were provided to lab staff, not decision makers, *id.* at 333:17-21, and were modest, *id* at 117:1-6.

This is a far cry from the extravagant meals and other remunerations that violate the AKS.  *See, e.g.*, *United States v. Aniemeka*, No. 17 C 4011, 2024 WL 665927, at *2 (N.D. Ill. Feb. 15, 2024) (alleging doctor received "over $82,000 in cash, as well as various gifts" in exchange for patient referrals); *United States ex rel. Hueseman v. Pro. Compounding Centers of Am.*, Inc., 664 F. Supp. 3d 722, 741 (W.D. Tex. 2023) (alleging all-expense paid international vacations given to customers as an incentive for purchases); *United States v. Cath. Health Initiatives*, No. 4:18-CV-123, 2022 WL 2657131, at *8 (S.D. Tex. Mar. 31, 2022) (alleging the provision of "'lavish' international trips" in exchange for Medicare/Medicaid referrals); *United States v. Marlin Med. Sols. LLC*, 579 F. Supp. 3d 876, 887 (W.D. Tex. 2022) (alleging that a prescriber received "checks to his charity totaling $7,500, travel, meal, and luxury hotel expenses for the San Antonio trip, and

premium tickets to a San Antonio Spurs game, with the opportunity to interact with some players"); *U.S. ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497, 515 (S.D.N.Y. 2014) (alleging that company provided "upscale, all-expense paid social outings for the doctors" for which company paid "exorbitant amounts of money").

### 3.    Bulk and Bundle Discounts Are Not Unlawful Remuneration.

As set forth in Medtronic's first Motion for Partial Summary Judgment, HRMC's purchase of bundled discounts comply with both Statutory and Regulatory Safe Harbors. *See* Doc. 430 at 40-55.  For these reasons alone, the discounts Relator has identified are, by definition, not unlawful remuneration.  *See* 42 U.S.C. § 1320a-7b(b)(2)(A)-(B).

### 4.    Relator Has Provided No Evidence That Device "Swap-Outs" Occurred At All or Were Unlawful.

In discovery, to cover the 2011 to 2014 period, Relator developed a new "kickback" theory on alleged "replacement" of "expired devices" owned by HRMC. First and foremost, these allegations must be dismissed because it has not been properly alleged by Relator in his FAC.

However, to the extent this new allegation is considered, Relator has identified 11 documents that he contends support these new allegations.  *Supra* at ¶ 11.  Review of those documents shows that Relator has overwhelmingly failed to develop sufficient evidence to demonstrate a triable question that a "transfer of something with substantial independent value" occurred.  *Nw. Mem'l Healthcare*, 2023 WL 6388328, at *5.

Indeed, in 8 of the 11 "Swap-Outs," there is no evidence that any HRMC-owned product was, in fact, swapped at all.  *See, e.g.,* SO 2-8, 10.  These transactions involve

either (1) product that was documented as on consignment, and thus not owned by HRMC at all, and/or (2) transactions in which the evidence identifies only an ask or a mention of expired devices, not an actual exchange that occurred. *Supra* at ¶¶ 10-17.

The remaining three transactions (SO 1, 9, 11) appear to involve issues with product performance or a sales representative error that Medtronic had a customer-service obligation to correct. *Supra* at ¶¶ 15-16. As the Central District of California recently and explicitly held, device "swap-outs" in such circumstances (*i.e.*, the provision of free devices as replacements for defective units) are not "remuneration." *See United States v. Medtronic PLC et al.*, No. 2:19-cv-10960-MEMF-SKx, 2024 WL 1363644, at *5 (C.D. Cal. Mar. 28, 2024) (noting prior holding that providing free devices as replacements for defective products was not remuneration). There, the court analyzed "whether repairs or replacements of defective parts constitute remuneration under the Anti-Kickback Statute." *Medtronic*, No. 2:19-cv-10960-MEMF-SKx, ECF No. 61 at *17 (C.D. Cal. June 15, 2023).

> Although "remuneration is not defined in the statute itself, agency guidance defines it as follows: "For purposes of the anti-kickback statute, 'remuneration' includes the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind." OIG Advisory Opinion No. 12-19, 2012 WL 7148095, at *5 (Nov. 30, 2012). This is consistent with the dictionary definition of "remuneration" as "payment" or "compensation." *Remuneration*, Black's Law Dictionary (4th ed. 2001 ). . . . [T]he Court notes that under the first inference—that the Defendants were replacing defective parts with free EVQ modules—such conduct **would not constitute remuneration under the Anti-Kickback Statute**.

*Id.* at *17–18 (emphasis added). Indeed, Medtronic has legal obligations to provide customers with replacement devices where a product performance issue arises, under both common law obligations of merchantability and Medtronic's contract warranty. *See, e.g.,*

*Wells v. Johnson & Johnson*, 554 F.Supp.3d 1207 (W.D. Ok. 2021) (discussing express and implied warranty obligations of medical device manufacturer).

Relator has identified no evidence to support his creative interpretations of these facially innocent emails, and his reliance on the mere "sheer possibility that a defendant has acted unlawfully" is not even sufficient to pass muster under Rule 12. *United States ex rel. Hanlon v. Columbine Mgmt Sv's, Inc.*, 676 Fed Appx. 787, 791 (10th Cir. 2017).

## B.   Defendants Did Not Knowingly or Willfully Engage In Acts They Understood To Be Unlawful.

Given that Medtronic's sales activities at HRMC fell within industry norms, it is not surprising that Medtronic had a good faith belief that their actions were lawful. As such, Relator cannot point to evidence that Medtronic knowingly and willfully acted unlawfully.

### 1.   Legal Standard on Knowing and Willfully Unlawful Conduct.

To succeed under the AKS, Relator must establish that Medtronic acted "knowingly and willfully"—that is, deliberately and with criminal intent. 42 U.S.C. § 1320a-7b(b)(2).

"To establish a *knowing* violation" of the AKS, Relators must prove that Defendants "acted voluntarily and deliberately rather than by accident or mistake." *United States v. Teva Pharms. USA, Inc.*, 560 F. Supp. 3d 412, 421 (D. Mass. 2021) (emphasis added). "To establish a *willful* violation," Relators must demonstrate that Defendants "acted with the knowledge that its conduct was unlawful." *Id.* (emphasis added). This requires Relator to prove that Defendants acted with a "bad purpose" knowing that its conduct violated the law. *United States ex rel. Hart v. McKesson Corp.*, 96 F. 4th 145, 154–157 (2d Cir. 2024). This is best understood as a "voluntary, intentional violation of a known legal duty." *Id.*

Thus, an individual who "accidentally violate[s]" the statute because he is "unaware" that a given payment arrangement is prohibited by law, does not violate the AKS. *Id.* Moreover, when the regulation at issue contains ambiguity, the Court must also determine whether "the defendant actually knew or should have known that its conduct violated a regulation in light of any ambiguity at the time of the alleged violation." *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017) (internal citation omitted). This heightened scienter standard "comports with the general goal of criminal law to punish only those who act with a vicious will." *Id.* at 155 (internal quotation marks omitted); *see also U.S. ex rel. Jamison v. McKesson Corp.*, 900 F. Supp. 2d 683, 702 (N.D. Miss. 2012) ("[C]arelessness does not evidence a willful wrong intentionally committed against the Government.").

2.   Because In-Service Meals Are Commonly Accepted and a Common Practice, No Evidence of Knowing or Willful Conduct Exists.

