# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,    )
*ex rel.* THOMAS SCHROEDER    )
    )
    Relator,    )
    )
    )    Case No. 2:17-02060-DCC-KGG
    )
MEDTRONIC, INC.; COVIDIEN, L.P.;    )
HUTCHINSON REGIONAL MEDICAL    )
CENTER, and WICHITA    )
RADIOLOGICAL GROUP, P.A.    )
    )
    Defendants.    )

## RELATOR'S RESPONSE IN OPPOSITION TO
## MEDTRONIC, INC. & COVIDIEN, L.P.'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

COMES NOW the United States of America ("USA"), *ex rel.* Thomas Schroeder Relator,

and hereby provides the following response to *Medtronic, Inc. and Covidien, L.P.'s Motion for*

*Partial Summary Judgment* (Doc. 515).

TABLE OF CONTENTS

I.     **Summary of Response** ................................................................................3

II.    **Additional Material Facts** .........................................................................4

       *HRMC's & Medtronic's Certification of AKS Compliance* .............................4

       *Industry Knowledge – Meals Cannot be Purchased for Government Employees* ...........5

       *Damages* .........................................................................................................6

III.   **Controverting Medtronic's Factual Allegations** ........................................7

IV.    **Responding Argument** .............................................................................20

       A.   Relator Meets the Causation Standard Under his FCA Claims at HRMC ..........21

            1.  *Medtronic Caused False Certification of AKS Compliance* ...........................24
            2.  *Medtronic's FCA Liability Under 42 U.S.C. § 1320a-7b(g)* .........................26
            3.  *Medtronic's FCA Liability Outside the AKS Context* ...................................32

       B.   A Reasonable Jury Court Find that Medtronic Violated the AKS/FCA
            at HRMC ................................................................................................32

            1.  *$215,581 in Free Devices are Illegal Bribes* .................................................32
            2.  *Whether Medtronic Knowingly and Willfully Acted is a
                Question for the Jury* .....................................................................................33
            3.  *Medtronic's Bribes Induced Sales* ................................................................37
            4.  *Sufficient Evidence Exists Supporting Relator's Conspiracy Claim* .............37
            5.  *Medtronic's AKS/FCA Violations Caused Significant Damage* ...................38

       C.   Over $100,000 in Bribes Paid to Dole VA Employees Are Illegal ....................39

       D.   Medtronic's Conduct at Dole VA Resulted in False Claims ............................41

            1.  *"But For" Causation is Not Required* ..........................................................41
            2.  *Sufficient Evidence Supports Relator's Conspiracy Claim* .........................42
            3.  *Damages From Medtronic's Conduct are Significant* ...................................42

## I.   Summary of Response

Despite the voluminous briefing, this case is straightforward.  Over seven years, Medtronic provided $100,000 in meals to a federal employee in charge of making device purchases at Dole VA.  In return, via this employee, Medtronic sold over $7 million in devices to the VA.  Dole VA Director Rick Ament described Medtronic's behavior best: "unethical," "violation of [VA] policy," "textbook inappropriate," "influence is trying to be asserted," and "my employee being used as a vessel to leverage volume."[1]  Over six years at Hutchinson Regional Medical Center (HRMC), Medtronic provided $215,581 in *known*[2] free devices off the books to secure sales of additional devices sales.  Devices tainted by these bribes were used in 3,999 procedures billed to the U.S. government  for $42,131,293.

Medtronic uses the same arguments asserted in prior briefing and rejected  by this Court (*e.g.,* Relator being upset at losing sales, government not intervening, shifting theories, *etc.*).  The Relator has maintained the same legal claims against the same parties throughout.  There has been no "moving target."  As the discovery unfolded, nearly all of the Relator's good faith allegations regarding illegal kickbacks and false claims have been confirmed.  This same discovery permitted the Relator to also narrow his claims.[3]  As addressed herein, he is not pursuing any illegal remuneration claims at HRMC prior to September 26, 2014.  Also, on August 24, 2023 (Doc. 381), the Relator limited the alleged illegal remuneration at HRMC to free devices and meals.  (*Id.* at 16-17)

---

[1] Exhibit Q – Ament quotes; 105:16-106:19; 107:9-21; 111:22-112:22; 194:1`4-195:5.
[2] Relator states "known" because facts exist whereby these bulk purchases involving free Medtronic devices occurred on a quarterly basis during this time, but only eleven "deal sheets" involving free devices were discovered and produced.  (*See*, Doc. 400, ¶¶ 141-144; pgs. 54-55)
[3] *See, e.g., In Defense of Animals v. U.S. Dept. of Agriculture*, 589 F.Supp.2d 41, 43 (D.D.C. Dec. 15, 2008) ("A prime purpose of allowing discovery . . . has been to try to crystalize facts and narrow claims and issues.").

## II.     Additional Material Facts

The Relator provides these additional uncontroverted material facts ("AMF").[4]

### *HRMC's & Medtronic's Certification of AKS Compliance*

1.      Nick Baldetti was produced by HRMC under a Rule 30(b)(6) notice of deposition. (Baldetti, depo. Ex. 1, **Exhibit A**).  His job title is Chief Operating Officer ("COO") (Baldetti, 10:18-22)  Baldetti provided testimony regarding HRMC's Medicare annual "cost reports." (Baldetti, 34: 3-5; 38:23-39:12; depo. Ex. 2)[5]

2.      When HRMC submits claims data to the government, the Medicare Administrative Contractor (MAC) aggregates this information into an "annual report" called the Provider Statistical & Reimbursement Report.  (Schmor I, 9:17-19; Depo Ex. 21, report dated May 26, 2023, pgs. 32-36, **Exhibit B**)  This data is summarized in various reports and used by providers like HRMC to prepare Medicare cost reports, and by MACs during the audit and settlement process.  *Id.*  Any false claims data produced during claims payment is then incorporated into these annual cost reports.  *Id.*

3.      Baldetti examined an accurate example of the cost report certification signature pages submitted by HRMC which expressly certifies the accuracy of the data and costs included.[6]  (Baldetti, 36:5-16; depo. Ex. 2, pg. 6)  These also certify compliance with all laws and regulations.  (*Id.*)  These are typically signed by HRMC's Chief Financial Officer (CFO). (*Id.* at 38:6-13)  Each of these cost reports expressly certifes that information contained therein was not directly or indirectly subject to an illegal kickback.  (Baldetti Depo Ex. 2, pg. 1)

---

[4] *See e.g., Berroth v. Farm Bureau Mut. Ins. Co., Inc.,* 232 F.Supp.2d 1244, 1246 n. 4 (D.Kan. 2002) ("Further, the court reminds counsel that in responding to a motion for summary judgment, a party that wishes to rely upon facts not contained in the movant's memorandum should set forth each additional fact in a separate paragraph.").
[5] Baldetti deposition Ex. 2 reflects cost report certification pages covering 2010 – 2018.
[6] This is a 2012 example of a cost report filed by HRMC.  Other examples in the exhibit reflect the hospital operated as Promise Regional Medical Center.

4.      Medtronic produced corporate witness Mark Osterman.  (Osterman, 156-157, **Exhibit C**)  HRMC is a member of the HealthTrust Purchasing—a group purchasing organization ("GPO").  GPOs negotiate contracts with vendors (*e.g.,* Medtronic) on behalf of that GPO's member facilities (*e.g.,* HRMC) that purchase products from vendors.  (Osterman, 188:6-189:22; Depo. Ex. 63)

5.      These GPO agreements required Medtronic and HRMC to comply with the False Claims Act ("FCA") and the Anti-kickback Statute ("AKS") including "the 'safe harbor' regulations regarding discounts set forth in 42 C.F.R. 1001.952(h)." (Osterman, 189:23-191:5; 191:18-192:5; Depo Ex. 63).   From one of the many examples provided by Medtronic in discovery,[7] these agreements require "vendors" [*i.e.,* Medtronic], expressly agree to comply with the AKS regarding sales to member HRMC.  (Depo. Ex. 63 at 6, 29)

### *Industry Knowledge - Meals Cannot be Purchased for Government Employees*

6.      Todd Brown worked as either a device sales representative or a clinical technician supporting devices sales, from 2012 to the present.  (Brown Decl., ¶ 1, **Exhibit D**).  Brown's employer would provide annual training on meals or gifts to federal employees, such as the VA.  (*Id.* at ¶ 2)  This training adamantly relayed that one is not permitted to give anything of value to Federal employees.  (*Id.*)  This includes any meals such as lunches or dinners.  (*Id.*)  Unlike making sales to the private sector customers, you were not permitted to provide such meals to Federal employes even if you were providing an "in service" education program.  (*Id.*)

---

[7] Including this example, Medtronic provided 15 other GPO agreements that it was subject to regarding sales to HRMC.  These covered various time frames as well as the Medtronic medical devices sold by its sales representative Doug Winger at HRMC.

