# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *ex rel.* THOMAS SCHROEDER | ) | |
| | ) | |
| Relator, | ) | |
| | ) | |
| | ) | Case No. 2:17-02060-DCC-BGS |
| | ) | |
| MEDTRONIC, INC.; COVIDIEN, L.P.; | ) | |
| HUTCHINSON REGIONAL MEDICAL | ) | |
| CENTER, and WICHITA | ) | |
| RADIOLOGICAL GROUP, P.A. | ) | |
| | ) | |
| Defendants. | ) | |

## RELATOR'S RESPONSE IN OPPOSITION TO
## DEFENDANT HUTCHINSON REGIONAL MEDICAL CENTER'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

COMES NOW the United States of America ("USA"), *ex rel.* Thomas Schroeder Relator,

and hereby provides the following response in opposition to *Defendant Hutchinson Regional*

*Medical Center's Motion for Summary Judgment* [Docs. 545-546].

TABLE OF CONTENTS

I.      Summary of Response ....................................................................................3

II.     Additional Material Facts .............................................................................4

III.    Controverting HRMC's Factual Allegations ..............................................7

IV.     Responding Argument ................................................................................21

        A.      HRMC Violated the AKS ................................................................21

                1.      $215,581 in Free Devices Were Illegal Bribes .................21

                2.      A Reasonable Jury Could Find HRMC Knowingly & Willfully
                        Solicited and/or Received Illegal Remuneration ..............23

        B.      Sufficient Evidence Exists for a Reasonable Jury to Find HRMC
                Submitted False Claims Leading to Damages Under the FCA....................30

                1.      HRMC's Claims & Reports Involving Tainted Devices
                        are False Claims Under the FCA ......................................31

                2.      HRMC Knowingly Presented False Claims........................32

                3.      Relator has Presented Sufficient Evidence that the $215,581
                        in Bribes Caused False Claims.........................................34

                4.      The Government Incurred Damages...................................37

        C.      Relator Has Presented Sufficient Evidence of a Conspiracy ........................39

## I.    Summary of Response

This is a simple case of bribes being paid in return for sales.  At Hutchinson Regional

Medical Center ("HRMC"), from September 2014 through July 2019, on eleven *known*[1]

occasions, Materials Manager Mark Wilson accepted $215,581 in free off-the-books devices

from Medtronic[2] to incentivize sales.  Wilson told the Relator that he must do the same as

Medtronic to obtain sales—despite the Relator telling him this was illegal.  To evade liability,

Defendants HRMC and Medtronic claim the free devices were "discounts" permitted under the

Anti-Kickback Statute's ("AKS")[3] safe harbor provision.  Frankly, safe harbor is the only way to

avoid this straightforward AKS/FCA violation.  Unfortunately, as briefed before this Court

[Docs. 400, 446, 450][4], the free devices are not permissible discounts under safe harbor

statute/regulations.  They are $215,581 in illegal bribes.  While other device manufacturers—

including the Relator's—refused to provide off-the-books free devices, HRMC and Medtronic

employees testified that these bribes incentivized (*i.e.,* induced) their device transactions.  During

this period, HRMC acquired $5.5 million in Medtronic devices tainted by ongoing bribes.

HRMC submitted claims for reimbursement utilizing these tainted devices.  It falsely certified

AKS compliance when submitting claims and in annual Cost Reports.  HRMC's data reflect

these devices were used in 3,999 procedures—billed in whole or in part to Federal health care

programs.  These programs paid $42,131,293 for these false claims.

---

[1] The Relator states "known" because Defendants were only able to locate paperwork addressing eleven instances where Medtronic provided HRMC free devices as part of bulk device sales.  As the reader will see herein (pg. 17, ¶ 29, *infra*), testimony from HRMC employees reflect that free device bulk sales would occur on a near quarterly basis—which would reflect at or near twenty instances during the applicable period.

[2] "Medtronic" collectively references Defendants Medtronic, Inc. and Covidien, L.P.

[3] 42 U.S.C. § 1320a-7b(b), *et seq.*

[4] Any reference to a docket number entry herein will apply to SEALED pleadings where applicable.

HRMC argues that Relator also offered Wilson free devices to secure bulk sales. (Defendant's memo, pg. 3, wherein it cites Doc. 435-13).  HRMC misses the point.  Relator has never asserted that providing free *on*-the-books devices to secure bulk sales violates the AKS. Instead, as spelled out in federal regulations, Medtronic and HRMC's <u>failure to disclose and report</u> the $215,581 in free devices implicates the AKS.  HRMC also claims that the alleged free devices and meals are based on "rumor and speculation."[5]  The overwhelming evidence from testimony, data, and documents demonstrate bribes being provided off-the-books by Medtronic on at least eleven occasions between September 2014 and July 26, 2019.  The records and testimony also reflect Medtronic's Winger would routinely provide meals to HRMC employees without any educational in-service programs.  These allegations of illegal remuneration are not speculative.

HRMC fails its burden under Rule 56.   The evidence presented to this Court—with all "inferences in the light most favorable to the [Relator]"—reflect a "genuine dispute [of] . . . material fact" on whether HRMC knowingly and willfully violated the AKS (and in turn, the FCA).  *Marie v. Mosier*, 122 F.Supp.3d 1085, 1099–1100 (D.Kan. 2015) (Crabtree, D.) (quoting Fed.R.Civ.P. 56(a)).  HRMC's motion for summary judgment should be denied.

## II.    <u>Additional Material Facts ("AMF")</u>

Here, the Relator is reasserting some of the additional material facts utilized in *Relator's Response in Opposition to Defendant Medtronic, Inc. & Covidien, L.P.'s Motion for Partial Summary Judgment* [Doc. 527, pgs. 4-7].

---

[5] HRMC addresses the allegations of NASCAR tickets, golf outings and travel costs being provided by Medtronic to HRMC employees.  As this Court has already addressed, these allegations were brought in good faith, and ultimately dropped by Relator after discovery—an acceptable and common occurrence in most litigation.  [Doc. 483, pgs. 12, 17]

### *HRMC's Certification of AKS Compliance*

1.      Nick Baldetti was produced by HRMC under a Rule 30(b)(6) notice of deposition. (Baldetti, depo. Ex. 1, **Exhibit A**).  His job title is Chief Operating Officer ("COO") (Baldetti, 10:18-22)  Baldetti provided testimony regarding HRMC's Medicare annual "cost reports." (Baldetti, 34: 3-5; 38:23-39:12; depo. Ex. 2)[6]

2.      When HRMC submits claims data to the government, the Medicare Administrative Contractor (MAC) aggregates this information into an annual report called the Provider Statistical & Reimbursement Report.  (Schmor I, 9:17-19; Depo Ex. 21, report dated May 26, 2023, pgs. 32-36, **Exhibit B**)  The data in these reports is used by providers like HRMC to prepare its annual Cost Reports and by MACs during the audit and settlement process with providers.  *Id.*  Any false claims data provided during the claim payment process would be erroneously and ultimately incorporated into these annual Cost Reports.  *Id.*

3.      Baldetti examined an accurate example of the Cost Report certification signature pages submitted by HRMC which expressly certify the accuracy of the data and costs included.[7] (Baldetti, 36:5-16; depo. Ex. 2, pg. 6)  These also certify compliance with all laws and regulations.  (*Id.*)  These are typically signed by HRMC's Chief Financial Officer (CFO).  (*Id.* at 38:6-13)  Each of these cost reports expressly certifies that information contained therein was not directly or indirectly subject to an illegal kickback.  (Baldetti Depo Ex. 2, pg. 1)

---

[6] Baldetti deposition Ex. 2 reflects cost report certification pages covering 2010 – 2018.

[7] This is a 2012 example of a cost report filed by HRMC.  Other examples in the exhibit reflect the hospital operated as Promise Regional Medical Center.

***Damages***

4.      At HRMC, Medtronic provided free devices to secure bulk sales beginning on

September 26, 2014 and ending on July 26, 2019.[8]  The eleven *known* bribes set forth in Docs.

400 (pgs. 21-54, ¶¶ 67-140) and 446 (pgs. 8-12, ¶¶ 1-10) are summarized as follows:

| Date | Event | Bribe's Value |
|---|---|---|
| 9/26/2014 | Bulk Sale | $8,994.00 |
| 4/7/2015 | Bulk Sale | $11,980.00 |
| 2/26/2016 | Bulk Sale | $35,585.00 |
| 7/26/2016 | Bulk Sale | $30,885.00 |
| 10/28/2016 | Bulk Sale | $4,990.00 |
| 1/24/2017 | Bulk Sale | $20,465.00 |
| 4/19/2017 | Bulk Sale | $20,700.00 |
| 4/27/2018 | Bulk Sale | $32,783.00 |
| 7/20/2018 | Bulk Sale | $11,279.00 |
| 1/11/2019 | Bulk Sale | $13,890.00 |
| 7/26/2019 | Bulk Sale | $24,030.00 |

$215,581.00

5.      Throughout the dates of these bribes, Medtronic sold $5,532,640 in devices to

HRMC.  (Doc. 399-5 – Excel Spreadsheet of sales at HRMC)[9]  Beginning with Winger's first

bulk bribe on September 26, 2014—and continuing through the last known bribe on July 26,

2019—all devices sold by Winger would have been tainted.  In turn, any claim to a federal

healthcare program involving these tainted devices would be false.  (Schmor II, 271:25-272:17,

**Exhibit C**)

---

[8] Relator had initially found that bulk sale bribes first occurred on April 7, 2015, but later revised this to
September 26, 2014.  (Doc. 400, pgs. 7-55: addressing deals from April 7, 2015 through July 26, 2019;
Doc. 446, pgs. 8-12: amending to first bulk sale with free devices occurring on September 26, 2014 and
also adding another bulk sale occurring on October 28, 2016).
[9] This figure is a simple Excel =SUM formula for the sale figures cells between this date range.

