IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> *ex rel.* THOMAS SCHROEDER <br><br> Relator, <br><br><br><br> v. <br><br> MEDTRONIC, INC.; COVIDIEN, L.P.; <br> HUTCHINSON REGIONAL MEDICAL <br> CENTER, and WICHITA <br> RADIOLOGICAL GROUP, P.A. <br><br> Defendants. | Case No. 2:17-02060-DCC-BGS |

## RELATOR'S MOTION FOR RECONSIDERATION

COMES NOW the United States of America ("USA"), *ex rel.* Thomas Schroeder Relator, and pursuant to Local Rule 7.3(b) hereby moves this Court to reconsider its September 26, 2024, Memorandum and Order (Doc. 565).

### I.   Introduction

The briefs' uncontroverted facts establish that a hospital Cost Report summarizes costs *and charges.* The Order imparts a substantial misunderstanding that a Cost Report contains only costs, not the charges. Relator's AUMF Nos. 8 and 9 (Doc. 450 at 10-11) explain that charges go in the Cost Report. These facts were uncontroverted. The defense experts and briefs made no arguments contrary to this premise.

The misunderstanding affected the rulings throughout the Order. In addition to the cost report error summarized above, the same misunderstanding directly impacts the Court's interpretations of whether Medtronic invoices or "coupons" (*i.e.,* Winger's "deal sheets")[1]

---

[1] Medtronic refers to these sheets as "bundled statements" in its briefing, but the witnesses all referred to them as "deal sheets" in the testimony.

1

promoted accurate reporting of the alleged discounts. Correcting this mistake, a reasonable jury question exists as to whether Defendants have met their burdens to prove both: (1) that the no-charge devices meet the Safe Harbor definition of "discount" in the first place, and (2) that Defendants accurately disclosed a non-cost discount.

This is a case of first impression regarding seller and buyer compliance under the AKS's safe harbor statute/regulations pertaining to no-charge device discounts provided to incentivize purchases. No-charge devices did not change the purchase price paid by HRMC to Medtronic. Indeed, that was the point. HRMC received more devices (of various types) in exchange for the same price it was paying Medtronic before the no-charge devices were added to the deal. Because of this fundamental truism, the *charges* on the "claims submission" portion of the cost report is critical in compliance analysis. Treatment of this portion of cost reporting is where the Court erred. The charges on the "claims submission" portion is not a "red herring"[2] but instead the exact opposite.

## II.   Standard for Reconsideration

"A motion to reconsider must be based on: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error or prevent manifest injustice." D. Kan. Rule 7.3(b). As this Court stated, "[t]hus, a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law." *Walker v. Corizon Health, Inc.*, 2022 WL 1521930, at *2 (D.Kan. May 13, 2022) (Crabtree) (citing *Servants of the Paraclete*, 204 F.3d at 1012 (citation omitted)). A district court has discretion when deciding whether to grant or deny a motion to reconsider. *Hancock v. City of*

---

[2] *See* Doc 565 at 60 ("Relator's focus on charges is – in HRMC's language – a red herring.") However, Defendant HRMC's characterization of charges as a "red herring" was not based on the presence or absence of charges-on-claims-submissions in the Cost Report. The full stop characterization in the Order, before any analysis of whether charges were accurately reported, is clear error.

*Okla. City*, 857 F.2d 1394, 1395 (10th Cir. 1988).  Under the third basis, the Relator is asking this Court to exercise such discretion regarding its Memorandum and Order (Doc. 565) granting Defendants Hutchinson Regional Medical Center ("HRMC") and Medtronic, Inc./Covidien, L.P.'s (collectively "Medtronic") respective Motions for Partial Summary Judgment pertaining to their affirmative defense based on the Anti-Kickback Statute's ("AKS") discount safe harbor.