As set forth above, the occasional and modest meals Medtronic provided to HRMC were a common and widely-accepted practice, both industry wide and among competitors. As one court recognized, "[p]aying for a client's meal in order to strengthen business relationships is, in and of itself, hardly an unusual sales strategy." *United States ex rel. Solis v. Millennium Pharms., Inc.*, 445 F. Supp. 3d 786, 799 (E.D. Cal. 2020).

Moreover, efforts to comply with company policies and applicable industry guidance like the PhRMA Code and AdvaMed Code are inconsistent with willful intent to violate federal law. *See, e.g.*, *United States v. Pfizer, Inc.*, 188 F.Supp.3d 122, 134 (D. Mass. 2016) (finding no evidence of knowing or willful intent due to defendant efforts to

ensure compliance with government requirements, reliance on external guidance, and following policy). Here, Medtronic representatives provided meals that complied with its own internal guidance: the meals were modest, expensed and submitted to the company, and the identities of any attendees at the meals were recorded. *Supra* at Fact Section III.

Indeed, if a meal was provided with a willful, criminal intent, there presumably would be some extraordinary evidence to permit an inference of bad intent—extravagant cost, locations that are unsuitable, attendance by individuals with no valid reason to participate. *See, e.g.*, *supra* at I.A.2. The record here, by contrast, lacks any evidence that would demonstrate any knowing and willful intent to violate the law. *United States ex rel. Gonzalez v. Fresenius Med. Care N. Am.*, 748 F. Supp. 2d 95, 113 (W.D. Tex. 2010) ("[T]he Anti–Kickback Act requires proof that a defendant acted 'knowingly and willfully'—***criminal intent***—in paying remuneration to induce referrals[.]") (emphasis added), *aff'd* 689 F.3d 470 (5th Cir. 2012).

Not only do none of the "red flag" factors exist, the in-service meals provided to HRMC Cath lab staff *did not involve HRMC purchasing decisionmakers*. This, too, is contrary to any notion of willfulness. Relator does not allege that Dr. Hagley—the actual product decisionmaker—was a kickback recipient and he rarely ate in-service meals. FAC ¶ 89 (not alleging Hagley received any meals as kickbacks). The Cath lab employees who ate the meals were not in charge of product purchasing or production selection, which alone is evidence that disproves a willful, criminal intent.

      3.    <u>Medtronic Employees Believed the Discounts Were Lawful and Thus Lack The Requisite Scienter.</u>

In its prior pending Motion for Partial Summary Judgment, Medtronic set forth why the bulk and bundle discount sales to HRMC did not constitute unlawful remuneration under the Statutory and Regulatory Safe Harbors. *See* Doc 430 (citing 42 U.S.C. § 1320a-7b(b)(3)(A), 42 C.F.R. § 1001.952(h)). However, even if the Court determined that the discounts did not technically meet the safe-harbor requirements, the discounts Medtronic provided to HRMC also do not violate the AKS and FCA. *See* DHS-OIG, *Fact Sheet, Federal Anti-Kickback Law and Regulatory Safe Harbors*, www.oig.hhs.gov/fraud/docs/safeharborregulations/safefs.htm (arrangements that do not comply with a safe harbor must be analyzed on a case-by-case basis AKS compliance). As set forth herein, the evidence shows Medtronic intended to comply and so did not have the requisite scienter.

As other Courts have recognized, "competitive pricing schemes within the health care field will lower the cost of health care services and goods." *United States v. Shaw*, 106 F. Supp. 2d 103, 115 (D. Mass. 2000). For that reason, "offering or receiving discounts in order to compete for business" is not also sufficient evidence that "the entity 'knowingly and willfully' induced" or arranged for referrals or for other business reimbursable under the Medicaid or Medicaid programs." *Id.* at 120. Relator must be able to point to specific record evidence that supports a finding of bad faith.

Relator cannot do so here. Rather, the record demonstrates a clear effort and intent by both HRMC and Medtronic to comply with federal requirements. As the seller, the Medtronic representatives expressly testified to (1) their understanding that the discounts

were lawful if provided in writing to the customer, and (2) Winger's practice of always providing HRMC written documentation of the products, discounts, and other financial information on each transaction. *See, e.g.,* Davisson Dep. 268:10-17 (Doc. 381-8) (there would be "paperwork or documentation in place that would reflect the impact of those free devices on the overall purchase."); Winger Dep. 322:9-324:7 (Doc. 381-10) (describing the process of providing approved discounts in writing). To that end, Winger "would always work with Greg Davisson my boss" and "yes, we would always include a spreadsheet like this with everything we supplied to Hutchinson." *Id.* at 207:9-12.

The documents Medtronic employees created were not the "wrong" type, as set forth in prior briefing regarding the Safe Harbor. At a minimum, however, they demonstrate good faith and a lack of criminal intent. There is no dispute that HRMC fully understood at the time of purchase the exact devices and discounts it had received. *See* HRMC Mot. for Part. S.J. Doc. 435. HRMC similarly understood the discount to be lawful. *Id.* Indeed, HRMC *saved* and *filed* the documents detailing the bulk and bundled deals, an action they would not take if Medtronic and HRMC believed they were engaged in an unlawful act. Doc. 430 at 50 (citing SOF ¶ 46-47; Rel. UMF ¶ 24-37; Atkins-Ray Dep. 82:11-82:17).

As is fairly well-recognized, there has been a great deal of ambiguity in how to apply and interpret the discount safe harbor over time. *See, e.g., Shaw*, 106 F.Supp.2d at 111; *Supervalu Inc.*, 598 U.S. 753; *United States ex rel. Banigan v. Organon USA Inc.*, 2016 WL 10704126, *3-4 (D. Mass. Aug. 23, 2016). Given the lack of regulatory clarity, the evidence that the Medtronic employees believed that they were complying with legal requirements of an ambiguous standard, should preclude this Court from finding a question

of fact for a jury to determine whether Medtronic had a willful and criminal intent to violate the law. *Lincare Holdings, Inc.*, 857 F.3d at 1155 (affirming grant of summary judgment because of absence of evidence of willful intent).

4.   <u>Occasional Replacement of Broken or Expired Devices Is Not a Knowing or Willful Kickback</u>.

Finally, Relator also lacks any evidence that the eleven so-called "Swap-Outs" were provided with a willful intent to violate the law.  When Winger was asked about replacing expired devices, he testified that he only recalled "swapping" expired devices when they were on consignment and, thus, still owned by Medtronic.  Winger Dep. 182:3-183:10, 192:10-15 (Doc. 381-10).  The only exception he could think of pertained to a Trellis device that was on recall.  *Id.* at 198:4-19.  HRMC witnesses agreed.  *See, e.g.,* Wilson Dep. at 87:3-14 (Doc. 398-4) (HRMC did not swap "owned product").

As discussed above, for eight of the eleven alleged "Swap-Outs," the record lacks any documentary evidence that an item of value was provided *at all* either because the device was on consignment, or because the exchange simply does not appear to have occurred.  *See supra* at ¶¶ 10-17 (referring to SO 2-8, 10).

As to the remaining three "Swap-Outs," SO1, SO9, and SO11, the documents show that each transaction involved a product defect or usage issue and there is no evidence that these transactions fall outside standard warranty or customer service behaviors.  But, even assuming *arguendo* it did, there is no evidence that three random exchanges constitute a bad faith, knowing, and willful act of criminal intent rather than a potential mistake as to

scope of warranty.  *See, e.g. McKesson Corp.*, 96 F. 4th at 154–157 (AKS violations

subjected to heighted standard because violation should involve a "vicious will.").