7.      Sales representative Dan Clinkscales worked for Becton Dickinson (C.R. Bard) in December 2015.  He was provided training that you are not permitted to give any meals or gifts to employees at the VA.  (Clinkscales, 7:24-8:21; 51:7-16, **Exhibit E**)

8.      Relator Schroeder has over 20 years of experience in both pharmaceutical and device sales ranging from entry level sales rep up through first level sales management. (Schroeder decl., ¶¶ 1-4, **Exhibit F**)  Interactions with government customers and HHS-OIG compliance is a topic routinely and intensely trained into every level of employee.  (*Id.* at ¶¶ 6-8) Providing meals to employees at Dole VA is not industry standard.  (*Id.* at ¶¶ 10-12)  In the industry, there is a well-known VHA directive expressly prohibiting food items of any type or value.  (*Id.* at ¶ 11-14)

### *Damages*

9.      During the period that Medtronic was purchasing meals for Dole VA cath lab manager Brinkley and her staff, Brinkley purchased $7,361,145.33 worth of devices from Medtronic.  (Report of Dr. Liesl Fox, Ph.D., ¶ 8, attached hereto as **Exhibit G**)

10.      At HRMC, Medtronic provided free devices to secure bulk sales beginning on September 26, 2014 and ending on July 26, 2019.[8]  The *known* bribes set forth in Docs. 400 and 446 are summarized as follows:

| Date | Event | Bribe's Value |
|---|---|---|
| 9/26/2014 | Bulk Sale | $8,994.00 |
| 4/7/2015 | Bulk Sale | $11,980.00 |
| 2/26/2016 | Bulk Sale | $35,585.00 |
| 7/26/2016 | Bulk Sale | $30,885.00 |
| 10/28/2016 | Bulk Sale | $4,990.00 |
| 1/24/2017 | Bulk Sale | $20,465.00 |

---

[8] Relator had initially found that bulk sale bribes first occurred on April 7, 2015, but later revised this to September 26, 2014.  (Doc. 400, pgs. 7-55: addressing deals from April 7, 2015 through July 26, 2019; Doc. 446, pgs. 8-12: amending to first bulk sale with free devices occurring on September 26, 2014 and also adding another bulk sale occurring on October 28, 2016).

| 4/19/2017 | Bulk Sale | $20,700.00 |
| 4/27/2018 | Bulk Sale | $32,783.00 |
| 7/20/2018 | Bulk Sale | $11,279.00 |
| 1/11/2019 | Bulk Sale | $13,890.00 |
| 7/26/2019 | Bulk Sale | $24,030.00 |
| | | $215,581.00 |

11.    Between the dates of these bribes, Medtronic sold $5,532,640 in devices to

HRMC.  (Doc. 399-5 – Excel Spreadsheet of sales at HRMC)[9]  Beginning on September 26,

2014 (date of first of the eleven known bribes), all of the devices sold by Medtronic afterwords

would have been tainted, so any government claim involving said devices would be false.

(Schmor II, 271:25-272:17, **Exhibit H**)

12.    Regarding damages pertaining to the value of false claims at HRMC, Relator's

expert began on September 26, 2014.  (Schmor Vol. II, 271:25-272:17; depo Ex. 35, pg. 5)

Schmor ran these damages through the last quarter reflecting Medtronic making bulk sales to

HRMC: April 20, 2020 (Schmor depo Ex. 35, pgs. 22-25).[10]  From HRMC data, Schmor was

able to trace where HRMC utilized these Medtronic devices in 3,999 procedures

billed/reimbursed in whole or in part by federal healthcare programs for a total of $42,131,293.

(Schmor II, 78:25-79:16; 159:17-23; depo Ex. 35, pg. 5, second table).

### III.    Controverting Medtronic's Factual Allegations

1.    Uncontroverted.

2.    Controverted.  Defendant fails to meet Local Rule 56.1 because these allegations

fail to refer to any portion of record let alone "with particularity."[11]

---

[9] This figure is a simple SUM formula for the sale figures cells between this date range.
[10] To determine this later date, Schmor followed the assumption that HRMC Atkins-Ray's testimony was accurate
and that these "deal sheets" with free devices were done on a quarterly basis (Doc. 400, ¶¶ 141-142, pg. 54), and
therefore, examined billings through April 20, 2020.  (Schmor depo Ex. 35, at 22-25; explaining damages date range
ending on April 20, 2020)
[11] These statements are pure argument and not appropriate as facts based upon the record.

3.      Controverted.  Brown's testimony cited states more.  As a former manager of a surgical center, his input mattered, along with price, availability, indications for treatment, and physician training.  (Brown, 122:13-123:20, **Exhibit I**)

4.      Uncontroverted.

5.      Controverted that physician preference drove device selection at HRMC.  As set forth in detail in Doc. 446, pg. 22-26, ¶22, ample evidence exists that HRMC's Material Manager Mark Wilson played a significant role in device selection at HRMC.  Also, prior to Wilson starting at HRMC, sales rep John Tebbe had made bulk sales of balloons.  Unlike Medtronic, Tebbe/Schroeder had refused to provide illegal free devices to Wilson to get these bulk sales.  (Doc. 446, ¶ 22, pg. 24).[12]  After Wilson began making purchases, Tebbe never obtained a bulk order again.  (Tebbe, 30:7-31:1, **Exhibit J**)

6.      Uncontroverted that Naab testified to this, but also stated that prices were discussed as well.  Otherwise, controverted (*see* ¶ 5, *supra*) that physician preference played a role at HRMC on what devices were bought.

7.      Controverted (*see* ¶ 5, *supra*).

8.      Controverted.  The cited Wilson testimony does not support this contention.

9.      Uncontroverted that Medtronic made device sales to HRMC outside the eleven (11) bulk sales involving illegal free devices.

10.   through 17.  Uncontroverted but not relevant.  Relator will not be making any AKS/FCA claims regarding any free devices provided by Medtronic to HRMC prior to September 26, 2014 (*i.e.,* the date of the first bulk sale where evidence demonstrates free devices were provided to induce the sale).

---

[12] *See* Doc. 446, ¶ 22 at pg. 22, setting forth other company sales reps who refused to provide illegal free product demanded by HRMC's Wilson.

18.     Controverted.  Dole VA's cath lab manager Brinkley decided the quantity and brand of devices that were purchased.  (See, ¶ 19, *infra*)

19.     Controverted.  Medtronic admits that cath lab technicians can play a role in driving sales at Dole VA.  In a performance review, Winger admitted, "I have a strong relationship with the staff[13] at the VA and they helped persuade Dr. Rust to use our products." (Winger, 116:11-17, **Exhibit K**).  Regardless, Relator is claiming that Dole VA cath lab *Manager* Teri Brinkley (recipient of the meals, i-phone, i-pad, NASCAR tickets) decided what medical devices were purchased at the Dole VA's cath lab.  (*See* Doc. 494, ¶¶ 13-21, pgs. 9-12) When CSI sales rep Todd Brown tried to make sales at Dole VA, Brinkley would give the thumbs up or thumbs down regarding what devices are in the lab and she controlled access to the facility.  (Brown, pg. 16:24-17:5; 48:11-17; 159:9-22)  While working for Becton Dickinson, sales rep Dan Clinkscales testified Brinkley decided which sales reps could come in the cath lab and make sales.  (Clinkscales, 13:15-18:25, Depo Ex. 1, pg. 15)  While selling cardiac devices at the Dole VA, Liebelt worked from April 2014 through January 2020.  (Liebelt, 14:14-15:15, 20:7-14, **Exhibit L**).  While working with cardiac devices at this same Dole VA cath lab, Liebelt said Brinkley was the one who made the decisions on what came in and out of the lab.  (*Id.* 21:7 – 19)  While Larry Valdivia worked as sales rep for peripheral devices for Abbott at Dole VA, he stated that all sales pitches had to go through lab manager Brinkley.  (Valdivia, 13:13-14:13; 18:17-19:24, **Exhibit M**)

20.     Uncontroverted this process existed, controverted regarding cath lab employees' role.  Cath lab manager Brinkley would often present cath lab devices to this committee for review and approval.  (Keene, 31:2-12, **Exhibit N**)  Brinkley would do this maybe six times a

---

[13] This would be the staff he had spent over $100,000 in meals.

year.  (*Id.* 132:2-15)  Brinkley admitted that she presented Medtronic devices to this committee

but never disclosed that Medtronic was buying meals for her.  (Brinkley Vol. II, 41:8-42:2,

**Exhibit O**)  Keene admitted that this committee review had been subject to short-cut on occasion

regarding cath lab devices.  (Keene 38:6-40:23)  Keene stated that there were times when the

cath lab was buying devices that the committee didn't know about, because the lab did its own

inventory.  (*Id.*)  Regarding the ordering of the devices, Brinkley was the person who

communicated with the committee, and in all the purchases, the employees in the procurement

process were relying on Brinkley.  (*Id.* 96:5-12; 109:2-5)  Brinkley also circumvented this

process.  Keene stated it was against VA policy for Brinkley to share with Medtronic rep Winger

how to get contracts approved in this process.  (*Id.* 110:7-111:25)  Brinkley changed a Medtronic

order to be below $500,000 and told Winger that it would be easier this way to get approval.

Keene said this was inappropriate.  (*Id.* 113:18-115:6; Depo Ex. 6)  Brinkley admitted that she

only did this bypass process for Medtronic's Winger and no other sales rep.  (Brinkley, Vol. I,

95:5-16; 98-12-16)

Regarding any levels (or amounts) of devices in the cath lab inventory, Keene relied

solely upon Brinkley setting those levels, and "having no influence on the things that we stocked

after it was initially put into stock."  That person was again Brinkley.  (Keene. 89:7-90:1)

Regarding all the large bulk orders of Medtronic devices that Brinkley placed, doing so was

against VA policy and Brinkley should not have been doing it.  (*Id.* 93:1-14)  Also, all of

Brinkley's large orders should have been put on consignment and not purchased.  (*Id.* 102:1-9)

Keene also stated that it was inappropriate for Brinkley emailing Medtronic sales rep Winger to

ask him how many devices the VA should purchase.  (*Id.* 103:9-104:3)

Chief of Logistics at Dole VA, Ryan Kittrell (2015-2017) was a co-chair of the medical device review committee.  (Kittrell, 12:12-13:2; 108:19-109:15, **Exhibit P**)  If a VA employee presented a medical device for approval to the committee—and that device company's sales rep had been buying this nurse meals—Kittrell stated that would impact his decision.  Accepting meals was inappropriate.  (*Id.* 112:10-113:5)

21.    Controverted.  See response to ¶ 20.

22.    Uncontroverted that this is the description of the process, controverted that this is what actually occurred.  (See response to ¶ 20)

23.    Uncontroverted that this is the description of the process, controverted that this is what actually occurred.  (See response to ¶ 20)

24.    Controverted.  All evidence points to Brinkley purchasing grossly excessive device inventory, and that the cath lab had much more product than they needed.  Dole VA Director Ament testified that from 2016 forward, it was found that the Medtronic device inventory was excessive.  (Ament, 104:2-105:8, **Exhibit Q**)  Chief of Logistics Kittrell found excessive inventory being purchased by Brinkley was not being entered into the VA's system.  (Kittrell, 12:12-13:2, 20:5-22, 50:14-18)  As an example, for 2016-2017, Kitrell found that the cath lab purchased 1,058 Medtronic DE (drug eluting) balloons, but only used 386—leaving an excess of 672 balloons.  (Kitrell, 87:3-88:13; depo Ex. 14 at 2)  Kitrell also examined one year of Dole VA balloon purchases compared to other VAs.  (Kitrell, 93:23-94:24, 97:15-25; depo Ex. 16)  Dole VA made up 28.5% of all balloons purchased nationwide.  (Id. 99:23-101:8)