6.      False claim damages began on September 26, 2014 when the first paperwork reflecting free off-the-books devices appeared.  (Schmor II, 271:25-272:17; depo Ex. 35, pg. 5) Relator's expert Schmor ran these damages through the last quarter reflecting Medtronic making bulk sales to HRMC: April 20, 2020 (Schmor II, depo Ex. 35, pgs. 22-25).[10]  From HRMC's data, Schmor was able to trace the tainted Medtronic devices sold by Winger to HRMC during this period.  HRMC utilized these devices in 3,999 procedures that were billed/reimbursed in whole or in part by Federal healthcare programs for a total of $42,131,293.  (Schmor II, 78:25-79:16; 159:17-23; depo Ex. 35, pg. 5, second table).

### III.      Controverting HRMC's Factual Allegations

1.      Uncontroverted.

2.      Uncontroverted.

3.      Uncontroverted.

4.      Uncontroverted.

5.      Uncontroverted, however, in 2016 Winger also began selling a limited number of Medtronic cardiac devices to HRMC.  (Fifth Amended Complaint, Doc. 233, ¶ 39; Medtronic Answer, Doc. 384, ¶ 39)

6.      Uncontroverted.

7.      Uncontroverted this is Hagley's declaration and Naab's testimony but controverted regarding any aspect of non-physicians' roles in determining what devices were actually purchased by HRMC.  Also, Wilson made determinations on what devices to purchase in bulk orders based on which manufacturer was willing to provided free devices off the books.

---

[10] To determine this later date, Schmor followed HRMC Atkins-Ray's testimony that these "deal sheets" with free devices were done on a quarterly basis (Doc. 400, ¶¶ 141-142, pg. 54), and therefore, examined billings through April 20, 2020.  (Schmor Vol. II, depo Ex. 35, at 24-25; explaining damages date range ending on April 20, 2020)

Relator Tom Schroeder met with Wilson a couple dozen times in person and with others present. (Schroeder, 41:15-24; **Exhibit H**) Wilson told Schroeder repeatedly that Medtronic's Winger would give him a month's worth of free inventory with every bulk buy deal. Schroeder explained to Wilson that such a volume of free devices could not be obtained legitimately from Medtronic. Schroeder explained to Wilson that he thought Winger may be taking inventory from the Dole VA to give to HRMC. (*Id.*, 98:5-21) Wilson told Schroeder that he wanted Bard to provide HRMC "off-the-book product." (*Id.*, 297:24-299:12) Wilson made the request for free devices in front of Schroeder, and sometimes his sales representatives as well. Schroeder would inform Wilson that giving HRMC free devices was not legal. Wilson would state that nothing would be in writing. Wilson would often couple this message with reference to Schroeder "being creative" with his offers. (*Id.*, pgs. 298:2-300:3)

Defendant HRMC subpoenaed Relator Schroeder's business emails from when he worked at Becton Dickinson. These contemporaneous emails confirm his testimony regarding Wilson getting free off-the-book devices from Medtronic.

Just a heads up but we won't get anywhere close to $1,200 in a hospital (i.e. Hutchinson) so unless we can get 100% AND it is on a HUGE rebate then we won't compete.   Especially when Doug has been kicking back with huge amounts of free catheters which we can't/won't do.

- We lost out on another 50 unit bulk deal to Medtronic in Hutchinson KS.  The VP of supply chain, again, stated that unless we can give him 10 free units of LTX on our 25 unit proposal or 25 units free on our 50 unit proposal we would then be close to what MDT has offered.  We explained cannot and do not do business this way despite his ongoing deals with MDT.  They continue to give Hutchinson hospital large amounts of "off the books" product to off-set their bids.

(Bates BD000002, 0015, attached as **Exhibit I**)

Beginning in 2015, Dan Clinkscales was a sales representative working for Bard Peripheral Vascular (the Relator Schroeder's employer at the time). (Clinkscales, 8: 4-8, **Exhibit E**) Clinkscales would work with Wilson to try and make sales.  (*Id.*, 64:13-18)  During one of his first meetings with Wilson, Clinkscales stated that Wilson would tell Schroeder and him that they needed to find a way to offset their proposed price for a bulk sale.  (*Id.*, 65:8-68:16) Clinkscales reviewed a statement he gave earlier to a court reporter where he was asked about Wilson asking for free devices. (*Id.,* 68:17-69:9; depo Ex. 1)  Wilson would ask for free product (a/k/a marketing material) on a quarterly basis.  When he referred to "free product," Wilson was wanting them off the books. (*Id.*, 69:11-71:4)

> Q. Okay. Is that your understanding? Are we on the same page as what we mean by when he asked for free product?
> A. Yes, we are.
> Q. Okay.
> A. To clarify that, he specifically said he *wanted off-the-record free product*.
> Q. Okay. Meaning *he didn't want any records showing that he was going to get something for free* in order to get -- for you to get the sale?
> A. *Correct. Correct*. And that was on one occasion.

(Clinkscales Depo Ex. 1, pg. 37:2-14) (emphasis added)  Clinkscales admits that his deposition Exhibit 1 statement from page 37:20 through 39:13 is an accurate description of what was said in this meeting with Wilson. (Clinkscale, 71:24-73:4, depo Ex. 1) This statement is as follows:

> And Tom Schroeder and I went in, and he said let's have a meeting with Mark and ask him about how we can get this deal done. And inside that meeting, to give a generalization of what happened in that meeting, you know, Mark said the issue you guys have at Bard is you're too small of a company and *you're fighting somebody like Medtronic and they know how to do business* and you don't. And Tom said we're here to try and win this bulk, and we need to know what we -- you know, we're trying to figure out how we get this done, because we feel like we're giving you great pricing on this bulk. And Mark said, *I don't understand how you don't get this. You have to provide free material*, free DCBs to win one of these bulks. And Tom said vehemently *there's no way that anybody is doing that*, because we don't do that, that's *against the law*, and you have to charge these to patients. I don't know how you would charge these to patients if they were not somehow billed to your hospital.

> So Mark had said, you know, let us worry about that. And Tom said, so you're telling me to win a bid I need to provide you free material? *And Mark said to Tom, that's -- of course, but you can't put it in black and white.* And Tom ended the meeting there and we walked out of that meeting, and Tom pulled me to the side and said, I know that you're new to this industry, but I don't ever want you to think that that is a normal conversation and that that is a normal way of doing business inside this industry. I think we both walked out of there feeling pretty disgusting, you know.

(Clinkscales depo Ex. 1, 38:2-39:13) (emphasis added).  In a second meeting with Wilson, Wilson stated that Doug Winger provided him free devices in order to secure sales. (Clinkscales depo 74:9-75:7; depo Ex. 1, 39:19-40:21) Every time Clinkscales met with Wilson he was told to provide free product like Medtronic to get things done. (Clinkscales depo Ex. 1, 47:3-13)

Another Bard Vascular sales representative John Tebbe and Relator Schroeder met with Wilson at HRMC. Wilson told them that they had to be "more creative" when trying to sell their drug coated balloons like their competitor.  Medtronic was the only competitor.  When pressed on what he meant by being "more creative," it boiled down to Wilson stating that there would have to be free product.  Schroeder stated that it would be fraud to do so, and Wilson stated it meant being creative.  Schroeder asked Wilson to put his request for free product in writing, and Wilson stated that he would not do that.  (Tebbe, pg. 23:16-26:12, **Exhibit F**)  Tebbe was clear that any free devices provided to a buyer by a company "has to be *contract-driven*, though. I mean, to request anything like that, you have to request a contract, the *contract has to be written up*, both parties have to *sign it*. And then, you know, no charge -- obviously, to get the equipment sent free of charge, a *no-charge PO* [purchase order] *needs to be created*." (*Id.*, 61:20-62:1) Schroeder used the word "fraud" to describe what Wilson was asking for in one of their meetings. Tebbe understood this fraud to be providing free devices outside of any written contract.  (*Id.*, 76:13-78:14)

While working for a PAD device manufacturer CSI, Todd Brown would call on HRMC one to two times per week. (Brown, pg. 22:7-13, attached as **Exhibit D**). He would deal with materials manager Mark Wilson and Cindy Naab when trying to sell his product. (Brown, pg. 22: 18-22; 22:23-23:9) Wilson—not any physician—was the person who made the decision to purchase devices. (Brown, pg. 27:25-28:5) Brown stated he would meet with Wilson maybe two to three times per quarter between 2012 and 2016 trying to make sales. (Brown, pg. 25:25-26:4) In trying to get more out of Brown, Wilson would try to get additional no charge devices. (Brown, pg. 23:17-24:16) Brown described where it was permissible to provide free devices in order to obtain a bulk purchase, but it had to be legal in writing, getting all the necessary approvals, and filling out the necessary paperwork. (Brown, 25:6-19; 135:15-136:2)

A sales representative for Abbott from 2015 through 2018, Larry Valdivia met with Wilson regarding sales of his company's drug coated balloons to HRMC. (Valdivia, pg. 12: 9-16; 70:5-9, **Exhibit G**). He spoke with Wilson once or twice over the phone and had one in-person meeting. (*Id.* at 70:10-16) At that meeting, Wilson told Valdivia that he wanted "marketing materials" as part of deals, and that his competitor was providing those. Valdivia told Wilson he did have marketing materials (meaning data, brochures), but Wilson again stated, "no, marketing materials." (*Id.* at 70:17-74:14) Valdivia understood that Wilson was talking about free product. (*Id.* at 71:16-21) Valdivia relayed what happened to his manager who laughed and said, "we're not doing that." (*Id.* at 72:12-73:2)

8.     Uncontroverted that this may occur but controverted as to whether that impacted HRMC's purchasing decision regarding manufacturers as reflected in ¶ 7, *supra*.