### III.   Argument

Motions to Reconsider are rarely granted.[3]  Most simply re-argue their case in response to the court's holding—a non-permissible basis.  Here, there are grounds warranting reconsideration.  The current Order permits providers to (i) accept no-charge devices (in unlimited quantities), (ii) report only the invoiced costs for the ones provided in the underlying order (excluding the no-charge devices and their respective discount), and (iii) then present the no-charge devices as though they were "charged" on claims to federal healthcare programs.  As is, this Order will have a significant impact on the medical device industry and the federal government's requirement for full and accurate disclosure in cost reports (including costs and charges for claims made for reimbursement).  By extension, this directly impacts the government's—and the taxpayers'—ability to equally share in the benefit of savings that no-charge device discounts can provide.  In addition, the Court erred regarding its "coupon" determination regarding Winger's "deal sheets" and the numerous other discounts provided to HRMC from 2015 through 2020.  These reasons warrant a second look.

**A.    Excluded, uncontroverted facts presented by Relator on Cost Reports conflict with the Court's facts.**

As the parties and the Court have demonstrated in voluminous briefs and orders, the safe

---

[3] In over 27 years of federal practice, Relator's counsel can recall only filing one such motion.  The decision to file was not taken lightly.

3

harbor affirmative defense is complex and layered.  But when the charges on the "claims submission" portion of the Cost Reports is properly included in the Cost Report analysis—as it must under the controlling statutes, regulations, rules and *Shaw, infra*—the analysis rights itself and the existing conflicting outcome disappears.

The content of a Cost Report is the foundation of many rulings in the Order.  Some inputs into a Cost Report are described on pages 8-9 (Doc. 565) in factual findings under the heading "HRMC's Report of Expenses."  This describes the cost centers and general ledger at HRMC.  However, the Order omitted a *material* uncontroverted fact on this topic—*charges on a hospital's claims also* go into the hospital's Cost Report.  Relator's AUMF No. 9 in its response/reply to HRMC is:

> 9. The charges on a hospital's claims are used in yearly Provider Statistical & Reimbursement Reports, which in turn are used in cost reports. [Ex. 31, Schmor Report, pp. 20, 32-33] [https://www.cms.gov/data-research/statistics-trends-anwed-reports/provider-statistical-reimbursement-report]  Russo's report also makes this point. [HRMC brief, Exh. L, Russo declaration, p. 20 – Doc. 435-12, p. 23 of 51]

(Doc. 450 at 11)



The fact that "*charges on claims*" go into HRMC's Cost Reports is supported by Schmor's report for Relator, Russo's report for HRMC, and the CMS website.  This material fact was —as it had to be—labeled "uncontroverted" by HRMC.  (Doc. 463 at 8)  Another material fact—also labeled as "uncontroverted" by

HRMC—explains how charges appear on claims for reimbursement, including claims with a fixed reimbursement rate. [Doc. 450 at 10-11 (AUMF No. 8)] (Doc. 463 at 8)

To explain how charges on claims submissions enter into Cost Reporting, Schmor provided the above illustration on page 32 of her Expert Report (Schmor report at 32 – Doc. 451 at 35 of 109), which is part of the factual support for uncontroverted AUMF No. 9. Her chart demonstrates a no-charge device should be reported (and passed on to) the federal healthcare plans by *claims submission* data (in blue, on the lefthand side). Relator argued this fact throughout the response/reply to HRMC. "As explained earlier, record-keeping as to costs (accounting ledger) and charges (claims data) will flow through to a hospital's cost report." (Doc. 450 at 41) Defendants incorrectly argued that costs are the only input for Safe Harbor compliance. *They did not argue that costs are the only input for Cost Reports*.