## C.  Device Swap-Outs and In-Service Lunches Were Provided Without Intent to Induce.

The third element of an AKS claim is the requirement that any alleged kickback was

provided with an intent to induce sales.  More than just standard sales or tokens of good

will, this requires Relator to prove an improper attempt to exercise influence of the

judgment of a purchaser or referral source.

### 1.    Legal Standard on Intent to Induce.

"The key to a Medicare Fraud case is the reason for the payment—was the purpose

of the payments primarily for inducement.  In addition to the knowing and willful

requirement, this imposes a second and stronger scienter requirement."  *United States v.*

*Bay State Ambul. & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 33 (1st Cir. 1989); *McClatchey*,

217 F.3d at 835 (holding that a violation of the AKS requires a showing that "one purpose

of the offer or payment" is inducement of a referral); *United States v. Medtronic, Inc.*, No.

CV 15-6264, 2017 WL 2653568, at *5 (E.D. Pa. June 19, 2017) (requiring proof that

defendant's "substantial purpose" was to induce referrals or purchases).  "'[T]o induce'

connotes 'an intent to exercise influence over the reason or judgment of another in an effort

to cause the referral of program related business.'"  *Hanlester Network v. Shalala*, 51 F.3d

1390, 1398 (9th Cir. 1995); *see also United States v. Marchetti*, 96 F.4th 818, 827 (5th Cir.

2024) ("not every sort of influence is improper").  Acts taken to generate mere goodwill or

hope, as opposed to with a specific expectation of a reciprocal purchase, do not violate the AKS.  *See, e.g.*, *Abbott Labs, Inc.*, 622 F. Supp.  at 932.

> 2. <u>Most Meals Were Provided to Staff Who Are Not Decisionmakers</u>.

Relator not only lacks evidence that Winger provided HRMC modest meals with a purpose to induce purchase, it lacks evidence of even a nexus between the meals and purchasing decisionmakers at HRMC.

Cath lab employees did not make product decisions for patient care at HRMC.  It is well-understood within the industry that physicians alone make those decision.  *See supra* at Fact Section II.  Relator does not even allege that HRMC physicians were influenced by kickbacks. HRMC meals were provided to Cath lab staff, such as the technicians and nurses whose job it was to help the physician open and deploy the physician-selected devices during procedures.  Why?  Winger provided the lunches when he attended procedures at the hospital, and he has testified he would provide product support and education while there.  *Supra* at ¶ 53.  In doing so, the Cath lab staff had nothing to improperly induce; at worst, Winger merely acted out of goodwill for people he worked within the lab.

While Relator's complaint also focuses on Wilson, Wilson also did not choose products. He negotiated reduced prices for the products physicians instructed him to purchase.  In any event, discovery has revealed that Winger and Wilson only shared two very modest lunches of less than $15-20 each.  *Supra* at ¶ 58.  These two modest meals are the definition of nominal value. *See, e.g.*, *Holzer Health Sys.*, 630 F. App'x at 402 (6th Cir. 2015) (holding that it "cannot plausibly be suggested" that a gift of a jacket and some hotdogs and hamburgers could induce a referral and the items "represent such a low

monetary value that they can only be characterized as 'token' gestures of good will under OIG guidance").

        3.      <u>Defendants Did Not Replace A Handful of Devices with the Intent to Induce Future Purchases.</u>

As to the "Swap-Outs," Relator has never identified any evidence that any device was exchanged with the intent and expectation that this would compel or influence HRMC to make future purchases. Indeed, even in the few cases where devices were not on consignment, the nature of the transaction is that HRMC would buy one *less* device. The documents cited by Relator contains no *quid pro quos* nor even any suggestion that the transaction contemplated future sales. Exs. 4 to 14.

Another hurdle to Relator's theory is the fact that device swaps were discussed exclusively with HRMC staff. Relator has not identified a single physician at HRMC who participated in these logistical discussions. Moreover, the correspondence cited by Relator for these "Swap-Outs" actually shows occasions when HRMC owned the product and Medtronic stated it *could not* swap devices because they were not consigned. *Supra* at ¶¶ 10-17. The "Swap-Out" transactions simply reflect standard customer service and good will intent; they do not demonstrate an improper attempt to "exercise influence over the reason or judgment of another" to obtain a sale. *Hanlester Network*, 51 F.3d at 1398.

## II.    <u>MEDTRONIC'S CONDUCT AT HRMC DID NOT RESULT IN FALSE CLAIMS OR DAMAGE TO THE UNITED STATES</u>

In addition to having to prove each element of his AKS claims, Relator must also prove that any violation of the AKS was also a violation of the False Claims Act. The FCA requires Relator to prove a Defendant "knowingly presents or causes to be presented a false

or fraudulent claim for payment or approval." 31 U.S.C. § 3729, subd. 1(a). This requires proof of: (1) a false claim, (2) made with knowledge that it was false, (3) that the falsity be material to payment, and (4) the falsity caused the government to pay money. *See United States v. Lawson*, 522 F. Supp. 746, 750 (D.N.J. 1981). A "claim that includes items or services resulting from a violation" of the AKS "constitutes a false or fraudulent claim for purposes" of the FCA. 42 U.S.C. § 1320a-7b(g).

In addition to failing under the AKS, judgment as a matter of law is appropriate because the undisputed record shows that (1) the alleged acts did not result in false claims, (2) that claims were not made with knowledge they were false, and (3) the alleged acts did not cause payment by the federal government.

## A.    The Alleged Kickbacks Did Not Cause False Claims.

Relator has no evidence Medtronic, in any way, caused HRMC to use items or services it would not have otherwise by means of the alleged kickbacks.

### 1.    Legal Standard

To prove an AKS-FCA case, Relator must first show the claim "include[d] items or services ***resulting from*** a violation" of the Anti-Kickback Statute. 42 U.S.C. § 1320a-7b(g) (emphasis added). This requires Relator to show that the violation of the AKS was the "but-for" cause of a false claim. *See Hathaway*, 63 F.4th at 1052 (holding that the violation of the AKS must be the "but-for" cause of the false claim); *United States ex rel. Cairns v. D.S. Med. LLC*, 42 F.4th 828, 831 (8th Cir. 2022) (holding that the words "resulting from" create "a but-for causal requirement between an anti-kickback violation and the 'items or services' included in the claim").

While the government and relators often advocate for a loose causal test,[9] there is a "wall of precedent" showing the correct standard is but-for causation. *Cairns*, 42 F.4th at 834. As a result, courts have become increasingly unwilling to sanction a "taint theory" that allows liability, treble damages, and penalties if the alleged back merely *may* have factored into a claim. *Cairns*, 42 F.4th at 834. The Tenth Circuit has not addressed the required causal connection.

In *Cairns,* the Eighth Circuit resoundingly rejected the government's "taint" theory. *Id*. Instead, the Court held that the plain meaning of the AKS language **"resulting from"** required "but-for" causality. *Id.* at 834-36. In reaching that result, the Court found the "resulting from" language in the AKS to be unambiguous and stated that its "interpretation both begins and ends with the text." *Id.* at 834. With no statutory definition available for the phrase "resulting from," the court looked to "the phrase's plain meaning at the time of enactment." *Id.* (citing *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020)). The court noted that the Supreme Court "undertook this task in interpreting a nearly identical phrase, 'results from,' in the Controlled Substances Act." *Id.* (citing *Burrage v. United States*, 571 U.S. 204, 210–11 (2014)). In *Burrage*, the Supreme Court "look[ed] to dictionary definitions" and

---

[9] This argument relies on *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 96–98 (3d Cir. 2018). As one district court explained, "the standard set forth in *Greenfield* is fraught with problems. To begin, and as the *Cairns* and *Martin* courts observed, that standard is divorced from the actual language of the statute and from basic principles of statutory interpretation. It is likewise disconnected from long-standing common-law principles of causation." *United States v. Regeneron Pharms., Inc.,* No. CV 20-11217-FDS, 2023 WL 6296393, at *8–10 (D. Mass. Sept. 27, 2023).