25.    Controverted.  Brinkley and Winger decided the quantity and types of devices purchased at Dole VA.  (See Doc. 469, ¶¶ 13-21, pgs. 9-12)

26.     Controverted that this is what actually occurred.  Brinkley bypassed the normal ordering process to favor Medtronic rep Winger and showed him how to game the system.  (See ¶ 20, supra; Doc. 469, ¶¶ 13-21, pgs. 9-12)  Dole VA Director Ament learned that Brinkley was by-passing the VA inventory system and that the devices she was purchasing (and storing in her personal office) compared to what was recorded in the system was "alarming."  (Ament, 70:5-72:23; 101:17-21)

As another example of how the process was manipulated by Brinkley, the Relator came across a 320 drug coated balloon open request for the Dole VA when they already had hundreds of these in stock.  He pointed this out to VA employee Dixon.  (Schroeder, 75:18-80:19, **Exhibit R**)  Dixon relayed to Schroeder that the VA was now not going to buy the balloons but take them in on consignment.  (*Id.* 191:15-193:9; 197:25-198:3)  Regardless of this, Brinkley bypassed this consignment and ended up purchasing an additional $250,000 of Medtronic balloons.  (*Id.* 198:4-25)

27.     Uncontroverted on definition of bulk order, otherwise controverted.  As set forth throughout Relator's briefing, Brinkley did not follow the proper process in making bulk orders at the VA.

28.     Controverted.  None of the physicians at Dole VA provided any input or had any control over the volume of inventory ordered by Brinkley.  (See Doc. 469, ¶ 13, pgs. 9-10)  Regarding conversations with Winger on volume of devices ordered, he exercised control over Brinkley (*e.g.,* making his boss's day by telling the VA to order another $100,000 in devices).  (See Doc. 469, ¶ 21, pg.12)  Brinkley hid the number of devices she purchased from Medtronic from the VA's inventory system.  When the devices arrived into the loading area, they ended up

in Brinkley's office and were never recorded into or out of the Dole VA inventory.  (Ament, 66:8-69:2; *see* ¶ 24 *supra*)

29.     Controverted.  Testimony set forth herein and in Relator's memorandum show how Brinkley bypassed the system to favor Winger's orders.

30.     Uncontroverted Dole VA's cath lab was closed.  The Dole VA internal investigations made "egregious" findings and confirmed Director Ament's suspicion that this situation involved grossly excessive device purchases, bad healthcare providers, as well as medical devices walking out the door.  (Ament 56:1-57:18)  This caused enough concern for the cath lab to be shut down.  (Ament, 58:2-13)

31.     Controverted.  There is no record supporting this statement. Uncontroverted that it is proper to have in-service meals occur at *non-government* facilities. Controverted otherwise.  (See AMF ¶¶ 6-8, *supra*)  At the VA, even cath lab manager Brinkley admitted that it violated VA policy for her to accept the meals—regardless of whether education programs were provided.  (Doc. 469, ¶¶ 27-33, pgs. 14-16).  Winger admitted that he rewarded Brinkley and her staff with meals based upon the volume of his devices being used—no relation to any educational programs.  If the lab does two legs or more in one day, Winger buys them lunch.  He admits that the cath lab employees "just want lunch."  (See Doc. 469, ¶¶ 46-47, pg. 19)  To best summarize Winger's thoughts: a March 2, 2018 text message to cath lab employee Travis which states, "Sweet 2 legs = bacon logs."  (SCH-MDT00128836, **Exhibit S**). Regardless, at the dinners Winger purchased for Brinkley and her staff, education programs were not provided.  (Hett, 47:3-11, **Exhibit T**)  Regarding lunches, Hett stated that Winger would only "talk shop" maybe 50 percent of the time.[14]  (*Id.* 33:21-34:1)  The infamous text messaging

---

[14] Certainly questionable whether "talking shop" equated to the formal educational programs Medtronic is claiming.

between Winger and Kirk during a Dole VA procedure celebrating 17 Medtronic balloons being inserted into one veteran patient ended with Kirk getting them all lunch immediately after(*e.g.,* high volume usage = meals). (Doc. 494, ¶ 45, pgs. 18-19)  Sales rep Liebelt-Lloyd estimated that Doug Winger brought the daily lunches 90% of the time.  (Liebelt, 20:7-14, 49:22-50:14).  She can only recall maybe one or two occasions where Winger performed an in-service.  (*Id.*, 50:22-51:16).  Larry Valdivia admitted that as a sales rep at Philips, he accidentally stated on an expense report that he purchased a meal for a government employee and got in trouble. (Valdivia, 166:19-168:8)

32.     Controverted.  No foundation presented as to what this data reflects in relation to meals for government employees.  It certainly makes no representation of any facts regarding the dollar value of meals provided to VA employees by industry sales reps.

33.     Controverted.  See response to ¶ 32.

34.     Controverted.  See response to ¶ 32.

35.     Controverted.  See response to ¶ 32.  Again, nothing in this data confirms any Bard employees purchasing meals for any federal employees, let alone the VA.

36.     Controverted.  No foundation is being presented as to whether the PhRMA Code applies to government employees.  However, even under these PhRMA standards, Winger's conduct at Dole VA would fail.  Lunch twice a week, dinners once a month are neither "occasional" nor "incidental" meals.  More on point, the VA's policy regarding promotion of medical products expressly prohibits exactly what Medtronic's reps were doing:

> No [pharmaceutical company representative] **is to provide food items of any type or any value to VA medical facilities** for provision to VA staff or non-VA staff (e.g., employees of affiliates, volunteers, without compensation employees).

(VHA Directive 1108.10, Schroeder Decl. ¶ 14) (emphasis added)  This VA directive is what Covidien's and Medtronic's policies require their sales reps to follow.  (Doc. 469, ¶¶ 56-61, pgs. 21-22)

37.     Controverted.  No foundation is being presented as to whether this applies to government employees.   See ¶ 32, even these requirements were not met.

38.     Controverted.  No foundation is being presented as to whether this applies to government employees.   See ¶ 32, even these requirements were not met.

39.     Uncontroverted, except that Relator had to locate additional Covidien and Medtronic policies on his own that directly address government employees.[15]  (Doc. 494, ¶¶ 56, 58, 60; pgs. 21-22)

40.     Uncontroverted that is what *this* Covidien policy states.  Covidien policies on doing business with the government are much different.  (Doc. 494, ¶ 58, pg. 21)

41.     See response to ¶ 40.

42.     See response to ¶ 40.  Also, the federal regulations regarding gifts to VA employees have limits on dollar amounts different than Covidien policies on meals to the private sector—*i.e.,* $20 per person, but no more than $50 per person per year.  (Doc. 469, pgs. 33-34)  Winger and Medtronic well exceeded these limits.  (See, Doc. 469, ¶¶ 39, 52; pgs. 17, 20)

43.     Uncontroverted, that is what *this* Medtronic policy states.  Medtronic policies on doing business with the government are very different.  (Doc. 469, ¶¶ 56, 60, pgs. 21-22)

44.     Uncontroverted.

45.     Uncontroverted, that is what *this* Medtronic policy states.  Controverted as to its application to government employees.  See ¶¶ 42-43 *supra*.

---

[15] It has always been troubling that numerous policies were found on-line on this topic that should have been produced in discovery.

46.    Controverted.  Medtronic failed to train Winger, Davisson, and Kirk on policies regarding gifts/meals to government employees.  (Doc. 469, ¶¶ 53, 56, 57-60, 62; pgs. 20-22)

47.    Uncontroverted that this was alleged in the Complaint.  As stated in Relator's prior briefing (Doc. 381 at 16-17), "After completion of fact discovery, Relator's claim of illegal remuneration paid by Medtronic to HRMC will take two forms: (i) hundreds of thousands of dollars in free devices to secure sales (*see* 5AC ¶¶ 91-98) and (ii) the free meals."

48.    Uncontroverted, but not relevant.  See ¶ 46.

49.    Uncontroverted, but not relevant.  See ¶ 46.

50.    Uncontroverted, but not relevant.  See ¶ 46.

51.    Uncontroverted, but not relevant.  See ¶ 46.

52.    Uncontroverted except last sentence.  According to Medtronic/Covidien policies, when providing meals to the private sector such as HRMC, you must do an educational program.  Here, Medtronic alleges that it only "occasionally" provided these educational programs.

53.    Controverted.  Winger did not do in-service education programs when he bought lunches for HRMC employees.  As an example, on February 9, 2018, Winger received a text message from Anita at HRMC asking to get lunch for 10 employees.  Winger told them to order whatever they wanted.  (Winger, 258:1-16; Ex. 27 @ 128606).   CSI sales rep Todd Brown sold at HRMC from August 2012 through January 2016.  (Brown, 16:24-17:5)  When Brown or other sales reps brought in lunches, they were related to an in-service educational program.  (*Id.* 30:8-31:24)  However, when Winger brought in lunches, there were no educational programs mostly because Winger was often not even present.  (*Id.* 32:3-19)  On the occasions when Winger was present for his lunches, Brown never saw him conducting any in-service.  (*Id.* 76:7-77:2)

54.     Controverted for lack of foundation.[16]  Relator's Expert Dr. Fox reviewed reported lunch receipts by Medtronic employees for meals at HRMC.  (Doc. 469-14, Ex. O, Table 1)   Her review of data states that 74 reported events occurred from March 2011 through March 2020 at HRMC whereby $16,034.54 was spent.  (*Id.* at Table 1).  This would lead to an average of $216.67 expenditure per event.

55.     Controverted for lack of foundation.  That one meal purchased by Kirk totaled $149.67.  (*Id.* at Table 1)

56.     Controverted.  Dr. Fox's review of reports reflects only one meal paid for by Davisson involving HRMC at $291.51.  (*Id.* at Table 1)

57.     Uncontroverted.

58.     Uncontroverted regarding these two *reported* lunches.   However, on Medtronic's spreadsheet for twelve different meal entries at HRMC, the attendees were listed as "unknown."