9.     Uncontroverted, but again this New Product Committee's actual role in what device is purchased is undermined by Wilson's decision making, *see* ¶ 7 *supra*.

10.     Uncontroverted, but again this does not negate the issue before this Court regarding Wilson's role in soliciting and accepting illegal bribes in the form of free devices to secure sales, *see* ¶ 7 *supra*.

11.     Uncontroverted with the additional role of deciding which devices were purchased (*e.g.,* Medtronic willing to give free devices off the books to secure sales to Wilson, *see* ¶ 7 *supra*).

12.     Uncontroverted, but additional facts are relevant to the issues before this Court. Medtronic produced corporate witness Mark Osterman. (Osterman, 156:18-160:3, **Exhibit J**) HRMC is a member of the HealthTrust Purchasing—a group purchasing organization ("GPO"). GPOs negotiate contracts with vendors (*e.g.,* Medtronic) on behalf of that GPO's member facilities (*e.g.,* HRMC).  (*Id.,* 188:6-189:22; Depo. Ex. 63)  These GPO agreements required Medtronic and HRMC to comply with the False Claims Act ("FCA") and the Anti-kickback Statute ("AKS") including "the 'safe harbor' regulations regarding discounts set forth in 42 C.F.R. 1001.952(h)." (*Id.*, 189:23-191:5; 191:18-192:5; Depo Ex. 63).

13.     Uncontroverted, but such discounts are only legal if they meet the AKS's reporting and disclosure requirements.  Regardless, the issue in this case is mostly "bundled" not bulk discounts.  Bundled discounts are when one provides free device "a" in order to secure a bulk purchase of device "b."  (*See* Memorandum in Support of Relator's Motion for Partial Summary Judgment, Doc. 400, pgs. 5-54, setting forth illegal bundled discounts Winger provided to Wilson)

14.     Uncontroverted that Relator's company provided bulk discounts, but unlike Medtronic and Wilson at HRMC, these bulk discounts were properly reported and disclosed (*see*,

¶ 7, *supra*, how Relator relayed this requirement to Wilson at HRMC and informing Wilson that Medtronic's conduct was illegal).

15.     Controverted as described in ¶ 7, *supra*.  Wilson was informed by Schroeder that the free off-the-books devices he was asking for were illegal, and numerous other sales reps rejected this proposition as well.  Wilson verified his knowledge of this illegality via his comments that he would not put anything in writing, and that he wanted the free devices off-the-books.  (*See*, ¶ 7, *supra*)

More important to Wilson's actions here, HRMC agreed to develop, distribute, and implement regular, effective educational training and programs for all affected employees regarding compliance with federal regulations including the AKS.  *Publication of the OIG Compliance Program Guidance for Hospitals*, 70 F.R. Vol. 19, Jan. 31, 2005.[11]  Yet, Wilson does not recall receiving any training at HRMC about how to internally document/report no charge devices. (Wilson, pg. 117:14-19, **Exhibit K**) Wilson did not even know if there was an HRMC policy on documentation of a no charge device. (*Id.*, 118:5-12)

16.     Controverted as to describing physicians as the "decision makers" on what devices were purchased in bulk (*see* ¶ 7, *supra*).  Otherwise, not relevant as Wilson—not any physician—is the person who allegedly solicited/accepted illegal bribes in the form of free devices off the books to secure device sales.  *Id.*

17.     Uncontroverted.

18.     Uncontroverted.

---

[11] Section III.  Hospital Compliance Program Effectiveness, § A.4, available at
https://www.govinfo.gov/content/pkg/FR-2005-01-31/pdf/05-1620.pdf

19.     Uncontroverted with additional relevant facts.   These "deal sheets" including the free devices were provided in paper form in person to Wilson.  (Winger, pg. 205:12-19; 207:1-12; 307:14-308:2)  The free devices listed on these "deal sheets" were not included on any of the formal paperwork for any of these bulk sales, such as Medtronic's price proposal agreements, HRMC's purchase orders, Medtronic's documents titled "Invoice", or Medtronic's Delivery Note document listing all the devices that were part of these bulk sales.  (*See* Memorandum in Support of Relator's Motion for Partial Summary Judgment, Doc. 400, pgs. 7-53)  HRMC did not enter any of the free device data into its system, so these free devices would not be accounted for in HRMC's device costs.  HRMC stipulated that none of its data systems would have recorded the receipt of these free devices from Medtronic. (Doc. 400 at pg. 14, Doc. 450 at pgs. 21-22)  HRMC admits that the free devices listed on the "deal sheets" were never incorporated into their purchase orders for these bulk sales.  (Doc. 400 at pg. 14, ¶¶ 37-40)  HRMC admits that the only purpose of the "deal sheets" was to ensure that Winger gave HRMC the free devices he promised.  HRMC's corporate representative admits that all discounts impacting the actual device prices should be on the purchase orders.  (*Id.* at 15-16. ¶ 46)  Wilson could not explain why HRMC purchase orders failed to include the free devices listed on Winger's deal sheets.  (*Id.* at pg. 20, ¶ 65)  Wilson at HRMC and Winger at Medtronic acknowledged that Winger had his own deal spreadsheet (which included the free devices), and his employer Medtronic had the separate corporate spreadsheet that did not.  (*Id.* at pg. 17, ¶¶ 53-54)

20.     Controverted.  If the "deal sheets" were part of Medtronic corporate's official price quote, then the free devices and their price impact would have been included on Medtronic's price proposal agreements, Invoices, and Delivery Notes.  Indeed, Medtronic's price proposal agreements and Invoices expressly told HRMC that all discounts were listed thereon.

Yet, they failed to include the free device discount.  (*See* Memorandum in Support of Relator's Motion for Partial Summary Judgment, Doc. 400, pgs. 21-53)  Also, HRMC would have incorporated the price impact of the free devices listed on Winger's paper deal sheets into its actual Purchase Order (per its corporate representative's testimony) and would have recorded this impact in its data system.  But, as reflected in ¶ 19, *supra*, HRMC failed to do this.

21.     Uncontroverted that Winger's personal paper deal spreadsheets included this information, but Medtronic corporate's spreadsheet for these bulk deals did not.  (*See* Memorandum in Support of Relator's Motion for Partial Summary Judgment, Doc. 400 at pg. 17, ¶ 53)  More importantly, all the "formal paperwork" for these bulk deals (Medtronic's price proposal agreements, HRMC's purchase orders, Medtronic's Invoices and Delivery Notes) failed to list any of the free devices or their impact on device costs.  (*Id.* at pgs. 21-53)  This is the paperwork utilized by HRMC to enter device costs and discounts into its systems.  The paper only deal sheets were not utilized to record any free devices or their impact on device costs.  Their only role was to ensure that Winger personally delivered the free devices listed thereon to HRMC.  (*Id.* at pg. 14-15, ¶¶ 37-41)

22.     Controverted.  In the cited testimony, Adkins-Ray refers to two documents (Adkins-Ray Depo Ex. 1 and 3, **Exhibit L**).  Nothing in this testimony states that they were received *at the same time*, just that both would be sent to her.  Deposition Ex. 1 is the paper deal sheet with the free devices listed, Ex. 3 is the Medtronic price proposal agreement not the Medtronic "Invoice."  (See Adkins-Ray Deposition Ex. 20 for what a Medtronic "Invoice" looks like, Exhibit L).  Also, Winger testified that he provided the "deal sheets" to Wilson in person and that they were always in paper form.  (Winger, pg. 307:10-308:2, **Exhibit M**)  Winger would send an email to Wilson and others at HRMC with only the price proposal agreements

attached—*not the paper deal sheets*.  Like the price proposal agreements, his emails also did not discuss the free devices being provided to secure the deal.  (*Id.*, 309:20-310:8; Ex. 38 @ 5231-5232).