As explained later, Schmor testified that under the no-charge scenario in this case, HRMC's charges are erroneously inflated within claims data (gathered in the PS&R Reports). This is why no charge devices *must be reported* in some form—as the regulations clearly require. A reasonable jury could conclude that HRMC filed inaccurate cost reports because it failed to make any record whatsoever of these no-charge devices. HRMC completely failed to specify which claims contained no charge devices (something HRMC's expert did not address at all.). A conflict of expert testimony exists, a question that should be resolved by the jury. *See, e.g., Cook v. Rockwell Intern. Corp.*, 580 F.Supp.2d 1071, 1085 (D.Colo. 2006) ("it is up to the jury to decide whether the expert used the best or most reliable methodology, what weight to accord to his testimony and which of competing experts' opinions should be credited."). In turn, HRMC and Medtronic would fail to meet their burden in proving that these devices meet the definition of "discount" under safe harbor. The no charge devices were not fully disclosed to the Federal

healthcare programs and accurately reflected to the reimbursement methodology. 42 C.F.R. § 1001.952(h)(5)(ii).  As such, all these no charge devices would be remuneration not subject to the AKS's safe harbor.

**B.      Legal authorities acknowledge that both costs and 'charges on claims submissions go into accurate safe harbor cost reporting compliance.**

The language in the OIG comments and the *Shaw* decision dovetail Schmor's chart and show the significance of the charges on the "claims submissions" part of a Cost Report.  As the Order correctly acknowledges, the OIG states that "discounts … may benefit the programs through lower costs *or charges* achieved through volume purchasing and other economies of scale." (emphasis added) (Doc. 565 at 29, citing 64 Fed. Reg. 63518, 63530)  In other words, when the costs (*i.e.*, the purchase price on the Medtronic invoices and paid by HRMC) do not change because of no-charge "discount" provided on these bulk deals, then the charges on the "claims submission" must show which devices were "no-charge.".[4]

The same OIG rule quoted in the Order states: "[P]arties who were uncertain about how or where to report on a particular *form* the fact that the price was due to a discount need not be concerned with reporting that fact, as long as the actual purchase price accurately reflects the discount."[5] (Doc. 565 at 42, 60, citing 64 Fed. Reg. 63518, 63527) (emphasis added).  However, the lines preceding that sentence explain that the "form" refers to a *claim or request for payment*, and that notations on such "form" are not necessary if "*the value of the discount [is] accurately*

---

[4] For a practical explanation, Relator directs the Court to his footnote on Chapter 4 of the Medicare Claims Processing Manual, which describes "No Cost Device Coding" and how a hospital may describe no-cost devices on claim forms. (Doc. 450 at 37, fn. 9)  Defendant HRMC distinguished that section by saying it applied to "[w]hen a hospital receives a one-off device unconnected to a bulk purchase of devices."  (Doc. 463 at 22)  Relator notes that HRMC does not deny that charges on claims be adjusted. A reasonable jury could find that HRMC had to adjust its charges on claims to fully and accurately report the no-charge devices at issue here.

[5] As discussed under section D, *infra*, Relator points out the Court's conclusion on this fact is in error.

6

*reflected in the actual purchase price.*" *Id.* (emphasis added). Ergo, disclosing the discount on the claim for payment is necessary when the value of the discount (*e.g.,* the no-charge device "discount") is not reflected on the actual purchase price (*i.e.,* the Medtronic invoiced price and paid price by HRMC). Here, the "value of the [no-charge device] discount" was never reflected on Medtronic's invoiced purchase price for any of these bulk sales. Since that is the case, this discounted value must be reflected on the "claim or request for payment" (*i.e.,* Schmor's left side of chart)—something all the parties agree never occurred for these no-charge devices. In furtherance, the OIG guidance explains how a claim for reimbursement does not need to show a discount *unless* there is a mis-match between the actual purchase price and the value of a discount—*e.g.,* our exact scenario (As HRMC <u>admitted</u> in its SUMF No. 28: "The costs HRMC reported on its cost reports relating to the bundle deals and bulk deals were the amounts paid to Medtronic on each purchase, not the value of the devices received."). (Doc. 435 at 10))