"concluded that the ordinary meaning of 'results from' imposes … a requirement of actual causality: the use of drugs had to be a but-for cause of the death." *Id.*

The Eighth Circuit also looked to the American Heritage Dictionary and Webster's Third New International Dictionary and "conclude[ed] that, in common and ordinary usage," the "resulting from" phrase "expresses a but-for causal relationship." *Id.* Thus, "[t]racking the textbook definition, the government had to prove here that the defendants would not have included particular 'items or services' absent the illegal kickbacks." *Id.* at 835. The court explained:

> Our holding here should be no surprise. After all, "[w]here there is no textual or contextual indication to the contrary, courts regularly read phrases like 'results from' to require but-for causality." *Burrage*, 571 U.S. at 212, 134 S.Ct. 881; *Comcast Corp.*, 140 S. Ct. at 1014 (calling it the "default" or "background" rule against which Congress legislates). With nothing in the text of the 2010 amendment [of the AKS][10] giving us reason to conclude otherwise, we follow *Burrage*'s example.

*Id.* at 835.  A year after *Cairns*, the Sixth Circuit agreed in *Hathaway*, 63 F.4th 1043.  Just as in *Cairns*, the Sixth Circuit looked to the phrase "resulting from" and found it requires proof of "but-for" causation:

> The ordinary meaning of 'resulting from' is but-for causation.  That understanding applies unless strong textual or contextual indication[s] indicate a contrary meaning. None exists.  As in *Burrage*, Congress added the "resulting from" language in 2010, against the backdrop of a handful of cases that observed similar language as requiring but-for causation.

*Id.* at 1052.  (citations and internal quotation marks omitted).

---

[10] In 2010, Congress amended the AKS to provide that a Medicare claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]."  42 U.S.C. § 1320a-7b(g).

In short, "[c]ausation is an essential element that must be proven[.]"  *Cairns*, 42 F. 4th at 835.   Because Relator cannot prove causation—namely, that any items in the purportedly false claims would not have been billed for ***but for*** Defendant's alleged AKS violations—summary judgment in favor of Defendants is appropriate.

Here, Relator's alleged kickbacks all fail for the same reason—there is no connection between the alleged kickback and the physician decisionmaker who determined which device to use in every patient treated at the HRMC. To the contrary, HRMC's Dr. Hagley has been described by Relator as a "phenomenal" physician. Schroeder Dep. 31:22-25 (Doc. 381-9). As one of Relator's then-employees, Todd Brown, described it: Dr. Hagley is someone he "absolutely" respects and "[o]ne of the best," and a physician that "always" acted with integrity; Brown was "astound[ed]" at the mere suggestion Dr. Hagley would be influenced by kickbacks.  Brown Dep. 149:13-21, 150:23-152:2 (Doc. 381-11).

2.   There Is No Causal Connection Between Staff Lunches and Dr. Hagley's Use of Devices.

Relator has developed no record evidence that would suggest that Dr. Hagley or any other HRMC physician would use any device based on lunches provided to Cath lab staff. It is undisputed that the physicians are the only individuals at HRMC that select what type of devices to purchase and use in their practice.  *Supra* at ¶ 5.  Yet, not a single HRMC physician was deposed and there is simply no evidence from which it can even be inferred that Cath lab staff lunches were a but for cause for the use of Medtronic devices at HRMC.

Relator's complaint focused on Mark Wilson, but the allegation still fails.  Wilson only ordered as he was asked to by physicians.  *Supra* at ¶¶ 5-9.  Moreover, whether a

device was billed to a federal healthcare program turned, solely, on whether a physician decided to use it.  In any event, there is little credible reason to believe that two modest lunches of less than $20 would have *caused* Wilson to purchase Medtronic devices that HRMC physicians had not requested.

>        3.        The Bundled Discounts Also Did Not Cause False Claims.

To survive summary judgment on his discount claims, Relator would have to be able to point some evidence that *but for* the discounts, HRMC would not have purchased and used the *Medtronic* DCBs and atherectomy devices in procedures reimbursed by federal healthcare programs.  Relator has no evidence to support but-for causation.  Indeed, the evidence overwhelmingly points in the opposite direction.

Dr. Hagley and the physicians at HRMC reviewed literature and decided which peripheral vascular devices they wanted stocked in the Cath lab.  *Supra* at ¶¶ 5-9.  During the at-issue time period, HRMC physicians had specific product preferences.  Wilson Dep. 174-175 (Doc. 398-4).  This included the Medtronic-manufactured DCBs; as well as a variety of atherectomy devices—including the directional atherectomy devices, a type of device which only Covidien and Medtronic sold. *Id.*; Medtronic's Mem. (Doc. 430); HRMC's Mem. (Doc. 435).

Physicians did not, however, complete the ordering process to purchase the devices. Rather, Wilson from the purchasing department was to obtain the devices consistent with physician instructions for the lowest possible price. *Supra* at ¶ 8. To this end, Wilson would push representatives to give him aggressive discounts, often masking Dr. Hagley's pre-determined choice to create competition.  *Id.*; Medtronic's Mem. (Doc. 430); HRMC's

Mem. (Doc. 435).  When the offers for DCBs started to come in the form of bulks, Wilson had his staff prepare a use-analysis to determine how many of certain devices (including size and other variables) Dr. Hagley was using over a set period of time.  Ex. 48.  This allowed Wilson to obtain a discount on a bulk volume purchase, store the devices in the purchasing department storage, and supply the Cath lab with their devices on an as-needed basis.  In short, Wilson was stocking the Medtronic devices HRMC would have purchased eventually because he could save money by buying in bulk.

Wilson did testify that he would share some general information about price points with physicians, and sometimes he would ask about the Cath lab's desire for devices offered at a discount.  Wilson Dep. at 176:21-177:20. However, Relator has identified *no evidence* that HRMC would not have purchased and used the devices included in the bundled transactions (or any transaction, for that matter) absent the inclusion of a "buy 10, get 1 free" offer.  The record shows, instead, that HRMC *did* purchase bulk DCB deals even when no bundle was offered.  Exhibit 2 at 15; Wilson Dep. at 176:9-17 (Doc. 398-4).

4.    <u>There is No Evidence about the Items or Services billed to the Government as a Result of "Swap-Outs."</u>

Relator has developed and identified no evidence that, but for the "Swap-Outs," an item or service would not have been billed to the federal government.  Indeed, even at the most fundamental level, there no evidence even tying the alleged "Swap-Outs" (to the extent they occurred) to a federal health care program at all.  Medtronic is not aware of any evidence showing if or when the devices Relator claims were "swapped" were used and whether the federal government was a payor for the care.

Second, there is also no evidence the physicians who make decisions for product use at HRMC were even aware of the "Swap-Outs."  The 11 documents Relator has identified are communications with HRMC staff, not physicians. Exs. 4-14 (communications each with a non-physician).  Thus, there is no evidence that the "Swap-Out" was a but-for cause of a physician's decision to (1) buy or use a device they would not have otherwise, and (2) bill for that device in a claim to a federal healthcare program.