59.     Controverted, but resolved by Court order regarding Relator's allegations of illegal marketing services being provided by Medtronic to physicians Dr. Hagley at HRMC.[17]

60.     Uncontroverted except argumentative adjective "extravagant."

61.     Uncontroverted at the time of Relator's deposition.  Voluminous evidence from discovery confirmed what he heard from these sales representatives was true.  Medtronic documents and the Dole VA internal investigation confirm this (Doc. 469, ¶ 63, pg. 23).  Regarding remuneration in the form of an i-phone, i-pad and NASCAR tickets, Valdivia testified that Brinkley had received these from Winger.  (Valdivia, pg. 75:18-77:5).

---

[16] Medtronic's counsel Huyser calculates cost per employee in cath lab but does not give that employee count or where it was derived from.
[17] *U.S. ex rel. Schroeder v. Medtronic, Inc.*, 2023 WL 5152513, at *3-5 (D.Kan. Aug. 10, 2023).

62.     Controverted.  Brown knew that Medtronic reps were buying meals for VA employees and that doing so was not allowed under industry standards.  He even reported the Medtronic meals internally to the Dole VA.  (Brown, 64:16-65:10, 69:10-21; 176:7-13)  Dr. Gonda (who worked at the Dole VA cath lab) told Brown that when Winger would pay for lunches he would tell staff he purchased them instead of Winger.  (*Id.* 92:2-13; 205:10-20)  Brown also heard cath lab staff talking about dinners they attended paid for by Winger.  (*Id.* 70:11-23)

63.     Uncontroverted.

64.     Controverted.  There is no record citation regarding this factual contention.

65.     Uncontroverted.

66.     Uncontroverted.

67.     Controverted.  Brinkley's version of the story is that she paid fair market value to Winger for the phone.  However, Valdivia stated that Brinkley told him that Winger just gave her his i-phone and i-pad when he upgraded to newer models.  (Valdivia, 116:3-117:8)  The VA OIG detectives asked Winger about the i-phone, and he told him that he gave Ms. Brinkley one of his wife's older cell phones, and that Brinkley then later returned it to him.  (Winger, pg. 14:18-15:15).  Winger later stated that it is possible that Brinkley did pay him for that phone.  (Winger, pg. 16:7-15).  The jury should decide who is the credible witness.

68.     Uncontroverted.

69.     Uncontroverted.

70.     Controverted.  Brinkley has admitted she was trained by the VA to not take Medtronic meals.  (Doc. 494, ¶ 29, pg. 14)

71.     Controverted.  (Doc. 494, ¶ 29, pg. 14)

72.     Controverted.  Whether other areas in the Dole VA hospital allowed lunches from sales reps, even if true, does not make it permissible.

73.     Controverted.  See AMF ¶¶ 6-8, ¶ 31 *supra*.

74.     Controverted.  Brinkley (the one who ate these meals) testified that Winger would bring in lunches "two or three times *a week*."  (Doc. 469, ¶ 27, pg. 14)  And while it does not matter, in-service educational programs were not provided by Winger.  (See ¶ 31, *supra*)

75.     Controverted.  Medtronic sale reps' expense reports do not reflect lunches two to three times per week or dinner once a month per VA employees Brinkley's and Hett's testimony. (See ¶ 74, *supra* and Doc. 469, ¶ 52, pg. 20)  Dr. Fox stated the true value of all these meals per these persons' testimony was $101,023.38 from March 11, 2011 through March 2020.  (Fox Report, Doc. 469, Ex. O, ¶ 8, pg. 3)  Finally, even Medtronic's $13.35 per meal (meals provided numerous times per month) violate the very federal regulations that Medtronic says its employees are required to follow (*i.e.,* no more than $10 per person and no more than $50 aggregate per person per year).  (See ¶¶ 40-43 *supra*)

76.     Controverted.  VA employee Stan Hett attended these dinners and stated that no in-service education programs were presented.  (See ¶ 31, *supra*)

77.     Controverted.  (See ¶¶ 31, 74, *supra*)

78.     Controverted.  Davisson's testimony addressed in-service meals for the *private* sector.  Davisson acknowledged a Medtronic policy stating that its sales reps must follow all regulations when dealing with government employees (*i.e.,* 5 C.F.R. § 3635.201, *et seq*.) prohibiting meals to VA employees.  (Doc. 469, ¶ 56, pg. 21)

79.     Controverted.  (See ¶ 31, *supra*)

80.     Controverted. Cited testimony reflects that Ament said that he was not aware of whether Brinkley was disciplined.  Also, even if a failure occurred, it does not make Medtronic's behavior legal.

### IV.     Responding Argument

Medtronic has civil liability under the FCA for paying illegal remuneration (bribes) to purchasing agents at both HRMC and Dole VA to induce device sales.  The facts presented allow a reasonable jury to reach this conclusion.  The FCA imposes civil liability for:

> "knowingly present[ing] or caus[ing] to be presented" to the federal government "a false or fraudulent claim for payment," or "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim."

31 U.S.C. § 3729(a)(1)(A), (B).  The AKS imposes criminal liability on whoever:

> knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b)(2)(B).  FCA civil liability can occur through AKS violations.

At HRMC, from September 2014 through July 2019, on eleven *known* occasions, Medtronic provided $215,581 in free off the book devices devices to secure large bulk orders. These illegal "discounts" fell outside the AKS's safe harbor provision; therefore, they are illegal bribes.  Medtronic and HRMC employees testified that these bribes incentivized (*i.e.,* induce) sales.  Other companies—including the Relator's—refused to pay these bribes and lost these sales.  During this timeframe, Medtronic sold $5.5 million in devices tainted by these ongoing bribes.  It certified AKS compliance with HRMC, and HRMC did the same when submitting claims for reimbursement.  HRMC used these tainted devices in 3,999 procedures (claims) that

20

were reimbursed at $42,131,293 from federal healthcare programs.  Medtronic caused these false

claims, records and statements to be made.  31 U.S.C. § 3729(a)(1)(A), (B).

At Dole VA, from January 2011 through April 2018, Medtronic's sales reps purchased

weekly lunches and monthly dinners for the Dole VA cath lab manager Teri Brinkley and her

staff.  Based upon the frequency of these meals, Relator's expert Dr. Fox calculated Medtronic

spent $101,023.  Brinkley decided the quantity and type of devices purchased.  She and Dole VA

management testified that Medtronic's actions violated VA policy.  Federal regulations and VA

policies specifically prohibit meals being purchased for employees.  Medtronic required its sales

reps to comply with these regulations and policies.  While these meals were being purchased,

Medtronic made device claims directly to the Federal government for $7,361,145.33.  In return,

Brinkley purchased excessive inventory, shut out competition, provided Medtronic's reps unique

access to physicians, assisted them in bypassing normal purchasing channels, allowed Medtronic

reps to use government purchased devices for private customers, and purchased volumes of

devices at Medtronic's request and not VA needs.[18]

The Relator has presented sufficient facts whereby a reasonable jury could find the

required causal connection between Medtronic's illegal bribes and its FCA violation.  The same

jury could also find Medtronic meeting the required intent under the AKS and FCA.  At best,

Medtronic has only presented an argument based on controverted facts that it incorrectly views

in a light most favorable to itself (the moving party).

## A.     Relator Meets the Causation Standard For his FCA Claims at HRMC:

Prior to discussing Medtronic's intent under the AKS and FCA, the Relator will first

address the correct causation standard.  The Relator's FCA claim against HRMC arises under

---

[18] The factual record supporting these allegations resides in Relator's Reply in Support of his Motion for Partial
Summary Judgment Against Defendants Medtronic, Inc. & Covidien, L.P., pgs. 4-7.

three different avenues—two involving the AKS.  *First*, Medtronic knowingly and willfully

provided $215,581 in free devices to HRMC to induce bulk sales.[19] Medtronic knew that paying

bribes would cause HRMC to falsely certify AKS compliance when submitting claims.

Certification of AKS compliance is a material requirement for reimbursement and violating this

leads directly to false claims under the FCA.  *See United States ex rel. Hutcheson v. Blackstone*

*Med., Inc.*, 647 F.3d 377, 379 (1st Cir. 2011) (The court held that "misrepresent[ing] compliance

with the AKS" is a "materially false or fraudulent" claim under the FCA).  *Second*, under 31

U.S.C. § 1320a-7b(g), Medtronic's AKS violation created *per se* FCA liability.[20] HRMC's false

claims and false records/statements resulted directly from Medtronic's bribes to HRMC.  There

is a clear causal connection (or link) between the two.  *Third*, Medtronic has FCA liability

outside the AKS context.[21]  It provided false records/statements to HRMC (*e.g.,* invoices

excluding the free devices).  Medtronic knew that doing so would cause HRMC to submit false

claims (and false records/statements).  This is a clear violation of the FCA under 31 U.S.C. §

3729(a)(1)(A) and (B).

   "Congress first enacted the AKS in 1972 to combat fraud and abuse in connection with

Medicare and Medicaid."  *Pfizer, Inc v. United States Department of Health and Human*

*Services*, 42 F.4th 67, 72 (2nd. Cir. 2022).  The AKS does not require that a kickback be

successful for it to be illegal.  *See, e.g.*, *United States ex rel. Witkin v. Medtronic, Inc.*, 2024 WL

1892405, at *20 (D. Mass. Mar. 31, 2024) ("A resulting sale is not an element of an AKS

violation, nor is the kickback recipient's subjective belief that he or she has been influenced. The

AKS may be violated even if no sale occurs.") (citation omitted).  Congress prohibited kickbacks

---

[19] Fifth Amended Complaint, ¶¶ 31, 42, 161, 164, 168, 171-173.
[20] Fifth Amended Complaint, ¶¶ 15, 42.
[21] Fifth Amended Complaint, ¶¶ 164, 171-172.

*standing alone* as such financial conflicts inherently corrupt medical decision making. Regardless, sufficient evidence exists that Medtronic's bribes at HRMC induced actual sales of its devices.