  23. Controverted.  HRMC admits that the free devices, or their impact on device prices, listed on the paper only deal sheets were never included on HRMC's purchase orders, therefore, these deal spreadsheets could not have played any role in creating the Purchase Orders.  (*See* Memorandum in Support of Relator's Motion for Partial Summary Judgment, Doc. 400 at pg. 14, ¶ 40)

  24. Controverted as to what Defendant means by "information regarding the bulk deal."  Regarding all these bulk sales involving free devices, HRMC has admitted that neither the free devices, nor the free devices price impact on devices contained within the bulk sales, were ever reported or recorded into its system in any manner whatsoever.  (*Id.* at pgs. 14-16, ¶¶ 37-40, 42-44, 46)

  25. Uncontroverted.

  26. Uncontroverted, but *see* ¶ 27, *infra*.

  27. Controverted that these documents reflect the free devices in any fashion.  The bulk sales may have included free devices, but HRMC's recording in its system did not reflect the free devices or the free devices' impact on the prices of the devices in the bulk sale.  As an example, from the *Memorandum in Support of Relator's Motion for Partial Summary Judgment*, Doc. 400, at pgs. 37-42:  All actual formal paperwork (price proposal agreement, Invoice, sales data, Purchase Order) for this April 27, 2018 deal (¶¶ 108, 109, 111, 112) showed HRMC paying $103,275 for 75 Medtronic drug coated balloons.  Figures on these documents/data reflect this same price for these devices.  These documents completely fail to reflect the price impact on

these 75 balloons when considering the $32,783 in free devices that Winger provided Wilson to secure this deal.  (*Id.* at pg. 37, ¶ 106)  These free devices should have been reported on all these documents at $0.00, or the 75 balloons should have reflected an actual cost of $68,426.50 instead of $103,275.  (*Id.*)  This did not occur.

28.     Controverted.  The Defendant lists the nine deals set forth in Relator's initial motion (Doc. 400, pgs. 21-53).  However, it fails to include two additional free device bulk deals described in Relator's *Response to Medtronic, Inc.'s and Covidien, L.P.'s Motion for Partial Summary Judgment & Reply in Support of Relator's Motion for Partial Summary Judgment* (Doc. 446, at pgs. 8-12).  This adds two additional deals: September 26, 2014 and October 28, 2016.  Defendant is correct that this matter is fully briefed before the Magistrate as to whether these two sales can be part of the Relator's claims.

29.     Controverted.   Medtronic made bulk sales to HRMC on a quarterly basis and HRMC's Adkins-Ray testified that each of these quarterly sales would include a Winger free device deal sheet.  (Winger, pg. 315:19-316:6)  (Adkins-Ray, pg. 49:1-5, depo Ex. 1, and pg. 94:18-20, depo Ex. 27, Exhibit L)  Wilson also agreed that HRMC received Medtronic bulk deal proposals about once per quarter.  (Wilson, pg. 48:17-22)  He recalled there were probably *some* occasions when he did not get a deal sheet for a Medtronic bulk deal.  (*Id.*, 48:8-15)  But, Wilson could not say how often Medtronic made a bulk buy proposal that excluded "no charge devices." (*Id.*, 48:24-49:23)  Starting in 2015 and going through 2019, twenty (20) "quarters" exist.  Yet, free device paper deal sheets could only be located by HRMC for nine (9) sales.[12]  While

---

[12] The additional two free device deals set forth in Relator's *Response to Medtronic, Inc.'s and Covidien, L.P.'s Motion for Partial Summary Judgment & Reply in Support of Relator's Motion for Partial Summary Judgment* (Doc. 466, at pgs. 5-12) did not have any of Winger's "deal sheet" spreadsheets. Instead, the free devices that were part of the deal were memorialized on handwritten posted notes accompanying the formal paperwork.

requested in discovery by Relator, no documents were produced by Defendants HRMC or

Medtronic reflecting any deal spreadsheets with no free devices.  The only deal sheets found by

Defendants were ones with free devices listed.  So, when Adkins-Ray, Wilson, or Winger

testified that the deal spreadsheets shown to them in their deposition (*i.e.,* the only ones produced

in discovery with free devices) were provided on a near quarterly basis, all these quarterly sheets

(if they could have been located by Defendants) potentially had free devices on them.  Given this

testimony, a reasonable jury could find that HRMC failed to save and/or produce all deal

spreadsheets reflecting additional Medtronic free device deals.

30.     Controverted, *see* ¶ 29, *supra*.  Also, HRMC's Adkins-Ray testified as follows

[when reviewing an example of Winger's paper deal sheet listing free devices]:

> Q How many of these quotes like this did you get
> in Exhibit 1?
> **A We would get bulks, do bulks quarterly usually.**
> Q So about four a year?
> **A Yeah.**
>
> Q Yeah, sure. I'm trying to figure out with every
> bulk order, would Mr. Winger give this line item
> here, these 19 products that we're looking at
> here, would he throw in products like that to
> **t**he bulk order – term sheet?
> **A I'm not sure.**
>
> Q Okay. Do you ever recall seeing a term sheet
> for a bulk deal that didn't include these
> products [referencing free products] listed above the line that Doug would
> bring in?
> **A Sorry, I don't remember.**

(Adkins-Ray, 49:1-50:8)

31-33:  Uncontroverted HRMC is claiming that it tracked costs based on money spent

when creating its Cost Reports. However, Relator refers this Court to *Relator's Suggestions in*

*Opposition to Hutchinson Regional Medical Center's Motion for Partial Summary Judgment &*

18

*Reply Suggestions in Support of Relator's Motion for Partial Summary Judgment* [Doc. 450, pgs. 10-15, ¶¶ 6-25]. As addressed above in ¶ 19, *supra*, HRMC has admitted that it made no entries into its data systems whatsoever reflecting the $215,581[13] in free devices Medtronic provided. (*Id.* at pg. 7, ¶ 2)

As Relator's expert Jessica Schmor testified, HRMC failed to properly document and report these no charge devices on any of the claims it submitted to federal healthcare programs. (*Id.* at pg. 10-11, ¶¶ 8-10) At the very least, it is undisputed that HRMC submitted claims for these no cost devices for payment. HRMC has failed to provide any evidence of accurate recording or reporting costs for these no charge devices. HRMC's "paid claims" history is compiled annually into a yearly Provider Statistical & Reimbursement ("PS&R") Report. (*Id.* at pg. 11, ¶ 9) These PS&R Reports are prepared by the Medical Administrative Contractor ("MAC") on behalf of the Centers for Medicare and Medicaid Services ("CMS"). PS&R Reports are an annual accumulation of statistical and reimbursement data for providers and are used by providers such as HRMC in preparing their annual Cost Reports. (*Id.* at pg. 18, ¶ 31) Failing to accurately report the costs and charges for devices acquired at no cost results in false claims. Also, this failure to accurately report charges and costs directly impacted and created false data compiled in the PS&R Report. In turn, HRMC's incorrect PS&R Report would directly lead to HRMC submitting incorrect annual Cost Reports. Finally, by not properly including the correct impact of these free devices in its Cost Reports, HRMC misrepresented its medical device cost/charge ratio on all future claims. These three forms of "false claims" all

---

[13] In Relator's earlier briefing, the value of free devices alleged was $206,587. However, since that earlier briefing, two additional free device deals were added [*See* Doc. 446, pgs. 8-11] increasing the total value of free devices to $215,581.

stem from HRMC's failure to report or record the $215,581 in free devices it received from 2014 through 2019.

34.     Uncontroverted, however, when meals are provided to private industry customers whereby the sales representative is required to perform an in-service educational program.  When Medtronic's sales rep Winger provided meals to HRMC cath lab employees, he did not provide these programs.  As an example, on February 9, 2018, Winger received a text message from Anita at HRMC asking him to get lunch for 10 employees. Winger told them to order whatever they wanted.  (Winger, 258:1-16; Ex. 27 @ 128606).  CSI sales rep Todd Brown sold at HRMC from August 2012 through January 2016. (Brown, 16:24-17:5)  When Brown or other sales reps brought in lunches, they were related to an in-service educational program.  (*Id.* 30:8-31:24) However, when Winger brought in lunches, there were no educational programs mostly because Winger was often not even present. (*Id.* 32:3-19)  On the occasions when Winger was present for his lunches, Brown never saw him conducting any in-service.  (*Id.* 76:7-77:2)

35.     Uncontroverted.

36.     Controverted that these in-service educational programs actually occurred.  *See* ¶ 34, *supra*.

37.     Controverted.  *See* ¶ 34 *supra*.

38.     Controverted.  *See* ¶ 34 *supra*.

39.     Uncontroverted, but the expense data cited does not reflect any in-service education program being provided, or topic of said program.  Also, the Relator's interrogatory no. 6 to Defendant Medtronic sought a listing of information (provider, date, description, recipient(s), documents relied upon) regarding all remuneration provided by its employees

Winger, Davisson, and Kirk to HRMC.  In its response, Medtronic admits that it does not have

all the documents or information regarding expense reporting.

> Medtronic is providing the data in this format because the expense reports
> themselves are not in Medtronic's custody and appear to *no longer exist*.
> Medtronic was able to identify *some* archival data that appears to be response.

(Attached as **Exhibit N**) (emphasis added)  Therefore, many expense records are simply

missing in action, and in turn, offer no support to Defendants.

40.    Uncontroverted, but his cath lab staff did.

41.    Uncontroverted, but assuming that all meals were reported.

### IV.    <u>Responding Argument</u>

A.    **HRMC Violated the AKS:**

*1.    $215,581 in Free Devices Were Illegal Bribes:*

HRMC claims that the $215,581 in free devices were permissible "discounts" under the

AKS's safe harbor affirmative defense.  The parties have separately briefed this issue.  The

Relator will not repeat his complete argument here.  But revisiting the basics of this defense

demonstrates that HRMC's Motion should be denied.  The $215,581 in free devices were clearly

"remuneration" (*i.e.,* something of value in cash or in kind).  HRMC "directly or indirectly,

overtly or covertly" solicited and/or received this remuneration from Medtronic in return for its

"arranging for or recommending" the "purchas[e]" of "goods" or "items."  42 U.S.C. § 1320a-

7b(b)(1)(B).  HRMC's Adkins-Ray testified that these free devices were provided as an

"incentive" to obtain HRMC's bulk orders.  (Doc. 400, pg. 12, ¶ 29)  HRMC's Wilson stated that

these off-the-books free devices were needed to get the deals done.  (*See*, ¶ 7, *supra*)  A

reasonable jury could easily find HRMC solicited/received these devices to induce sales.