The Order also quotes from *U.S. v. Shaw*, 106 F. Supp. 2d 103 (D. Mass. 2000), which explains the purpose of the Anti-Kickback Statute discount exception. "The statute aims at reduction of the price of the goods or services *through disclosure*, so a lower price can be reflected in lower *costs claimed from or charged* to a federal health care program." *Id.* at 119 (emphasis added). Like the OIG statement, *Shaw* recognizes that a lower price be reflected in lower charges to the federal healthcare program (*i.e.,* when that lower cost from the discount is not set for in the provider's costs data). The charges on "claims submissions," which enter the Cost Reports through the PS&R Reports, are therefore crucial in the analysis of disclosure and safe harbor given the facts in this case.

The reporting set forth above only makes sense. The statutory/regulatory safe harbor requirements for buyers like HRMC clearly mandate some form of reporting the value of said

7

no-charge devices. Here, as described by Relator's fact statements, HRMC admits that it made no recording/reporting whatsoever under the methods presented on the lefthand side of Schmor's chart addressing cost reports. (Doc. 400 at 14, Relator's UMF Nos. 37-39, Doc. 450 at 8-10, Relator's AUMF No. 4) The Court is correct that the regulations do not spell out what form such reporting should take—but never-the-less *some form or reporting must be taken*. While the regulations do not spell this out, the OIG rules and guidance adopted by the Court in its Order do. Since the value impact of all these no-charge devices (*e.g.,* over $200,000) were never reflected in the bulk deal pricing, they had to be disclosed in HRMC's "charges on claims submissions." HRMC admits, and Schmor verified, that this never occurred. This failure not only defeats meeting the "discount" definition (meaning both Defendants' safe harbor defense fails), but it also leads to HRMC failing its safe harbor requirement to disclose such deals in its cost reports.

C.  **The Court's holdings stemming from its Cost Report errors were significant and material to its safe harbor rulings.**

The Court misconstrues the existence of the "charges on claims submissions" used in the Cost Reports when it erroneously concludes, "[t]he regulatory safe harbor buyer standards say nothing about charges. Instead, they require solely that the 'buyer must fully and accurately report the discount in the applicable cost report[.]'"[6] [7] Order at 60 (citing 42 CF.R. § 1001.952(h)(1)(ii)(c)) Relator agrees that the buyer must fully and accurately report the discount in the applicable cost report—which, as HRMC correctly admits, *also consists of charges on*

---

[6] "Cost Reports" obviously contain the word "cost" in the title. But, as demonstrated by Relator throughout, such reports do not end with "costs" only. Indeed, in the circumstances presented herein, the charges on claims made aggregated in PS&R Reports go into Cost Reports.

[7] The regulatory safe harbor discount definition is a prerequisite for the analysis of the buyer standards. This discount definition is not tethered to the cost report. Yet, it specifically requires that "the reduced charge is fully disclosed." 42 C.F.R. § 1001.952(h)(5)(ii)

8

*claims submissions*. So, "cost reports" do address charges via the claims submission aspect. When the value of the no-charge device discount is not reflected on the invoice documents utilized to report costs by buyers, buyers like HRMC must include them on charges of "claims submissions" to meet the Cost Report accuracy requirements. So, unlike the Court's conclusion, given the uncontroverted facts in this case, HRMC had to account for these no-charge device "discounts" in its charges on claims data.

The misapprehension that charges on "claims submissions" in Cost Reports is a "red herring" is a clear error that affected rulings throughout the Order as reflected below:

- <u>In the context of finding that there was no reasonable jury question as to whether Defendants have met their burden to prove that the no-charge devices qualify as a "discount" under safe harbor for both Defendants' arguments</u>: "So, as long as the applicable cost report includes the actual purchase price, HRMC fully has disclosed the discount and accurately reflected it." (Doc. 565 at 47)
- <u>In the context of finding that there was no reasonable jury question as to whether Medtronic met its burden to prove that its documentation met regulatory safe harbor</u>: "But the total purchase price—all that HRMC had to report—didn't change between the invoice (that included the notice) and the bundle table sheet." (Doc. 565 at 53)
- <u>In the context of finding that no reasonable jury could find that HRMC failed to report its costs and therefore has met its burden to prove it qualifies under the statutory safe harbor exception</u>: "It stands to reason, then, that the 'or charges made' language in the statutory discount exception doesn't apply to buyers. At bottom, the statute, regulations, and HHS OIG guidance all indicate that when a cost-reporting entity accurately reflects its costs in its cost report, that's enough." (Doc. 565 at 60)

**D.     The Court erred in finding that the reimbursement methodology insulates Medicare from overpaying when no-charge devices go unreported.**

In the context of analyzing the reimbursement methodology element of the safe harbor regulations, the Court admittedly made a "highly simplified" description of Medicare reimbursement structures. (Doc. 565 at 40) It concluded that all of the Medtronic devices at issue were reimbursed with "fixed fee reimbursement." In other words, HRMC was being reimbursed the same amount for procedures involving these devices whether the devices cost $0 or full price. However, HRMC actually argued that the reimbursement methodology is the

9

"Prospective Payment System" (PPS) which has exceptions to the fixed fee rates. (Doc. 435 at 29-30). Medtronic made the same point about PPS. (Doc. 430 at 48) The Court correctly noted that "Relator doesn't address the reimbursement methodology requirement at all." (Doc. 565 at 41) There was no need to challenge HRMC's description of the Prospective Payment System *as a reimbursement methodology* when briefing on the discount definition within the safe harbor defense. Reimbursement amounts really go to damages and motivation for the fraudulent scheme. (Schmor explained how certain aspects of the PPS reimbursement methodology were a likely financial incentive for these kickbacks). (Schmor rebuttal report at 42 – Doc. 451 at 45 of 109)) Venturing into Russo's opinions on damages, *etc.*[8] is not a factor regarding the safe harbor defense. The Court thought otherwise as this "fixed rate" reimbursement analysis clearly played a role in addressing whether HRMC properly disclosed these no-charge devices in the cost portion of the Cost Report (*i.e.,* the right side of Schmor's chart). Russo argued, as the Court recited, "the use of the no-charge devices still wouldn't have affected the Medicare payment HRMC received."[9] Later, the Court brings these two notions together: ""[I]f the items are reimbursed under the same methodology, such line-item pricing isn't crucial." (Doc. 565 at 45).

Setting aside Russo's conclusion goes to damages, he is also incorrect on his fixed rate proposition in this scenario. Between 2015-2018, Medtronic's In.Pact DCBs—the most common device in these bulk deals—had new technology add-on payment (NTAP) and temporary passthrough payment (TPT) status. (*See* Schmor's damages rebuttal, Doc. 541-1 at 15 of 29, fn. 48-49) Schmor's report explains with regard to outpatient claims:

---

[8] The Court went beyond HRMC's brief and into Russo's report to explain the concept of New Technology Add-On Payment. (Doc. 565 at 40, fn. 13)

[9] The Order's footnote 13 is relevant to this Motion for another reason. The Court describes the cost-to-charge ratio that comes from the Cost Report. This is one of the reasons why accurate "charges on claims" must be in the Cost Report as the denominator of the CCR directly impacts future reimbursements. (*See* description of CCRs in Schmor's reports, Doc. 451 at 36-38, 101 of 109)

10

> This is because between April 2015 and January 1, 2018, HCPCS C2623 [drug coated balloons such as In.Pact] was designated as a device for which additional pass-through payment was made. As will be further described below, additional payment was made by the government above and beyond the payment for the procedure for DCB when HRMC charges exceeded the pass-through charge amount. *By inflating these charges, HRMC garnered additional payment specifically for the Medtronic DCB which were purchased as part of a bribe.*

(Schmor report at 42, Doc. 451 at 45 of 109) (emphasis added)  Therefore, to the extent the Court relied upon "fixed rate" in reaching any conclusion, this is incorrect.