**B.      Medtronic Did Not Present False Claims, Nor Knowingly Cause The Submission Of False Claims.**

To prove scienter under the FCA, Relator must prove a defendant "knowingly" either (1) "presented" false claims (Relator's Count I), or (2) caused false claims to be submitted (Relator's Count II).  Medtronic does not, itself, present claims associated with care at HRMC to the federal government and, thus, Count I fails.  As to Count II, the record lacks any evidence that Medtronic knowingly caused HRMC to submit false claims.  The FCA defines knowingly as "actual knowledge of the information," "deliberate ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A).

Indeed, "'mere' contractual or regulatory non-compliance" is not a "false claim" because the FCA is "not an appropriate vehicle for policing technical compliance with administrative regulations. The FCA is a fraud prevention statute; violations of [agency] regulations are not fraud unless the violator knowingly lies to the government about them." *United States ex rel. Farmer v. City of Houston,* 523 F. 3d 333, n. 12 (5th Cir. 2008) (citation omitted).  "In fact, if the regulations were thoroughly unclear, as a matter of law,

the FCA's knowledge and falsity requirements have not been met." *Id.* (citing *Southland Mgmt.*, 326 F.3d at 684 (Jones, J., specially concurring) ("Where there are legitimate grounds for disagreement over the scope of the contractual or regulatory provision, and the claimant's actions are in good faith, the claimant cannot be said to have knowingly presented a false claim.")).

In 2023, the United States Supreme Court further explained that, for purposes of the FCA, a defendant's knowledge of and subjective beliefs about the legal requirements—not what an objectively reasonable person may have believed—are what matters when determining whether the defendant "knowingly" caused false claims to be submitted. *States ex rel. Schutte v. SuperValu, Inc.*, 143 S.Ct. 644, 598 U.S. __ (2023).

For the same reasons set forth above in Sections I.B and I.C, the record demonstrates that both Medtronic employees who serviced HRMC and the HRMC employees, had a good faith belief that the exchanges, in-service lunches, and discounts were lawful. Moreover, the existing regulatory ambiguity over the edges of AKS's permissive activities, including as it pertains to discounts and in-service meals, further supports the reasonableness of Medtronic's subjective belief as a matter of law. Relator cannot point to any issue of material fact to support his contention that Medtronic *knowingly* caused HRMC to submit any false claims to the federal government.

## C.    Relator's Allegations Of Conspiracy Under The False Claims Act Are Wholly Without An Evidentiary Basis.

In order to survive summary judgment on Count III, alleging conspiracy under § 3729(a)(3), Relator most prove that Defendant "conspire[d] to defraud the Government

by getting a false or fraudulent claim allowed or paid."  In addition to the above elements, Relator must also prove "the (1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid," and "(2) at least one act performed in furtherance of that agreement."  *City of Houston,* 523 F. 3d at 343.  This includes a requirement that Relator show two separate Defendants "shared a specific intent to defraud the [G]overnment."  *Id.*

Relator has identified *no* evidence of an unlawful agreement between Medtronic and HRMC, including specifically one designed to "get" a false claim "allowed or paid" by the federal government.  Indeed, Relator provides no evidence Medtronic had any knowledge *at all* as to whether devices it sold to HRMC were: (1) submitted to a federal healthcare program, or (2) how the claims were submitted.  (Doc. 430.)  Nor has Relator identified any evidence of any intent to defraud the government, let alone a "specific intent."  As such, Relator's Count III necessarily fails.

**D.  There Is No Evidence of Any Damage to the Federal Government.**

1.  <u>The Legal Standard.</u>

The False Claims Act permits the Government to recover triple the actual "damages which the Government sustains *because of the act of*" a defendant.  31 U.S.C § 3729(a)(1) (emphasis added).  This sets forth a second "causal" requirement that Relator must meet, tying the alleged bad act to actual damages suffered.  *See, e.g., Cairns*, 42 F.4th at 836; *Burrage*, 571 U.S. at 212.

Damages are "the difference between the market value of the [goods] received and retained and the market value that the [goods] would have had if they had been of the

specified quality." *Bornstein*, 423 U.S. at 317 n.13.  *See also United States. ex rel. Concilio De Salud Integral De Loiza, Inc. v. J.C. Remodeling, Inc.*, 962 F.3d 34, 42 (1st Cir. 2020); *Wall I*, 813 F.3d at 617; *United States ex rel. Davis v. D.C.*, 679 F.3d 832, 840 (D.C. Cir. 2012); ("*SAIC*"); *United States v. Coop. Grain & Supply Co.*, 476 F.2d 47, 63 (8th Cir. 1973).   "[T]he relevant question is not whether in some hypothetical scenario the government would have withheld payment, but rather, more prosaically, whether the government in fact got less value than it bargained for."  *Wall I*, 813 F.3d at 618; *see Hendrix ex rel. United States v. J-M Mfg. Co., Inc.*, 76 F.4th 1164, 1174 (9th Cir. 2023).

As the Seventh Circuit very recently explained, a broad suggestion that "every claim for payment following an anti-kickback violation is automatically false" and therefore a damage is "inconsistent with" the AKS.  *Stop Illinois Health Care Fraud, LLC v. Sayeed*, 100 F.4th 899, 909 (7th Cir. 2024).

2.   Relator Has Made No Attempt to Identify Actual Damages To the United States and There Are None.

Relator has identified Jessica Schmor as his damages expert.  Schmor offers her estimation of the reimbursement the United States paid for *all* peripheral vascular and cardiology claims submitted by HRMC, in which any Medtronic device was used, between 2011 and 2020.  Schmor Rep. (Doc. 451) at 5-6.  Relator's Supplemental Rule 26 Disclosure claims that each is a "damage," subject to treble damages and penalties.

As set forth above, Relator has made no attempt to develop evidence that would *causally* connect his alleged damages to his theories of liability.  *Supra* at II.A.  In addition,

Relator also has not calculated the existence or amount of any *actual* damages to the United States. That is because actual financial damage to the United States is zero.

CMS pays both inpatient and outpatient claims for peripheral vascular device using prospective payment fees. Greg Russo Rpt. at 8-9 (Doc. 435-12). Whether using a DRG under the inpatient IPPS, or a packaging payment under the outpatient OPPS, the United States payment is a set fee. *Id.* CMS payment is not based on line items billed, and medical devices used in PAD and Cardiology procedures are not reimbursed separately. *Id.* This means that the *manufacturer* of a device is irrelevant to payment.

There is no dispute in this case that CMS received the value it paid for. Patients were, in fact, provided the care for which the United States was billed. There is no claim in this case any of the medical procedures performed at HRMC were medically unnecessary, involved the use of devices that were not appropriate to the patient, or otherwise improper. To the contrary, Relator himself describes HRMC's head physician as "phenomenal" and his then-employee says he is "one of the best." *See* Schroeder Dep. 31:22-25 (Doc. 381-9); Brown Dep. 149:13-21 (Doc. 381-11).

In short, HRMC device selection has no impact on the CMS reimbursement *amount* paid by Medicare, Tricare, or Medicaid for claims. Russo Rpt. at 8-14 (Doc. 435-12); Ex. 2 at 20-21. Thus, whether a physician uses one company's stent, balloon, or atherectomy device *does not* impact the price paid by the United States. The financial implications to government payors as a result are zero. *Id.*; Ex. 2.

Thus, regardless of Relator's kickback theory, he has provided no evidence to support the cause and existence of any damage and his request to present the jury damages of more than $61 million dollars without *any* nexus to liability or harm should be rejected.

### III.   AS WITH HRMC, MODEST IN-SERVICE FOOD AT THE  DOLE VA ARE NOT UNLAWFUL KICKBACKS.

**A.   Again, Modest In-Service Food is Not Unlawful Remuneration.**

Medtronic has set forth the well-accepted industry standards on the provision of meals to healthcare providers, as well as HHS-OIG's position that modest and occasional meals are not *per se* prohibited under the AKS.  The record reflects that during the time-period in question the Dole VA functionally operated under these commonly-accepted industry standards.