In 2010, Congress amended the AKS.

In addition to the penalties provided for in this section or section 1320a-7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31.

42 U.S.C. § 1320a-7b(g).  This amendment continued Congress's desire that AKS violations directly lead to civil liability under the FCA.  *See United States v. Berkeley Heartlab, Inc.*, 225 F.Supp.3d 487, 498 (D.S.C. Mar. 28, 2016) ("However, this Court finds that the weight of authority supports the conclusion that the 2010 amendment adding 42 U.S.C. 1320a–7b(g) was merely a clarification of the law; *claims tainted by AKS violations constitute false claims* for the purposes of the FCA *regardless* of whether the violation occurred before or after the 2010 amendment.") (emphasis added).[22]

A sponsor of the 2010 amendment explained that it was meant to "strengthen[] whistle-blower actions based on medical care kickbacks," and to overrule *United States ex rel. Thomas v. Bailey*, 2008 WL 4853630 (E.D. Ark. Nov. 6, 2008).  155 Cong. Rec. S10,853 (daily ed. Oct. 28, 2009) (Sen. Kaufman).  *Thomas* concluded that a hospital's reimbursement claims for surgeries were not false, even though a manufacturer had violated the AKS by paying a surgeon to use its products.  The court reasoned that because the hospital had not itself violated the AKS or been aware of the violation, it had no FCA liability.  *Id.* at *12-13.  Overcoming this holding, the

---

[22] *Berkeley* cites in support: *See, e.g., U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 312 n.19 (3d Cir. 2011) (holding that the 2010 amendment was a clarification); *U.S. ex rel. Westmoreland v. Amgen, Inc.*, 812 F.Supp.2d 39, 52 (D. Mass. 2011) ("The amendment's legislative history, however, evinces Congress' intent to clarify, not alter, existing law that claims for payment made pursuant to illegal kickbacks are false under the False Claims Act.").

sponsor explained, "all claims resulting from illegal kickbacks are 'false or fraudulent,' even when the claims are not submitted directly by the wrongdoers themselves." 155 Cong. Rec. S10,853 (daily ed. Oct. 28, 2009) (emphasis added); *see also United States ex rel. Kester v. Novartis Pharm. Corp.*, 41 F. Supp. 3d 323, 333-335 (S.D.N.Y. 2014) (discussing this legislative history).

### 1.    *Medtronic Caused False Certification of AKS Compliance:*

FCA liability based on an AKS violation does not reside solely through the avenue presented in § 1320a-7b(g). *United States v. Stevens-Henager Coll.*, 2:15-cv-00119-JNP-DAO, at *9 (D. Utah June 6, 2024). This causation avenue existed before the AKS amendment §1320a-7b(g) and continues to exist.  *See United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1053 (6th Cir. 2023) (If Congress had intended the false certification causation requirement under the FCA be codified in § 1320a-7b(g), it would have used that language).  False certification is actionable as a "false record or statement" material to the provider's claim.  31 U.S.C. § 3729(a)(1)(B).  "[C]ompliance with federal health care laws, including the [anti-kickback statute], is a condition of payment" under Medicare or Medicaid.  *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005); *Hutcheson*, 647 F.3d at 393 (1st Cir. 2011) (same); *see also Wilkins*, 659 F.3d at 313 (holding that plaintiffs "need not allege a relationship between the alleged [anti-kickback] violations and the claims ... submitted to the Government"), *abrogated on other grounds by Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 136 S.Ct. 1989, 195 L.Ed.2d 348 (2016); *United States ex rel. West-moreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 54 (D. Mass. 2011) (collecting cases for the proposition that "courts, without exception, agree that compliance with the [AKS] is a precondition of Medicare payment").

In *Hutcheson*, the relator alleged that a manufacturer had "engaged in a nationwide kickback scheme to induce physicians to use its medical devices in spinal surgeries and that [the manufacturer] knew this scheme would cause physicians and hospitals (unwittingly) to present federal healthcare programs with payment claims that contained material misrepresentations" of complying with the AKS. 647 F.3d at 378. The court held that the complaint "state[d] a claim under the FCA that the hospital and physician claims for payment … were materially false or fraudulent" because they misrepresented compliance with the AKS. *Id.* at 379. From that conclusion, the Court held, "[i]t follows that [the relator had] stated a claim that [the manufacturer] knowingly caused the submission of materially false or fraudulent claims." *Id.* at 379-380. The court reached that holding without any discussion of whether the physicians targeted by the kickback scheme might have used the manufacturer's devices even absent the kickbacks. This court's analysis relied exclusively on provisions of the FCA—that continue to exist today even after the 2010 § 1320a-7b(g) AKS amendment.

Relator's "false certification" FCA claim exists outside any alternative claim under § 1320a-7b(g) of the AKS. Medtronic entered into annual written agreements with HRMC's GPO whereby all parties certified AKS compliance. (AMF, ¶¶ 1-8, *supra*) Medtronic paid $215,581 in bribes to secure device sales to HRMC. In turn, these contradictory actions "caused" HRMC to falsely certify AKS compliance (*e.g.,* annual cost reports verifying claims, reimbursements, and AKS compliance) for procedures involving these tainted devices. (AMF, ¶¶ 1-8) While not required, *see Hutcheson, supra*, Relator has presented sufficient evidence that HRMC was aware of these AKS violations—HRMC's Wilson requested and received these bribes.

Moreover, even in circumstances not involving an express certification, a provider can be liable under the FCA where it "makes specific representations about the goods or services

provided" but "fail[s] to disclose noncompliance with material *statutory, regulatory, or contractual requirements*" in a way that "makes those representations misleading half-truths." *Universal*, 579 U.S. at 190 (emphasis added).  Despite HRMC's express certification—and Medtronic knowing it was doing so—both have liability for failing to disclose the AKS violations to the government outside that context.

### 2.    *Medtronic's FCA Liability Under 42 U.S.C. § 1320a-7b(g):*

Evidence exists whereby a reasonable jury could find that Medtronic's providing bribes to HRMC (an AKS violation) has a causal connection to HRMC's false claims.  Medtronic argues that "resulting from" in § 1320a-7b(g) requires the Relator to prove that "but for" these bribes, HRMC would not have made the claims at issue.  It argues that without these alleged bribes, HRMC would still have made the same claims.  This approach is wrong-headed on many levels.  It contradicts Congress's intent, court precedent, and basic logic.

When Congress enacted § 1320a-7b(g) in 2010, it offered a pathway to establish falsity in FCA actions based on AKS violations without the need to establish the "materiality" required under the "false certification" theory.  "[I]t is enough to say that in light of § 1320a-7b(g), '[a]n AKS violation that results in a federal health care payment is a per se false claim under the FCA.'" *Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019) (citation omitted).  Under § 1320a-7b(g), "if there is a **sufficient causal connection** between an AKS violation and a claim submitted to the federal government, that claim is false within the meaning of the FCA."  *Id.* (emphasis added).  *Guilfoile* refutes the "but for" standard that Medtronic seeks.

*Guilfoile* relied on *United States ex rel. Greenfield v. Medco Health Solutions, Inc.*, 880 F.3d 89 (3d Cir. 2018).  There, the court agreed with the government's argument.  "'[I]f a medical service provider pays kickbacks to a doctor to induce referrals and then submits claims

to Medicare for services it provided to patients who were referred by that doctor, the claims are false,'" and that is true "'regardless of whether the doctor would have referred the patients absent the kickbacks … and regardless of whether the patients would have chosen the service provider absent the referral.'" *Id.* at 98 (citation omitted).  Like *Guilfoyle, Greenfield* finds that an AKS/FCA claim via § 1320a-7b(g) can proceed regardless of whether the good or service would have been provided absent the bribe.

The legislative history also rejects Medtronic's "but for" argument.  As the sponsor explained, "all claims resulting from illegal kickbacks are 'false or fraudulent,' even when the claims are not submitted directly by the wrongdoers themselves." 155 Cong. Rec. S10,853; *see id.* at S10,854; *Kester*, 41 F. Supp. 3d at 334.  As previously stated, one reason Congress enacted the 2010 AKS § 1320a-7b(g) amendment was to overrule *Thomas*.  2008 WL 4853630.  Even under *Thomas*' holding—requiring the submitting hospital to have knowledge of the AKS violation—Relator Schroeder's false certification claim could proceed.  HRMC did have full knowledge of the bribes leading to the AKS violation because it solicited and accepted them.  In turn, logic dictates that the 2010 AKS amendment would continue to permit Schroeder's claim to survive even under *Thomas*.  A reasonable jury could find a "causal connection" between Medtronic's bribes from September 2014 through July 2020 and HRMC's claims for reimbursement tainted by said bribes.  Evidence reflects Wilson requesting, and Medtronic providing, free devices off the books to secure bulk sales at HRMC in violation of the AKS.  In turn, Medtronic has *per se* liability under the FCA via § 1320a-7b(g).

Medtronic relies upon opinions from the Sixth and Eighth Circuits.  *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 224 (2023); *United States ex rel. Cairns v. D.S. Med. LLC*, 42 F.4th 828 (8th Cir. 2022).  First off, neither *Martin*

nor *Cairns* address the false certification claims Relator asserts under the FCA, 31 U.S.C. § 3729(a)(1)(A), (B).  The relator in *Cairns* did not allege a false certification theory, 42 F.4th at 831, and *Cairns* acknowledged, "[w]e do not suggest that every case arising under the False Claims Act requires a showing of but-for causation."  42 F.4th at 836; *see also United States ex rel. Hueseman v. Pro. Compounding Centers of Am., Inc.*, 664 F. Supp. 3d 722, 742, n.4 (W.D. Tex. 2023) (The court stated that "*Cairns* is inapplicable here because the Government has asserted alternative theories of falsity under the FCA and other claims for recovery under federal common law.").  In *Martin*, the court stated that if § 1320a-7b(g) was a codification of false certification cases, Congress would have used that language.  *Id.* at 836.  Since it did not, then § 1320a-7b(g) did not address false certification claims.  Bottom line, neither Circuit created a "but for" causation standard for Relator's FCA false certification claim.