The only way to avoid this finding—HRMC must prove that the free devices were "discounts" explicitly defined in the AKS's safe harbor regulations.  HRMC must present uncontroverted evidence that the $215,581 in free devices were "properly disclosed" and "appropriately reflected" in its "costs claimed" or "charges made." 42 U.S.C. § 1320a-7b(b)(3)(A).  These phrases are defined in the Federal Regulations, 42 C.F.R. § 1001.952(h).  However, first, HRMC must meet the definition of an acceptable "discount."  To do so, the government must benefit from the same $0.00 cost on these free devices.  § 1001.952(h)(5)(ii).  HRMC has presented <u>no evidence</u> whatsoever that the government reaped the same $0.00 benefit on any of the $215,581 in free devices.  HRMC presented no data reflecting a $0.00 allocation for any of these free devices.  [Doc. 450, pg. 11, ¶ 10]   It fails in two other ways.  First, the discount definition also required HRMC to "fully disclose" and "accurately reflect" these free devices to Federal health care programs.  *Id.*  Second, even if HRMC meets this definition, it must still prove that it "fully and accurately" reported the $215,581 in discounts in applicable "cost reports."  § 1001.952(h)(1)(ii)(C).  Two uncontroverted facts defeat these two requirements:

- The $215,581 in free devices were never set forth ("disclosed" or "reflected") on any of HRMC's Purchase Orders to Medtronic or any claims made by HRMC to a Federal health care program.  HRMC has failed its burden to provide evidence this occurred.

- The $215,581 in free devices could not have been "fully and accurately" reflected in HRMC's annual Cost Reports.  HRMC never reported the $0 value or price impact value of these free devices into any of its systems whatsoever.  As a result, these devices could be neither fully nor accurately included in HRMC Cost Reports.  (*See*, ¶¶ 30 – 33, *supra*)

Indeed, a reasonably jury could only find that HRMC failed its burden of proof under the AKS's safe harbor affirmative defense.  HRMC did absolutely nothing to "disclose, reflect" or "report"

the $215,581 in free devices.  Its only response: "we didn't have to."  This cannot square with Federal statutes and regulations expressly requiring the exact opposite.

Relator also alleges that the meals Winger provided to HRMC's cath lab staff were illegal remuneration under the AKS—*e.g.,* no educational programs were being provided.  Standing alone, the Medtronic meals may not be sufficient evidence of an AKS violation.  However, coupled with receiving significant amounts of free devices from Medtronic, the free meals further support the Relator's position.

### 2. *A Reasonable Jury Could Find HRMC Knowingly & Willfully Solicited and/or Received Illegal Remuneration:*

If HRMC fails its safe harbor affirmative defense, it alternatively claims that Relator failed to provide sufficient evidence that it "knowingly" and "willfully" solicited/received the free devices in exchange for buying Medtronic devices.  Courts find summary judgment not well suited where intent, motive or state of mind are essential elements of the case.  *See United States ex. rel. Taylor-Vick v. Smith*, 513 F. 3d 228, 231 (5th Cir. 2008) (noting that cases which turn on state of mind are not-well suited for summary judgment).  This applies to the AKS/FCA's scienter requirements.  "[I]issues of knowledge and intent are particularly inappropriate for resolution by summary judgment … the question of AKS scienter is one for the jury." *United States ex rel. Gohil v. Sanofi U.S. Servs. Inc.*, 500 F. Supp. 3d 345, 360 (E.D. Pa. 2020) (citations omitted); *see also United States v. Taneja*, No. 8:21-CV-102-SCB-MRM, 2023 WL 3563602, at *5 (M.D.Fla. Apr. 25, 2023) (In an AKS/FCA matter, court stated, "[o]rdinarily, summary judgment should not be granted in cases where motive, intent, subjective feelings, and reactions are to be searched.  No exception to that general rule applies here.").

HRMC is liable for the actions and conduct—*e.g.,* scienter—of its agents (*e.g.,* Mark Wilson and Carol Adkins-Ray).  *See United States ex rel. Feaster v. Dopps Chiropractic Clinic,*

*LLC*, No. 13-1453-EFM-KGG, 2016 WL 3855560, at *2 (D. Kan. July 15, 2016) ("Tenth Circuit

plaintiffs have stated viable FCA claims against corporate entities by alleging that those entities'

employees undertook FCA-prohibited actions.").  HRMC's scienter is also established via its

written policies and certifications addressing AKS/FCA knowledge.  Under the AKS, the Relator

must establish the following:

> Whoever knowingly and willfully solicits or receives any remuneration (including
> any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash
> or in kind . . . in return for purchasing, leasing, ordering, or arranging for or
> recommending purchasing, leasing, or ordering any good, facility, service, or item
> for which payment may be made in whole or in part under a Federal health care
> program

42 U.S.C. § 1320a-7b(b)(1)(B).  For guidance in defining the term "knowingly," the FCA

provides:

> "[K]nowingly" means — (A) mean that a person, with respect to information—
> (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the
> truth or falsity of the information; or (iii) acts in reckless disregard of the truth or
> falsity of the information; and (B) require no proof of specific intent to defraud;

31 U.S.C. 3729(b)(1); *see also United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 750

(2023) ("[i]n short, either actual knowledge, deliberate ignorance, or recklessness will

suffice.").[14]

Sufficient evidence exists whereby a reasonable jury could find that HRMC knowingly

solicited and/or received $215,581 in free devices as bribes in return for purchasing or

recommending the purchase of Medtronic's devices.

- Relator's testimony demonstrates Wilson's knowledge that requesting and receiving free
  devices off-the-books was illegal.  The Relator explicitly told him this.  The free devices
  have to be fully disclosed because they will be used in procedures paid by the government or
  insurance.  Indeed, all of Wilson's actions confirmed this knowledge: free device deal sheets
  in paper form only, not putting devices on HRMC purchase orders, not entering any data

---

[14] "That three-part test largely tracks the traditional common-law scienter requirement for claims of fraud.
*See* Restatement (Second) of Torts § 526 (1976); Restatement (Third) of Torts: Liability for Economic
Harm § 10 (2018)."  *Id.*

whatsoever into HRMC's system for reporting purposes, unwilling to put his request for free devices in writing, and telling Schroeder that free devices must be "off-the-books" (*See* ¶ 7, *supra*).

- Wilson explicitly told the Relator and other sales reps that the free off-the-book devices were needed—as Medtronic's Winger was providing—in order to make any bulk sales to HRMC. (*See* ¶ 7, *supra*)

Some courts have found that an explicit quid pro quo by itself is sufficient to meet the AKS's "knowingly" *and* "willfully requirement." *See, e.g., United States ex rel. Hockaday v. Athens Orthopedic Clinic, P.A.*, 616 F. Supp. 3d 1339 (M.D. Ga. 2022) (The court denied defendant's summary judgment motion where evidence presented reflected physicians would receive an ownership interest based on their bringing patients to defendant's surgical center—finding AKS scienter met, the court stated, "this type of remuneration fits within the straightforward quid pro quo category that is clearly forbidden by the Anti-Kickback Statute."). Just soliciting and receiving free devices in the manner described above reflects his knowledge of illegality. *See e.g., U.S. v. Starks*, 157 F.3d 833, 838 (11th Cir. 1998) ("the giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal…").

- Numerous other manufacturers' sales reps also ran into Wilson making these illegal free device requests, and they all refused knowing it was illegal. (*See* ¶ 7, *supra*)

- In its Cost Reports, HRMC swore having full knowledge of, and compliance with, the AKS statute. This includes AKS's safe harbor regulations. (*See* AMF, ¶ 3, *supra*) The safe harbor regulations explicitly state free device discounts have to be fully disclosed and accurately stated in Cost Reports. Yet, HRMC reported and recorded nothing.

- Under its policies, HRMC's corporate representative stated that any free devices included in these deals should have been disclosed on HRMC's purchase orders to Medtronic.[15] (*See* Doc. 450, pg. 10, ¶ 5) This never occurred regarding any of the $215,581 in free devices.

---

[15] As discussed throughout the Relator's briefing, the data on these purchase orders are what HRMC relied upon when entering costs, *etc.* into its system. It is this data that is utilized in making claims for reimbursement and ultimately disclosed in Cost Reports.

When questioned about their absence from these forms, Wilson could not provide any answer.  (*See* ¶ 19, *supra*)

- As a Medicare recipient, HRMC was required to comply with safe harbor discount reporting and train its employees on the same.  (*See,* ¶ 15, *supra*).  The AKS safe harbor regulations are crystal clear in one aspect.  Free devices received by "buyers" have to be fully disclosed and accurately stated in claims made and Cost Reports filed.  Wilson and Adkins-Ray agreed that they did nothing whatsoever to enter any information regarding the $215,581 in free devices on HRMC's systems to ensure correct reporting occurred.  (*See* ¶¶ 31- 33, *supra*)

These four bullet points—whereby HRMC's actions and policies claim to have full

knowledge and compliance of the same—are sufficient to meet the AKS's scienter requirement.