Also, it was contradictory for the Court to conclude that Medtronic met its safe harbor disclosure requirements via the Winger "coupons" because they disclosed the lower prices created by the no-charge devices "discount" (*e.g.,* the $47,936.06, Doc. 565 at 7) while at the same time finding HRMC met its reporting requirement when reporting the higher $69,797 (*Id.*) from said coupon in its cost reporting.  Disregarding Relator's opinion on what constitutes all these deals' "actual purchase price" (*e.g.,* the $47,936.06—*See* Schmor rebuttal report at 20-21 – Doc. 451 at 80-81 of 109), these two findings cannot simultaneously exist.  One cannot reward Medtronic for reporting the true no-charge device "discount" on its "coupons" while rewarding HRMC for disregarding the same on its costs.  The Court erroneously relies upon Medtronic's expert Maida's flawed example regarding a $105,000 invoice.[10]  (Doc. 565 at 47)  Indeed, when HRMC's expert Russo was confronted with how it should report no-charge devices in its books on these bulk deals, he had no opinion and simply stated they should speak to an attorney.  (Doc. 450 at 14, Relator's AUMF No. 22)

Again, the only logic that might square this finding is the "no harm no foul" approach—

---

[10] Maida's example does not attempt to comport with the scenario at hand.  It excludes the fact that this "invoice"—as is the case here—does not include the no-charge discount whatsoever.  Looking at actual out of pocket dollars and nothing more—*e.g.,* price reduction due to no-charge devices—disregards the entire lefthand side of Schmor's chart.  It also seems to fall back on the incorrect "no harm no foul" reasoning.

11

HRMC was being reimbursed the same amount for procedures using these devices. But as set forth above, the methodology is PPS which sometimes departs from fixed fee reimbursement (as is the case here in DCBs). Relator's position folds into the mandate that the regulations clearly require HRMC to make *some form of disclosure* of all its discounts including no-charge ones. Yet, the $200,000+ no-charge devices addressed herein are admittedly reported nowhere. While the Court comments that the regulations do not specify how to report these discounts, some form is suggested by advisory opinions[11] and the Medicare Claims Processing Manual.[12] Having no documentation of this discount on HRMC's behalf just cannot square with this regulatory mandate as the Relator establishes throughout.

E.  **The Court misapprehended the facts and Relator's position in finding that Winger's "deal sheets" met the "coupon" requirement.**

Again, Defendants bear the burden of proof on all issues raised in their Motions for Summary Judgment. There were two Medtronic corporate documents accompanying all sales with HRMC: (i) the Medtronic price proposal agreements (*see, e.g.,* Doc. 400 at 38, ¶ 108) and (ii) the Medtronic document literally entitled Invoice[13] (*see, e.g.,* Doc. 400 at 39, ¶ 109). HRMC (not Medtronic who is required by the AKS's safe harbor regulations to maintain such documents) produced Winger's deal sheets for only nine of twenty plus bulks sales involving no-

---

[11] HHS OIG Guidance certainly points out numerous ways this can be accomplished as well as the HHS OIG advisory opinions. The Court disregarded these opinions and concluded they are non-controlling and not providing a mandated manner to report free device discounts. Setting aside the prior conclusion, the latter finding tells only part of the story. These opinions clearly state the law that a buyer must report said discounts in some fashion and then stated the proposed method was acceptable.