In-service meals were permitted in the Cath lab and elsewhere in the VA facility. *Supra* at ¶¶ 70-79.  Both the VA staff and Medtronic employees recalled seeing sales representatives from other companies bringing in food and meals, for both the Cath lab and other clinical areas in the facility.  *Supra* at ¶¶ 72-73, 78-79. Other company representatives admitted on the record to bringing food and meals to the facility.  *Id*. It is also clear that this occurred over many years, as the practices predated the management of the Cath lab from 2011 to 2018.  Ex. 26, Brinkley Dep., Vol. 1, 250:10-15.

The food provided at the VA was overwhelmingly modest, averaging just $13.35 per person.  Huyser Decl. ¶ 42.  Some food was just coffee or donuts.  Ex. 39 at Exs. A-C. In-service food was provided when the representatives were present and providing education either during or after procedures.  *Supra* at ¶¶ 70-79. Off-site dinners were

uncommon and, when they did occur, included educational content. *Supra* at ¶¶ 78-79. Moreover, even filtering for the most expensive meals reveals just six dinners between $50 and $122 per person, all of which falls within industry standards and company policy at the time. Ex. 39. These meals are not the sort of extravagant expenses that rise to the level of illegal remuneration under the AKS. *Supra* at I.A.1-2.

In his last motion for partial summary judgment, Relator does not move for judgment on any claim or element of a claim, including remuneration. Rel's Mem. at 4 (Doc. 494). However, Relator appears to contend that because the Dole VA is a government-run medical facility, the Court should look beyond the AKS to define what constitutes a kickback. But the Court must apply the plain meaning of the statutes and regulations at issue, and Relator relies on a regulation, unconnected to the AKS, which regulates only government employees: The Executive Branch Ethics Standard, 5 C.F.R. § 2635.201. Medtronic and its employees are not, of course, employees of the United States Executive Branch. *See, e.g., id.* at § 2635.106(a)-(b) (explaining that the sole remedy available for a violation is "corrective or disciplinary action" by the "employing agency" or the "Director of the Office of Government Ethics" against a *government employee*).

There is no text within the AKS that defines remuneration by reference to this regulation. Nor can such a standard be inferred because, as a criminal statute, the AKS must be narrowly interpreted. *United States v. Galaviz*, 645 F.3d 347, 361-62 (6th Cir. 2011) (explaining the rule of lenity). The definition of "remuneration" is static and the in-service meals to the Dole VA do not fall that definition.

**B.      Medtronic Did Not Knowingly And Willfully Violate The Law.**

  1.      Relator Cannot Show Medtronic Employees Acted Knowingly or
          Willfully.

There is extensive testimony and evidence establishing that Cath lab attendees universally understood that the meals they accepted were permitted at the Dole VA, including the Cath lab managers, employees, and company representatives from multiple different companies. *Supra* at ¶¶ 70-74. The undisputed testimony is that these individuals, including Medtronic employees, did not believe they were violating any law by participating in modest, industry-compliant food. There is also no evidence:

  a.      That either the VA employees or Medtronic employees involved had actual knowledge of the Executive Branch Ethics Standards cited by Relator.

  b.      Of the contents of the Dole VA training or policies for employees.

  c.      Of *any* Dole VA training or communication to medical device vendors.

  d.      Of *any* effort to stop or halt lunches, provided openly for more than 8 years.

There is also no evidence that even a single VA employee was disciplined or punished for requesting, encouraging, and accepting food from sales representatives, including by Ament.[11]

---

[11] While Relator tries to suggest that there is a black-and-white rule about the provision of food at VA facilities, the evidence does not bear the claim out. Representatives reasonably believed there was not a ban. VAs around the country have differing practices. Report of Donna Fagan at 4. Brinkley recalled her predecessor permitting food and stated that her training indicated food is allowed. *Supra* at ¶¶ 70. Even Ament, testifying in the wake of an OIG investigation, believed he could take meals along with an educational event. *Supra* at Response to R.P. 66. Given this, it is hardly surprising that sales representatives did not perceive the Dole VA to have a total ban on the provision of modest food.

69

Indeed, the government's cooperation and participation in these events *negates* a finding of intent. The Dole VA employees with whom Winger, Kirk, and Davisson interacted not only accepted meals, but requested and encouraged them—including two different Cath lab managers. *Supra* at ¶ 70. *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 534 (10th Cir. 2000) (extensive government knowledge and communication with a contractor can negate FCA intent requirement); *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999) (where there is government approval, contractor "cannot be said to have knowingly presented a false or fraudulent claim.") In light of this, Relator can identify no evidence that Medtronic employees knowingly or willfully violated the law.

2.  <u>Relator's "Summary Judgement" Focuses Entirely On the Executive Branch Ethics Standard, Which Does Not Apply.</u>

In his motion for summary judgment, Relator attempts to move for summary judgment on Defendants "affirmative defense" of good faith. In doing so, his motion attempts to improperly shift his own burden, which requires he prove Defendants acted "knowing that his conduct was unlawful." *McKesson Corp.*, 96 F.4th at 154. Good faith is just a converse of the *Relator's* burden. *United States v. Goldstein*, 442 F.3d 777, 781 (2d. Cir. 2006) (affirming instruction that "defendant, however, has no burden to establish defense of good faith"); *United States v. Kimmel*, 777 F.2d 290, 293 (5th Cir. 1985) ("In reality, a criminal defendant's good faith defense is the affirmative converse of the government's burden of proving his intent to commit a crime.").

Once again, Relator's arguments on good faith are predicated entirely on a regulation called the Executive Branch Ethics Standards, 5 C.F.R. § 2635.106. In addition

to lack of evidence Medtronic employees were aware of the regulation, the ethics standard does not apply here.   As set forth above, by its plain language, 5 C.F.R. Part 2635 exclusively governs *executive branch employees*; it does not regulate or apply to private parties like Medtronic.  5 C.F.R. § 2635.201 (prohibiting "*an employee* from soliciting or accepting any gift from a prohibited source or any gift given because of the employee's official position"); 5 C.F.R. § 2635.202(a) (an "employee may not . . ."); *see also Kubin v. Abode Servs. Agency*, No. 18-CV-00658-MEJ, 2018 WL 776355, at *4 (N.D. Cal. Feb. 8, 2018)("5 C.F.R. Part 2635 codifies the Standards of Ethical Conduct for Employees of the Executive Branch."),

The regulation is also not enforceable by Relator, as it explicitly states that a violation of the regulation "does not create any right or benefit, substantive or procedural, enforceable at law *by any person* against the United States, its agencies, its officers or employees, o*r any other person*."  5 C.F.R. § 2635.106(c); *Scherer v. United States*, 241 F. Supp. 2d 1270, 1285 (D. Kan.), *aff'd sub nom*; *Scherer v. U.S., Dep't of Educ.*, 78 F. App'x 687 (10th Cir. 2003) (dismissing claims premised on the Executive Branch Ethical Standards because there is no private right of action under the regulation); *see also Atkins v. Vilt*, No. 3:21-CV-295-BJB, 2021 WL 2021125, at *4 (W.D. Ky. May 20, 2021) ("That regulation explicitly states that no private right of action allows plaintiffs to enforce or obtain relief for any violation of these ethical standards"); *Kubin v. Abode Servs. Agency*, No. 18-CV-00658-MEJ, 2018 WL 776355, at *4 (N.D. Cal. Feb. 8, 2018) ("But there is no private right of action to enforce or obtain relief for any violation of these ethical standards." (citing 5 C.F.R. § 2635.106(c)); *McClintic v. U.S. Postal Serv.*, 2013 WL

12123492, at *1 (E.D. Cal. Dec. 19, 2013) (concluding that a cause of action based on ethical standards failed to state a claim).