Regardless, *Cairns* and *Martin* incorrectly interpreted the "resulting from" language under Supreme Court precedent.  Both based their "but for" conclusion on reasoning in *Burrage v. United States*, 571 U.S. 204 (2014).  The phrase "'[r]esults from' imposes … a requirement of actual causality" (*i.e.*, causation in fact) and that, "[i]n the usual course," causation in fact means that a given outcome "would not have occurred in the absence of—that is, but for"—a given event.  *Id.* at 211 (quotation marks omitted); *see Martin*, 63 F.4th at 1052-1053; *Cairns*, 42 F.4th at 834-835.  However—in the same Term when *Burrage* was decided—the Supreme Court recognized that the "but-for test" is nothing more than a "default" standard of causation.  *Paroline v. United States*, 572 U.S. 434, 458 (2014).  Other options exist, and "the availability of alternative causal standards where circumstances warrant is, no less than the but-for test itself as a default, part of the background legal tradition against which Congress has legislated." *Id.* *Burrage* even explains that courts properly "read phrases like 'results from' to require but-for

causality" *only if* "there is no textual *or* contextual indication to the contrary." 571 U.S. at 212 (emphasis added).  Otherwise, "circumstances" may "warrant" an "alternative causal standard[]." *Paroline*, 572 U.S. at 458).  *Cairns* and *Martin* engaged in no meaningful analysis of whether there is a "textual or contextual indication," that but-for causation is not the appropriate standard under § 1320a-7b(g).[23]  Both courts not only disregard *Burrage* and *Paroline* but the broader principle that "[t]he plainness of statutory language 'is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'"  *U.S. v. Burkholder*, 816 F.3d 607, 614 (10th Cir. 2016) (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341 (1997)); *see United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 753-754 (2023) (applying this principle to the FCA).

The AKS clearly states that kickbacks are unlawful when given "to induce" the purchase of particular items or services.  42 U.S.C. § 1320a-7b(b)(2).  This "plain language" clearly states that the AKS is not limiting liability to situations where the desired outcome of bribes actually materializes—*i.e.,* where the kickback is the but-for cause of the outcome.  *United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 665 (S.D. Tex. 2013).  Applying this limitation would be inconsistent with the AKS's animating principle: that financial conflicts in themselves corrupt medical decision making. When Congress enacted § 1320a-7b(g) as an amendment to the AKS, it built on a statutory scheme.  The scheme under which the propriety of particular remuneration turns on the presence or absence of a specified nexus between payment and the provision of federally reimbursable items or services—namely, on whether the payments were given to induce the provision of the items or services.  Section 1320a-7b(g)'s presence

---

[23] *See U.S. ex rel. Fitzer v. Allergan, Inc.*, 2022 WL 3599139, at *10 (D.Md. Aug. 23, 2022) (noting the Eighth Circuit's failure to address the "contextual indications" that a standard other than but-for causation applies under § 1320a-7b(g)).

within a statute that requires a link between a kickback and a given outcome—but that does *not* require but-for causation—strongly suggests that this provision's "resulting from" language likewise does not require the same.  The natural inference from the text and structure of § 1320a-7b is that the nexus requirement of the AKS's substantive prohibition—the prohibition of kickbacks meant "to induce" a given outcome, 42 U.S.C. § 1320a-7b(b)(2)—carries over into the provision, § 1320a-7b(g), addressing when a claim is false for FCA purposes.  If the claimed items or services are those that the kickback was given to induce, then the statutory text and context make clear that the claim "includes items or services resulting from" the kickback within the meaning of § 13207b(g).  Other "contextual factors," *Burrage, supra*, also favor Relator Schroeder's position.

Congress imposed *criminal* liability for kickbacks in the AKS without requiring a showing that they actually changed medical decision making.  In this context, it is not logical that they would later require a heightened "but-for" causation standard to impose *civil* liability under the FCA for claims rendered false by AKS violations.  *See Greenfield*, 880 F.3d at 96; *Witkin*, 2024 WL 1892405, at *18; *Fitzer*, 2022 WL 3599139, at *10.  The Medicare and Medicaid programs "offer[] a subsidy … with conditions," *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008), one of which is AKS compliance. "When the conditions are not satisfied, nothing is due." *Id*.  The United States is harmed by kickbacks which compromise the integrity of medical decision making—regardless of whether the same care might have been provided (and federally reimbursed) absent the kickback.  *Wilkins*, 659 F.3d at 314.

The legislative history of § 1320a-7b(g) also defeats *Cairns's* and *Martin's* "but-for" causation standard.  As stated in *Guilfoile*, Congress meant to make it *easier* to prove "'whistleblower actions based on medical care kickbacks,'" including by simplifying the proof

required under the "long-standing" false-certification case law.  913 F.3d at 190-191.  This objective would be completely contradicted by requiring plaintiffs to establish that claimed items or services would not have been purchased but for a kickback.  *See Witkin*, 2024 WL 1892405, at *18 & n.32; *Fitzer*, 2022 WL 3599139, at *10; *Kester*, 41 F. Supp. 3d at 332-333.  It defies logic to conclude that Congress intended to create a more onerous burden of proof under § 1320a-7b(g) under this context.[24]  Courts "'should not lightly conclude that Congress enacted a self-defeating statute.'" *Pugin v. Garland*, 599 U.S. 600, 607 (2023).

Typically, courts do not look to legislative history where statutory text is clear.  However, this is not a case where legislative history and other contextual indicators of statutory meaning stand in tension with the statutory text.  As discussed above, § 1320a-7b(g)'s "resulting from" language is silent as to the appropriate standard of factual causation, and the text and structure of § 1320a-7b more broadly support the same interpretation as does the legislative history.  As *Greenfield* correctly found, only "a link" between the claim for payment and the AKS violation is needed. 880 F.3d at 98.

A reasonable jury could find the "causal connection" ("link") between the bribes paid by Medtronic to HRMC, and HRMC's subsequent claims involving devices tainted therefrom.  HRMC and Medtronic employees testified that the free devices incentivized these purchases.  Wilson and Davisson/Winger reached agreement that over $200,000 in free devices would be provided off the books to secure Medtronic sales.  All knew that HRMC would be submitting claims for reimbursement from federal healthcare programs involving these tainted devices.

---

[24] The Sixth Circuit indicated that it would be improper to "consider legislative history in construing a statute with criminal applications." *Martin*, 63 F.4th at 1054. But the Sixth Circuit was incorrect to characterize § 1320a-7b(g) as "a statute with criminal applications."  The AKS's substantive prohibition against kickbacks, 42 U.S.C. § 1320a-7b(b), imposes criminal liability—but § 1320a-7b(g) simply specifies that certain claims are "false or fraudulent … for purposes of" the FCA, which imposes solely civil liability.  The interpretation of § 1320a-7b(g)'s "resulting from" language has no criminal-law consequences whatsoever.

Indeed, this factual scenario would even meet a "but for" standard. "But for" these bribes, HRMC would not be making any false claims. "But for" these bribes, devices other than Medtronic's could have been purchased instead.

### 3. Medtronic's FCA Liability Outside the AKS Context:

The Relator also pleaded that Medtronic—outside the context of the AKS—violated the FCA. Medtronic knowingly violated the FCA by causing HRMC to submit false claims, statements and records for reimbursement. *See United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1171 (9th Cir. 2006) (There are "two doctrines that attach potential False Claims Act liability to claims for payment that are not explicitly and/or independently false: (1) false certification (either express or implied); and (2) promissory fraud."). Standing alone, the FCA imposes civil liability for "knowingly . . . caus[ing] to be presented" to the federal government "a false or fraudulent claim for payment," or "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B). As discussed herein, Medtronic presented false paperwork (*e.g.,* price agreements and invoices) to HRMC failing to disclose the $215,581 in free devices. In turn, throughout the 2014 – 2020 timeframe, this caused HRMC to submit both false claims and false records/statements (*i.e.,* cost reports).

### B. A Reasonable Jury Could Find Medtronic Violated the AKS/FCA by Inducing Sales to HRMC:

#### 1. $215,581 in Free Devices are Illegal Bribes:

The $215,581 in free devices that Medtronic provided to HRMC from September 2014 through July 2019 were not permissible safe harbor discounts. (See Docs. 400, 466). Everything about the AKS's safe harbor statutes and regulations requires free devices to be disclosed on the books (*e.g.,* on company price agreements, invoices, shipping docs, *etc.*). Every fact presented to

this Court reflects Medtronic's free device deals being *off the books* (*e.g.*, not present on any contracts or invoices, in person paper deal sheets only, deal sheets missing, separate "Winger spreadsheets," no documents fully identifying free devices delivered, *etc.*).

Relator has also alleged that meals Winger provided to HRMC cath lab staff were illegal remuneration under the AKS—*i.e.,* no educational programs were being provided.  Unlike the significant bribes paid to HRMC, the meals alone may not have sufficed to evidence inducement of sales under the AKS.  However, they still matter and play a role coupled with Medtronic's bribes as sufficient evidence to further Relator's position.

### 2.    *Whether Medtronic Knowingly and Willfully Acted is a Question for the Jury:*

"[I]issues of knowledge and intent are particularly inappropriate for resolution by summary judgment … the question of AKS scienter is one for the jury." *United States ex rel. Gohil v. Sanofi U.S. Servs. Inc.*, 500 F. Supp. 3d 345, 360 (E.D. Pa. 2020) (citations omitted). Courts will generally find summary judgment to well suited where intent, motive or state of mind are essential elements of the case." *See United States ex. rel. Taylor-Vick v. Smith*, 513 F. 3d 228, 231 (5th Cir. 2008) (noting that cases which turn on state of mind are not-well suited for summary judgment).

Medtronic is liable for the actions and conduct of its agents (*e.g.,* sales reps Davisson/Winger and clinical specialist Kirk).  *See United States ex rel. Feaster v. Dopps Chiropractic Clinic, LLC*, No. 13-1453-EFM-KGG, 2016 WL 3855560, at *2 (D. Kan. July 15, 2016) ("Tenth Circuit plaintiffs have stated viable FCA claims against corporate entities by alleging that those entities' employees undertook FCA-prohibited actions.").  In addition to these individuals, Medtronic's corporate state of mind (*e.g.*, policies, training, preparation of paperwork regarding sales to HRMC, *etc.*) applies as well.