*See e.g., United States ex rel. Yarberry v. Sears Holdings Corp.*, No. 09-CV-588-MJR-PMF,

2013 WL 12111729 (S.D. Ill. Nov. 20, 2013) (despite defendant alleging it did not know issuing

coupons to government health care program recipients was illegal, there was sufficient evidence

of the AKS's "knowingly and willfully" requirement where its coupons expressly stated they

were not valid for any government program payment along with defendant's policies citing AKS

knowledge and compliance).

- Wilson only accepted the Medtronic free devices via personal delivery from Medtronic's Winger—*e.g.,* no paper trail (not via HRMC's shipping department, *etc.*).  HRMC produced no records whatsoever reflecting the physical intake of the $215,581 of free devices into their system (*e.g.,* complete device description, serial numbers, lot numbers, cost, *etc.*).  This violated HRMC's policies and procedures which required all incoming devices to be listed on an HRMC purchase order.  [*See* Doc. 450, pg. 10, ¶ 5]

All of the above demonstrate that HRMC had "actual knowledge" that its conduct directly and

overtly violated the AKS.  At the very least, it is evidence of "indirect" or "covert" attempts to

solicit and accept illegal remuneration in violation of the AKS.  § 1320a-7b(b)(1)(B)

Next, "deliberate ignorance" encompasses "a person shut[ting] his eyes to the facts, or

purposely abstained from inquiring into them."  *Schutte.* 598 U.S. at 750 (citation omitted).

Again, the above facts demonstrate HRMC "looking the other way" when it comes to safe harbor

compliance regarding free devices.  The Relator told Wilson his requested off-the-book free

devices were illegal.  Wilson's response and actions acknowledged the same.  HRMC had policies that employees (Wilson) follow the AKS's safe harbor discount reporting requirements and be trained on the same.  Wilson clearly failed to record/report the $215,581 in free devices and testified that he was never trained on the AKS's requirements during his *eight years* of employment.[16]  This easily equates to deliberate ignorance.  *See e.g., United States ex rel. Phalp v. Lincare Holdings, Inc*., 857 F.3d 1148, 1155 (11th Cir. 2017) ("Congress added the 'reckless disregard' provision to the FCA in 1986" in order "to ensure that 'knowingly' captured the 'ostrich' type situation whether an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted.") (citation omitted).

"Reckless disregard" similarly captures defendants who are "conscious of a substantial and unjustifiable risk" of behavior violating the AKS.  *Schutte.* 598 U.S. at  751.  At the very least, these facts certainly demonstrate reckless behavior by HRMC—*e.g.,* failing to train employees on the safe harbor "discount" reporting requirements, Wilson being informed his request was illegal but proceeding all the same, no system in place ensuring free devices are listed on HRMC purchase orders to ensure full and accurate reporting.  *See Yarberry*, 2013 WL 12111729, at *11 ("fail[ing] to have an adequate system in place that allowed them to identify these beneficiaries . . . may be sufficiently reckless to yield False Claims Act liability.").

While only needing to meet one category of the "knowingly" definition, the Relator has met all three.  These facts also support the AKS's "willful" scienter. The Second Circuit defined willful in the AKS context as follows: "a person can 'willfully' violate a criminal statute like the AKS, 'as long as he knows that his conduct is illegal, even if he is not aware of the exact

---

[16] Again, Wilson's conduct begs to differ with this alleged ignorance.

statutory provision that his conduct violates.'" *United States ex rel. Hart v. McKesson Corporation*, 96 F.4th 145, 154 (2nd Cir. 2024) (citation omitted).  Willful is a "voluntary, intentional violation of a known legal duty." *Pfizer, Inc v. United States Dep't of Health & Hum. Servs.*, 42 F.4th 67, 77 (2d Cir. 2023).  While HRMC argues otherwise, establishing "bad faith" or "bad purpose" is not synonymous with "willful." *Id.*  The Relator is not required to provide any such evidence.

"A defendant's 'willfulness' can be (and often is) proven through circumstantial evidence." *Taneja*, 2023 WL 3563602, at *4 (M.D. Fla. Apr. 25, 2023).  Indeed, most cases analyzing the AKS's "knowingly" and "willful" requirements do so under the same factual allegations reflecting the necessary scienter via actions and conduct.  In *Taneja*, the defendant responded that he had a general knowledge of the AKS but did not "knowingly" or willfully violate the AKS.  The court found this general knowledge alone was sufficient to create a jury issue on scienter.  *Id.* at *6.  The bullet points above support HRMC having full knowledge of its AKS reporting/certification obligations.  Summary judgment opinions addressing AKS/FCA cases support the Relator's position.

While not an AKS case, HRMC points to *Lincare, supra*, where the court found insufficient evidence of defendant knowingly presenting a false claim under the FCA.  857 F.3d at 1155.  *Lincare* is presented in the context that HRMC "believed" the $215,581 in free devices were a "permissible discount."  Wilson's actions set forth above—along with HRMC's policies acknowledging AKS safe harbor regulations—strongly contradict this notion.  It is hardly the shortcomings found in *Lincare*.  There, defendant argued that the FCA's "knowingly" scienter cannot be met if the regulations at issue are ambiguous.  *Id.*  While not argued here by HRMC, even this notion was rejected.  "[S]cienter is not determined by the ambiguity of a regulation and

can exist even if a defendant's interpretation is reasonable." *Id.* The AKS's safe harbor discount regulations are not ambiguous.[17] Unlike here, the relator in *Lincare* presented no evidence of scienter—*e.g.,* only two emails (one unrelated to the issue and one postdating the relevant events by several months). *Id.* at 1156. It is helpful to examine cases where courts have found that the "knowingly" and "willfully" requirements were met under Rule 56's standards.

In *United States v. Teva Pharms. USA, Inc.*, 682 F. Supp. 3d 142, 144 (D. Mass. 2023), the government contended that defendant violated the AKS by knowingly and willfully providing illegal remuneration (*e.g.,* paying for patient co-pays) under Medicare, which in turn, caused such claims to be false under the FCA. Defendant argued that the government failed under Rule 56 to establish the requisite scienter of "knowingly" and "willfully." *Id.* at 146. The court rejected this argument by pointing to evidence of defendant's policies informing its employees that such conduct is not permitted. *Id.* at 147. In other words, the defendant knew better. Here, HRMC's corporate representative testified that the $215,581 in free devices should have been reported on its purchase orders. Doing so would ensure that the discounts would be accurately and fully reported in HRMC's system and ultimately its Cost Reports. HRMC's compliance filings stated its employees knew the safe harbor discount regulations and were trained in the same. HRMC's Cost Reports certified this knowledge and compliance. Most telling, the Relator expressly told HRMC's Wilson that what he was doing was illegal, yet Wilson refused to comply (*e.g.,* nothing in writing, let me handle the reporting). Schroeder has presented more evidence of scienter than what was found sufficient in *Teva Pharms*.

In *United States ex rel. Gohil v. Sanofi U.S. Servs. Inc.*, 500 F. Supp. 3d 345 (E.D. Pa. 2020), the defendant moved for summary judgment. In this AKS/FCA matter, the court

---

[17] Again, the regulations require full and accurate disclosure, recording and reporting. HRMC has admitted it did none of these regarding the $215,581 in free devices.

correctly stated that "[i]ssues of knowledge and intent are inappropriate for resolution by summary judgment." *Id.* at 364. Evidence was presented that defendant's employees ignored compliance guidelines, and that company guidelines prohibiting the illegal remuneration at issue demonstrated their knowledge of wrongdoing. *Id.* 365-66. The relator was found to have raised sufficient evidence of scienter under the AKS to support a jury finding in his favor. *Id.* at 366. Here, Schroeder has presented the same plus more.

HRMC argues that even if it violated the AKS's safe harbor reporting requirements, the $215,581 in free devices did not violate the AKS. It cites a 1999 HHS OIG Fact Sheet in support.[18] HRMC claims that simply offering or receiving discounts by itself does not meet the "knowingly and willfully" requirement. The Relator would agree if the story ended there. But again, such discounts have to be *fully documented, disclosed and reported* as required under the AKS's safe harbor statue/regulations. As demonstrated throughout, HRMC was fully aware of these requirements but failed them across the board.

**B.    Sufficient Evidence Exists for a Reasonable Jury to Find HRMC Submitted False Claims Leading to Damages under the FCA:**

HRMC accepting free devices from Medtronic in exchange for purchasing its devices was illegal remuneration under the AKS. As discussed throughout Relator's summary judgment briefing on the AKS safe harbor defenses, these free devices did not fall under the permissible "discount" definition, and regardless, HRMC further failed its disclosure/reporting requirements. In exchange for being paid the $215,581 in ongoing illegal remuneration, HRMC purchased $5.5 million in Medtronic devices tainted by these bribes. It then used these tainted devices in 3,999 procedures whereby the claims reimbursed by Federal health care programs equaled

---

[18] It is unclear what point HRMC is relying upon after reviewing this Fact Sheet.

$42,131,293.  HRMC data allowed Relator's expert Schmor to locate and trace each one of these

3,999 claims submitted and the dollar amounts paid by federal health care programs.

     1.    **_HRMC's Claims & Cost Reports Involving Tainted Devices are False Claims Under the FCA:_**

HRMC erroneously limits the Relator's FCA claim to false certification of AKS

compliance—*i.e.,* "Relator's only claim for legal falsity [is] based on HRMC's certification of

AKS compliance."  (HRMC memo, pg. 17)  As discussed in *Relator's Response in Opposition to*

*Medtronic, Inc. & Covidien, L.P.'s Motion for Partial Summary Judgment* [Doc. 527, pgs. 21-

22], the three ways in which Medtronic violated the FCA apply equally to HRMC.