[12] "No Cost Device Coding" in the MCPM. (Doc. 450 at 37, fn. 9)

[13] The Relator terms "Invoices" as the paper documents with this title created by Medtronic with their corporate labeling, *etc*. (Doc. 400 at 39, ¶ 109). For whatever reason, Medtronic could not locate these paper invoices for all nine deals discussed. However, Medtronic's Excel sales data reflects this invoice data. The Court is correct that this data is just that, however, it failed to acknowledge that HRMC's corporate representative stated the quantity and price discounts on this Excel data is what would be directly transferred to Medtronic's paper "Invoices" to HRMC (Doc. 446 at 15, ¶ 24). So, the data is telling, especially when it again excludes all the no-charge devices (*i.e.,* they never appeared on any of the paper Invoices at issue).

charge devices between 2015 and 2020. One HRMC designated representative admitted that she only started keeping some of these deal sheets because it would be a good idea for ensuring Winger provided what he promised (Doc. 400 at 14-15, ¶¶ 40-41)—a purpose outside of the Court's conclusion for their existence as something for a jury's consideration. The Court determined that Medtronic met its burden—a reasonable jury could *only find* that these nine deal sheets were "coupons" under 42 C.F.R. § 1001.952(h)(2)(ii).

Throughout this summary judgment briefing, the Relator has alleged facts demonstrating that Winger and Wilson conducted under the table deals: off-the-books no-charge devices were provided to induce HRMC to make bulk device purchases. This evidence was not taken into account by the Court when examining the reasonable jury standard. This includes:

- HRMC's Wilson's testimony that he did not want any of the no-charge devices in these deals disclosed in any of the paperwork, and this is what Winger had been doing (Doc. 446 at 22-26, ¶ 22);

- Winger's admission that he kept two separate sets of books (the Medtronic corporate ones and his personal ones from his laptop) for these deals (Doc. 400 at 17, ¶¶ 53-54);

- Winger's admission that he did not share his deal sheets with people at Medtronic who created the actual price proposal agreements on invoices for deals (Doc. 400 at 17, ¶ 52);

- Medtronic's corporate representative testifying that any no-charge devices should be listed at $0 on invoices to comply with the law (Doc. 446 at 13, ¶ 15);

- Medtronic has never been able to produce "trunk stock" records to support its story that the devices came from trunk stock. (Doc. 446 at 31-33);

- The only time Medtronic did not list $0 on its invoices for no-charge devices were these under the table bulk deals with HRMC (Doc. 446 at 16-19, ¶¶ 31-33);

- Winger and Wilson taking all steps to hide physical delivery and documentation of no-charge devices being provided:

    - Outside of the deals at issue, HRMC required all incoming devices whether free or not to be listed on its Purchase Orders (Doc. 450, at 10, AUMF No. 5; Doc. 400 at 20, ¶ 65)
    - Medtronic corporate representative stating all devices delivered to customer including no-charge ones must be listed on formal delivery documents (Doc. 446 at 12, ¶¶ 11-12), and

13

        federal regulations required detailed data for each device delivered to customer for tracking purposes (Doc. 446 at 19-20, ¶¶ 35-39).  This never occurred.

- Testimony from PAD sales representatives Todd Brown (working at PAD device manufacturer CSI), Dan Clinkscales (Bard Peripheral Vascular), John Tebbe (Bard Peripheral Vascular) and Larry Valdivia (Abbott) that they understood that HRMC's Wilson was asking them to provide him with free off-the-books devices to secure sales (Doc. 446 at 22-26, ¶ 22); and

- Testimony from PAD sales representative Dan Clinkscales that HRMC's Wilson stated that Doug Winger provided Wilson with free devices to secure sales (Doc. 446 at 24).

Equipped with this evidence, a jury could find that both persons took all necessary steps to hide these discounts from their respective employers, and that these "deal sheets" reflect nothing more than under-the-table notes and promises by bad actors.  Indeed, taking this evidence into account, a reasonable jury could find the deal sheets as actual evidence of Medtronic evading its safe harbor disclosure requirement.  The Court should have taken this evidence into account before deciding that Winger's deal sheets meet the "coupon" definition.  A reasonable jury could find these are not "coupons," and in turn, reject Medtronic's safe harbor defense.