The sole remedy available for a violation of the Executive Branch Ethics Standards is "corrective or disciplinary action" against a government employee by the "employing agency" or the "Director of the Office of Government Ethics." 5 C.F.R. § 2635.106(a)-(b). That does not apply here. Moreover, tellingly, the undisputed evidence in this case reflects the government agency who had authority to enforce the regulation did not do so. *Supra* at ¶ 80 (VA did not discipline employees). Thus, Relator's argument that Medtronic violated the Executive Branch Ethics Standards is a red-herring—Medtronic cannot *as a matter of law* violate the regulation. Indeed, 5 C.F.R. Part 2635 has never been cited in an AKS or FCA case except unsuccessfully by *pro se* litigants.

## C.     Relator has Identified No Evidence That Meals Were Provided With an Intent to Induce Purchases.

Relator must also provide evidence to support "the second and stronger scienter requirement," namely that any meals were provided with an intent to induce purchases. *Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d at 33. "[N]ot every sort of influence is improper." *Marchetti*, 96 F.4th at 827. Rather, Relator must have evidence of "an intent to exercise influence over the reason or judgment of another." *Hanlester Network*, 51 F.3d at 1398.

Medtronic employees have stated that meals were provided with in-service content or education. *Supra* at ¶¶ 70-79. While not always a formal presentation, the purpose was to educate lab technicians who assisted physicians in procedures. *Id.* These nurses and lab

technicians were not making product decisions and did not decide what to buy, nor which products to use in a procedure. *Supra* at ¶¶ 18-19.

Indeed, as with HRMC, it is well-known that the physicians decided *which* devices to use. *Id.* Dole VA also had employees who oversaw purchasing, *supra* at Fact Section II, and Relator does not allege kickbacks were given to the physicians or the purchasers. Thus, once again, Medtronic's provision of food to non-decisionmakers, such as nurses and lab techs, simply does not suggest an intent to willfully influence device selection.

Karianne Kirk also noted, on at least one occasion, that she got lunch at the end of a long procedure because it was "2:30 p.m." and it was "obvious [the staff] haven't eaten." Kirk Dep. 218:24-24 (Doc. 381-4). Relator likely will point to a text message in which Winger stated that he usually gets Dole VA techs lunch if they do two or more leg cases. Ex. 46. Winger explained that was because the techs usually missed lunch on days with long procedures. Winger Dep. 251:13-18 (Doc. 381-10). While this may create a question of whether Winger and Kirk desired to engender good will rather than provide education, that still does not violate AKS. Relator must have proof, specifically, of an "intent to induce purchases" to proceed to a jury on his AKS claim and Relator has no such evidence.

## IV.   MEDTRONIC'S ACTIONS DID NOT RESULT IN FALSE CLAIMS NOR CAUSE DAMAGE TO THE UNITED STATES.

As set forth above in Section II, to have a triable claim Relator must also be able show genuine issues of material fact on each element of the FCA. Just as above, discovery has not revealed evidence to support Relator's claims.

While the allegations of kickbacks are largely similar to those alleged at HRMC, the nature of the claims at issue for Dole VA are different. Rather than involving Medicare (or other similar payors), the claims at Dole VA involve the United States' direct purchasing of supplies.  It is undisputed that Medtronic delivered the products ordered by the United States; requesting payment for the items delivered is not a false claim.

## A.    Relator Can Identify No Evidence That But-For Modest Food To Staff, the Items Sold By Medtronic Would Not Have Been Purchased.

Once again, to prove an AKS-based FCA case, Relator must first show the alleged false claims "include[d] items or services *resulting from* a violation" of the Anti-Kickback Statute.  42 U.S.C. § 1320a-7b(g) (emphasis added).  This requires Relator to show "a but-for causal link between an anti-kickback violation and the 'items or services' included in the claim."  *Cairns*, 42 F.4th at 831; *Hathaway*, 63 F.4th at 1052 (violation of the AKS must be the "but-for" cause of the false claim); *supra* at Section II.A.

Purchasing at the VA involves a significant amount of process, each step of which individually cuts off any potential claim of but-for causation:

- First, medical devices need to be requested by a physician for use in patient care.  None of the Cath lab physicians are alleged recipients of kickbacks.

- Then, the medical devices need to be reviewed and approved by the Dole VA's Product Review Team.  The Product Review Team consisted of logistics staff, administrative staff, and medical staff.  There is no allegation *any* of these employees received kickbacks.

- The VA Logistics department has to place the orders and receive the shipments.  Logistics is also charged with tracking product inventory levels.  There is no allegation the VA Logistics department received kickbacks.

- If the VA Logistics department decides a bulk purchase is warranted, the purchase is made by the VA Procurement Office.  These employees, who are

not even located in Wichita, oversee all large purchase to ensure they comply with VA regulations on sourcing and pricing. Again, there is no allegation that the VA Procurement officials received kickbacks.

- Then, once purchased, a physician must decide to use the product. Only once enough products are used are the items replaced. VA Cath lab staff plays some role in re-ordering product. But the need and type of product to order is still driven by physician use.

In short, there are numerous steps and checks on VA ordering, and the VA decisions about what to purchase and how to purchase is driven by physicians and officials with *no* connection to Relator's allegations.

While Cath lab employees did have a role in monitoring product levels to ensure the lab has the medical devices the physicians want for procedures, they were not the decisionmakers. Ex. 26 Brinkley Dep., Vol I, 28:13-20. There is also no evidence that any food actually influenced any order. Thus, while Relator claims there are 1,194 "false" invoices, Relator does not point to any evidence that an item in those invoices would not have been ordered *but for* the provision of food. Nor does Relator offer any explanation of his decision to seek damages for sales of devices to the VA for two years *after* the Cath lab closed in April 2018.

**B.    Relator Has Identified No Facts To Support an Alleged Conspiracy.**

Discovery has identified no facts to support Relator's Count III for conspiracy to commit a violation of the FCA. 31 U.S.C. § 3729(a)(1)(C). Relator's claim fails, first and foremost, because there cannot be liability for conspiracy where there is no underlying violation of the FCA. *See United States ex rel. Amin v. George Washington Univ.*, 26 F.Supp.2d 162, 165 (D.D.C.1998) (dismissing a conspiracy action because, among other

things, the alleged fraudulent actions of defendants were "entirely lawful" and did not

violate the FCA).  In addition, Relator cannot show the additional elements of conspiracy.

*Penchen Si v. Laogai Research Foundation*, 71 F.Sup.3d 73, 89 (D.D.C. 2014).  The record

also contains no evidence of an "agreement" to violate the law.

## C.      The United States Received the Exact Products It Purchased and There Is No Evidence of Damage.

Under the FCA, Relator must prove the United States incurred damages as a result

of a false claim.  However, "there can be no false claim where the Government has received

the benefit of its bargain."  *U.S. ex rel. Stebner v. Stewart & Stephenson Services, Inc.*, 144

Fed. Appx. 389, 394 (5th Cir. 2005).  As one Court of Appeals explained:

> In calculating FCA damages, the fact-finder seeks to set an award that puts
> the government in the same position as it would have been if the defendant's
> claims had not been false. In a case where the defendant agreed to provide
> goods or services to the government, the proper measure of damages is the
> difference between the value of the goods or services actually provided by
> the contractor and the value the goods or services would have had to the
> government had they been delivered as promised.