As previously stated (pgs. 21-22, *supra*), the Relator has three theories of recovery under the FCA regarding Medtronic's conduct at HRMC (false certification, AKS violation under § 1320a-7b(g), FCA violation unrelated to AKS).  The first two involve the AKS's "knowingly and willfully" requirement.  42 U.S.C. § 1320a-7b(b)(2)(B).  For guidance in defining the term "knowingly," the FCA provides:

> "[K]nowingly" means — (A) mean that a person, with respect to information— (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud;

31 U.S.C. 3729(b)(1); *see also United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 750 (2023) ("[i]n short, either actual knowledge, deliberate ignorance, or recklessness will suffice.").[25] Sufficient evidence exists for a reasonable jury to find that Medtronic, Davisson, and Winger (*i.e.,* Medtronic) "knew" the $215,581 in free devices provided to Wilson at HRMC were not legal discounts but were instead hidden "under the table" bribes.  This includes:

- The only document reflecting the "free devices" were paper deal sheets (not on Medtronic forms or letterhead) shared among the bad actors in person only (*i.e.,* Davisson, Winger, Wilson)

- Davisson/Winger never provided their deal sheets to anyone at Medtronic who prepared the price proposals or invoices for any of these sales.  These deal sheets did not inform Wilson to report the free devices.

- Medtronic's corporate representative stated any free devices to HRMC should be shown at $0 on paper invoices.

- All of Medtronic's actual paperwork for these deals (*e.g.,* price proposals and invoices) failed to report the free devices despite these forms stating otherwise—even though this paperwork stated all discounts were shown thereon in compliance with the AKS.

- Other Medtronic deals at HRMC for lower amounts of free devices reflected those devices at $0 on invoices sent to HRMC.

---

[25] "That three-part test largely tracks the traditional common-law scienter requirement for claims of fraud. *See* Restatement (Second) of Torts § 526 (1976); Restatement (Third) of Torts: Liability for Economic Harm § 10 (2018)." *Id.*

- Winger maintained two spreadsheets regarding the bulk deals.  "His" spreadsheet that listed the free devices (*i.e.,* the deal sheet tables), and the company "Medtronic's" spreadsheet that did not.

- The free devices were delivered in person only and not included in the shipment of these quarterly bulk sales.  Despite federal regulations and Medtronic policies, there is no documentation whatsoever identifying the free devices provided (*e.g.,* serial numbers, lot numbers, *etc.*).

Giving free devices in the manner described above reflects Medtronic's knowledge of illegality.

*See e.g., U.S. v. Starks*, 157 F.3d 833, 838 (11th Cir. 1998) ("the giving or taking of kickbacks

for medical referrals is hardly the sort of activity a person might expect to be legal").

 Next, "deliberate ignorance" encompasses "a person shut[ting] his eyes to the facts, or

purposely abstained from inquiring into them."  *Schutte.* 598 U.S. at 750 (citation omitted).

Again, the above facts demonstrate conduct of "looking the other way" when it comes to legal

compliance regarding free devices.  Finally, "reckless disregard" similarly captures defendants

who are "conscious of a substantial and unjustifiable risk" of behavior violating the AKS.  *Id.* at

751 (citations omitted).   At the very least, these facts certainly demonstrate reckless behavior by

Medtronic—a conscious attempt to skirt the safe harbor "discount" reporting requirements.

While only needing to meet one usage of the "knowingly" definition, Relator has met all three.

 Unlike "knowingly," there is no statutory definition of "willfully."  The Second Circuit

defined willful in the AKS context as follows: "a person can 'willfully' violate a criminal statute

like the AKS, 'as long as he knows that his conduct is illegal, even if he is not aware of the exact

statutory provision that his conduct violates.'"  *United States ex rel. Hart v. McKesson*

*Corporation*, 96 F.4th 145, 154 (2nd Cir. 2024) (citation omitted).  Relevant here, "[c]ourts that

have found concealment probative of wrongful intent have typically done so when the

concealment happened *concurrently* with the violation." *Id.* at 160.   All the evidence supporting

"knowing" intent equally applies here.  *Concurrent* to all the bulk sales involving free devices:

- Davisson/Winger concealed the free devices on paper deal sheets.

- Davisson/Winger kept separate spreadsheets (their own with discounts and Medtronic's without) (*i.e.,* concealment).

- Medtronic did not have any corporate paperwork identifying these $215,581 in free devices (*i.e.,* concealment).

- Medtronic did not put any of the $215,581 in free devices on invoices, but for other smaller deals with free devices, it did (*i.e.,* concealment).

- Winger delivered the free devices directly to Wilson.  They were not shipped with the sale whereby paperwork itemizes each device provided (*i.e.,* concealment).

- Winger stating that free devices came from some "fund" maintained by Davisson. Despite being covered by document requests, there is no documentation regarding this "fund" (quantity of devices, amount, in or out accounting, *etc.*) whatsoever.  Winger later claimed the devices came from his "trunk stock" (*i.e.,* concealment).

- All the other reps from Abbott, CSI, and Becton Dickinson knew what Wilson was asking for (*i.e.,* free devices but not on any formal paperwork) was completely illegal.

This "knowingly and willfully" violation of the AKS leads to liability under the Relator's false certification FCA claim and his *per se* liability claim under § 1320a-7b(g).  Finally, regarding Relator's third FCA claim outside the AKS context, he only needs to present evidence of "knowing" behavior by Medtronic.  31 U.S.C. § 3720(a)(1)(A), (B).  As discussed at length in Relator's briefing regarding the safe harbor discount (Doc. 400, pgs. 9-54), Medtronic provided HRMC false documents (*e.g.,* pricing agreements, invoices, shipping notes) that excluded the $215,581 in illegal free devices.  As summarized above, a reasonable jury could find that Medtronic knowingly failed to properly include these free devices.  Medtronic provided these documents to HRMC which caused it to submit false claims and false records/statements for reimbursement (*e.g.,* its annual cost reports).  This is a direct violation of the FCA.

### 3.   *Medtronic's Bribes Induced Sales:*

Regarding inducement under the AKS, "the issue of sole versus primary reason for payments is irrelevant since *any* amount of inducement is illegal."  *United States v. Bay State Ambulance and Hosp. Rental Serv., Inc.,* 874 F.2d 20, 30 (1st Cir.1989).  Therefore, when illegal bribes are involved, it does not matter if HRMC would have purchased Medtronic's devices regardless.  *See e.g., United States v. Greber,* 760 F.2d 68, 72 (3d. Cir.1985) (finding that payment to physicians violated AKS if, in addition to compensating the physicians for legitimate duties, it was also intended to induce referrals).  Here, the facts are arguably uncontroverted.  Davisson, Winger and HRMC (Wilson, Atkins-Ray) all admitted that the $215,581 of free devices were meant to secure or incentivize the device sales.  Wilson admitted to numerous other sales reps that Medtronic was willing to give free devices off the books.  All those reps refused (knowing it was illegal) and lost out on these sales.  While not necessary, a reasonable jury could easily find that the sole or primary reason or primary for the bribes was to induce these sales.

### 4.   *Sufficient Evidence Exists Supporting Relator's Conspiracy Claim:*

The Relator has shown: (1) the defendants agreed to defraud the United States by getting "a false or fraudulent claim paid by the United States;' and (2) one or more of the conspirators "performed an act to effect the object of the conspiracy."  *U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.,* 459 F. Supp. 2d 1081, 1091 (D. Kan. 2006), *vacated on other grounds,* 543 F.3d 1211 (10th Cir. 2008).   Medtronic and HRMC agreed to defraud the U.S.:

- HRMC's Wilson provides all the evidence necessary for a jury to find conspiracy with Medtronic's Davisson/Winger.  Wilson told the Relator and numerous other representatives that Winger was willing to give him free devices off the books to secure sales.  He stated that if they wanted to compete, they would have to do the same.

- Davisson/Winger willing to meet Wilson's request for off-the-books free devices.

- Wilson receiving the devices directly from Winger and not through shipping.

- Wilson not putting free devices on any of HRMC's paperwork (*i.e.,* purchase orders, inventory sheets, *etc.*) avoiding inclusion on claims and annual cost reports.

- Winger providing no proper paperwork identifying the transfer of free devices.

A reasonable jury could find this first element met.   This same conduct also supports meeting the object of their scheme.  HRMC took these bribes off the books and excluded their no-cost impact on cost reports—it was reimbursed as though it paid for these free devices.  Medtronic's objective of the conspiracy was met—giving off the books free devices in order to secure millions in sales at HRMC.

### 5. *Medtronic's AKS/FCA Violations Caused Significant Damage:*

Medtronic's $215,581 in illegal bribes to HRMC led to 3,999 false claims equaling $42,131,293 in reimbursements from federal healthcare programs.  (AMF, ¶ 12).  "'[W]hen a defendant is paid by [Medicare or Medicaid] for services tainted by a kickback,'" the government "'does not get what it bargained for.'" *Wilkins*, 659 F.3d at 314 (citation omitted). That is true even if a bribe-free provider would have given identical care.  Courts that have considered claims tainted by an AKS violation have found that "the amount of damages which the Government sustains because of" the false claim, 31 U.S.C. § 3729(a)(1), *is the full amount of the claim*. [26]  The government would have paid nothing had the claim truthfully disclosed the AKS violation.  *Rogan* involved reimbursement claims rendered false by violations of the AKS. The Seventh Circuit found it irrelevant whether patients had received "all the care reflected in

---

[26] *See, e.g., Rogan*, 517 F.3d at 453 ("The government offers a subsidy . . . with conditions.  When those conditions are not satisfied, nothing is due.  Thus, the entire amount . . . must be paid back."); *see also United States v. Teva Pharms USA, Inc.* No. 20-CV-11548-NMG, (D. Mass. Jun. 7, 2022) ("As a matter of law, however, damages for violations of the FCA predicated on violations of the AKS are measured as the entirety of the government's payments for claims tainted by those illegal kickbacks."), *United States ex rel. Freedman v. Suarez-Hoyos*, No. 8:04-cv-933-T-24 EAJ, at *8 (M.D. Fla. Sep. 21, 2012) ("[T]he amount of the Government's damages resulting from the payment of false claims tainted by a kickback arrangement equals the full amount that Medicare paid on such claims.").

the claim forms." 517 F.3d at 453. Medicare and Medicaid offer a government "subsidy … with conditions," the court explained, and "[w]hen the conditions are not satisfied, *nothing* is due." *Id.* (emphasis added). Several district courts have reached the same conclusion.[27]

Finally, the $215,581 in bribes paid by Medtronic on eleven known occasions tainted not only the devices included in those bulk sales, but all other devices that Winger sold HRMC's Wilson in between. Each bribe is not required to be tied to each subsequent sale by Medtronic to HRMC. *See e.g., United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011) ("if part of the payment compensated past referrals… that portion of the payment violates' [the statute]"). This flows directly from the statutory text: "The AKS's plain language thus makes it unlawful for a defendant to pay a kickback with the intent to induce a [sale], whether or not a particular [sale] results." *Parikh*, 977 F. Supp. 2d at 665. Winger's ongoing relationship with Wilson, born from these significant bribes, served him in all other HRMC sales. A jury could certainly find a "causal connection" or "link" between Winger's bulk sale bribes and all other sales he made in between.