    *First*, HRMC knowingly and willfully solicited and/or accepted $215,581 in free devices

from Medtronic to secure sales.  HRMC's policy admissions and Cost Report certifications (*i.e.,*

stating that none of its claims involved devices obtained in violation of the AKS) (*see,* AMF, ¶¶

2-3) led to its submission of 3,999 false claims for procedures utilizing tainted devices.

Certification of AKS compliance is a material requirement for reimbursement.  Violation of this

certification leads directly to false claims under the FCA.  *See, e.g., See United States ex rel.*

*Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 379 (1st Cir. 2011) (The court held that

"misrepresent[ing] compliance with the AKS" is a "materially false or fraudulent" claim under

the FCA).  In an AKS/FCA case based on false certification, a court rejected defendant's

summary judgment motion alleging relator must brief each and every false claim stemming from

illegal remuneration.  *United States ex rel. Wallace v. Exactech, Inc.*, No. 2:18-CV-01010-LSC,

2022 WL 2919349 (N.D. Ala. July 25, 2022).  The court denied this motion, finding "[w]hile

Relators must certainly present evidence of reimbursement by CMS at trial, Relators have

produced enough to meet their burden for the purposes of summary judgment."  *Id.* at *9.

"Relators presented forms and data, and the statement of their expert demonstrate that a genuine

issue of material fact exists as to whether a false claim was *indirectly* presented for payment." *Id.* (emphasis added).  Schroeder's expert Schmor has provided a detailed report (and related testimony) of HRMC's data *directly* tracking Medtronic's tainted devices to each of the 3,999 claims made.

    *Second*, under 31 U.S.C. § 1320a-7b(g), HRMC's AKS violation created *per se* FCA liability.  *United States ex rel. Lutz v. United States*, 853 F.3d 131, 135 (4th Cir. 2017).  HRMC's 3,999 false claims resulted from accepting Medtronic's free off-the-book devices.  There is a clear causal connection (or link) between the two.  *Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019).  *Third*, HRMC has FCA liability outside the AKS context.  It provided false records/statements to federal healthcare programs for reimbursement (*e.g.,* claim forms for the 3,999 procedures, data used in PS&R Reports, and data in Cost Reports).  None of these records/statements reflected the free devices provided or informed Federal health care programs that Medtronic devices were tainted by illegal bribes under the AKS.

    **2.**    ***HRMC Knowingly Presented False Claims:***

    The evidence presented above addressing HRMC's knowing and willful violation of the AKS (*see* pgs. 24-25, *supra*) applies equally to its FCA violation.  HRMC's policies and Cost Reports informed Defendant of its obligations under both the AKS and the FCA.  Despite its "knowing and willful" violation of the AKS, HRMC certified AKS/FCA compliance throughout the relevant time period via its claims made for reimbursement and Cost Report data.  These claims and reports are "false claims" under the FCA.  *See Hutcheson, supra.*  Under the AKS, 31 U.S.C. § 1320a-7b(g), HRMC's AKS violation equates to a *per se* violation of the FCA.  A knowing and willful violation of the AKS equates to a knowing violation of the FCA where some causal connection exists between the illegal remuneration and the claims made.  Here,

Relator has traced each device tainted by Medtronic's bribes to 3,999 claims made by HRMC (*i.e.,* the causal connection).

Outside the AKS context, HRMC still knowingly "presented" claims and false records (*e.g.,* claim forms and Cost Reports) to Federal health care programs. 31 U.S.C. § 3729(a)(1)(A), (B). It was fully aware that its claims involving $0.00 cost devices were false because HRMC never disclosed this to Federal health care programs. In turn, annually these false claims led to HRMC's false Cost Reports.

Regarding "knowingly," HRMC argues that "the only evidence is that HRMC believed it was acting lawfully." This is clearly controverted. First, Wilson was informed by Schroeder that his "off-the-books" $215,581 in free devices were illegal. Second, Wilson made verbal requests for a quid pro quo exchange of free off-the-book devices to secure sales. Third, Wilson's actions confirm his knowledge of wrongdoing (*e.g.,* refusal to put request for free devices in writing, never putting these free devices on purchase orders, no paperwork tracing the free devices into HRMC's system and accepting free devices in person instead of regular shipping channels). HRMC's agreement and certification to follow the AKS/FCA in its policies and Cost Report certifications further reflect a knowing violation.

HRMC argues that "there was no concealment" of the free devices, supporting its belief that this scheme was legal. Since the actual paperwork on the bulk deals (*e.g.,* Medtronic's price proposal agreement, HRMC's purchase orders, Medtronic's Invoices and sales data, and Medtronic's Delivery Notes) concealed the free devices, Defendant must be referencing the paper only deal sheets shared in person among the bad actors. Sufficient evidence supports the proposition that HRMC attempted to conceal the free devices. Regardless, some record of illegal conduct does not exonerate HRMC. Bad actors writing down plans to commit fraud does not

equate to an innocent scienter under the FCA.  It reflects nothing more than evidence supporting

an illegal scheme.  Regardless, as presented throughout, Wilson took every step conceivable to

conceal the free devices in the actual paperwork and data.  He hid these free devices from

inclusion in HRMC's systems, claims, and Cost Reports.  Finally, Adkins-Ray admitted that

nearly every quarter (twenty in play) involved bulk deals with free devices from Medtronic.

Defendants could only locate nine of these paper deal sheets.  A jury could easily find that

Defendants knowingly concealed the free device bribes.

### 3. *Relator Has Presented Sufficient Evidence that the $215,581 in Bribes Caused False Claims:*

The causation standards for the Relator's three avenues under the FCA were addressed in

*Relator's Response in Opposition to Medtronic, Inc. & Covidien, L.P.'s Motion for Partial

Summary Judgment* (Doc. 527, 21-32).  HRMC side steps two of these.  It does not address

Relator's "false certification" FCA claim, or the FCA claim outside of the AKS context (*i.e.,*

providing a false claim or false record/statement).[19]  Instead, it focuses solely on the FCA claim

permitted under 42 U.S.C. § 1320a-7b(g) of the AKS.  Like Medtronic, HRMC argues that

Relator must show that "but for" the illegal bribes, there would not have been any false claims.

HRMC states that it would have made the same claims using the same devices even absent the

alleged bribes, ergo, the Relator fails the "but for" standard.  Like Medtronic, it relies upon

*United States ex rel. Martin v. Hathaway*, 63 F.4th 1043 (6th Cir. 2023), *cert. denied*, 144 S. Ct.

224 (2023); and *United States ex rel. Cairns v. D.S. Med. LLC*, 42 F.4th 828 (8th Cir. 2022).[20]

The Relator will not restate what has been argued already regarding the inapplicability of these

two cases.  Given the "text and context" behind the "resulting from" language in § 1320a-7b(g),

---

[19] Since this is the case, and if the Court were to address these avenues in its order on HRMC's Rule 56 Motion, the Relator would refer the Court to the legal reasoning set forth in Doc. 527, pgs. 24-26, 32.

[20] Again, neither of these cases addresses Relator's "false certification" AKS/FCA claim.

only a "causal connection" between the AKS violation and false claims is necessary—not "but

for" causation. *See Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019); *United States ex rel.

Greenfield v. Medco Health Solutions, Inc.*, 880 F.3d 89 (3d Cir. 2018).

 HRMC incorrectly claims that Schroeder seeks strict liability under § 1320a-7b(g)—*i.e.*,

liability "that has no demonstrated causal link, and instead presumes the contested activity

tainted all other device purchases during that time period." (HRMC memo, pg. 18). HRMC is

confusing two issues: (1) what is the causation requirement under § 1320a-7b(g) of the AKS to

permit an FCA claim, and (2) would the illegal bribes from the eleven *known* bulk sales taint all

other sales in between? Regarding the first issue, the Relator has never argued for strict liability.

He argues that a "causal connection" (or link) must exist between the AKS violation and claims

under § 1320a-7b(g) for *per se* FCA liability. [Doc. 527, pg. 26, 31] The statutory language

clearly states some connection between the two must exist (*i.e.,* "a *claim that includes items or*

*services* resulting from a violation of this section constitutes a false or fraudulent claim for

purposes of [the FCA]."). Here, the Relator has tied the tainted Medtronic devices to 3,999

claims made by HRMC. Finally, as *Guilfoile* and *Greenfield* point out, these 3,999 procedures

are FCA false claims regardless of whether HRMC would have performed the same otherwise.

 Regarding the second issue, the Relator has always argued that the fact finder should

determine this issue—ergo, no strict liability. Given the pattern of behavior unique to this case

regarding Winger and Wilson's ongoing scheme, the jury should decide whether all of their sales

are tainted by the numerous bribes paid between 2014 and 2019. *See e.g., United States v.*

*Southwest Orthopaedic Specialists*, PLLC, 2020 WL 5984814, at *10 (W.D.Okla. Oct. 8, 2020)

(holding that it is the "defendants' alleged pattern of conduct that is the basis of the [FCA]

claims, not anything particular to any one claim.").