**F.**    **Medtronic has failed to present any evidence of "coupons" documenting all the other no-charge device bulk sales between 2015 and 2020.**

As previously pointed out, HRMC's failure to meet the Cost Report requirements means these no-charge devices fail the "discount" definition.  In turn, none of these bulk deals can be subject to Medtronic's seller-specific safe harbor defense under AKS regulations.  Even if the Court rejects this argument, Defendants could only locate nine "deal sheet" coupons for all quarterly deals occurring between 2015 and 2020.  Even though the other quarterly deals in this timeframe had no charge devices, the Defendants' failure to produce any documentation whatsoever leaves everyone in the dark as to how many (and what value) the no charge devices were on these deals.  Again, this completely undermines the entire purpose of the AKS's safe

harbor regulations that *some documentation* of these discounts must exist. Defendants, per the Court's order rejecting its Motion to Dismiss on this affirmative defense, clearly had the burden of producing any "statements, invoices or coupons" *for all these deals*.[14] It failed to do so.

The Court concludes the production of these "deal sheet" coupons for these transactions does not make a difference to what "HRMC had to report." (Doc. 565 at 53) It reverts back to its earlier finding: since HRMC reported only the costs for these deals meeting the cost report requirement, providing such coupons is not necessary for these other deals. This is erroneous for two reasons. First, as pointed out above, the Court's cost report analysis is incorrect. As such, the Court's rationale on all these deals falls through. Second, it begs the question as to why the Court bothered with the seller Medtronic's safe harbor disclosure analysis regarding the nine deals. The Court found Medtronic met its seller disclosure requirements for these nine deals *because* those deal sheets exist. Yet, Medtronic does not have the same requirement for all the other 2015-2020 deals? This contradictory logic requires the Court to reconsider its findings on these numerous other deals. Medtronic fails its disclosure requirements here.

As it stands now, the Court's ruling defeats the AKS's purpose of protecting Medicare and patients from kickbacks masquerading as legitimate transactions and thwarts the safe harbor discount. It leads to an illogical result where buyers can accept an unlimited number of no-charge devices (in unlimited value) from sellers to induce sales and not report them whatsoever—as HRMC has done.[15] Once the errors are corrected, the illogical result disappears.

WHEREFORE, Relator respectfully requests that this Court reconsider the rulings in the Order (Doc. 565) that granted partial summary judgment on the basis of those Defendants' Safe

---

[14] "And regardless—if [defendant] is right—'then discovery should expose the detailed documenting of all such transactions required under the safe harbor provisions.'" (Doc. 67 at 47)
[15] (Doc. 400 at 14, Relator's UMF Nos. 37-39, Doc. 450 at 8-10, Relator's AUMF No. 4)

Harbor affirmative defenses, and in turn, deny defendant Hutchinson Regional Medical Center's Motion for Partial Summary Judgment (Doc. 434) and Defendant Medtronic, Inc.,/Covidien LP's Motion for Partial Summary Judgment (Doc. 429).

Respectfully submitted,

Carrie Mulholland Brous KS #18157
Cristina Olson KS #29845
**Brous Law LLC**
3965 West 83rd Street, Ste. #115
Prairie Village, KS  66208
(913) 209-8596
cbrous@brouslaw.com



/s/ Brendan J. Donelon
Brendan J. Donelon, KS #17420
4600 Madison, Suite 810
Kansas City, Missouri 64112
Tel:   (816) 221-7100
Fax:   (816) 709-1044
brendan@donelonpc.com

Daniel W. Craig
6642 Clayton Rd., #320
St. Louis, Missouri 63117
Tel:   (314) 297-8385
Fax:   (816) 709-1044
dan@donelonpc.com

Attorneys for Relator

Certificate of Service

I hereby certify that on October 9, 2024 the above and foregoing was sent pursuant to this Court's CM/ECF procedures to the attorneys of record in this matter.

/s/ Brendan J. Donelon

Attorney for Relator