*United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1278 (D.C. Cir. 2010); *see*

*also, e.g., U.S. ex rel. Felman v. Van Gorp*, 697 F.3d 78 (2d Cir. 2012) (explaining same).

Here, Relator's allegations involve an agreement by Medtronic to provide goods in

the form of medical devices to the Dole VA.  To that end, when the Dole VA placed an

order with Medtronic, Medtronic would deliver the ordered product to the Dole VA.  Along

with each order, an invoice was submitted accounting for the devices included in the

shipment.  Relator alleges that Medtronic submitted 1,194 "false" invoices to the Dole VA

for payment between January 31, 2011 and May 24, 2020, and that the Dole VA paid

$7,361,145.33 for devices as a result.  There is no allegation that Medtronic did not deliver the product invoiced for, however; nor that the products were not consistent with the description and quality of the products requested, nor that the charge were inaccurate.  In short, the VA received the full benefit of the bargain.  The VA ordered devices and received those devices.  No damages have been suffered.

## V.      RELATOR'S PARTIAL MOTION FOR SUMMARY JUDGMENT FAILS FOR ADDITIONAL REASONS.

Relator purports to seek summary judgment "on Medtronic's three affirmative defenses applying to this [in-service meal AKS/FCA claim], Doc. 468 at 4, as follows:

- **The Good Faith Defense, No. 5:** "The actions of Medtronic and its agents were taken in good faith and not with any improper or illegal purpose, intent, or knowledge." Doc. 384 at 23, ¶ 5.

- **The Compliance Defense, No. 8:** "The claims alleged are barred, in whole or in part, because Medtronic's conduct was in compliance with, or authorized by, laws and regulations administered by any regulatory body or officer acting under state or federal statutory authority." *Id.* at 24, ¶ 8.

- **The Ambiguity Defense, No. 9:** "The claims alleged are barred because they rely on ambiguous provisions of the False Claims Act and other provisions of regulation and law and the rule of lenity requires such ambiguities be construed in Medtronic's favor." *Id.* at 24, ¶ 9.

As an initial matter, these defenses were not pled solely to apply solely to Relator's AKS claims at the Dole VA—they apply to all claims.  More importantly, these defenses are all **rebuttal defenses** to Relator's claims and dismissal for procedural reasons is required.

## A.      Relator's Rule 56 Motion Fails Because Arguments Go to Elements of His Own Claim on Which He Does Not Seek Judgment.

As the Court is aware, an affirmative defense is generally a defense that, if established, requires judgment for the defendant *even if* the plaintiff can prove his case by

a preponderance of the evidence.  *See* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice.  "The fundamental concept of an affirmative defense is that it does not negate an element of the adversary's case."  *United States v. Allen,* 449 F.3d 1121, 1125 (10th Cir. 2006); *Bell v. Taylor*, 827 F.3d 699, 704–05 (7th Cir. 2016) ("An affirmative defense limits or excuses a defendant's liability even if the plaintiff establishes a *prima facie* case.").

A rebuttal defense, by contrast, is one that points out a flaw in the plaintiff's case. *In re Rawson Food Service, Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988) ("A defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense.").  It is evidence that counteracts or disproves the plaintiff's allegations or burden of proof.  Here, it is black-letter law that the issues of good faith, ambiguity, and compliance with law all *negate* the elements of the claims Relator has alleged.

While Defendants protectively pled the three at-issue defenses, each are a rebuttal defense that negates Relator's burden to prove Defendants acted "knowingly and willingly" and with "an intent to induce."  *See, e.g.*, *United States v. Goldstein*, 442 F.3d 777, 781 (2d. Cir. 2006) (affirming instruction that "defendant, however, has no burden to establish defense of good faith"); *SuperValu Inc.*, 143 S. Ct. 139 (analyzing legal and regulatory ambiguity as potential defects to Relator's burden to prove the elements of knowledge and intent).  As to Defendants' No. 9 defense, Relator must also prove that Defendants acted illegally.  *E.g., Universal Health Services, Inc. v. U.S.*, 579 U.S. 176, 192 (explaining that under the False Claims Act, Relator must prove a "misrepresentation about compliance with a statutory, regulatory, or contractual requirement" that is "material to the

Government's payment decision").  Evidence of compliance with statutes or regulations contradicts Relator's burden of proof.

Because these three defenses go to the elements of Relator's claims, rather than seeking to avoid or limit Medtronic's liability even if Relator prevails on his claims, the burden of proof remains with Relator.  *See Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Cont'l Ins. Co.*, 891 F.2d 772, 778 (10th Cir. 1989) (concluding that the district court erred in instructing the jury that the defendant bore the burden of proof on a certain defense because the defense was "interposed only to prevent the [plaintiff] from meeting its burden of proving [an element of its claim]," and, therefore, was a rebuttal defense rather than an affirmative defense).

Relator does not argue that the undisputed facts prove the elements of his claim as a matter of law.  To the contrary, he admits he does not support or seek such a ruling.  Rel's Mem. at 4 (Doc. 494).  For this reason alone, Relator's motion fails under Rule 56.

**B.**   **Relator Does Not Seek Judgment As a Matter of Law, and As Such His Motion Does Not Meet the Requirements For a Rule 56(a) Motion.**

Relator also fails to file a motion that can be adjudicated under Fed. R. Civ. P. 56.  Rule 56 is a *dispositive motion* rule—it provides for a pre-trial, merit-based determination of claims or defenses in the case.  The rule specifically states: a "party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, while a

summary judgment ruling may encompass all or part of a claim or defense, it must at least *seek* judgment as a matter of law on that portion of the claim.

By contrast, when a party seeks to prevent the admission of evidence or arguments that it considers irrelevant or insufficiently supported by the evidence, it must do so through a motion *in limine* filed under Federal Rule of Evidence 104 ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible."). Motions *in limine* are *non-dispositive motions* because they do not seek judgment, but rather seek to exclude certain arguments or evidence.

As set forth above, Relator's motion as to Medtronic's "rebuttal defenses" is non-dispositive and does not seek judgment as required by Rule 56. As such, Relator's motion must be dismissed for this independent reason.

## **CONCLUSION**

Because there is no genuine issue of fact sufficient to support Relator's kickback-based allegations in Count I, Count II, and Count III, the Court should grant Medtronic's Motion for Partial Summary Judgment and dismiss each of Relator's claims related to the alleged provision of kickbacks to HRMC and to Dole VA.

Dated: June 7, 2024           Respectfully submitted,

                          *s/ Robert J. McCully*
                          Robert J. McCully (KS #12433)
                          Rebecca M. Gosch *(admitted pro hac vice)*
                          **SHOOK, HARDY & BACON L.L.P.**
                          2555 Grand Blvd.
                          Kansas City, MO 64108
                          Phone: (816) 474-6550

Fax : (816) 421-5547
Email: rmccully@shb.com
Email: rgosch@shb.com


*s/ Alethea M. Huyser*

Joseph T. Dixon, III *(admitted pro hac vice)*
Alethea M. Huyser *(admitted pro hac vice)*
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street, Suite 1500
Minneapolis, MN  55402-4400
T 612.492.7000
jdixon@fredlaw.com
ahuyser@fredlaw.com

***Attorneys for Defendants***
***Medtronic, Inc. and Covidien, L.P.***

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2024, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF attorneys of record.

SHOOK, HARDY & BACON L.L.P.

*s/ Robert J. McCully*
Robert J. McCully (KS #12433)