**C.    Over $100,000 in Bribes Paid to Dole VA Employees Are Illegal:**

"Though the bribe be small, yet the fault is great."[28] While each meal purchased for Brinkley and her staff may not be significant (averaging $216), the cumulative effect is significant over seven years (greater than $100,000). The dollar value of a kickback does not determine whether it was improper. The Anti-Kickback Statute addresses "any" remuneration. "[F]ood and drink … qualify as 'any remuneration.'" *United States ex rel. Wilkerson v. Allergan*

---

[27] *United States ex rel. Fesenmaier v. Cameron-Ehlen Group, Inc.*, 2023 WL 36174, at *3 (D.Minn. Jan. 4, 2023) (AKS); *United States ex rel. Wheeler v. Union Treatment Ctrs., LLC*, 2019 WL 571349, at *9 (W.D. Tex. Feb. 12, 2019) (AKS); *United States ex rel. Emanuele v. Medicor Assocs.*, 2017 WL 4867614, at *9 (W.D. Pa. Oct. 26, 2017) (AKS and Stark Law); *United States ex rel. Freedman v. Suarez-Hoyos*, 2012 WL 4344199, at *4 (M.D. Fla. Sept. 21, 2012) (AKS).
[28] Sir Edward Coke (1552-1634). Lord Chief Justice of England and Wales.

*Ltd.*, 2024 WL 1242989, at *11 (N.D. Ill. Mar. 22, 2024); *see also Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1104-1105, 1106 (7th Cir. 2014) (the principal kickbacks were cultural and Russian-language products, explaining that a $1 refund can be analyzed as a kickback, and that the relator could total up the value of the cultural packages over the year.) Significantly, *Grenadyor* addressed the impact on the kickback recipient – the patient – and cited the HHS Office of Inspector General rule about gifts to Medicare beneficiaries. *Id.* at 1107.[29] Medtronic is free to argue "modest" to the jury, but doing so has no place under Rule 56.

Medtronic quotes *United States ex. rel. PCTLS, LLC v. Nw. Mem'l Healthcare*, 19-cv-00593 (N.D. Ill. Sep. 29, 2023) to say: "[r]emuneration demands the transfer of something with substantial independent value[.]"  However, in both *Grenadyor* and *PCTLS*, whether gifts or meals are improper depends on *whom they target* and whether they are *enough to induce AKS violations*.  A jury could find Medtronic's meals to Brinkley and staff were sufficiently frequent (weekly) and cumulatively significant (over $100,0000) to induce Medtronic's sales.  Also, this fails to address the different standards for private and government employees.

Regarding intent, Medtronic claims its sales reps did not knowingly offer Brinkley[30] and her staff illegal remuneration to induce sales.  Yet, Medtronic had written policies specifically stating that its sales reps were to comply with regulations and policies when dealing with government customers.  This certainly reflects Medtronic's "actual knowledge"[31] that its reps are not allowed to purchase meals—*i.e.,* 5 C.F.R. §§ 2635.201, *et seq*. discussed in Relator's

---

[29] The HHS Office of Inspector General guidance containing the $50/year threshold is at 65 Fed. Reg. 24411 (Apr. 26, 2000) (Final Rule) and 67 Fed. Reg. 55858 (Aug. 30, 2002) (OIG Special Advisory Bulletin on Offering Gifts and Other Inducements to Beneficiaries) ("For enforcement purposes, inexpensive gifts or services are those that have a retail value of no more than $10 individually, and no more than $50 in the aggregate annually per patient.") Both pertain to the Civil Monetary Penalty Law, Sec. 1128A of the Social Security Act. [42 U.S.C. 1320a–7a]
[30] Medtronic repeatedly claims that recipients of meals such as Brinkley did not decide what to purchase.  However, Relator has demonstrated that Brinkley did make these decisions, or at the very least made "recommendations" for these purchases.
[31] 31 U.S.C. § 3729(b)(1).

briefing.  The alleged bad actors in this litigation (Winger, Davisson, Kirk) are the only ones who believed doing so was acceptable.  The industry as a whole, Medtronic's written policies, all VA employees, the VA OIG, *etc.* all knew doing so was illegal.  At the very least, this demonstrates Medtronic acting with "deliberate ignorance" or "reckless disregard."  *See* 31 U.S.C. § 3729(b)(1).

Sufficient evidence also exists for a jury to find that Medtronic willfully violated the AKS—*i.e.,* aware its conduct violated *some* law.  *Hart*, 94 F.4th at 142.  It consistently (and contemporaneously) provided meals to Brinkley and staff while selling devices procured by Brinkley.  Medtronic's written policies—incorporating federal regulations prohibiting meals for VA employees—confirm doing so is illegal.  Yet, Medtronic's agents purchased these meals, and Medtronic approved their expense reports reflecting the same.  However, evidence strongly suggests that Winger failed to report (concealed) a significant amount of these meals.[32]  Winger and Davisson even joked about wearing an orange jumpsuit due to their conduct.[33]

This was all done by Medtronic to induce sales.  Brinkley admits how accepting Medtronic's meals near device orders would appear inappropriate.  Medtronic proposes that a reasonable jury could find the Dole VA meals were for "in-service content or education" and to engender good will with employees.  Possible?  Sure.  But it is also possible the jury could reach the exact opposite conclusion (*i.e.,* no educational programs provided, feed employees only when they do two or more legs, the employees "just want to be fed," *etc.*).

## D.   Medtronic's Conduct at Dole VA Resulted in False Claims:

### 1.   *"But For" Causation is Not Required:*

---

[32] See, ¶ 75, *supra*; Doc. 494, ¶ 39, pg. 17. Staff at Dole VA were told employee Dr. Gonda purchased lunches to hide the fact that Winger did so.

[33] On May 18, 2018, around the time that Winger had met with the federal investigators, Davisson sent him a text message stating, "also any update on the VA.  Have you tried on any orange jumpsuits lately."  (Winger, pg. 273:25-274:19; Ex. 28 @ 128389)

As discussed herein (pgs. 24-31, *supra*), the Relator is not required to establish "but for" causation.  The Relator has established a causal connection between Medtronic's meals and the claims it made for device sales at Dole VA.  Regardless, even if this Court required such a showing, a reasonable jury could find it easily met.  Here, Medtronic directly made bribes to the VA to induce sales.  "But for" doing so, the sales of their devices arguably would not have occurred.  Competitors were shut out due to these bribes.  Grossly unnecessary Medtronic inventory was purchased.  The bribes directly caused this to occur.

2.      ***Sufficient Evidence Supports Relator's Conspiracy Claim:***

An underlying FCA violation has occurred at Dole VA based on Medtronic's AKS violation, ergo, there is an underlying basis for Relator's conspiracy claim.  Medtronic and Brinkley agreed to defraud the United States by getting a false or fraudulent claims paid by the United States.  Medtronic knowingly provided, and Brinkley knowingly accepted, illegal bribes (*i.e.,* false claims).  Both performed acts to complete the conspiracy's goals.

3.      ***Damages from Medtronic's Conduct are Significant:***

Medtronic's $100,000 plus in free meals provided to Dole VA cath lab manager and staff were provided on a weekly basis.  This covered a timeframe when Winger/Davisson sold $7,361,145.33 in devices directly to the U.S. government.  Sufficient facts have been presented that Brinkley—the recipient of these bribes—decided what devices were purchased and in what quantity.  At the very least, she "recommended" these devices for purchase—meeting the AKS requirement.  42 U.S.C. § 1320a-7b(2)(B).  A previously stated, Medtronic claiming these sales would have occurred regardless of the bribes is not the applicable causation standard for AKS/FCA claims.  But again, even this standard can be met given the facts here.

WHEREFORE, the Relator respectfully requests that this Court deny *Medtronic, Inc. and Covidien, L.P.'s Motion for Partial Summary Judgment* (Doc. 515) in its entirety.

Respectfully submitted,

Carrie Mulholland Brous KS #18157
Cristina Olson D. Kan. #79005
**Brous Law LLC**
3965 West 83rd Street, Ste. #115
Prairie Village, KS  66208
(913) 209-8596
cbrous@brouslaw.com



*/s/ Brendan J. Donelon*
Brendan J. Donelon, KS #17420
4600 Madison, Suite 810
Kansas City, Missouri 64112
Tel:    (816) 221-7100
Fax:    (816) 709-1044
brendan@donelonpc.com

Daniel W. Craig
6642 Clayton Rd., #320
St. Louis, Missouri 63117
Tel:    (314) 297-8385
Fax:    (816) 709-1044
dan@donelonpc.com

Attorneys for Relator

<u>Certificate of Service</u>

I hereby certify that on <u>July 8, 2024</u> the above and foregoing was sent pursuant to this Court's CM/ECF procedures to the attorneys of record in this matter.

*/s/ Brendan J. Donelon*