Distancing itself from Wilson's conduct, HRMC claims that he was simply a "facilitator and negotiator" acting on physicians' directions.  In turn, the bribes paid to HRMC via Wilson played no role in the types and quantities of devices purchased.  HRMC is free to make this argument at trial—one that is certainly contested, *see* ¶ 7, *supra*.  Sufficient evidence has been presented for a reasonable jury to find that Wilson decided what devices were purchased and in what quantity.  But even accepting HRMC's argument, it does not exonerate Wilson's conduct and HRMC's AKS/FCA liability.  While physicians may have directed Wilson to obtain Medtronic devices "a" and "b", his decision to solicit/accept illegal bribes to accomplish this is a clear AKS violation.

Finally, under the facts in this case, the Relator could still meet a "but-for" causation standard.  Unlike *Cairns* and *Martin*, the recipient of the illegal bribes (HRMC) was the same entity that ultimately made false claims involving the same.  Indeed, the reason Congress passed § 1320a-7b(g) was to overrule a finding in *United States ex rel. Thomas v. Bailey*, 2008 WL 4853630 (E.D. Ark. Nov. 6, 2008). 155 Cong. Rec. S10,853 (daily ed. Oct. 28, 2009) (Sen. Kaufman).  *Thomas* concluded that a hospital's reimbursement claims for surgeries were not false, even though a manufacturer had violated the AKS by paying a surgeon to use its products. The court reasoned that because the hospital had not itself violated the AKS or been aware of the violation, it had no FCA liability. *Id.* at *12-13.  The Relator would even meet *Thomas*'s holding.  The HRMC hospital—that submitted the claims—was fully aware of the bribes.  It solicited/accepted them.  A jury could easily find that "but for" Medtronic paying these bribes, Wilson would not have purchased their devices.

### 4.      *The Government Incurred Damages:*

HRMC argues that the government incurred no damages because there is no evidence it would have reimbursed any lessor amounts on the 3,999 claims—*i.e.,* the government got what it bargained for regardless of the alleged bribes.  Therefore, there are no damages under Schroeder's FCA claim.  HRMC disregards case law stating the exact opposite.  "'[W]hen a defendant is paid by [Medicare or Medicaid] for services tainted by a kickback,'" the government "'does not get what it bargained for.'" *U.S. ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 314 (3rd 2011) (citation omitted).  FCA "[c]ompliance . . . require[s] a participant in a federal health care program to refrain from offering or entering into payment arrangements which violate the AKS, while making claims for payment to the Government under that program." *Id.*  "We do not think this is an unreasonable requirement to impose on federal health care contractors, for as Justice Holmes once wrote: 'Men must turn square corners when they deal with the Government.'" *Id.*  "An AKS violation that results in a federal health care payment is a *per se* false claim under the FCA," *Lutz*, 853 F.3d at 135, since "[t]he Government does not get what it bargained for when a defendant is paid ... for services tainted by a kickback." *Greenfield*, 880 F.3d at 97.

Furthermore, the general rule in the Tenth Circuit is "claims under the FCA need only show the specifics of a *fraudulent scheme* and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1172 (10th Cir. 2010) (emphasis added).  The fraudulent scheme at play here is HRMC soliciting/accepting illegal bribes in acquiring Medtronic devices.  *See e.g., United States v. Bewley*, 2020 WL 12814226, at *2 (N.D.Okla. July

23, 2020) (the fraudulent scheme is that defendant's claims "were false or fraudulent because they were tainted by kickbacks.").

The Relator Schroeder is not arguing—as HRMC asserts—that the FCA should be transformed into a "strict liability" statute. Indeed, framing the issue in this manner was identified and rejected in *Wilkins*. 659 F.3d at 314. "We have not overlooked appellees' argument that our holding will transform the FCA into a strict liability statute in which 'every participant in the Medicare program impliedly certifies each time it submits a claim for payment to the program that the claim does not arise from some payment arrangement that—however attenuated, immaterial, and unknowing—could be characterized as a violation of the AKS.'" *Id.* However, *Wilkins* points out that "strict liability" does not exist under AKS/FCA claims. Why? Because a defendant can only be liable for "knowing" illegal conduct under the AKS. *Id.* This scienter requirement negates any argument that strict liability for AKS/FCA violations exists. As demonstrated above, the Relator Schroeder has set forth sufficient evidence establishing HRMC's knowing and willful AKS violation.

Also, the damages equal the amount reimbursed by the government for HRMC's 3,999 false claims (*i.e.,* $42,131,293). It does not matter whether all or part of these claims would have been reimbursed absent the bribes. "[T]he amount of damages which the Government sustains because of" the false claim, 31 U.S.C. § 3729(a)(1)(G), is the full amount of the claim. *See, e.g., U.S. v. Rogan*, 517 F.3d 449, 453 (7th 2008) ("The government offers a subsidy . . . with conditions. When those conditions are not satisfied, nothing is due. Thus, the entire amount . . . must be paid back."); *see also United States v. Teva Pharms USA, Inc.* No. 20-CV-11548-NMG, (D. Mass. Jun. 7, 2022) ("As a matter of law, however, damages for violations of the FCA predicated on violations of the AKS are measured as the entirety of the government's payments

for claims tainted by those illegal kickbacks."), *United States ex rel. Freedman v. Suarez-Hoyos*, No. 8:04-cv-933-T-24 EAJ, at *8 (M.D. Fla. Sep. 21, 2012) ("[T]he amount of the Government's damages resulting from the payment of false claims tainted by a kickback arrangement equals the full amount that Medicare paid on such claims.").

Again, the Relator maintains that HRMC soliciting/accepting $215,581 in bribes not only tainted all the devices involved in the eleven *known* bulk sales, but all of Medtronic's other sales to HRMC in between.  Each of the eleven known bribes do not have to be directly tied to the "in between" sales between Medtronic and HRMC.  *See e.g., United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011) ("if part of the payment compensated past referrals, that portion of the payment violates' [the statute]").  This flows directly from the statutory text: "The AKS's plain language thus makes it unlawful for a defendant to pay a kickback with the intent to induce a [sale], whether or not a particular [sale] results." *U.S. ex rel. Parikh v. Citizens Medical Center*, 977 F. Supp.2d 654, 665 (S.D.Tex. 2013).  The inducement language—coupled with the AKS not requiring a sale resulting from soliciting/offering bribes—demonstrates that this illegal conduct can be part of an ongoing relationship between the offeror and recipient.  Winger's scheming with Wilson—born and maintained from these significant bribes over several years— are tied to all sales made in this relationship.  A reasonable jury could find this causal connection between Winger's bribes on bulk sales and all other sales between.

## C.   Relator Has Presented Sufficient Evidence of a Conspiracy:

The Relator has shown: (1) the defendants agreed to defraud the United States by getting "a false or fraudulent claim paid by the United States;' and (2) one or more of the conspirators "performed an act to effect the object of the conspiracy."  *U.S. ex rel. Conner v. Salina Reg'l*

*Health Ctr., Inc.,* 459 F. Supp. 2d 1081, 1091 (D. Kan. 2006), *vacated on other grounds,* 543

F.3d 1211 (10th Cir. 2008).   HRMC and Medtronic agreed to defraud the U.S.:

- HRMC's Wilson provides all the evidence necessary for a jury to find conspiracy with Medtronic's Davisson/Winger.  Wilson told the Relator and numerous other representatives that Winger was willing to give him free devices off the books to secure sales.  He stated that if they wanted to compete, they would have to do the same.

- Medtronic's Davisson/Winger willing to provide off-the-books free devices.

- Wilson receiving the devices directly from Winger and not through shipping.  HRMC cannot provide any paperwork reflecting the intake of any of Winger's free devices (*e.g.,* shipping order; purchase order; records of serial numbers, lot numbers, *etc.*).

- Wilson not putting free devices on any of HRMC's paperwork or entering them into any system utilized to make claims, record costs, or generate Cost Reports.

- Winger/Medtronic providing no proper paperwork identifying the transfer of the significant amount of $215,581 in free devices but having correct paperwork for handful of other free devices provided in much less quantity (Medtronic corporate representative stated all free devices should be listed at $0.00 on invoices).

From this, a reasonable jury could find Defendants agreeing to defraud the government by

making tainted false claims.  This same conduct also supports the second conspiracy element.

Medtronic provided, and HRMC accepted, illegal off-the-books free devices.  These acts

effectuated their objectives (*e.g.,* HRMC received and used free devices it billed/reported to the

government as though they were not; in return, Medtronic secured significant sales against

competitors who were not willing to break the law).

WHEREFORE, the Relator respectfully requests that this Court deny Defendant

HRMC's Motion for Summary Judgment in its entirety.

Respectfully submitted,

Carrie Mulholland Brous KS #18157
Cristina Olson D. Kan. #79005
**Brous Law LLC**
3965 West 83rd Street, Ste. #115
Prairie Village, KS  66208
(913) 209-8596
cbrous@brouslaw.com



*/s/ Brendan J. Donelon*
Brendan J. Donelon, KS #17420
4600 Madison, Suite 810
Kansas City, Missouri 64112
Tel:    (816) 221-7100
Fax:    (816) 709-1044
brendan@donelonpc.com

Daniel W. Craig
6642 Clayton Rd., #320
St. Louis, Missouri 63117
Tel:    (314) 297-8385
Fax:    (816) 709-1044
dan@donelonpc.com

Attorneys for Relator

<u>Certificate of Service</u>

I hereby certify that on <u>September 5, 2024</u> the above and foregoing was sent pursuant to this Court's CM/ECF procedures to the attorneys of record in this matter.

*/s/ Brendan J. Donelon*